# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

RECEIVED

2006 NOV 27  P 4: 54

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| JANICE McCOLLUM, | ✦ | |
| Plaintiff, | ✦ | |
| | ✦ | |
| | ✦ | |
| vs. | ✦ | Case No.  2:05-CV-1237-WKW |
| | ✦ | |
| AMTREN, INC., | ✦ | |
| | ✦ | |
| Defendant. | ✦ | |

---

## DEFENDANT'S BRIEF
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

Defendant Amtren, Inc. ("Amtren"), by and through counsel, submits this Brief in Support of its Motion for Summary Judgment.  The motion should be granted because the factual record presented to the court establishes that no genuine issue as to any material fact exists as to any of Plaintiff Janice McCollum ("McCollum") claims, and thus, Amtren is entitled to a judgment as a matter of law.

## I.  INTRODUCTION

McCollum filed a Complaint bringing claims of sex, race, and national origin discrimination pursuant to *42 U.S.C. § 2000e, et seq.* ("Title VII") and *42 U.S.C. § 1981a* ("Section 1981").  (Doc. # 1).  Amtren has filed a motion for summary judgment on all claims in Plaintiff's Complaint which is support by admissible evidence.

1

## II.   JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this action pursuant to *28 U.S.C. § 1331* (federal question) and *28 U.S.C. § 1343* (civil rights). The parties do not contest personal jurisdiction or venue.

## III.  SUMMARY JUDGEMENT STANDARD

Under *Rule 56(c) Federal Rules of Civil Procedure*, a party's motion for summary judgment is due to be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there are no genuine issues as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Rojas v. Florida*, 285 F.3d 1339, 1341 (11th Cir. 2002). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute as to any material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.

2

*Id.* at 322-23.

Once the moving party has met its burden, *Rule 56(e)* "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Indeed, a party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Eberhardt v. Waters,* 901 F.2d 1578, 1580 (11th Cir. 1990). In this context, a court ruling on a motion for summary judgment must believe the evidence of the nonmoving party and must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Bass v. Board County Commissioners, Orange County, Florida,* 256 F. 3d 1095 (11th Cir. 2001). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See, Rule 56(c) Federal Rules of Civil Procedure.*

## IV.    STATEMENT OF UNDISPUTED FACTS

1.    Amtren is a privately held corporation which was started in 1995. Depo. of Lamberth, p. 7, lines 7-10; p. 8, lines 3-5. Kirk Lamberth ("Lamberth") is the sole owner of Amtren. Depo. of Lamberth, p. 7, lines 7-10. He is also the President and CEO of Amtren.

3

Depo. of Lamberth, p. 22, lines 9-10.

2.      Amtren is a manufacturer of CD and DVD duplication systems. Depo. of Lamberth, p. 8, lines 12-16.  The machines manufactured by Amtren make multiple copies of CDs or DVDs from a master recording or directly from a personal computer.  Depo. of Lamberth, p. 8, lines 20-23; p. 9, lines 1-11.

3.      Amtren currently employs approximately 20 full-time employees.  Depo. of Lamberth, p. 17, lines 12-23; p. 18, lines 1-9. During McCollum's employment, Amtren employed a few more than 20 employees.  Depo. of Lamberth, p. 17, line 23; p. 18, lines 1-9.

4.      Amtren currently has five employees who are considered management personnel: Lamberth, Bobby Lake (general manager), Susan Seeber (accounting manager), Derrick Garrett (service manager) and Michael Rogers (logistics and inventory manager).  Depo. of Lamberth, p. 21, lines 19-23; p. 22, lines 1-23; p. 23, lines 1-8.

5.      McCollum applied for a position with Amtren in response to an advertisement in the newspaper.  Depo. of McCollum, p. 25, lines 14-21; Depo. of Lamberth, p. 39, lines 20-23; p. 40, line 1.

6.      McCollum received a B.A. degree in accounting from Auburn University at Montgomery in 1996.  Depo. of McCollum, p. 21, lines 17-23; p. 22, lines 1-3.  She is not a certified public accountant.  Depo. of McCollum, p. 22, lines 4-6.

7.      McCollum interviewed with Lamberth by telephone and then interviewed with him in person.  Depo. of McCollum, p. 26, lines 11-23; p. 27, lines 1-12; Depo. of Lamberth, p. 40, lines 2- 4.

4

8.      Lamberth offered McCollum the position of accounting manager and she started working for Amtren in January 2004.  Depo. of McCollum, p. 27, lines 13-23; Depo. of Lamberth, p. 27, line 23; p. 28, lines 1-6.

9.      Lamberth was McCollum's immediate supervisor. Depo. of Lamberth, p. 39, lines 4-7; Depo. of McCollum, p. 44, lines 21-23; p. 45, line1.

10.     During the time that McCollum worked at Amtren, she was the only accountant. Depo. of McCollum, p. 41, lines 15-23; p. 42, lines 1-3.  Amtren did not employ a controller. Depo. of McCollum, p. 45, lines 2-9.

11.     McCollum's starting salary was $961.54, weekly.  Exhibit 1. Effective April 19, 2004, Lamberth increased her salary to $1,153.85, weekly.  Exhibit 1.  Effective April 1, 2005, Lamberth again increased her salary to $1211.53, weekly.  Exhibit 2.

12.     For the year ending 2004, Lamberth decided that Amtren's management employees, including McCollum, would receive a profit sharing bonus of $10,000.00.  Depo. of Lamberth, p. 30, lines 1-23; p. 31, lines 1-8.

13.     For the year ending 2004, Lamberth decided that Amtren's production employees would receive a similar, although lesser amount, as a profit sharing bonus.  Depo. of Lamberth, p. 31, lines 1-4.

14.     Lamberth did not pay Amtren's employees a profit sharing bonus in 2005 because the growth rate of the company slowed when there was a delay in the release of a planned product.  Depo. of Lamberth, p. 34, lines 10-12; p. 15, lines 1-16.

15.     McCollum's duties as accounting manager were related to performing the

5

accounting functions for Amtren. She had responsibility for accounts receivable, accounts payable, other types of entries into the accounting system, remitting state and federal payroll taxes, making insurance payments to Blue Cross Blue Shield for Amtren's employees, and writing checks to make payments on behalf of Amtren. Depo of McCollum, p. 27, lines 22-23; p. 28, lines 1-23; p. 29, lines 16-23; p. 30, lines 13; p. 31, lines 7-10. Depo. of Lamberth p. 36, lines 9-18.

16.    McCollum also had duties related to inventory control. Amtren planned for inventory needs using a concept referred to as "just-in-time" management. Amtren would establish guidelines for inventory and then those needs would be met by McCollum issuing blanket purchase orders for materials to be delivered during a specified time frame. McCollum received updates on shortages, overages and/or incorrect deliveries during weekly staff meetings and directly from other employees of Amtren. Depo. of Lamberth, p. 36, lines 19-23; p. 37, lines 1-23; p. 38, lines 1-20.

17.    In October 2004, Lamberth gave McCollum the authority to sign checks on behalf of Amtren and to control the disbursement of moneys. Depo. of Lamberth, p. 43, lines 21-23; p. 44, lines 1-10.

18.    McCollum alleges in her complaint that "Lamberth terminated [her] employment on or about April 8, 2005; purportedly because of an error she had committed and corrected. Lamberth informed [her] that he could not [sic] longer trust her as a result of this." Complaint, par. 12. (Doc #1).

19.    McCollum testified in her answers to Amtren's interrogatories that the error

referenced in paragraph 12 of the Complaint was a "payment error ... to Plextor; the incorrect price of the drive was paid to them, but the error was caught and corrected by me. I had inadvertently paid them what was on the invoice but then realized they had billed us for an incorrect amount." Exhibit 3 (Answers to Amtren's interrogatories), pp. 2-3, par. 7.

20.    Other than the payment error involving Plextor, McCollum testified she satisfactorily performed her job duties.    Exhibit 3 (McCollum's answers to Amtren's interrogatories), p. 2, par. 5. Depo. of McCollum, p. 48, lines 20-23; p. 49, lines 1-11.

21.    During the end of February, March and first part of April 2005, Lambert started to learn that McCollum was not satisfactorily performing her job duties. Depo. of Lamberth, p. 78, lines 21-23; p. 79, lines 1-16. Lambert was contacted by several vendors of Amtren who complained that they not being paid on a timely basis. Depo. of Lamberth, p. 74, lines 7-23; p. 75, lines 1-23; p. 76, line1; p. 78, lines 21-23; p. 79, lines 1-16. Lamberth was contacted by Brundidge Electronics Corporation and Carter & Carter Manufacturing who are Amtren's largest vendors. Depo. of Lamberth, p. 69, lines 5-18. These vendors threaten to stop shipments because Amtren's outstanding balances were being to exceed the allowable limits. Depo. of Lamberth, p. 69, lines 20-23; p. 70, lines 10-16. Lamberth was unaware of the fact that Amtren's vendors were not being timely paid and this information was not being provided to him by McCollum in her weekly reports. Depo. of Lamberth, p. 70, lines 17-22; p. 74, lines 18-22; p. 76, lines 6-13. At this time, Amtren had sufficient cash and credit available to timely pay its vendors. Depo. of Lamberth, p. 71, lines 12-23; p. 72, lines 1-12. During this time frame, Lamberth discussed with McCollum, on numerous occasions, the need to ensure that the

information in the accounting system related to accounts payable matched every invoice received by the company and also accurately reflected the amount that Amtren owed its vendors. Depo. of Lamberth, p. 79, lines 17-23; p. 1-10.

22. Padus is another major vendor of Amtren that was not timely paid by McCollum. Exhibit 4. Padus provides the software tool kit used by Amtren that is essential in operating the machines manufactured by Amtren. Depo. of Lamberth, p. 130, lines 1-19. The loss of the software license from Padus would immediately prevent Amtren from selling and shipping its product. Depo. of Lamberth, p. 132, lines 19-23; p. 133, lines 1-13. It was McCollum's responsibility to insure that Padus timely paid. Depo. of McCollum, p. 185, lines 3-12. McCollum does not recall if there were problems with making timely payments to Padus. Depo. of McCollum, p. 185, line 23; p. 186, lines 1-4. Exhibit 4 documents the problems that Elisabetta Benetollo, from Padus, had in attempting to get McCollum to make timely payments. McCollum does not recall talking with Elisabetta Benetollo about Amtren's payments to Padus. Depo. of McCollum, p. 187, lines 8-23; p. 188, lines 1-10. McCollum did not inform Lamberth that she was not paying Amtren's vendors within 45 days. Depo. of McCollum, p. 188, lines 14-19.

23. McCollum failed to satisfactorily perform her duties related to Amtren's bank accounts. Between October 2004 - April 2005, McCollum issued, signed and disbursed checks from Amtren's checking account and then incorrectly transferred moneys from Amtren's money market accounts. These accounting mistakes by McCollum resulted in $1,230.00 in overdraft charges to Amtren. Depo. of Lamberth, p. 53, lines 22-23; p. 54, lines 1-23; p. 55, lines 1-23;

8

p. 56, lines 1-22; p. 57, lines 1-23; p. 58, lines 1-23; p. 59, lines 1-23; p. 60, lines 1-23. Exhibit 5 (identified as Plaintiff's Exhibit 3 to the deposition of Lamberth). If McCollum would have correctly performed her duties, Amtren had sufficient moneys for these transactions. *Id.* McCollum never informed Lamberth of these overdraft charges. Depo. of Lamberth, p. 61, lines 16-23; p. 62, lines 1-7.

24.    It was McCollum's responsibility to insure that the checking account contained sufficient moneys to avoid overdraft charges. Depo. of McCollum, p. 178, p. 16-23; p. 177, lines 1-14. There were occasions when McCollum did not insure that Amtren had sufficient moneys in the checking account to cover the checks she had written. Depo. of McCollum, p. 176, lines 16-23; p. 177, lines 6-9; p. 71, lines 12-23; p. 72, lines 1-23; p. 73, lines 1-15. McCollum does not recall if she notified Lamberth that Amtren was receiving overdraft charges for insufficient funds. Depo. of McCollum, p. 177, lines 16-23.

25.    McCollum's duties included remitting payroll taxes to the state and federal tax agencies. Depo. of McCollum, p. 29, lines 16-23; p. 30, lines 1-6. Depo. of Lamberth, p. 43, lines 13-23. During McCollum's employment, Amtren received substantial penalties because she failed to satisfactorily perform her duties. Depo. of Lamberth, p. 90, lines 5-10; p. 91, lines 11-21. Depo. of McCollum, p. 120, lines 19-23; p. 121, lines 1-21; p. 125, lines 3-13; p. 126, lines 15-23; p. 127, lines 1-5. McCollum testified there were penalties assessed against Amtren; however, she does not recall why the penalties were assessed. Depo. of McCollum, p. 120, lines 19-23; p. 121, line 1-9; p. 122, lines 7-23; p. 125, lines 16-20. During this time frame, McCollum was the only person at Amtren responsible for insuring that these taxes were timely

9

paid. Depo. of McCollum, p. 125, lines 3-13.

26.    On or about March 14, 2005, Amtren was notified by the Internal Revenue Service that it owed $1, 556.56 because of errors made by McCollum in the 941 forms that she filed between October 4, 2004 and January 5, 2005. This amount included $541.39 in additional taxes, $1, 012.05 in penalties and $3.12 in interest. Exhibit 6 (these documents are identified in McCollum's deposition as Exhibits 5 & 6). Depo. of McCollum, p. 127, lines 10-23; p. 128, lines 13-23; p. 129, lines 1-15; p. 130, lines 2-7; p. 132, lines 3-8. McCollum received these documents from the Internal Revenue Service. Depo. of McCollum, p. 128, lines 13-23. The tax returns were changed by the Internal Revenue Service because of calculation errors. Depo. of McCollum, p. 128, lines 1-9; p. 130, lines 2-9. These penalties were assessed because of errors McCollum made in completing the forms on behalf of Amtren. Depo. of McCollum, p. 132, lines 3-8. McCollum testified she corrected this error before her termination. Depo. of McCollum, p. 132, lines 22-23; p. 133, line 1.

27.    After McCollum's termination, Amtren received a notice that the Internal Revenue Service intended to levy on its assets for failing to pay the taxes owed. Exhibit 7. A penalty of $38.00 was added to the amount owed, apparently, because McCollum did not promptly respond to the notice from the Internal Revenue Service. Exhibit 7.

28.    Amtren received another notice from the Internal Revenue Service that McCollum had failed to correctly and timely file 941 forms for the time period January 21, 2005 - March 30, 2005, resulting in additional penalties of $1, 406.10. Exhibit 8.

29.    McCollum's duties included making payments to Blue Cross Blue Shield. Depo.

of McCollum, p. 146, lines 20-23; p. 147, lines 1-2. McCollum failed to make timely payments to Blue Cross Blue Shield. Exhibit 9 (identified as Exhibit 12 in McCollum's deposition). Depo. of McCollum, p. 148, lines 19-23; p. 149, lines 1-19; p. 150, lines 1-8. Exhibit 10 (identified as Exhibit 13 in McCollum's deposition). Depo. of McCollum, p. 152, lines 11-23; p. 153, line1. Because of McCollum's failure to make timely payments to Blue Cross Blue Shield, Amtren received notice that the insurance for its employees was being cancelled at the end of the statutory grace period. Exhibit 11.

30.    Although McCollum testified that payments to Blue Cross Blue Shield were made in a timely fashion, Depo. of McCollum, p. 147, lines 11-23, she admitted that Exhibit 9 (identified as exhibit 12 in McCollum's deposition) identifies late payments to Blue Cross Blue Shield. Depo. of McCollum, p. 148, lines 19-22, p. 149, lines 1-23; p. 150, lines 1-8.

31.    Amtren's credit card processing account with Chase Merchant Services was cancelled during the time that McCollum was Amtren's accounting manager. Exhibit 12 (identified as exhibit 14, document # 0040 to the deposition of McCollum). Depo. of McCollum, p. 158, line 23; p. 159, lines 1-10. Exhibit 12 informs Amtren that its "MasterCard/Visa account with Chase Merchant Services has been cancelled due to overdue unpaid charges(s) of $118.41." McCollum does not recall whether she received any notice from Chase Merchant Services of a problem prior to receiving the notice of cancellation. Depo. of McCollum, p. 160, line 23; p. 161, lines 1-6; p. 163, lines 7-11. Chase Merchant Services would typically provide some notification of an unpaid charge prior to cancelling the account. Depo. of McCollum, p. 161, lines 7-12. Amtren's account with Chase Merchant Services was

11

cancelled because of a missed payment of $118.41. Depo. of Lamberth, p. 120, lines 14-18. Apparently, Chase Merchant Services could not debit Amtren's checking account for this amount. Depo. of McCollum, p. 160, lines 2-16. It was McCollum's responsibility to insure that sufficient funds were in Amtren's checking account and to know which account Chase Merchant Services would debit to insure that this type of problem did not happen. Depo. of Lamberth, p. 123, lines 19-23; p. 124, line 1; p. 125, lines 5-15. Notice of any debit to the Amtren's checking account by Chase Merchant Services would have been sent to McCollum. Depo. of McCollum, p. 169, lines 4-23; p. 170, lines 1-23; p. 171, lines 1-10. McCollum testified that prior to receiving the notice of cancellation, she may have received notification from Chase Merchant Services that they had attempted to deduct moneys from Amtren's checking account and there were not sufficient moneys in the account. Depo. of McCollum, p. 175, lines 1-15. It was McCollum's responsibility to insure that sufficient funds were in the checking account to cover any deduction made by Chase Merchant Services. Depo. of McCollum, p. 173, lines 20-23, p. 174, lines 1-19.

32.     The cancellation of Amtren's Chase Merchant Services account is a significant problem because a quarter of Amtren's sales are by credit card and most of the its purchases are by credit card. Depo. of McCollum, p. 122, lines 4-17. Because Amtren's account was cancelled, it must now use third-party companies at a higher rate of commission. Depo. of Lamberth, p. 122, 14-17.

33.     McCollum failed to satisfactorily perform her duties related to accounts payable. Amtren planned for inventory needs using a concept referred to as "just-in-time" management.

Amtren would establish guidelines for inventory and then those needs would be met by McCollum issuing blanket purchase orders for materials to be delivered during a specified time frame. McCollum received updates on shortages, overages and/or incorrect deliveries during weekly staff meetings and directly from other employees of Amtren. Depo. of Lamberth, p. 36, lines 19-23; p. 37, lines 1-23; p. 38, lines 1-20. Plextor Corporation ("Plextor") is a major supplier of CD and DVD drives to Amtren. Amtren had a pre-negotiated price adjustment agreement with Plextor which allowed it to receive a lower price if Plextor made such an adjustment during the applicable time period. Depo. of Lamberth, p. 86, lines 20-23; p. 87, lines 1-7. Lamberth learned that another trade vendor was selling the Plextor drives at a price less than Amtren was paying. Depo. of Lamberth, p. 87, lines 13-15. Lamberth discussed this issue with McCollum in a weekly staff meeting and upon further investigation learned that Plextor had made a price change during October 2004. Depo. of Lamberth, p. 87, lines 15-19; p. 130, lines 1-7. Lamberth instructed McCollum review this issue, revise the purchase documents and obtain a credit for the missed price adjustment for payments made at the higher price. Depo. of Lamberth, p. 87, lines 19-23. McCollum failed to revise the purchase documents and she paid subsequent invoices at the higher price. Depo. of Lamberth, p. 87, line 23; p. 88, lines 1-14. Lamberth again discussed this issue with McCollum and she assured him that it had been corrected and that Amtren would receive proper credits. Depo. of Lamberth, p. 88, lines 15-19. Lamberth later discovered that McCollum had not corrected this problem; did not adjust the vendor purchase agreement; and accepted invoices at the higher price. Depo. of Lamberth, p. 88, lines 15-23; p. 89, lines 1-7. After McCollum's termination, Lamberth handled this issue and

13

obtained credits with Plextor amounting to several thousand dollars. *Id.*

34.    McCollum failed to satisfactorily perform her duties related to Amtren's inventory .  Amtren established guidelines for inventory and then those needs would be met by McCollum issuing blanket purchase orders for materials to be delivered during a specified time frame.  McCollum received updates on shortages, overages and/or incorrect deliveries during weekly staff meetings and directly from other employees of Amtren.  Depo. of Lamberth, p. 36, lines 19-23; p. 37, lines 1-23; p. 38, lines 1-20. McCollum participated in an inventory audit or verification process to identify and correct parts inventory.  Depo. of Lamberth, p. 48, lines 16-23; p. 1-6.  It was then McCollum's responsibility to make adjustments in the accounting system related to the parts inventory.  Depo. of Lamberth, p. 49, lines 1-8.  In late December 2004 - early January 2005, Amtren was planning to release a new product which would replace its current product.  The new model would require numerous changes in the parts used by Amtren. Depo. of Lamberth, p. 64, lines 10-11. Amtren planned to reduce the materials/inventory used to manufacture the older model.  Depo. of Lamberth, p. 63, lines 16-23; p. 64, lines 1-2.  These plans were discussed with McCollum in the weekly staff meetings.  Depo. of Lamberth, p. 64, lines 8-10.  The plan was to decrease the parts inventory for the older model by the end of January 2005, perform changes to the manufacturing process/retooling in February 2005, and the start back up in March 2055 with the planned new product.  Depo. of Lamberth, p. 64, lines 11-18.  McCollum failed to make the proper changes in the blanket purchase orders to deplete the inventory and reduce the purchasing of the older parts.  Depo. of Lamberth, p. 64, lines 19-23; p. 1-14; p. 66, lines 8-23; p. 76, lines 1-10, 15-23; p. 68, lines 1-5.  These errors by

14

McCollum resulted in Amtren delaying the release of the new product. Depo. of Lamberth, p. 64, lines 19-23.

35.    McCollum exceeded her authority by entering into a lease agreement for a copier without Lamberth's approval. Depo. of Lamberth, p. 93, lines 3-16.

36.    McCollum failed to satisfactorily perform her duties related to the purchase and complete integration of a new accounting software system (MAS90). During the end of 2004, the management staff of Amtren had extensive discussions related to the purchase and installation of MAS90. Lamberth instructed McCollum to handle the discussions with possible vendors and to obtain bids for a completely installed and fully integrated system. Depo. of Lamberth, p. 94, lines 1-23; p. 95, 1-23; p. 96, lines 1-16. Amtren entered into a contract with Wilson Price for a turnkey installation for MAS90 at a fixed price. *Id.* It was McCollum's responsibility to obtain a turnkey fully integrated system. Depo. of Lamberth, p. 95, lines 7-9. McCollum failed to insure that Amtren had a completely installed and implemented system. Depo. of Lamberth, p. 95, line 23; p. 96, lines 1-10. The contract between Amtren and Wilson Price included technical services for installing MAS90. Depo. of McCollum, p. 180, p. 17-20. McCollum released Wilson Price from the contract prior to the complete and satisfactory conversion to the new accounting system. Depo. of Lamberth, p. 96, lines 11-20. McCollum released Wilson Price because she believe she could implement the system. Depo. of McCollum, p. 180, lines 21-23; p. 181, lines 1-2. McCollum did not inform Lamberth of the release of Wilson Price before the complete installation of the system. Depo. of Lamberth p. 95, line 23; p. 96, lines 1-16.

15

37.     As President and CEO of Amtren, Lamberth either hires its employees or has the authority to prohibit the employment of any person. Depo. of Lamberth, p. 118, lines 18-23; p. 119, lines1-6. Depo. of McCollum, p. 92, lines 12-15.

38.     McCollum is a female who is of Korean ancestry.  Depo. of McCollum, p. 90, lines 21-23; p. 91, lines 1-6.

39.     Before McCollum was terminated, Lamberth hired Lisa McNamee. Depo. of McCollum, p. 91, lines 14-23; p. 92, lines 1-15.  Depo. of Lamberth, p. 118, lines 6-17.

40.     Lisa McNamee is a female who is of Korean ancestry.  Depo. of Lamberth, p. 118, lines 6-11. Depo. of McCollum, p. 91, lines 14-18.

41.     During the time that both Lisa McNamee and McCollum worked at Amtren, both Lamberth and McCollum supervised Lisa McNamee.  Depo. of McCollum, p. 92, lines 4-6. During this time frame, Lisa McNamee's duties consisted, in part, of entering invoices, customer purchase orders and other data entry into Amtren's accounting system.  Depo. of McCollum, p. 92, lines 19-23; p. 93, lines 1-13.

42.     After McCollum was terminated, Lamberth assigned her duties to Lisa McNamee. Depo. of Lamberth, p. 101, lines 20-23; p. 102, lines 1-23. Lisa McNamee assumed the accounting duties related to payroll, accounts receivable, accounts payable, producing checks to make Amtren's payments, completing tax forms, and generating blanket purchase orders. Depo. of Lamberth, p. 102, lines 1-23; p. 103, lines 1-3; p. 107, lines 5-13.

43.     When Lisa McNamee assumed these new duties, Lamberth increased her salary to $25,000.00. Exhibit 13.  After Lisa McNamee satisfactorily performed these accounting

16

duties, Lamberth again increased her salary to $32,000.00, effective May 2, 2005.   Exhibit 14.

Lambert later promoted her to the position of accounting manager and again increased her salary

to $40,000.00, effective June 19, 2005.  Exhibit 15.  Depo. of Lamberth, p. 119, lines 7-20.

44.    Lisa McNamee resigned her position with Amtren. Depo. of Lamberth p. 111,

lines 19-23.

45.    In November 2005, Susan Seeber was hired by Lamberth to be the accounting

manager for Amtren. Exhibit 16. Depo. of Lamberth, p. 26, lines 13-17.  Susan Seeber replaced

Lisa McNamee.  Depo. of Lamberth, p. 27, lines 19-20; p. 111, lines 19-23.

46.    Susan Seeber's performs the accounting duties related to accounts payable,

accounts receivable, purchase orders, prepares monthly income statements, financial statements,

prepares checks, makes payments to Blue Cross Blue Shield, makes tax payments  and she has

general responsibilities for all accounting areas.  Depo. of Lamberth, p. 24, lines 3-23; p. 25,

lines 1-9.

47.    After Susan Seeber satisfactorily her duties, Lamberth increased her salary to

$45,000.00. Exhibit 17.  Depo. of Lamberth, p. 120, lines 1-5.

## V.  ARGUMENT

**A.    Title VII Claims**

Title VII makes it an unlawful employment practice for an employer to "fail or refuse to

hire or to discharge any individual, or otherwise discriminate against any individual with respect

to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a).*

17

A plaintiff may attempt to prove unlawful discrimination under any one of three discrete theories: pattern and practice discrimination, disparate treatment discrimination, or disparate impact discrimination.[1] *EEOC v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1286 (11th Cir. 2000). "A Title VII disparate treatment plaintiff must prove that the defendant acted with discriminatory purpose", *Nix v. WLCY Radio/Rahall Communications,* 738 F. 2d 1181, 1184 (11th Cir. 1984), either through direct or circumstantial evidence. *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1085 (11th Cir. 2004).

If a plaintiff establishes a *prima facie* case of discrimination by presenting direct evidence of discriminatory intent, then the "ultimate issue of discrimination is proved." *Bell v. Birmingham Linen Serv.,* 715 F.2d 1552, 1556 (11th Cir. 1983). However, if the evidence suggests, but does not prove a discriminatory motive, then it is circumstantial evidence. *Wilson,* 376 F.3d at 1086.

## 1.    Direct Evidence

Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption. *Denny v. City of Atlanta,* 247 F.3d 1172 (11th Cir. 2001), *quoting EEOC v. Joe's Stone Crab, Inc.,* 220 F.2d 1263, 1286 (11th Cir. 2000). The Eleventh Circuit Court of Appeals has defined direct evidence as "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Wilson,* 376 F.3d at 1086.

---

[1] McCollum has not alleged a disparate impact, or pattern and practice theory of discrimination.

18

In the context of employment discrimination cases, it is well-settled that direct evidence is evidence which, if believed, proves the existence of a fact in issue, such as the existence of discriminatory motive, without inference or presumption; if the evidence merely suggest that the employer acted with a discriminatory motive then it is circumstantial evidence, not direct evidence. *Id.* at 1086-87. "Therefore, remarks by non-decision makers or remarks unrelated to the decision making process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Servs., Inc.,* 161 F. 3d 1079, 1330 (11th Cir. 1998). Moreover, direct evidence is composed of "only the most blatant remarks, whose intent could be nothing other that to discriminate" on the basis of some impermissible factor. *Carter v. City of Miami,* 870 F. 2d 578, 582 (11th Cir. 1989).

    a.    **McCollum cannot identify any facts which constitutes direct evidence that she was terminated because of her sex, race or national origin.**

McCollum alleges in her complaint that she was hired by Amtren as an accounting manager in January 2004, and soon after her employment learned that "Lamberth expected her [to] order lunch [for everyone], set it up and clean up afterwards as a regular part of her job duties." She further alleges Lamberth expected her "to prepare coffee for the management office and became irate if there was not coffee made when guests came in" and that he "never assigned lunch duties or coffee-making chores to male member of Amtren's staff." Complaint, par. 8. Concomitantly, she alleges during her employment she "had occasion to observe gender bias in Lamberth's employment actions and his comments about the place of women in the workplace." Complaint, par. 10. These allegations, even if believed, do not prove the existence

of discrimination without inference or presumption.

### 2.    Circumstantial Evidence

#### a.    Overview of the Legal Paradigm

In evaluating disparate treatment claims supported by circumstantial evidence, the court must use the framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248 (1981). To establish a discrimination claim by circumstantial evidence under this framework, the plaintiff has the initial burden of establishing a *prima facie* case of disparate treatment. *Wilson,* 376 F.3d at 1087. The essence of the *prima facie* case is that the plaintiff presents evidence sufficient to allow a fact-finder to draw a reasonable inference that the defendant used prohibited criteria in making an adverse decision about the plaintiff.

A plaintiff may establish a *prima facie* case for a discharge-discrimination claim under Title VII by showing that: (1) she is a member a protected class; (2) she was qualified for the position at issue; (3) she was discharged despite her qualification; and (4) she was subject to differential treatment, that is, she was either (a) replaced by someone who was not a member of the plaintiff's class or (b) a similarly situated employee who was not a member of the protected class engaged in nearly identical conduct and was not discharged. *Wilson, 376 F. 3d at 1087; Keel v. Roche,* 256 F. Supp. 2d 1269 (M.D. Ala. 2003) , *quoting Davis v. Qualico Miscellaneous Inc.,* 161 F. Supp. 2d 1314, 1319 (M.D. Ala. 2001).

The Eleventh Circuit Court of Appeals has emphasized that the requisite showings that make up a *prima facie* case are not meant to be rigid or inflexible. *See, e.g., Schoenfeld v.*

*Babbitt,* 168 F.3d 1257, 1268 (11th Cir. 1999)

> "In cases where the evidence does not fit neatly into the classic *prima facie* case formula, for example, [the Eleventh Circuit has] stated that a '*prima facie* case of disparate treatment can be established by any proof of actions taken by the employer from which we infer discriminatory animus because experience has proven that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations."

(citing *Hill v. Metro. Atlanta Rapid Trans. Auth.,* 841 F.2d 1533 (11th Cir. 1988), *modified,* 848 F.2d 1522 (11th Cir. 1988) quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 576 (1978)).

Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Wilson,* 376 F. 3d at 1087. The employer has a burden of production, not a burden of persuasion, and it need not persuade the court that it was actually motivated by the proffered reasons. *Id.*

If an employer satisfies its burden by articulating a non-discriminatory reason, it rebuts the presumption of discrimination created by the *prima facie* case. *Id.* The burden of production shifts to the plaintiff to offer evidence that the alleged reason of the defendant if a pretext for illegal discrimination. *Vessels v. Atlanta Ind. School System,* 408 F.3d 763,768 (11th Cir. 2005). The plaintiff can satisfy this burden by producing "evidence, including previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Davis v. Qualico Miscellaneous, Inc.* 161 F. Supp. 2d 1314,

1322 (M.D. Ala. 2001).  At the summary judgment stage, the issue is whether there is sufficient circumstantial evidence from which a reasonable jury could find that a discriminatory reason motivated the employer or that the employer's proffered explanation is unworthy of credence. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 16 F.3d 1519, 1528 (11th Cir. 1997).

McCollum contends that Amtren terminated her employment because of her sex, race or national origin.  These claims may be analyzed together as the burden shifting approach for race and for sex claims is the same.

### b.    McCollum cannot prove her *prima facie* case of discriminatory termination.

McCollum can establish that: (1) she is a member of a protected class; (2) she was qualified for the position; and (3) she was discharged despite her qualification.[2]  The Eleventh Circuit Court of Appeals has adopted two means by which a plaintiff may prove the fourth element.   McCollum must show that she was replaced by a person outside her protected class or that she was treated less favorably that a similarly situated individual outside her protected class. *Maynard v. Bd. of Regents*, 342 F. 3d 1281, 1289 (11th Cir. 2003); *Keel v. U.S. Dep't of Air Force*, 256 F. Supp. 1269, 1285 (M.D. Ala. 2003); *accord, Williams v. Motorola*, 303 F. 3d 1284, 1293 (11th Cir. 2002).  McCollum cannot prove her *prima facie* case under either

---

[2] Amtren admits McCollum was qualified for the position when she was employed and only as to establishing a *prima facie* case.  Amtren does not admit that McCollum satisfactorily performed her job duties. *See, Clark v. Coats & Clark, Inc.*, 990 F. 2d 1217, 1227 n.3 (11th Cir. 1993) (noting "whether an employee possesses the qualifications for a position is ... generally distinct from the issue whether [s]he performed the job satisfactorily.")

22

paradigm.

1.    **McCollum was not replaced by someone outside of her protected class.**

McCollum is a female who is of Korean ancestry. Depo. of McCollum, p. 90, lines 21-23; p. 91, lines 1-6. Lisa McNamee is a female who is of Korean ancestry. Depo. of Lamberth, p. 118, lines 6-11. Depo. of McCollum, p. 91, lines 14-18. After McCollum was terminated, Lamberth assigned her duties to Lisa McNamee. Depo. of Lamberth, p. 101, lines 20-23; p. 102, lines 1-23.

Lisa McNamee assumed the accounting duties related to payroll, accounts receivable, accounts payable, producing checks to make Amtren's payments, completing tax forms, and generating blanket purchase orders. Depo. of Lamberth, p. 102, lines 1-23; p. 103, lines 1-3; p. 107, lines 5-13. After Lisa McNamee satisfactorily performed these accounting duties, Lambert promoted her to the position of accounting manager. Depo. of Lamberth, p. 119, lines 7-20.

2.    **McCollum cannot show a similarly situated male, Caucasian employee engaged in the same conduct, but was not terminated.**

In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, McCollum and the other employee must be "similarly situated in all relevant respects." *Holifield v. Reno,* 115 F. 3d 1555, 1556 (11th Cir. 1997). "The quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges." *Maniccia v. Brown,* 171 F. 3d 1364, 1368 (11 th Cir. 1999). "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider

whether the employees are involved in or accused of the same or similar conduct and are disciplined in different way. *Jones v. Bessemer Carraway Med. Ctr.,* 137 F. 3d 1306, 1311 (11th Cir. 1998), *superceded in non-relevant part on denial of reh's,* 151 F. 3d 1321 (1998). "The most important factors in the disciplinary context ... are the nature of the offenses committed and the nature of the punishment imposed." *Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1259 (11th Cir. 2001). "If a plaintiff fails to identify similarly situated, non-minority employees who were treated more favorably, [her] case must fail because the burden is on [her] to establish [her] prima facie case." *See, Jones,* 137 F. 3d at 1311; *Silvera v. Orange County Sch. Bd.,* 244 F. 3d 1253, 1259 (11th Cir. 2001)(reversing judgment in favor of plaintiff because employer entitled to judgment as a matter of law where plaintiff's comparator engaged in fewer instances of misconduct than plaintiff); *Holifield v. Reno,* 115 F. 3d 1555, 1563 (11th Cir. 1997) (affirming summary judgment where plaintiff failed to produce sufficient evidence that non-minority employees with which he compares his treatment were similarly situated in all aspects, or that their conduct was of comparable seriousness to the conduct for which he was discharged; *Nix v. WLCY Radio/Rahall Communications,* 738 F. 2d 1181, 1185-87 (11th Cir. 1984) (African American plaintiff who was replaced by another African American after termination failed to make out a *prima facie* case of race discrimination because he did not meet his burden of showing that a white employee in similar circumstances was retained while he was fired).

It is undisputed there is no similarly situated male, Caucasian employee who failed to perform his job duties as McCollum failed to perform hers, and was not terminated. In her

24

complaint, McCollum alleges "Lambert did not terminate white male employees who committed errors in their work assignments which cost the corporation significant sums of money." Complaint, p. 4, par. 17. McCollum testified David Fields made an inventory error, and three male engineers made errors and they were not terminated. Depo. of McCollum, p. 57, lines 11-23; p. 58, lines 1-2. McCollum testified Lamberth told her David Fields made a large inventory error costing the company $70,000.00; however, she does not know any specifics about the error. Depo. of McCollum, p. 58, 3-23; p. 60, lines 4-8. Lamberth testified that error was not solely David Field's mistake. The error was a mistake in a preliminary report and involved the costing of Amtren's product which showed an additional $70,000.00 of income. This error was identified before the final end of the year report. Depo. of McCollum, p. 100, lines 17-23; p. 101, lines 1-12; p. 126, lines 15-23; p. 127m kubes 1-10. McCollum admits she does not have any first hand knowledge about the errors made by the three engineers. Depo. of McCollum, p. 61, lines 8-23; p. 62, lines 1-5; p. 64, lines 15-19.

As a matter of law, McCollum cannot identify a similarly situated employee outside of her protected class who received more favorable treatment.

### 3.    Amtren had legitimate, nondiscriminatory reasons for McCollum's termination.

If an employee establishes a *prima facie* case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason:" for the termination. *McDonnell Douglas,* 411 U.S. at 802. The Eleventh Circuit Court of Appeals has held the employer's burden is "exceedingly light" requiring only that the employer offer evidence that could lead a

rational fact-finder to believe the decision was not discriminatory. *Turnes v. AmSouth Bank, N.A.,* 36 F. 3d 1057, 1061 (1994). At this stage, Amtren has only the burden of production, not of persuasion. *See, e.g., Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253-55 (1981). It is not necessary that the court believe the evidence; the court's analysis "can involve no credibility assessment." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993). If the employer is able to satisfy this burden, "the McConnell Douglas framework – with it presumptions and burdens' – disappear[s] and the sole remaining issue [is] 'discrimination vel non.'" *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 142-43 (2000).

Beyond question, Amtren has articulated numerous legitimate, nondiscriminatory reasons for McCollum's termination. *See, Statement of Undisputed Facts.*

### 4.    McCollum cannot establish that Amtren's proffered reasons for her termination are mere pretexts for discrimination.

To avoid summary judgment, McCollum must introduce "significantly probative evidence showing that the asserted reasons are merely a pretext for discrimination." "A reason in not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" *Johnson v. Atlanta Independent School system,* 137 F. 3d 311, 315 (11the Cir. 2005). "The general rule in analyzing discrimination claims based on circumstantial evidence is that when a defendant has articulated several different reasons for an employment action, a plaintiff must demonstrate that each of the proffered reasons is unworthy of credence in order to establish pretext." *Lewis v. Chattahoochee Valley Community College,* 136 F. Supp. 2d 1232, 1239 (M. D. Ala. 2001).

In this case, Amtren has set forth several reasons for McCollum's termination. Based on McCollum's testimony, she cannot demonstrate that each reason articulated by Amtren is unworthy of credence. Concomitantly, she cannot demonstrate that her termination was in anyway motived by race, or sex.

**B.      Section 1981 claims.**

Title VII and 42 U.S.C. Section 1981 have the same legal elements and are analyzed in the same manner. *Standard v. A.B.E.I. Services, Inc.,* 161 F. 3d 1318, 1330 (11th Cir. 1998). Therefore, Amtren has addressed McCollum's Title VII claims with the understanding the analysis also applies to her Section 1981 claim as well.

## VI.   CONCLUSION

McCollum cannot establish her claims based on race, sex or national origin discrimination. McCollum's testimony establishes that Amtren had sufficient legitimate, nondiscriminatory reasons for her termination. Thus, Amtren is entitled to a summary judgment on all of her claims.

WHEREFORE, Amtren respectfully requests that this Court grant its Motion for Summary Judgment as to all of McCollum's claims as set forth in her complaint.

Respectfully submitted this 27th day of November, 2006.

**CLIFTON E. SLATEN (Ala. SLA013)**
**G.R. TRAWICK (Ala. TRA007)**
**Attorneys for Defendant Amtren, Inc.**

27

**OF COUNSEL:**
**SLATEN & O'CONNOR, P.C.**
105 Tallapoosa Street, Suite 101
Montgomery, Alabama  36104
(334) 396-8882
(334) 398-8880 fax


### CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing instrument upon the following attorney(s) of record by placing a copy of same in the United States Mail, postage prepaid this the 27th day of November, 2006.

Jimmy Jacobs, Esquire
143 Eastern Boulevard
Montgomery, Alabama 36117

*N. R. Trawick*
**OF COUNSEL**

F:\Business Group\Amtren Corporation\McCollum\Plead\Brief in Support of Summary Judgment.wpd