# Exhibit "18"

1

```
 1        IN THE UNITED STATES DISTRICT COURT

 2        FOR THE MIDDLE DISTRICT OF ALABAMA

 3                  NORTHERN DIVISION

 4

 5     CASE NUMBER

 6     05-cv-0326-W

 7     (JURY DEMAND)

 8

 9     JANICE McCOLLUM,

10          Plaintiff,

11     vs.

12     AMTREN, INC.,

13          Defendant.

14

15

16            DEPOSITION TESTIMONY OF:

17                 JANICE McCOLLUM

18

19     October 25, 2006

20     9:00 a.m.

21

22     COURT REPORTER:

23     JENNIFER DAVIS, CSR
```



2

```
 1              S T I P U L A T I O N

 2         IT IS STIPULATED AND AGREED by and

 3    between the parties through their respective

 4    counsel that the deposition of JANICE

 5    McCOLLUM, may be taken before Jennifer

 6    Davis, Certified Shorthand Reporter and

 7    Notary Public, State at Large, at the

 8    offices of Slaten & O'Connor, 105 Tallapoosa

 9    Street, Montgomery, Alabama, on October 25,

10    2006, commencing at approximately 9:00 a.m.

11         IT IS FURTHER STIPULATED AND AGREED

12    that the signature to and the reading of the

13    deposition by the witness is hereby waived,

14    the deposition to have the same force and

15    effect as if full compliance had been had

16    with all laws and rules of Court relating to

17    the taking of depositions.

18         IT IS FURTHER STIPULATED AND AGREED

19    that it shall not be necessary for any

20    objections to be made by counsel to any

21    questions, except as to form or leading

22    questions, and that counsel for the parties

23    may make objections and assign grounds at
```

1    the time of trial or at the tine said

2    deposition is offered in evidence, or prior

3    thereto.

4

5                    I N D E X

6    EXAMINATION BY:                    PAGE NO.

7    MR. TRAWICK                        6-193

8    CERTIFICATE                        194

9

10                INDEX OF EXHIBITS

11   EXHIBITS                          PAGE NO.

12   DX 1 - response to defendant's
            interrogatories              8
13
     DX 2 - notice of deposition         9
14
     DX 3 - 3/30/05 letter              73
15
     DX 4 - charge of discrimination    90
16
     DX 5 - IRS document               117
17
     DX 6 - IRS document               127
18
     DX 7 - IRS document               134
19
     DX 8 - IRS document               138
20
     DX 9 - IRS document               139
21
     DX 10 - IRS document              143
22
     DX 11 - IRS document              145
23

Jennifer Davis, CSR

4

```
 1                    INDEX OF EXHIBITS (continued)

 2     EXHIBITS                        PAGE NO.
```

```
 3     DX 12 - Blue Cross Blue Shield of
                Alabama group invoice          149
 4
       DX 13 - Blue Cross Blue Shield of
 5              Alabama group invoice          150

 6     DX 14 - Chase Merchant Services
                document                       159
 7
       DX 15 - lease agreement                 176
 8
       DX 16 - Wilson Price invoices           178
 9
```

```
10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

Jennifer Davis, CSR

```
 1              A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4         JIMMY D. JACOBS, ESQUIRE

 5         Attorney at Law

 6         143 Eastern Boulevard

 7         Montgomery, Alabama 36117

 8

 9

10    FOR THE DEFENDANT:

11         G.R. "RICK" TRAWICK, ESQUIRE

12         Slaten & O'Connor

13         Winter Loeb Building

14         105 Tallapoosa Street

15         Suite 101

16         Montgomery, Alabama  36104

17

18

19

20

21

22

23
```

1            I, Jennifer Davis, a Certified

2     Shorthand Reporter of Millbrook, Alabama,

3     and a Notary Public for the State of Alabama

4     at Large, acting as Commissioner, certify

5     that on this date, pursuant to the Federal

6     Rules of Civil Procedure, and the foregoing

7     stipulation of counsel, there came before me

8     at the offices of Slaten & O'Connor, 105

9     Tallapoosa Street, Montgomery, Alabama,

10    commencing at approximately 9:00 a.m. on

11    October 25, 2006, JANICE McCOLLUM, witness

12    in the above cause, for oral examination,

13    whereupon the following proceedings were

14    had:

15

16            JANICE McCOLLUM,

17    having first been duly sworn, was examined

18    and testified as follows:

19                EXAMINATION

20    BY MR. TRAWICK:

21        Q.    State your name for the record,

22    please.

23        A.    Janice McCollum.

```
 1          A.    Correct.

 2          Q.    Why did you voluntarily leave

 3    Thermalex?

 4          A.    Because I thought I might be

 5    laid off.

 6          Q.    Did you have another position to

 7    go to?

 8          A.    Yes.

 9          Q.    Which one?

10          A.    Amtren.

11          Q.    Had you accepted a position with

12    Amtren before you resigned from Thermalex?

13          A.    I did.

14          Q.    Tell me about how you learned

15    about the position at Amtren.

16          A.    Newspaper ad.

17          Q.    What process did you go through

18    to apply for this job?

19          A.    I sent a resume.

20          Q.    To whom?

21          A.    To Amtren.

22          Q.    Do you recall any particular

23    person, or was it just addressed to the
```

1   A. Two hundred dollars.

2   Q. Weekly?

3   A. Weekly, estimated.

4   Q. Do you have any documents that

5 indicate how much unemployment compensation

6 you received?

7   A. Probably so in a tax file.

8   MR. TRAWICK:  Can we get a copy

9 of that?

10   MR. JACOBS:  I'm going to object

11 to relevance, but I think we can provide

12 that to you.  Unemployment is not countable

13 in mitigation.

14   MR. TRAWICK:  That's an issue we

15 will address later.  I'm just asking if you

16 will provide what she received.

17   Q. (By Mr. Trawick)  Tell me your

18 post high school education.

19   A. I have a BS, BA from Auburn

20 University at Montgomery.

21   Q. When did you receive that

22 degree?

23   A. 1996.

22

```
 1          Q.   Did you have a major other than

 2   business?

 3          A.   Accounting.

 4          Q.   Are you a certified public

 5   accountant?

 6          A.   No.

 7          Q.   Where did you work prior to

 8   starting with Amtren?

 9          A.   Thermalex.

10          Q.   Can you spell that for me?

11          A.   T-H-E-R-M-A-L-E-X.

12          Q.   What kind of company is that?

13          A.   It's a manufacturer of aluminum

14   extrusions.

15          Q.   Here in Montgomery?

16          A.   Yes.

17          Q.   Did you start with that company

18   after you received your degree in accounting

19   from AUM?

20          A.   No.

21          Q.   Did you start before?

22          A.   I'm sorry.  Did I start after?

23          Q.   After you received your degree
```

26

1    corporation?

2          A.    I don't recall.

3          Q.    If you will, just generally tell

4    me, from the time you sent the resume to

5    Amtren in response to the ad in the

6    newspaper and the time that you were offered

7    the position, what process was followed in

8    your employment.

9          A.    Okay.  Please restate that

10   question.

11         Q.    From the time you sent the

12   resume to Amtren until you were offered a

13   position, just tell me the process that was

14   followed for you -- by you to obtain that

15   job.

16         A.    I received a call from Kirk

17   Lamberth.

18         Q.    Lamberth?

19         A.    I believe it was a call.  Hold

20   on a minute.  There was contact by Kirk

21   Lamberth to me to set up a telephone

22   interview.  Are you asking me how I received

23   the position?  What happened and how did I

1    receive the position?

2         Q.    Yes.

3         A.    Okay.  Contacted me to set up a

4    telephone interview.  I went through a

5    telephone interview with him, and then I

6    went through a formal interview with him.  I

7    don't recall how much time it took exactly

8    before he called me and offered me the

9    position.

10        Q.    Did you interview with anyone

11   else at Amtren?

12        A.    Not that I recall.

13        Q.    And when did you start working

14   for Amtren?

15        A.    I believe it was --

16        Q.    The month and year would be

17   sufficient.

18        A.    Okay.  January of 2004.

19        Q.    And what position did you accept

20   with Amtren?

21        A.    Accounting manager.

22        Q.    What was your understanding of

23   your duties as the accounting manager at

1    Amtren?

2          A.    My understanding would be to

3    perform the accounting functions for that

4    business, help with projections, and help

5    with some analysis.

6          Q.    Anything else?

7          A.    Not that I can think of.

8          Q.    What do you mean by perform

9    accounting functions for the business?

10         A.    I mean, produce financial

11    statements, book journal entries.

12         Q.    Let me ask you to assume that

13    the person reading this deposition is not an

14    accountant.

15         A.    Okay.

16         Q.    I'm not an accountant.  It will

17    help if you explain what you mean by journal

18    entries and things like that.

19         A.    Journal entries, those would be

20    entries that would be made to the accounting

21    system by way of a double entry system,

22    debits and credits.

23         Q.    Accounts receivable and accounts

29

1    payable, things like that?

2           A.    Yes.

3           Q.    What type of accounting system

4    was in place at Amtren when you started?

5           A.    Peachtree.

6           Q.    Explain what Peachtree is.

7           A.    The system that they had was

8    basically a small accounting-type,

9    bookkeeping package.

10          Q.    Is it computerized?

11          A.    It was PC based, yes.

12          Q.    Anything else that you did as an

13   accounting function for the company?

14          A.    Not that I can think of right

15   now.

16          Q.    Did you have responsibility for

17   dealing with tax issues?

18          A.    I don't understand.  What type

19   of tax issues?

20          Q.    Payroll taxes, filing tax

21   returns, making the payments on behalf of

22   the company to the IRS, the Alabama

23   Department of Revenue, those types of

1    issues.

2         A.    I had responsibility regarding

3    payroll taxes.

4         Q.    What were your responsibilities

5    regarding payroll taxes?

6         A.    Basically remitting the payroll

7    taxes to the proper departments.

8         Q.    State and federal?

9         A.    Yes.  And filling out the

10   remittal form, the 941, and I don't recall

11   the payroll form for the state.

12        Q.    The 941 is a federal form?

13        A.    Yes.

14        Q.    Any other accounting-type

15   functions that you recall?

16        A.    Not that I recall.

17        Q.    Did you have any responsibility

18   for making payments on behalf of the company

19   for insurance?

20        A.    Accounts payable.

21        Q.    Insurance would be an accounts

22   payable of the company?

23        A.    Yes.

1          Q.   What type of insurance?  Health

2     insurance for the employees, for example?

3          A.   Yes.

4          Q.   Any other type of insurance?

5     Liability insurance for the company?

6          A.   Not that I recall.

7          Q.   But you do recall having to make

8     payments to, I assume, to Blue Cross Blue

9     Shield for insurance for the employees?

10         A.   Yes, I do recall that.

11         Q.   When you first started working

12    with the company, did you have the authority

13    to write checks to accomplish these

14    accounting functions?

15         A.   No.

16         Q.   At some point in time, did you

17    receive that authority?

18         A.   Yes.

19         Q.   How long after you started

20    working for Amtren?

21         A.   I don't recall.

22         Q.   A couple of months, three

23    months?

1      Q.   What did you do?

2      A.   I don't recall exactly.  It

3   wasn't much.

4      Q.   As an accountant, what does help

5   with analysis mean to you?

6      A.   That would, to me, mean help

7   with analysis of the financial position of

8   the company to make decisions.

9           THE WITNESS:  I need to get

10   something to drink.  Would that be all

11   right?

12          MR. TRAWICK:  Let's take a

13   minute.

14          (Brief recess.)

15      Q.   (By Mr. Trawick)  During the

16   time that you worked with Amtren, did anyone

17   else perform those accounting functions that

18   you testified about?

19      A.   Yes.

20      Q.   Who?

21      A.   There were some clerical or

22   temps.  I don't recall all of their names.

23      Q.   Was there any other accountant,

1    though, that performed these accounting

2    functions?

3          A.    Not that I recall.

4          Q.    Well, Ms. McCollum, you worked

5    at Amtren, and you have brought this

6    lawsuit.

7          A.    Yes.

8          Q.    You would recall whether or not

9    there was another accountant there.

10          A.    David Fields is an accountant.

11   He was there.

12          Q.    Tell me what David Fields did.

13          A.    You know, I wasn't his

14   supervisor.  I really didn't know all of his

15   functions.

16          Q.    Do you know any of his

17   functions?

18          A.    He was in production, I believe.

19     The production manager.

20          Q.    Did he have anything to do with

21   the accounting functions you've testified

22   about?

23          A.    I don't really recall.  You

44

1    that you worked with Amtren, did David

2    Fields perform any of these accounting

3    functions that you previously testified

4    about?

5        A.    Not that I recall.

6        Q.    Did anyone else perform any of

7    these accounting functions that you

8    previously testified about?

9        A.    I've already answered the

10    question.

11        Q.    Well, answer it again.

12        THE WITNESS:  Do I have to

13    answer the question twice --

14        MR. TRAWICK:  Yes, you do.

15        MR. JACOBS:  Go ahead and tell

16    him again.

17        A.    There were clerical people that

18    performed some of those functions.

19        Q.    Any other accountants?

20        A.    Not that I recall.

21        Q.    Who was your immediate

22    supervisor during the time that you worked

23    at Amtren?

45

```
1          A.    Kirk Lamberth.

2          Q.    Was there a controller during

3     the time that you worked at Amtren?

4          A.    That I reported to?

5          Q.    Yes.

6          A.    No.

7          Q.    Was there a controller that you

8     didn't report to?

9          A.    No.

10         Q.    Tell me the reasons you left

11    Amtren.

12         A.    I did not voluntary leave

13    Amtren.

14         Q.    You were terminated?

15         A.    Yes.

16         Q.    When were you terminated?

17         A.    April.

18         Q.    April of 2005?

19         A.    Yes.

20         Q.    Were you given any reasons why

21    you were terminated?

22         A.    The one mainly that I recall is

23    because Mr. Lamberth had stated that he did
```

Jennifer Davis, CSR

48

1    Do you recall that?

2         A.   I'm sorry.  What was that?

3         Q.   In the interrogatories that we

4    submitted to you, which your responses are

5    identified as Defendant's Exhibit 1, we

6    asked that you identify any errors that you

7    made in the performance of your job duties.

8    Do you recall that?

9         A.   You asked me to identify any

10   errors.

11        Q.   Yes.

12        A.   I assume, if it's in there.

13        Q.   Let me just direct your

14   attention to paragraph seven.

15        A.   Okay.

16        Q.   Take a minute and read it and

17   your response.

18        A.   (Witness reviews document.)

19   Okay.

20        Q.   Is it your testimony that the

21   only error that you made in the performance

22   of your job duties was this one payment

23   error regarding Plextor?

49

1          A.    Can you restate the question?

2          Q.    Did you make any errors in the

3    performance of your job duties at Amtren,

4    other than the one error that you have

5    identified in paragraph seven of your

6    responses to the defendant's interrogatories

7    pertaining to a payment error to Plextor?

8          A.    Not that I recall.

9          Q.    Does that imply that there were

10   errors that you may have forgotten about?

11         A.    It's just not that I can recall.

12         Q.    Tell me about this error that

13   was made to Plextor.

14         A.    I would need to see all of the

15   documents, the original invoice, the payment

16   to Plextor, the accounts payable aging, in

17   order to fully give you all the information.

18         Q.    Ms. McCollum, I'm asking you

19   what you recall about this payment error.

20         A.    Okay.  What I recall is that

21   there was a pricing change that I was not

22   aware of, notified of.  This pricing change

23   is only sent to OEM.

57

```
1          Q.    That's not my question,

2    Ms. McCollum.  Listen to my question.  It's

3    a very simple question.

4          A.    Okay.

5          Q.    Do you recall after this --

6    after making payment to this vendor at the

7    incorrect price, any other invoices that

8    were received from this same vendor that

9    contained the incorrect price?

10         A.    I don't recall.

11         Q.    In response to the

12   interrogatory, you state that other male and

13   white employees, who held a professional

14   position such as myself, were not treated in

15   the same manner.  What do you mean by that

16   statement?

17         A.    I mean that other male

18   employees, for example, David Fields, who

19   made an error -- an inventory error -- was

20   not terminated.  There are three engineers

21   that work there, male, who have made

22   mistakes and errors costing the company.

23   They have not been terminated.
```

1          Q.    Anyone else?

2          A.    Not that I recall.

3          Q.    How did you learn of David

4     Fields making the inventory error?

5          A.    Through Mr. Lamberth and other

6     employees.

7          Q.    What did Mr. Lamberth tell you

8     about this?

9          A.    That David Fields made a large

10    inventory error.

11         Q.    Did he tell you anything else?

12         A.    Not that I recall.

13         Q.    When was this error made?

14         A.    I don't know.

15         Q.    Before you were terminated, I

16    assume?

17         A.    Yes.

18         Q.    When you left Amtren, was David

19    still employed?

20         A.    Yes.

21         Q.    Do you know if David has

22    subsequently been terminated?

23         A.    Yes, I believe he has.

1    Ms. McCollum.  This lady can't take both of

2    us talking at the same time.

3          A.    Okay.

4          Q.    Do you recall anything else

5    about the conversation with Mr. Lamberth

6    wherein you allege that he told you about

7    this error that David Fields made?

8          A.    No.

9          Q.    Are you aware of any other

10   errors that David Fields made?

11         A.    I don't recall.

12         Q.    Do you know if the error that

13   David Fields made cost the company any

14   money?

15         A.    Seventy thousand dollars.

16         Q.    How do you know it cost the

17   company seventy thousand dollars?

18         A.    That is what I was told.

19         Q.    Told by whom?

20         A.    Kirk Lamberth.

21         Q.    So you do remember something

22   else about the conversation?

23         A.    Yes, sir.

1        Q.    Do you recall anything else?

2        A.    No.

3        Q.    How did it cost the company

4    seventy thousand dollars?

5        A.    I'm not sure.

6        Q.    You didn't ask?

7        A.    I don't recall.

8        Q.    Who were the three engineers

9    that made mistakes?

10        A.    I believe Steve, Mike --

11        Q.    Do you know Steve's last name?

12        A.    No.  I don't know.  I can't

13    remember any of them's last name.  Steve,

14    Mike, and there's a John.

15        Q.    Steve, Mike, and John are --

16        A.    Uh-huh.

17        Q.    Let me finish my question.

18    Steve, Mike, and John are the three

19    engineers that you are referring to?

20        A.    Yes, I am.

21        Q.    What type of error did Steve

22    make?

23        A.    They had -- I believe Steve had

```
 1    shut down the production line because of a

 2    product -- what he thought was a product

 3    defect.

 4          Q.    Anything else?

 5          A.    Not that I recall.

 6          Q.    How did you learn that Steve had

 7    shut down the production line because of a

 8    production defect?

 9          A.    I don't remember who told me

10    about that.

11          Q.    Do you know whether or not there

12    was a product defect?

13          A.    No, I don't.

14          Q.    Do you know whether it was

15    proper or improper to shut down the

16    production line because of a production

17    defect?

18          A.    No, I don't.

19          Q.    What type of error did Mike

20    make?

21          A.    All three of them would be the

22    same.  It's basically the same thing as far

23    as shutting the production line down.
```

1    remember who they are or who that was.

2         Q.   How did you learn of Mike's

3    error of shutting down the production line?

4         A.   I believe somebody told me.  I

5    don't know exactly who it was.

6         Q.   Is it a fair statement that you

7    have no firsthand knowledge about the

8    production line being shut down and whether

9    or not there was a product defect?

10        A.   No.

11        Q.   That's not correct?  You do have

12   firsthand knowledge?

13        A.   I'm sorry.  Ask the question

14   again.

15        Q.   Is it correct that you have no

16   firsthand knowledge about the production

17   line being shut down and whether or not

18   there was a product defect which caused --

19        A.   Yes.

20        Q.   -- the production line to be

21   shut down?  Is that a correct statement?

22        A.   I did not know if the product

23   defect was there or not.  That is a correct

1    abilities and the accounting system I had

2    put in.

3        Q.   Was that Mas90, the accounting

4    system?

5        A.   I believe, if I recall

6    correctly.

7        Q.   Did you put in any other

8    accounting system other than Mas90?

9        A.   Yeah, sure did.  I put in

10   Peachtree for manufacturing, and I believe

11   one other integrated system.

12       Q.   You previously testified that

13   when you started working at Amtren, the

14   accounting system was Peachtree.  Is that

15   different from Peachtree for manufacturing?

16       A.   Yes, it is.

17       Q.   Do you recall the name of the

18   other accounting system that you put in?

19       A.   It was still Peachtree.  It was

20   just a different version of it.

21       Q.   This letter that you testified

22   about that was presented to the banker, did

23   you prepare that letter?

1        A.    No.

2        Q.    Did you receive a copy of that

3    letter?

4        A.    Yes.

5        Q.    Who sent you a copy of the

6    letter?

7        A.    Kirk.

8        Q.    Do you still have a copy of the

9    letter?

10       A.    Yes.

11       Q.    Was it produced?

12             THE WITNESS:  Was it produced?

13       A.    I'm sure it was.

14             MR. TRAWICK:  If it wasn't

15    produced, it should have been produced.

16             MR. JACOBS:  We gave you

17    everything we have.  Can we go off the

18    record a minute?

19             (Off-the-record discussion.)

20       Q.    (By Mr. Trawick)  Let me show

21    you what has been marked as Defendant's

22    Exhibit 3.  Is that a copy of the letter you

23    have previously testified about?

1              (Whereupon, a document was

2    marked as Defendant's Exhibit 3 and is

3    attached to the original transcript.)

4         A.    Yes.

5         Q.    How many meetings did you

6    observe between Kirk, Jerry, and a banker?

7         A.    One.

8         Q.    You previously testified that

9    you saw Jerry perform duties with various

10   customers.  What were those duties?

11        A.    I'm not exactly sure.

12        Q.    What did you see?

13        A.    Meetings with the customers.

14        Q.    Anything else?

15        A.    That's basically it, that I can

16   think of.  Mainly meetings with the

17   customers.

18        Q.    Do you know what these meetings

19   were about?

20        A.    No, I do not know what they were

21   all about.

22        Q.    Is it a fair statement you have

23   no firsthand knowledge of what these

1                    (Whereupon, a document was

2       marked as Defendant's Exhibit 4 and is

3       attached to the original transcript.)

4              A.    Uh-huh.

5              Q.    Is that your handwriting?

6              A.    The signature?

7              Q.    Yes.

8              A.    Yes.

9              Q.    The date on that is May 19,

10      2005; is that correct?

11             A.    Uh-huh.

12             Q.    At the time you filed this, did

13      you have a lawyer?

14                   THE WITNESS:   Both you and I put

15      that together.

16             A.    Uh-huh.

17             Q.    Is it correct that your

18      attorney, Mr. Jacobs, assisted you in

19      drafting this document?

20             A.    Yes.

21             Q.    In this document, you have

22      alleged that the cause of discrimination is

23      based upon color.   What do you mean by that?

```
1          A.    I am an Asian.

2          Q.    Korean?

3          A.    Yes.

4          Q.    And you have also alleged sex,

5    which is obviously female; is that correct?

6          A.    Correct.

7          Q.    And you also allege national

8    origin.  What is your national origin you

9    are contending you were discriminated

10   against?

11         A.    Asian.

12         Q.    Again, Korean?

13         A.    Uh-huh.

14         Q.    You know Lisa McNamee, don't

15   you?

16         A.    Yes.

17         Q.    Is she part Korean?

18         A.    I believe she is.

19         Q.    And is it correct that she was

20   hired at Amtren while you were still working

21   there?

22         A.    Yes.

23         Q.    And I believe you previously
```

```
1      testified that Lisa -- you worked with Lisa;

2      is that correct?

3             A.   Yes.

4             Q.   Did you supervise Lisa?

5             A.   To some extent.  Both

6      Mr. Lamberth and myself.

7             Q.   Do you know who hired Lisa?

8             A.   Myself and Mr. Lamberth.

9             Q.   Did you have the authority to

10     hire Lisa without Mr. Lamberth's approval?

11            A.   No.

12            Q.   Is it a correct statement, then,

13     that Mr. Lamberth had the authority to hire

14     new employees at Amtren?

15            A.   Yes.

16            Q.   When you left Amtren, was Lisa

17     still working there?

18            A.   Yes.

19            Q.   When you worked with Lisa, what

20     were Lisa's duties?

21            A.   Data entry.

22            Q.   Into Mas90?

23            A.   Into whatever system was there.
```

93

1          Q.   Do you recall if Mas90 was --

2          A.   I believe it was, but I would

3     need to look at all those to make sure.

4     Whatever accounting system, it's data entry.

5          Q.   What type of data would she

6     enter into the accounting system?

7          A.   Invoices.

8          Q.   Anything else?

9          A.   I don't remember everything.

10    But I know it was invoices, customer

11    purchase orders.

12         Q.   Anything else?

13         A.   Not that -- it was mostly --

14    distribution of mail.

15         Q.   I didn't make myself very

16    clear.  Any other type of data entry that

17    Lisa did into the accounting system other

18    than invoices and customer purchase orders?

19         A.   I thought you said what her

20    duties were.

21         Q.   I did first.  But you said data

22    entry, and I'm asking you about what type of

23    data did she enter into the system, and you

1    your question?

2            Q.    That's my question.   Yes.

3            A.    Probably, yes.

4            Q.    Probably?

5            A.    Uh-huh.   Yes.

6            Q.    Tell me what you recall about

7    the penalty that was assessed against

8    Amtren.

9            A.    There was a penalty for the

10    three months of state taxes that was not

11    filed.

12            Q.    And I think you testified that

13    was before you got there; is that correct?

14            A.    I saw the -- no.   Well, the

15    three months that weren't filed happened

16    before I got there.

17            Q.    You told me about that.

18            A.    Okay.

19            Q.    Now, during the time that you

20    were there and the time that you were

21    responsible for making the payroll taxes to

22    the IRS and to the state, were there any

23    penalties assessed against Amtren?

121

```
 1          A.   Yes, I believe so.

 2          Q.   Tell me about those penalties.

 3          A.   Okay.  I just don't recall all

 4    what they were.  I know that there were.  I

 5    don't know exactly which form it was or

 6    which tax it was.  I mean, I just don't

 7    recall.

 8          Q.   Who was responsible for making

 9    those payroll taxes?

10          A.   That would be myself.

11          Q.   And it's your testimony that you

12    don't recall anything about those penalties

13    being assessed against Amtren, even though

14    it was your responsibility, other than the

15    fact that the penalties were assessed?

16          A.   There were penalties assessed.

17    I don't recall --

18          Q.   More than one?  On more than one

19    occasion; is that correct?

20          A.   I believe so, but I don't recall

21    which form it was, which tax it was.

22          Q.   I'm not asking you that.  I'm

23    asking you was it your responsibility to
```

122

1    make those payments in a timely fashion?

2         A.   Yes.

3         Q.   Did you fail to make those

4    payments in a timely fashion and, thus, a

5    penalty was assessed?

6         A.   No.

7         Q.   Why was the penalty assessed,

8    then?

9         A.   I would need to see the

10   documentation.  I'm not sure.

11        Q.   You don't know; is that correct?

12        A.   I'm not sure.

13        Q.   And you're saying it wasn't

14   your --

15        A.   I don't see Amtren's name on

16   there at all.

17        Q.   You've previously testified that

18   on more than one occasion penalties were

19   assessed against Amtren, either by the state

20   or by the federal government for late tax

21   payments; is that correct?

22        A.   I'm not sure what the penalties

23   were for.  I know there were some

1    Are you saying payroll tax payments?  I was

2    responsible --

3           Q.   Ms. McCollum, you just testified

4    that during the time that you worked at

5    Amtren, there were penalties assessed

6    regarding taxes.

7           A.   Yes.  But I don't know which tax

8    it was.

9           Q.   And my question is, was anyone

10   else responsible for ensuring that those

11   taxes were paid timely or paid correctly,

12   other than you?

13          A.   Not -- it was just me.

14          Q.   We've established that, then.

15          A.   Okay.

16          Q.   And is it your testimony that

17   sitting here today you have no recollection

18   of the reasons those penalties were

19   assessed?

20          A.   Not at this time.

21          Q.   All right.  Is it your

22   testimony, Ms. McCollum, that these

23   penalties were not the result of your errors

126

1    and omissions?

2          A.    I don't know what penalty you're

3    talking about.

4          Q.    Ms. McCollum, you testified --

5          A.    That there were penalties.

6          Q.    Yes.  And my question is, is it

7    your testimony those penalties were not

8    assessed because of your errors and

9    omissions?

10          A.    I'm not sure.  I would have to

11    look at the paperwork.

12          Q.    Ms. McCollum, this is not a

13    difficult question.

14          A.    Uh-huh.

15          Q.    You're obviously a very

16    intelligent woman, and you've previously

17    testified that penalties being assessed are

18    something that is significant.

19          A.    Yes.

20          Q.    And it's your testimony you

21    don't know if these penalties were assessed

22    because of something you failed to do or

23    not?

1          A.    I'm just not sure.

2          Q.    Then it could be because of your

3    duties?

4          A.    It could be.

5          Q.    Okay.  You just don't have any

6    recollection of the facts as to why these

7    penalties were assessed; is that correct?

8          A.    Like I said, it could have

9    been.  I just would need to see it.

10          Q.    Let me show you what's been

11    marked as Defendant's Exhibit 6, which are

12    documents number 0297, 298, and 299, which

13    were produced to your lawyer.

14                (Whereupon, a document was

15    marked as Defendant's Exhibit 6 and is

16    attached to the original transcript.)

17          A.    Okay.

18          Q.    Take a look at those documents.

19          A.    (Witness reviews documents.)

20    Okay.

21          Q.    You would agree that that's --

22    strike that.  Tell me what those documents

23    are that are marked as Defendant's Exhibit

128

1    6.

2          A.    It's a notice saying that they

3    have changed the balances in the federal tax

4    deposits for the quarter, and this would be

5    for tax period December 31, 2004.

6          Q.    And why would there be changes

7    made by the IRS?  Let me ask you this

8    question, then.  Strike that.  Did you

9    receive this document when you were employed

10   at Amtren?

11         A.    I may have.  I received many

12   documents.  I can't pinpoint exactly.

13         Q.    I think, as Mr. Lamberth pointed

14   out just a second ago, Defendant's Exhibit 6

15   and Defendant's Exhibit 5 go together.

16   Would you agree with that?

17         A.    Let's see.  Deposits

18   insufficient -- yes, it appears that it

19   does.

20         Q.    Okay.  During the time that you

21   worked with Amtren, do you recall receiving

22   the documents, Defendant's Exhibit 6 and 5?

23         A.    Yes, I believe I did.

129

1          Q.   Defendant's Exhibit 6 states, we

2     changed your tax return because we found a

3     calculation error.  Did I read that

4     correctly?

5          A.   Yes.

6          Q.   Who is responsible for filing

7     the returns that these documents,

8     Defendant's Exhibit 5 and 6, apply to?

9          A.   I was responsible.

10          Q.   And as a result of the

11     calculation error or the errors in those

12     documents, is it correct that Amtren was

13     assessed a penalty of $1,012.05?

14          A.   According to this letter, they

15     were.  I wonder if they paid that penalty.

16          Q.   Who would have been responsible

17     for paying it?

18          A.   Well, let's see.  This right

19     here -- sometimes you can do some things.

20     This right here is a 941, probably not due

21     until January 31st.  This is dated March

22     14th, 2005.  So I was terminated on April

23     8th.  So that notice was just before my

1    termination.

2         Q.   But you agree that this notice

3    that's identified as Defendant's Exhibits 5

4    and 6 pertain to the time that you had

5    responsibility for performing these duties;

6    is that correct?

7         A.   Yes.

8         Q.   And you will agree that because

9    you failed to perform your duties correctly,

10   Amtren was assessed a penalty of $1,012.05;

11   is that correct?

12        A.   I would not agree with that.

13        Q.   Why was Amtren assessed that

14   penalty, then?

15        A.   According to this, it was

16   because of a calculation error.  But that

17   could be a lot of different things.  For one

18   thing, if I recall correctly, this right

19   here, when I received this notice, most of

20   it was due to the fact that the incorrect

21   week numbers were listed on the 941.  But

22   again, I would have to see the 941s to be

23   able to --

132

1    to my question.  I think the testimony is

2    going to show they had to pay it, but that's

3    not material at this point.  You will agree

4    -- strike that.  Is it correct that this

5    penalty was assessed because of an error you

6    made in filing the forms on behalf of

7    Amtren?

8          A.    It would appear to be.

9          Q.    When you received the documents

10   identified as Exhibits 5 and 6, did you

11   inform Mr. Lamberth of this problem?

12         A.    Yes, I believe did.

13         Q.    What did you tell him?

14         A.    To the best of my memory, that

15   there was a penalty; that I was researching

16   it and would try to correct it.  But I don't

17   recall -- I do believe I informed him about

18   it, though.

19         Q.    Was anyone present when you told

20   him about this?

21         A.    No.

22         Q.    Did you correct this error

23   before you left?

133

1          A.    I believe I did.  I believe I

2     did.

3          Q.    Whose handwriting is this on the

4     first page of Defendant's Exhibit 6 that has

5     some numbers, 94-11342?

6          A.    I have no idea.

7          Q.    That's not your handwriting?

8          A.    No.

9          Q.    Is this 185 here your

10    handwriting?

11         A.    It doesn't look like it.

12         Q.    Let me direct your attention to

13    document number 0298, which is a part of

14    Defendant's Exhibit 6.  This indicates a

15    balance due of $1,556.56; is that correct?

16         A.    That is what this says, yes.

17         Q.    Do you know what that dollar

18    amount represents?

19         A.    I'm not real sure.  I would have

20    to study the 941.

21         Q.    It is your testimony that you

22    took care of this before you left; is that

23    correct?

1   issue that needed to be corrected if the IRS

2   couldn't determine the tax periods.

3           Q.   Okay.  And you don't recall

4   whether or not you filed those returns or

5   whether or not the bank filed those returns;

6   is that correct?

7           A.   The remittance, that would be

8   correct.  I do not recall, but I believe it

9   was the bank.  Excuse me.  Let me retract

10  that, because I had just started working

11  there.

12          Q.   And you don't recall talking to

13  the bank about this problem?

14          A.   I don't remember.

15          Q.   Is it correct you did not recall

16  at this time discussing this issue with the

17  bank?

18          A.   I don't really remember, but I

19  may have.

20          Q.   You previously testified that it

21  was your responsibility during the time that

22  you were at Amtren to make the payments on

23  behalf of Amtren to Blue Cross Blue Shield;

1    is that correct?

2          A.    Yes.

3          Q.    Were there ever any problems

4    with those payments?

5          A.    Not that I would consider major

6    problems.   They were all paid.

7          Q.    What were the minor problems,

8    then?

9          A.    Well, I don't -- in my opinion,

10   there weren't any as far as payment.

11         Q.    Were the payments always on

12   time?

13         A.    They were in a timely fashion.

14         Q.    That's not my question.   Do you

15   want me to repeat my question?

16         A.    They were made in a timely

17   fashion.

18         Q.    Were they made by the date that

19   they were due?

20         A.    I believe they were.

21         Q.    Were the insurance payments made

22   in advance of the time period -- let me

23   rephrase that.   It's a bad question.   Were

148

1    the insurance payments made monthly or

2    quarterly?

3        A.   I believe it was monthly.

4        Q.   Is it correct that, for example,

5    the payment for the month of March would

6    have been due in February?

7        A.   I'm not really sure exactly when

8    it would have been due.  I would need to see

9    an invoice.

10       Q.   You don't recall one way or the

11   other?

12       A.   To the best of my recollection,

13   it would have been due by the 10th of the

14   month that it was covering, or the 5th.  I

15   don't exactly remember, but it was not -- to

16   the best of my knowledge, you know, if it

17   was to cover the month of March, it would

18   have been due March 1st.

19       Q.   Let me show you what's been

20   marked as Defendant's Exhibit 12.  Do you

21   recall receiving this document from Blue

22   Cross Blue Shield?

23          (Whereupon, a document was

```
 1    marked as Defendant's Exhibit 12 and is

 2    attached to the original transcript.)

 3            A.    Yes, I believe so.

 4            Q.    Does this indicate that the

 5    payment has not been made on time?

 6            A.    This does have a previous

 7    balance on it.

 8            Q.    So your testimony previously

 9    that the payments were made on time is

10    incorrect; is that correct?

11            A.    According to this document,

12    that's what would appear to be so.

13            Q.    Do you have reason to dispute

14    that document?

15            A.    No, I don't.  But the document

16    does indicate -- see, this portion was

17    probably already paid because I wrote only

18    to pay this amount, the current portion

19    due.  So the checks were probably crossed up

20    in the mail.  This document process date is

21    3/18.  So the check was probably crossed up

22    in the mail.  I have a notation.  This is my

23    handwriting.
```

1        Q.   Only pay the amount of $6,810;

2   is that correct?

3        A.   Yeah, because the other portion

4   had already been paid.  The amount past due

5   had already been paid.

6        Q.   So it wasn't timely made, then;

7   is that correct?

8        A.   Okay.

9        Q.   All right.  Let me show you

10  what's been marked as Defendant's Exhibit

11  13.  Do you recall receiving this document?

12             (Whereupon, a document was

13  marked as Defendant's Exhibit 13 and is

14  attached to the original transcript.)

15       A.   No.

16       Q.   Does this document indicate that

17  the March payment was not made timely?

18       A.   I don't believe so.  Huh-uh.

19  No.  That's not what it's saying.

20       Q.   What's it saying, then?

21       A.   This says that there was an

22  adjusted previous balance of $7,980, and the

23  current amount due is $6,810.  This process

1    have had the payment and didn't have time to

2    post it.  It happens in accounting all of

3    the time.

4         Q.   It's your testimony, then, it

5    was made on time; is that correct?

6         A.   I think I've already answered

7    that question.

8         Q.   Answer it again.

9         A.   I'm not sure.  I would have to

10   see the check date.

11        Q.   Let me show you again

12   Defendant's Exhibit 13.  The process date of

13   this document is April 5, 2005.  Would you

14   agree with that?

15        A.   The process date is April 15,

16   2005.  I was terminated on 4/8.

17        Q.   What's this date over here in

18   the left-hand corner?

19        A.   Amount applied to this invoice

20   -- this is the process -- this says that

21   this $6,960 was processed on 4/5, when that

22   payment was received on 4/5.

23        Q.   Which made it late?

153

1          A.    I believe that's what it says.

2          Q.    Okay.  Thank you.  Isn't it

3    correct, Ms. McCollum, that you instructed

4    Lisa McNamee to hold payments and make

5    payments to Blue Cross during the grace

6    period and not to make them on time?

7          A.    No.

8          Q.    You deny that, then?

9          A.    Yes.

10         Q.    So if Ms. McNamee testified to

11   that, she would be lying; is that correct?

12         A.    I answered your question.  I'm

13   not going to say if Ms. McNamee lies or not.

14         Q.    It's my understanding that she

15   is going to testify that you instructed her

16   to do that.

17         A.    That's fine.  It's my testimony

18   that I didn't.

19         Q.    Okay.  Do you recall the

20   circumstances under which Amtren's credit

21   card processor with Chase Visa was

22   cancelled?

23         A.    Yes.

1    credit cards were processed, Chase Visa

2    determined that the credit cards were no

3    good; is that correct?

4        A.    I believe so.

5        Q.    And because the credit cards

6    were no good, Chase Visa charged it back to

7    Amtren; is that correct?

8        A.    Yes.

9        Q.    Do you know when those three

10   systems were sold?

11       A.    I don't recall.

12       Q.    Do you recall when you received

13   notification of the charge backs?

14       A.    I saw the charge backs coming

15   through the bank system when I checked the

16   bank accounts on-line.

17       Q.    Do you remember when that was?

18       A.    No.

19       Q.    Well, do you recall when the

20   credit card processor was cancelled?

21       A.    Not exactly, no.  Just before I

22   left.  I don't remember exactly when.

23       Q.    Let me show you what's been

1    marked as Defendant's Exhibit 14, which is

2    also document 0040.  Do you recall receiving

3    this document?

4                    (Whereupon, a document was

5    marked as Defendant's Exhibit 14 and is

6    attached to the original transcript.)

7          A.    Yes.

8          Q.    Whose handwriting is on that

9    document?

10         A.    Mine.

11         Q.    Okay.  Is it correct that this

12   document is from Chase Merchant Services

13   notifying Amtren that the merchant services

14   account has been cancelled?

15         A.    Yeah, I believe that's what it

16   -- let's see.  Yes.

17         Q.    It's your testimony that this

18   was cancelled because of excessive charge

19   backs?

20         A.    From my understanding, yes.

21         Q.    This notice states that it's

22   being cancelled because of an overdue unpaid

23   charge of $118.41; is that correct?

1      A.   Yes, that's what it says.

2      Q.   Who was responsible for paying

3 this $118.41?

4      A.   The $118.41 would have been

5 drafted from our bank accounts, and that's

6 the way the credit card processors collected

7 their fees.  So they would have been drafted

8 by the bank accounts by the credit card

9 processor.  After this transaction with the

10 fraudulent credit card companies, I believe,

11 under Mr. Lamberth's instruction, he signed

12 bank cards so that you couldn't debit

13 certain accounts or take money from them.

14 It happened to be the account that the

15 credit card companies used to debit those

16 fees.  They were unable to debit those fees.

17      Q.   So it's your testimony that it

18 was Mr. Lamberth's fault that this $118.41

19 was not paid?

20      A.   I'm saying that he changed the

21 debits on the accounts, and the credit card

22 company could not debit the accounts.

23      Q.   Did you receive any notices

1    prior to receiving Defendant's Exhibit 14

2    that there's an unpaid charge of $118.41?

3        A.    You know, I don't recall.  I

4    don't remember.  I apparently tried to do

5    something.  My handwriting and notes are all

6    over this.

7        Q.    You would agree, would you not,

8    that typically Chase Merchant Services

9    provides some notification of an unpaid

10   charge prior to cancelling the account?

11       A.    I would assume that they

12   should.  I don't know if they did.

13       Q.    When did you discuss this with

14   Mr. Lamberth?

15       A.    I don't remember the exact time,

16   but just as soon as I found out.

17       Q.    Did you find out before or when

18   you received Defendant's Exhibit 14?

19       A.    I believe when I received

20   Defendant's Exhibit 14.

21       Q.    Tell me about your conversation

22   with Mr. Lamberth when you received

23   Defendant's Exhibit 14.

1        Q.    It's a very significant problem,

2    is it not?

3        A.    I would agree it is a problem.

4        Q.    Well, it's not a significant

5    problem?  Just a problem?

6        A.    I would agree it is a problem.

7        Q.    Okay.  And it's your testimony

8    that prior to receiving Defendant's Exhibit

9    14 you had no information that there was a

10    problem?

11        A.    I don't recall.

12        Q.    You may have received some

13    information?

14        A.    May have.

15        Q.    All right.  Then when

16    Mr. Lamberth testifies that you failed to

17    notify him about this, you can't refute

18    that; is that correct?

19        A.    Please restate that question.

20        Q.    It is my understanding there

21    will be testimony that you received notice

22    regarding a problem with this account prior

23    to receiving Defendant's Exhibit 14 and that

169

1      Q.   What was the process by which

2  Amtren would bay that charge back?

3      A.   I'm not sure.

4      Q.   Did you ever receive any

5  documentation that either Chase Merchant

6  Services or a credit card company had made a

7  draft on Amtren's checking accounts for a

8  charge back?

9      A.   Okay.  That may be the way they

10  got it through the bank.  Yeah.  You're

11  right.  I'm sorry.

12      Q.   It is correct that those kinds

13  of documents came to you, and you were

14  advised of that since you were responsible

15  for the checking accounts?

16      A.   I was responsible for the

17  checking account, and I assume those

18  documents would have come to me, yes.

19      Q.   O even though you don't recall

20  at the present time other than there were

21  some charge backs, you would have been

22  notified through some documentation that

23  either Chase Merchant Services or a credit

Jennifer Davis, CSR

1  card processing company had attempted to

2  deduct some money from Amtren's checking

3  account because of a charge back; is that

4  correct?

5      A.   I would assume they would notify

6  me, yes.

7      Q.   Are you testifying they could

8  have deducted money from Amtren's checking

9  accounts and you wouldn't have known

10 anything about it?

11     A.   They couldn't have done it if

12 somebody didn't give them authorization, and

13 that would have been Kirk Lamberth.

14     Q.   Okay.  Assuming they had

15 authorization, is it your testimony that

16 they could have deducted the money and you

17 would not have known through any

18 documentation that the money was deducted

19 from the account?

20     A.   I would know the money was

21 deducted from the account, because I

22 reconciled the bank statement.  So I'd know

23 if money was deducted from the account.

1          Q.    You would get some kind of

2    documentation from whoever deducted the

3    money from the account that we deducted X

4    amount of dollars and here's the reason we

5    deducted X amount of dollars; is that

6    correct?

7          A.    I would assume so.

8          Q.    And you routinely received such

9    documentation, did you not?

10          A.    I probably did.

11          Q.    Ms. McCollum, this is nuts.

12    Strike that.  Is it your testimony that

13    sitting here today, you don't recall what

14    your duties were regarding the balancing of

15    checking accounts and whether or not you

16    received any documentation from companies

17    that they were deducting money from Amtren's

18    checking account?

19          A.    No, that is not my testimony.

20          Q.    Is it correct, then, that you

21    routinely received documentation from Chase

22    Merchant Services or other processing

23    companies that money was being deducted from

1        Q.   What kind of documentation would

2   that have been, then?

3        A.   I would assume a notice of some

4   sort, you know.  I'm not really sure.

5        Q.   You just don't recall ever

6   receiving a notice, then, that money was

7   being deducted?

8        A.   I said I may have.

9        Q.   Okay.  Were there ever occasions

10  when the Chase Merchant Services attempted

11  to deduct the money from Amtren's checking

12  account and there was not money in there

13  sufficient for that deduction?

14       A.   That may have been possible.  I

15  just don't know.  I would have to see the

16  bank account.

17       Q.   You don't recall any specific

18  incident when that happened?

19       A.   I don't recall.

20       Q.   Whose responsibility would it

21  have been to ensure that there was enough

22  money in that account to cover that

23  deduction?

174

1       A.   It was my responsibility to

2   maintain the checking account, if that's

3   what you're asking.

4       Q.   And it would have been your

5   responsibility to ensure that there were

6   sufficient funds in that account to cover

7   any deductions that Chase Merchant Services

8   may have made?

9       A.   I don't believe that would have

10   been all my responsibility.

11       Q.   Whose responsibility would it

12   have been?

13       A.   There's a lot of factors

14   involved.  You just can't sit there and say

15   -- there's just a lot of factors involved.

16       Q.   What factors?

17       A.   Ask the question again.  I'm

18   getting tired.  I'm sorry.

19       Q.   So am I.

20       A.   Okay.  And I'm trying to

21   remember.  This was two years ago.  It's

22   been a long time.

23       Q.   We've established that this was

1    a significant problem -- or at least a

2    problem.  You wouldn't say it was

3    significant.  But it was at least a problem

4    that Amtren encountered.

5         A.   Yes, it was a problem.  The

6    credit card processing was definitely a

7    problem.

8         Q.   And my question is, prior to

9    receiving Defendant's Exhibit 14, were there

10   occasions when you received notification

11   from Chase Merchant Services that they

12   attempted to deduct money from Amtren's

13   account to process charges when there was

14   not sufficient funds in that account?

15        A.   I may have.

16        Q.   But you don't recall that?

17        A.   I don't.

18        Q.   Even though it was a problem?

19        A.   Right.

20        Q.   Let me show you what's been

21   marked as Defendant's Exhibit 15 and ask you

22   if you recall seeing that document.

23             (Whereupon, a document was

Jennifer Davis, CSR

1    marked as Defendant's Exhibit 15 and is

2    attached to the original transcript.)

3         A.    Yes, I do.

4         Q.    Tell me about that document.

5         A.    It's a lease agreement for a

6    copier.

7         Q.    Did you get approval to enter

8    into this lease agreement?

9         A.    Yes.

10        Q.    Who gave you that approval?

11        A.    Mr. Lamberth.

12        Q.    When did he give you that

13   approval?

14        A.    Prior to me turning in the

15   agreement.

16        Q.    Okay.  During the time that you

17   were responsible for Amtren's checking

18   accounts, were there occasions when the

19   checking accounts did not have sufficient

20   funds in the accounts and there were charges

21   to Amtren because of insufficient funds?

22        A.    Yes.

23        Q.    Tell me about that.

177

1        A.    I'm not really sure.  I couldn't

2    elaborate on that.  I would have to look and

3    see exactly what the insufficient -- the

4    balances were and insufficient funds were

5    for.

6        Q.    Whose responsibility was it to

7    ensure that the checking accounts did not

8    have insufficient funds?

9        A.    I guess it was mine.

10        Q.    You would agree that that was an

11    error, then?

12        A.    (No response.)

13        Q.    You may think it's funny, but I

14    don't think it's funny.

15        A.    I know you don't.  That's okay.

16        Q.    Did you advise Mr. Lamberth that

17    Amtren was receiving insufficient funds

18    charges because of a lack of funds in the

19    checking accounts?

20        A.    I'm sure.  I don't remember.

21    I'm sure I did, you know.  He had access to

22    the on-line records.  I just don't remember,

23    but I'm sure I did.

178

1          Q.    Let me show you what's been

2     marked as Defendant's Exhibit 16, document

3     0042 through 0048.  Have you seen those

4     documents before?

5               (Whereupon, a document was

6     marked as Defendant's Exhibit 16 and is

7     attached to the original transcript.)

8          A.    Yes.  I believe these are the

9     ones --

10              THE WITNESS:  Didn't we receive

11    these in the packet?

12         Q.    (By Mr. Trawick)  Let me

13    rephrase that question.  Do you recall

14    receiving those documents during the time

15    you worked at Amtren?

16         A.    I couldn't have received those.

17         Q.    You could have received --

18         A.    I could not have received

19    those.  And I believe I did receive these.

20         Q.    You received document numbers

21    0042, 0043, and 0044 and 0045; is that

22    correct?

23         A.    Yes, I believe I did.

Jennifer Davis, CSR

1    But I don't know what that code means, that

2    code that's on there.

3            Q.    Mas90?

4            A.    Okay.  Yes.

5            Q.    I believe you previously

6    testified that Bobby Lake was the person at

7    Wilson Price who, for lack of a better word,

8    trained you on Mas90?

9            A.    He was the consultant that

10   helped us install Mas90, yes.

11           Q.    Okay.  Was there an occasion

12   when you informed Mr. Lake that his services

13   were no longer needed?

14           A.    I don't remember, you know,

15   telling him that, that his services were no

16   longer needed.

17           Q.    Did Amtren have a contract with

18   Wilson Price for a certain amount of

19   technical services on installing Mas90?

20           A.    Yes.

21           Q.    Did you ever reduce that amount

22   of technical service?

23           A.    I don't know.  I may have to

1    save Amtren money.  I felt that I could put

2    the system in myself.

3          Q.    So if Bobby Lake testified that

4    you did reduce the amount of services, you

5    couldn't refute that; is that correct?

6          A.    I just don't recall at this

7    time.

8          Q.    Okay.  And is it your testimony

9    that at the time you decided to reduce the

10   amount of services that Wilson Price would

11   provide, Mas90 was fully integrated and you

12   were fully trained on the system?

13         A.    I don't recall reducing the

14   services, and it takes years to install a

15   fully integrated software system.  We just

16   started installing this, I believe, in

17   September or October of 2004.  I was

18   terminated in April.  I didn't really have a

19   chance.

20         Q.    You previously testified about

21   the error with Plextor.  Do you recall that

22   testimony?

23         A.    I do.

185

```
 1    payable accounts?

 2             A.    Sure, uh-huh.

 3             Q.    And it's my understanding that

 4    Padus -- is that the way you pronounce it?

 5             A.    I believe that's right.  Padus.

 6             Q.    Would send invoices to Amtren to

 7    be paid?

 8             A.    Yes.

 9             Q.    I believe it was your

10    responsibility to ensure that those invoices

11    were timely paid?

12             A.    Yes.

13             Q.    Were there ever any problems

14    with Amtren making timely payments to Padus?

15             A.    When you say timely payments,

16    what are the terms?

17             Q.    What do you mean by timely

18    payments?

19             A.    We tried to pay all of our

20    vendors within 45 days.  Sometimes that

21    worked out, and sometimes it didn't.  It

22    depended on cash flow.

23             Q.    Now, my question is, were there
```

186

1    problems with making timely payments to

2    Padus?

3            A.    There may have been.  I don't

4    remember.

5            Q.    You don't recall any?

6            A.    I mean, I don't know.  I would

7    have to see the documents.

8            Q.    Well, were there lots of

9    accounts that there were problems with

10   making timely payments to?

11           A.    No, not in my opinion.

12           Q.    Then, if there was a problem

13   with Padus, you should remember that, then;

14   is that correct?

15           A.    Maybe I should.  It's two years

16   ago.  I don't.

17           Q.    However, you do recall that

18   there were problems with making timely

19   payments to some of the accounts payable of

20   Amtren; is that correct?

21           A.    No, I don't recall that.  We

22   tried to pay everybody in 45 days.  You

23   know, that was our terms.

Jennifer Davis, CSR

187

```
 1          Q.   Were the accounts paid within 45

 2    days?

 3          A.   We tried to.

 4          Q.   Does that mean that sometimes --

 5          A.   I'm not going to sit here and

 6    say we paid every account in 45 days,

 7    because I don't know.

 8          Q.   Do you know who Elisabetta

 9    Benetollo is?

10          A.   Does she work for Padus?

11          Q.   Yes.  It's spelled

12    E-L-I-S-A-B-E-T-T-A, B-E-N-E-T-O-L-L-O.

13          A.   Okay.

14          Q.   Do you recall her?

15          A.   I believe I do.

16          Q.   I spelled it for the court

17    reporter, not you.

18          A.   I know that.

19          Q.   Did you ever have any problems

20    with -- strike that.  Do you recall

21    discussing any problems with Ms. Benetollo

22    about problems getting the invoices paid to

23    Padus?
```

```
1          A.    I don't remember the specifics.
2     I would need to see the documents.
3          Q.    What do you remember generally?
4          A.    I remember talking to her, I
5     believe.  I don't know every piece of the
6     conversation.
7          Q.    Well, do you recall generally
8     what the problem was or problems were?
9          A.    I don't know if there was a
10    problem.
11         Q.    You just don't know --
12         A.    If it's regarding payment.  Like
13    I said, we tried to pay everyone in 45 days.
14         Q.    Did you ever talk with
15    Mr. Lamberth about problems with not paying
16    everyone in 45 days?
17         A.    No, not that I remember.
18    Mr. Lamberth was all for paying everybody in
19    45 days.
20         Q.    Was it your responsibility --
21    strike that.  Did you have any
22    responsibility with the processing of orders
23    from Amtren's customers?
```

194

```
 1                C E R T I F I C A T E

 2

 3      STATE OF ALABAMA)

 4      COUNTY OF ELMORE)

 5

 6           I hereby certify that the above and

 7      foregoing deposition was taken down by me in

 8      stenotype, and the questions and answers

 9      thereto were transcribed by means of

10      computer-aided transcription, and that the

11      foregoing represents a true and correct

12      transcript of the deposition given by said

13      witness upon said hearing.

14           I further certify that I am neither

15      of counsel nor of kin to the parties to the

16      action, nor am I in anywise interested in

17      the result of said cause.

18

19                        Jennifer Davis, CSR

20

21

22      My Commission expires

23      October 11, 2010
```

Jennifer Davis, CSR