# Exhibit "19"

1

# COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JANICE McCOLLUM,

     Plaintiff,

Vs.                                    CIVIL ACTION NO.
                                       05-cv-0326-W
Amtren, Inc.,

     Defendant.



       * * * * * * * * * * * *


     DEPOSITION OF KIRK LAMBERTH, taken

pursuant to stipulation and agreement before

Patricia G. Starkie, Registered Diplomate Reporter,

CRR, and Commissioner for the State of Alabama at

Large, in the Law Offices of Slaten & O'Connor, 105

Tallapoosa Street, Montgomery, Alabama, on

Wednesday, November 15, 2006, commencing at

approximately 10:05 a.m.

       * * * * * * * * * * * *

2

APPEARANCES

FOR THE PLAINTIFF:

Mr. Jimmy D. Jacobs
Attorney at Law
143 Eastern Boulevard
Montgomery, Alabama

FOR THE DEFENDANT:

Mr. G. R. "Rick" Trawick
SLATEN & O'CONNOR
Attorneys at Law
105 Tallapoosa Street
Montgomery, Alabama

ALSO PRESENT:

Ms. McCollum

                * * * * * * * * * * * *

                EXAMINATION INDEX

                  KIRK LAMBERTH

BY MR. JACOBS . . . . . . . . . .    5

BY MR. TRAWICK . . . . . . . . . .  118

3

### EXHIBIT INDEX

### PLAINTIFF'S EXHIBITS

1    Amtren's responses to Plaintiff's          28
     discovery requests

2    Five-page letter to the EEOC from Mr.       57
     Lamberth

3    Attachment to PX-2 relating to item five    58
     (bank overdrafts)

4    Attachment to PX-2 relating to item two     80
     (health insurance premium payments)

5    Attachment to PX-2 relating to item one     91
     (Late Payroll Tax Deposits)

6    Attachment to PX-2 relating to item         93
     three (Credit Card Processor
     Cancellation due to lack of payment)

7    Attachment to PX-2 relating to item four    93
     (Lease of Copier)

8    Form 941 - penalty and interest (Also       108
     marked DX-5 to McCollum deposition)

* * * * * * * * * * * *

STIPULATION

It is hereby stipulated and agreed by and

between counsel representing the parties that the

deposition of:

KIRK LAMBERTH

is taken pursuant to the Federal Rules of Civil

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

7

1   Q.   That's my home town, so I have a little

2        familiarity with that plant and what they

3        did years ago.  I thought it had to do with

4        manufacture of tape.

5          What is your position with Amtren?

6   A.   I am the president.

7   Q.   Okay.  Is Amtren a public corporation?

8   A.   No, it is not.

9   Q.   All right.  Are you the sole owner?

10   A.   Yes.

11   Q.   When was the company begun?

12   A.   Amtren Corporation was -- the company was

13        incorporated in 1995.  There was a

14        three-year period where we were another

15        entity.  So 1992 was when I founded the

16        basic company.  From 1992 to 1995 we

17        operated under another company name because

18        we were on a different path.  In 1995 we

19        changed direction, and basically we

20        separated the two -- there were two groups

21        at that time, and we separated them, and I

22        took product development.  The name Amtren

23        was developed and we incorporated in

1          October of -- I believe it was in '95 as

2          Amtren.

3    Q.    All right.  So Amtren as a business entity

4          came into being in 1995?

5    A.    1995, correct.

6    Q.    Okay.  And it grew out of another entity --

7    A.    It did.

8    Q.    -- that was prior to that?

9    A.    It did.

10   Q.    Does that other entity still function?

11   A.    No, it does not.

12   Q.    Could you tell me what Amtren does.

13   A.    Amtren is classified as a manufacturer in

14         that we manufacture CD and DVD duplication

15         systems.

16   Q.    Okay.  And I'm going to try to explain that

17         to you, and if you would, tell me if I

18         understand it.

19   A.    All right.

20   Q.    You would manufacture machines that would

21         make multiple copies of an original, either

22         data or music or whatever?

23   A.    Yes.  It is -- that's exactly right.  The

9

1       exception is you can also take straight

2       from your PC the information.  So you can

3       bring an original work into the machine

4       like a xerox -- like a photocopy, and you

5       can also submit work to it from your PC.

6   Q.   If a friend of mine recorded a CD or what

7       we used to call an album and had a master,

8       then you would manufacture machines that

9       could reproduce that, the copies that could

10      be sold?

11  A.   Right.

12  Q.   Is that right?

13  A.   That is exactly right.

14  Q.   Okay.  That's what I thought it was, but I

15      wanted to be sure.

16         What raw inputs are necessary for

17      Amtren to operate?

18  A.   Raw inputs would be -- there would be --

19      depending on the area, of course, there

20      would be --

21         And let me clarify raw.  You mean like

22      reporting, weekly reporting, this kind

23      of -- you mean --

10

1    Q.    No.  Really, what I mean is what sort of

2          supplies -- or perhaps you could just

3          describe suppliers that you would have to

4          have in order to --

5    A.    Can I say materials?

6    Q.    Yes.

7    A.    Do you mean materials?

8    Q.    Materials, yeah.

9    A.    All right.  Materials are provided -- and

10         there are probably three categories of

11         materials.  The materials are purchased

12         parts, which would be items that are

13         specified from, you know, certain vendors

14         and purchased.

15              Then there would be parts that would be

16         built from vendors to our specifications.

17         Those could be sheet metal or plastic,

18         molded parts.

19              The third is usually PC boards and

20         those type.  Those are also designed and

21         built to our specifications and populated.

22    Q.    And what was the last thing you said?

23    A.    That's pretty much it.

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

11

1    Q.    What kind of board?

2    A.    The PC -- the circuit boards.

3    Q.    Okay.  I'm sorry.

4    A.    Circuit boards, the internal controllers.

5    Q.    Okay.  Are there any soft materials that

6          you have to have in order to produce your

7          product?

8    A.    Can you explain soft, make sure --

9    Q.    Yes.  I was hoping that that would explain

10         it.  Are there any processes or software

11         that you would have to purchase or lease or

12         whatever in addition to raw materials?

13   A.    For the product itself?

14   Q.    Yes.

15   A.    Primarily for the product?

16   Q.    For you to produce the product that you

17         then sell.

18   A.    Two things I want to clarify.  We actually

19         purchase software as a material for our

20         product.

21   Q.    Okay.

22   A.    That's different.  We don't -- we just --

23         if I can, it's XP, Windows XP.  It goes

12

1        with our systems.  There's an option to

2        provide -- that we provide the operating

3        system.  That's a material.

4               Now, is that related -- are you

5        asking -- or software related to

6        running the app?

7    Q.   Yes.  Is there any software that you have

8        to have or other processes that you have to

9        lease or license in order to produce what

10       you produce?  And I would assume Windows XP

11       would be one of those things, because you

12       put it in the machine.

13   A.   Right.

14   Q.   As a raw material.

15   A.   Not have to, but, yes, we do -- we do elect

16       to use certain packages to -- and I guess

17       it's probably because it's more required

18       for business operations than anything

19       else.  So we do, you know, use a couple --

20       primarily we use I would say probably a

21       couple of packages.  Couple of them are the

22       Microsoft Office type packages, and the

23       other would be an accounting package.

13

1   Q.   And we're going to talk I'm sure this

2        morning some about Peachtree and the

3        MAS90.  And I'm not sure that's how y'all

4        pronounce it, but that's --

5   A.   Well, that's right.  Those two are the way

6        we refer to those.

7   Q.   Over on the production side, it would be

8        the Microsoft Office type application?

9   A.   Exactly.

10  Q.   And then I would assume for your internal

11       business operations, you're also using

12       something like Microsoft Office or

13       Enterprise or something of that nature?

14  A.   Generally Office, just the Excel and Word

15       documents within Office.

16  Q.   Okay.  What is your -- taking '95 as a

17       baseline, what has been your rate of growth

18       in production?

19  A.   Dollars or volume?

20  Q.   Either one.

21  A.   I'll have to think a minute about that.  I

22       can say it's been substantial.  For a

23       period -- if I can just use a couple of

14

1  periods here.  From '95 through '98,

2  minimal growth.

3  Q.  Okay.

4  A.  '98 to 2001, significant, you know, sharp

5  growth.  So from '98 to 2001, it was

6  substantial growth, a lot more than before.

7  Q.  Are you talking about 25 percent a year or

8  more growth?

9  A.  Let me think just a minute.  So I've got --

10  Not quite that sharp during those periods.

11  Cumulative yes, probably for that period.

12  Cumulative.  Probably from '98 to '01, it

13  probably could be 25 percent; maybe as much

14  as 35 percent.

15  Q.  Okay.

16  A.  Maybe on an annual basis, that would be ten

17  or so, 15.

18      From '02 to the current, we've had

19  substantial growth.

20  Q.  Better than 50 percent?

21  A.  Probably 25 per year.

22  Q.  Okay.

23  A.  I'm not sure how that relates totally.

15

1  Now, we slowed down a little bit in the

2  last two years, though, so I would say that

3  you probably are talking about 30 to 40

4  percent growth per year.

5      Then in 2005, we slowed down

6  substantially, and we've -- so the end of

7  2005 is probably flat compared to previous

8  years.  2006 is picking back up some.

9  Q.  Was there any external cause of that 2005

10     slow down, something in the industry?

11 A.  It was primarily the -- there were a couple

12     of reasons.  The most significant was

13     delayed release of a planned product.

14         We had planned a product release for

15     2004 and 2005.  It was delayed.  This delay

16     caused that.

17 Q.  Was there any particular cause for the

18     delay?

19 A.  No single cause.

20 Q.  Okay.  Were there more than three causes?

21 A.  Yes.  There -- to try to clarify that.

22     When you release a new product -- we have

23     not released a new product since 2001.

16

1     There were a lot of areas that we had

2     planned well to do that were not executed.

3          There are probably three categories.  A

4     couple that I would mention would be the

5     proper execution of material changeover.

6     You have an old model to a new model.  So

7     you have to plan the materials that will

8     not be used from the old model to be --

9     reduce the inventory.  Then you have to

10    plan the materials for the new model, and

11    you have a changeover plan.  That's kind of

12    an operational mode.

13         Then the other item is the design, that

14    the designers do, our R&D people.  So a

15    secondary item that relates to this is that

16    when you release a new revision, some of

17    the designs are not fully complete, so it

18    takes additional time to work out some of

19    the -- I may call them bugs.  It's not

20    software only, but it's sometimes the

21    hardware doesn't fit right.  So I would say

22    it's probably a combination of the two

23    items.

17

1   Q.   Okay.  Has that product now been released?

2   A.   Yes, it has.

3   Q.   And you are back on track with the

4       substantial growth?

5   A.   Yes, we are.  This year we would -- the

6       product was formally released last

7       November.  That would be -- let's see.

8       We're in '06, so that would be November of

9       '05.  And it is -- I would say it's --

10      we've experienced 30 to 40 percent growth

11      in that product this year.

12  Q.   How many people are employed by Amtren?

13  A.   I was going to count them this morning.  I

14      forgot.  I don't know the whole number.

15           MR. TRAWICK:  Are you asking

16             today?

17  A.   Today?

18  Q.   I was asking generally today, but we can go

19      back specifically.

20  A.   Can I use a rough number?

21  Q.   Sure.

22  A.   I think it's about 20.  I'm not...

23  Q.   And is that more or less than when Janice

18

1    was employed there, that 20?

2  A.   I think it's less, but I'd have to verify

3      that.  I can't remember exactly the

4      number.  Now, I am using full time, but on

5      occasion we do use contractors or

6      temporary.  And that's what -- your

7      question --

8  Q.   Was to full-time employees.

9  A.   Right.

10  Q.   In breaking down that roughly 20 -- and I'm

11      not going to hold you to that number --

12      about how many are engineers?

13  A.   Twenty-five percent roughly.  I think four

14      operate in that department completely, so

15      it would be a little less than 25.

16  Q.   Are the engineers responsible for inventory

17      control and production?

18  A.   Not responsible for it.

19  Q.   Okay.  How many people would be involved in

20      inventory control?

21  A.   One person.

22  Q.   One person?

23  A.   Yes.

19

1   Q.   Purchasing?

2   A.   Purchasing, same person.

3   Q.   Same person?

4   A.   Yes.

5   Q.   Do you have a separate shipping department?

6   A.   We do not have a shipping department.  It's

7        usually a shared duty.

8   Q.   Okay.  Would the person who also does

9        inventory and purchasing do shipping as

10       well?

11  A.   Yes.

12  Q.   Who else would be involved in shipping by

13       position or title, not by name?

14  A.   What happens now is generally we pull from

15       the management staff when we need it for

16       that.  If there's a shipment going out,

17       generally there's -- including myself, if

18       needed, and others will just assist with

19       the shipping of the product.

20            The primary person that's mentioned,

21       the inventory and logistics person,

22       prepares the shipment as far as they can,

23       and then we have additional people that

20

1        will help with the finalization of it.

2        It's not assigned specifically.  It's

3        usually as we can -- you know, as we can

4        find people.

5    Q.  What is your primary product now that you

6        sell?

7    A.  It's the CD and DVD duplicator.

8    Q.  Since I have never seen one of those, is

9        that larger than a kitchen microwave?

10   A.  Yes.  There's three levels of the product.

11       One is the level that is under two

12       thousand.  It would probably be smaller

13       than that.  It would be similar to -- maybe

14       similar to a microwave.

15   Q.  Okay.

16   A.  Then the levels -- two levels above that

17       are substantially larger.  They would be

18       similar to your office copier without the

19       stand.  They would be 45 to 50 pounds.

20   Q.  And you have a staff that actually

21       manufactures those?

22   A.  Yes, we do.

23   Q.  How many people are involved in

21

1      manufacture?

2    A.   Let me count, because I want to try -- I'm

3         not going -- again, I'm going to use a

4         number that I just -- I think it's going to

5         be six or seven.

6    Q.   Okay.  Now, do the engineers do any of the

7         manufacturing work?

8    A.   Their responsibility does not do that, but

9         they do assist from time to time.

10   Q.   Okay.  And to sort of get a picture in my

11        head, once a unit is produced, I would

12        assume it's boxed somehow, and your

13        manufacturing people would do that and move

14        it to some location to be sold?

15   A.   We have an assembly line process.  At the

16        end of the line it's quality checked, and

17        then it goes into a carton and is closed

18        up, yes.

19   Q.   How many people are currently involved in

20        management with Amtren?

21   A.   Currently?  Five.  Let me count...

22             MR. TRAWICK:  To keep from

23                 confusing the court reporter,

1           if you verbalize your

2           thoughts, she takes it down.

3       THE WITNESS:  Sorry about that.

4           My apologies.

5   A.   I'm going to say five.

6   Q.   Okay.  And I'm assuming that you are one of

7        those?

8   A.   Yes, that's correct.

9   Q.   You are the president and CEO?

10  A.   That's correct.

11  Q.   Who are the other four?

12  A.   By name, Bobby Lake, Susan Seeber, Derrick

13       Garrett --

14  Q.   Derrick?

15  A.   D-E-R-R-I-C-K, Garrett, G-A-R-R-E-T-T, and

16       Michael Rogers.

17  Q.   What is Bobby Lake's title?

18  A.   His title is general manager.  There's a

19       secondary title with that, too, controller.

20  Q.   Is Susan Seeber --

21  A.   Seeber.

22  Q.   Seeber?

23  A.   Yes, uh-huh (positive response).

23

1   Q.   What's her title?

2   A.   Accounting manager.

3        Let me clarify that.  It's accounting

4        and business management.

5   Q.   And Derrick Garrett?

6   A.   Service manager.

7   Q.   And Michael Rogers?

8   A.   He's the logistics and inventory manager.

9   Q.   Is he that person that we were talking

10       about that would purchase and --

11  A.   Exactly.

12  Q.   -- do inventory control and so on?

13  A.   Yes.

14  Q.   Okay.  And typically service manager to me

15       means something in a retail setting, but

16       what does your service manager do?

17  A.   Our service manager receives calls from the

18       customer.  He manages a small group,

19       there's only two in it, but they're the

20       calls that come in from the customer with

21       issues regarding the systems.

22  Q.   Okay.

23  A.   Questions that -- you know, it's service

24

1       calls similar to if you would call a

2       manufacturer for help with a product.

3   Q.  And the accounting manager?

4   A.  Susan?

5   Q.  Yes.

6   A.  What was your question?

7   Q.  What specifically does she do?

8   A.  Susan is responsible for the accounts

9       payable, the accounts receivable, the

10      basically matching the purchase orders with

11      the packing lists.  I would say primarily

12      any accounting duty up and to the

13      production of -- in fact, I guess all

14      accounting areas.  She also manages the

15      front office, too, anybody in the front

16      office.

17  Q.  Okay.  Does she do like monthly income

18      statements?

19  A.  Yes, she does.

20  Q.  Financial statements for the end of the

21      year?

22  A.  Yes, she does.  Those are nonaudited, just

23      output type reports.  And she does,

25

1    actually, some of them weekly.

2   Q.   Okay.  Is she also responsible for writing

3        checks?

4   A.   Yes, she is.

5   Q.   Making payments to Blue Cross Blue Shield?

6   A.   Yes, she is.

7   Q.   And tax payments?

8   A.   Yes, she is.

9   Q.   Is she a CPA?

10  A.   No, she is not.

11  Q.   To try to shorten things a little bit, I'm

12       going to say I think the general manager is

13       responsible for everything; is that right?

14  A.   The general manager in the role is -- yes,

15       operations and -- I call it the front

16       office, if you will.  It would be the

17       service and the purchasing and the

18       accounting areas, yes.

19  Q.   Okay.

20  A.   I think that's correct.

21  Q.   And how is that role different from that of

22       controller?

23  A.   The controller title in Mr. Lake's

26

1    situation is because he is the CPA, and he

2    does review our accounting output; thus,

3    the title is, if you will, a co-title to

4    allow that role to be a double check for

5    the accounting system.

6  Q.   Okay.  When was Bobby Lake employed as

7    general manager and/or controller?

8  A.   I believe the dates are somewhere -- we can

9    verify this.  It would be January or

10    February of this year.  We can verify the

11    exact date if you want to.  I do know it

12    was the beginning of this year.

13  Q.   Okay.  How about Susan Seeber?

14  A.   I believe her role -- it would be in the

15    fall of last year.  It would be somewhere

16    around October -- again -- September,

17    October, I believe.

18  Q.   Was Susan Seeber hired into the position of

19    accounting manager or --

20  A.   Yes, she was.

21  Q.   Okay.  And I want to ask the same question

22    about Bobby Lake.  Was he hired as general

23    manager or did he have some other position

1        before that?

2    A.  No, he was hired in as general manager.

3    Q.  Okay.  What about Derrick Garrett?  How

4        long has he been with you?

5    A.  Again, I'm going to estimate 2003.  Late

6        2003, early 2004.

7    Q.  And Michael Rogers?

8    A.  Spring of 2006.  Exact month, I would

9        estimate May.

10   Q.  Who did Mr. Rogers replace?

11   A.  At the time of his employment?

12   Q.  Yes.

13   A.  Wayne Crabtree.

14   Q.  And who did Derrick Garrett replace?

15   A.  The position did not -- it's a growth

16       position.  It did not exist.

17   Q.  New position?

18   A.  Yes.

19   Q.  And whom did Susan Seeber replace?

20   A.  Lisa McNamee.

21   Q.  And Bobby Lake?

22   A.  New position.

23   Q.  Do you recall the date that Janice McCollum

28

1    was initially employed?

2    A.    The dates of her employment?

3    Q.    Yes.

4    A.    January of 2004 through April of 2005.

5    Q.    Okay.  Who was responsible for hiring her?

6    A.    I was.

7                        (Plaintiff's Exhibit 1 was marked

8                        for identification.)

9    Q.    If you would look at -- I'll represent to

10    you this is Amtren's responses to

11    Ms. McCollum's discovery requests.  Have

12    you ever signed a copy of this?

13                        MR. TRAWICK:  Yes.

14    A.    Yes.

15                        MR. TRAWICK:  We can get you a

16                        signed copy.

17                        MR. JACOBS:  I'm not sure that I

18                        have one.

19                        MR. TRAWICK:  My recollection is

20                        we sent this to you and told

21                        you we would supplement with a

22                        signed copy.

23                        MR. JACOBS:  That you would get a

30

1   Q.   And I note in the response that she got a
2       $10,000 bonus.

3   A.   Uh-huh (positive response).

4   Q.   And what I'm trying to find out, what I'm
5       trying to ask and not doing it very well, I
6       suppose, is was her bonus set up according
7       to some formula as a percentage of sales
8       or -- how was it arrived at?

9   A.   The bonus is a merit bonus, and it's -- the
10      bonus that you're discussing --

11         If it's the $10,000 bonus, then I can
12      explain a little bit.

13   Q.   Right.

14   A.   That's a merit bonus.  At the end of each
15      year, based on the company's performance,
16      we award a merit bonus.  This bonus is --
17      the management staff as a whole is
18      reviewed, and each individual receives part
19      of this bonus.  The bonus is based on our
20      profits.

21   Q.   Okay.  And was that divided according to
22      some preset percentage?

23   A.   It is not a preset percentage each year.

31

1          Generally the management staff receives a

2          general -- similar amount, and the

3          production workers receive a lesser but

4          similar amount.

5     Q.   Similar amount?  Okay.  Is that amount at

6          the end of a year entirely discretionary

7          with you?

8     A.   Yes, it is.

9     Q.   Okay.  Did Ms. McCollum's position carry

10          with it the payment of any insurance

11          benefits, health insurance or life

12          insurance?

13     A.   I can't remember specifically her scenario,

14          but we do pay health insurance, a part of

15          the premium for health insurance, and

16          provide -- I don't think at that time we

17          provided life insurance.  But I do know

18          that if an employee elects to be part of

19          it, then the premium for the employee is

20          matched, and we do provide that.

21     Q.   Okay.  How about any type of 401(k) plan or

22          retirement plan?

23                    MR. TRAWICK:  You're asking for

34

1       plan that she's eligible to be a

2       participant in?

3  A.   Depending on the profits of the company, it

4       would be similar that I discussed earlier.

5       Each person would participate.

6  Q.   Okay.  So depending on the profitability of

7       the company, there could be a bonus and a

8       contribution to a retirement plan?

9  A.   Yes.

10  Q.   Were there any bonuses or retirement

11      contributions in 2005?

12  A.   No.

13  Q.   Okay.  I believe that's the year you told

14      me business was --

15  A.   Right.  Right.  I'm going to verify -- I'm

16      going to say no, but I'm almost certain

17      that we -- because of the condition, we --

18      there was no contribution made to the

19      profit sharing or any bonusing.  I'm going

20      to -- I don't think so.  Again, that --

21      sometimes -- I can't remember exactly, but

22      I'm going to say I don't think so.

23  Q.   Would the same general principle apply to

36

1    A.    Again, I --

2    Q.    I guess I really want to know --

3    A.    It's available to him.  Is that what you --

4          Yes, it's available to him.  I'm not sure

5          if he participate or not.

6    Q.    But in the event he does, the company would

7          pay half his premium?

8    A.    Exactly.

9    Q.    Okay.  Tell me what Ms. McCollum's duties

10         were when she was initially hired.

11   A.    She was basically in the accounting

12         manager's position.  The accounts payable,

13         the payroll, the accounts receivable.  And

14         to some degree, her duties also had the --

15         she issued or -- I can't remember what she

16         did exactly, but she issued purchase orders

17         or assisted with the issue of purchase

18         orders.

19   Q.    If materials were needed for the production

20         process, would your inventory control type

21         person be one who would initiate obtaining

22         those materials?

23   A.    The way we would plan it is a guideline for

1      needs that we try to establish, and then

2      those needs are met with issuing blanket

3      purchase orders.  Blanket purchase orders

4      are over a length of time, and they allow

5      delivery of certain parts on a schedule.

6      Generally, Ms. McCollum issued these POs.

7      The materials individuals would update her

8      on shortages or overages, I guess, in the

9      case it does happen, or I guess in some

10     cases when there's a yield loss if there

11     are parts that are received wrong.

12  Q.   I'm going to talk here a little bit more

13     than I want to, but, again, trying to

14     understand.  I have read of something

15     called just-in-time management.  Is that

16     what you attempt to do with your --

17  A.   That's very much what we attempt to do.

18  Q.   So Ms. McCollum would be the person who

19     would send the purchase order out based on

20     what someone else told her the need was, or

21     what was her role?

22  A.   Her role at that period would be -- I

23     believe she at that time issued the

38

1    purchase order based on -- she would

2    discuss -- we had a weekly meeting, and --

3    or if we didn't have a weekly meeting, she

4    would discuss with the logistics person the

5    requirements, and then she would issue the

6    blanket orders on that behalf.

7  Q.  And could you tell me just -- could you

8      tell me in a simple sort of way what a

9      blanket order is?

10 A.  A blanket order is a purchase agreement for

11     delivery of parts over time.  So rather

12     than one document saying a certain number

13     of parts delivered at one time, it's a

14     document that has multiple deliveries,

15     delivered over time.

16 Q.  Okay.  Would it be something that would

17     authorize up to a certain amount --

18 A.  Yes.

19 Q.  -- over a period of time?

20 A.  That's exactly what it is.

21 Q.  Okay.  I noticed in our discussion thus

22     far, I don't believe there has been any

23     mention of a sales force.  Do you have a

39

1    specialized sales division?

2    A.    That's my role primarily, but we sell

3          through distributors.

4    Q.    Okay.  When Ms. McCollum was hired as

5          accounting manager, who was her

6          supervisor?

7    A.    I was.

8    Q.    At any time during her employment, did she

9          have any other supervisor other than you?

10   A.    No.

11   Q.    I think the answer is obvious, but who in

12         the company would be in the best position

13         to know about Janice's performance as

14         accounting manager?

15   A.    I would.

16   Q.    Were there any personality conflicts

17         between Ms. McCollum and other management

18         staff?

19   A.    Not that I was aware of.

20   Q.    How did you come to hire Ms. McCollum?  How

21         did you learn about her?

22   A.    She responded to an ad we placed in the

23         paper, Montgomery Advertiser, and she

40

1     submitted her resume.  We talked to her.

2   Q.   Okay.  Did you then interview her after

3     that?

4   A.   Yes, I did.

5   Q.   Did you contact any references or other

6     persons before you made a decision to hire

7     her?

8   A.   I can't recall in her case specifically.

9     Generally, we do ask for a couple of

10     references.  I can't remember exactly what

11     I did in her case.

12   Q.   Okay.

13   A.   She did have a -- because her -- if I can

14     say, there was an automatic reference.  Her

15     husband did work next door.

16   Q.   Okay.  That's a different company?

17   A.   Uh-huh (positive response).  Yes.  I'm

18     sorry.

19   Q.   Okay.  So did you feel like you knew her or

20     knew of her?

21   A.   No.  Only thing is that was one --

22   Q.   One of the things you remember about --

23   A.   Right.  Considering her for employment,

43

1   A.   I would say her job was to manage the

2        accounting system:   Receipt of invoices

3        from vendors.   Matching those invoices to

4        purchase orders and packing lists,

5        generating the payment for those,

6        generating the check for those, signing the

7        check, and even putting it in the envelope

8        and processing it for mail.

9            On the AR side -- excuse me -- accounts

10       receivable side, she would issue the

11       statements from Amtren to our customers.

12       On the payroll side, she would issue the

13       payroll on a weekly basis.   She was also

14       responsible for paying tax deposits

15       weekly.   She was responsible for

16       submission -- in the accounting role,

17       submission of the statements that the --

18       the reporting that has to go to the state

19       and the federal agencies.

20           I think that pretty much sums it up.

21  Q.   Okay.   Did she get additional duties as she

22       was employed other than those you've

23       described?

44

1   A.   Yes, but if I can back up.  Some of the

2         duties I just mentioned, she was -- they

3         were provided at the end versus the

4         beginning.

5   Q.   At the beginning?

6   A.   And around October of -- let's see --

7         September, October of 2004, she received

8         the authority to sign checks and to

9         completely control the disbursement of our

10        funds.

11   Q.   What reports did she provide to you on a

12        regular basis?

13   A.   There's a report that we call recap report

14        that was a weekly recap that she would

15        summarize the basic parts of the company as

16        far as cash, the money we owed vendors,

17        accounts payable, the money that's owed us,

18        accounts receivable, the position on our

19        line of credit.

20          Additionally, the form would have maybe

21        some forecasting in it; you know, based on

22        the current open orders, this may be the

23        potential income.

48

1   A.   No.

2   Q.   Were there any that you are aware of that

3        were not reported to you?

4   A.   Yes.

5   Q.   What was that?

6   A.   Just talking about specific inventory

7        items, right?

8   Q.   I'm talking --

9   A.   Let me back up and state that I can't give

10       you specifics on that.  And I want to be

11       careful and answer your exact question.  I

12       was saying in general in making a

13       statement, so --

14            Go back and ask me one more time.  Let

15       me make sure I'm being very specific.

16  Q.   It was my understanding that you were

17       telling me that her responsibilities in the

18       area of inventory control were what I'll

19       call an audit process.

20  A.   Exactly.

21  Q.   A verification process.

22  A.   Right.

23  Q.   Tell me exactly what she was supposed to

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

49

1    do.

2    A.    She would basically go into -- she would

3          work with production and schedule it.  She

4          would go in there with the production

5          staff.  We would stall production.  They

6          would count all the parts.  She would then

7          return to her office and sit down and enter

8          all the corrections into the system.  What

9          she would then report is an outage of

10         inventory.  What -- did not isolate

11         individual outages per part.  So she would

12         indicate a -- I guess a gross outage.

13              What I indicated in errors were that as

14         we discovered, when she was making the

15         gross adjustments, she was just basically

16         taking the plus and minuses and giving me a

17         net result.  When some of the swing of the

18         inventory count was significant, I was not

19         being reported that.

20    Q.    Did she have any other responsibilities as

21         far as inventory control was concerned?

22    A.    Not actually control.  That would be it.

23    Q.    Okay.  This process of reporting to you a

53

1    A.    I gave her that.

2    Q.    How did you do that?

3    A.    I asked for more information be provided

4          during the weekly summaries that she was

5          providing.

6    Q.    Okay.  And when you say you asked, was that

7          verbal or in writing?

8    A.    It was verbal.

9                    MR. JACOBS:  I'd like to take a

10                   short break.

11             (Brief recess.)

12   Q.    (Mr. Jacobs continuing)  Mr. Lamberth, did

13         Ms. McCollum have a written job

14         description?

15   A.    No.  I don't recall.  I don't think we ever

16         did.  As a whole, we don't do job

17         descriptions.

18   Q.    That was going to be my next question.

19         Does anyone in the company have a job

20         description, a written one?

21   A.    No.

22   Q.    In your response to our discovery

23         request -- I'm going to ask you about a

54

1    series of things and reasons that you gave

2    for terminating Ms. McCollum.

3            One of those things was you allege that

4    she failed to adequately perform her

5    responsibilities pertaining to Amtren's

6    accounting system.

7                    MR. TRAWICK:  You're reading from

8                        paragraph number eight on page

9                        four?

10                   MR. JACOBS:  I believe so, yes.

11                       We're going to be drawing from

12                       that for the next period of

13                       time.

14                   THE WITNESS:  What page?

15                   MR. TRAWICK:  Four.

16   Q.    Page four, number eight.

17           What responsibilities did she fail to

18   adequately perform?

19   A.    For?

20   Q.    The accounting system.

21   A.    The accounting system?  Like the day-to-day

22   activity or the --

23   Q.    I honestly don't know.  I'm reading your

55

1    response to you and telling you -- asking

2    you to tell me what responsibilities she

3    adequately failed to perform.

4  A.   The accounting system -- basically, there

5    were several areas that -- you know, in the

6    accounting system, this is -- you're not

7    really pertaining to the software or

8    anything, you're talking about the

9    duties -- we're talking about the duties,

10   you're basically saying now?

11 Q.   I don't know what I'm talking about.  I'm

12   asking you about your --

13              MR. TRAWICK:  I think he's just

14                   asking you to explain this

15                   answer.

16 Q.   Yes.

17 A.   Okay.  I can clarify that the system in

18   that statement was a process, so I can

19   explain her deficiencies in that.  When I

20   mean system, I mean a system like our

21   entire process.

22        Several areas that she did.  One is

23   that she did overdraw at our -- on our bank

56

1    account. We had never had that before. I

2    was unaware of that. I was never made

3    aware of that, and Amtren had adequate

4    funds for the transactions.

5        She issued the checks -- signed the

6    checks, disbursed the checks, and then

7    pulled money from our money market account

8    to our checking account incorrectly. And

9    then they would basically, apparently, not

10    be covered, and we would pay for those

11    penalties with overdraft charges.

12  Q.  Was this a particular transaction you're

13    talking about, or was this more than one

14    transaction?

15  A.  No, it was more than one transaction. If

16    I'm not mistaken, it was several. It

17    amounted to several thousand dollars in

18    overdraft charges.

19  Q.  Could you identify those transactions for

20    me?

21  A.  Could I identify them?

22  Q.  Yes.

23  A.  I believe that -- I don't know if we

57

1      provided a list or not.  I'm not sure.

2  Q.  Let me represent to you that I haven't seen

3      a list.

4  A.  Well, I guess we will have to -- I believe

5      that there is a list in this.  Hang on.

6      There is a list in here.

7                  MR. TRAWICK:  I think the last

8                  page.

9  A.  It is in the --

10                  MR. TRAWICK:  We produced this to

11                  you.

12  A.  Right.  It is the last page of this.

13  Q.  And that would be the last page of your

14      response to the EEOC?

15  A.  That's correct.

16  Q.  All right.

17  A.  Regarding the --

18  Q.  If we could mark this as Plaintiff's

19      Exhibit 2.

20                  (Plaintiff's Exhibit 2 was marked

21                  for identification.)

22                  MR. TRAWICK:  Plaintiff's Exhibit

23                  2 will be this five-page

58

1                 letter to the EEOC signed by

2                 Kirk?

3         MR. JACOBS:  Right.

4         (Plaintiff's Exhibit 3 was marked

5         for identification.)

6         MR. JACOBS:  And then Plaintiff's

7         Exhibit 3 will be the

8         attachment relating to item

9         five.

10 Q.   Is that the one you're referring to, bank

11     overdrafts, Mr. Lamberth?

12 A.   Yes.

13 Q.   If you would, explain that sheet to me.

14 A.   This sheet is a summary that outlines just

15     the transactions on our checking account

16     for these periods of time regarding this

17     activity.  We -- I had never really

18     experienced overdrafts before, so when we

19     discovered this, we just produced this

20     document as a summary document to represent

21     the number of NSFs which are identified in

22     there.

23 Q.   First of all, when was this document

59

1      generated, this summary?

2  A.  I would say it would be on or around the

3      date of this letter.

4  Q.  Okay.

5  A.  June 29th of 2005.

6  Q.  Let me just look at the very first item

7      there, 10/26/2004.  It says,

8      reversal/credit, and then it has the number

9      30 over there.  Could you explain to me

10     what that represents?

11 A.  I'm not sure what that means.  The only

12     part of this document that I'm probably

13     going to be -- that I focused on or --

14     would be the NSF charges.

15 Q.  Okay.  And there are a series of those from

16     10/29 of 2004 to 4/13/2005.

17         If you would, take the first one of

18     those, 10/25, and tell me what that

19     represents.

20 A.  You mean the NSF?

21 Q.  Yes.  Yes, the NSF.

22 A.  It's my understanding that that is a charge

23     for nonsufficient funds for a check

60

1        presented at our bank without proper funds

2        in the account.

3    Q.   What does the dash 30 mean?

4    A.   I think that that is a charge to our -- for

5        the overdraft charge.

6    Q.   Okay.  You're not sure what that is?

7    A.   I'm -- on that one, I think that is.  It

8        states NSF fee.  I'm pretty certain that

9        that's a charge from the bank to us for the

10       overdraft.

11   Q.   Okay.  Is it my understanding, then, that

12       these other items on here other than NSF

13       fees don't represent errors of any kind

14       that you're referring to as --

15   A.   Not to my knowledge.  I think that was a

16       summary document that was produced that had

17       other information on it.  We were primarily

18       for this attachment focused on the NSF fee

19       portion.

20   Q.   Okay.  And who generated this report?

21   A.   I did.

22   Q.   You did?

23   A.   Uh-huh (positive response).

61

1    Q.    How did you generate this report?

2    A.    This report was pulled from our -- if I'm

3          not -- basically, it was produced as an

4          export from our on-line banking system, I

5          guess, log in.

6    Q.    Okay.  Did you have at that time open

7          access to your on-line accounts?

8                 MR. TRAWICK:  At which time?

9    Q.    In 2004 and 2005.

10    A.    I had access to it.  I did not use it,

11          though.

12    Q.    Okay.  And it's your testimony that you

13          never had NSFs before?

14    A.    Not to that magnitude, nor were they not

15          reported to me.

16    Q.    Okay.  Then it's your testimony that

17          Ms. McCollum was responsible for this and

18          that she never informed you of this in any

19          way?

20    A.    No.

21    Q.    Okay.

22                 MR. TRAWICK:  Wait.  Read the

23                    question back and read his

62

1          answer.

2               (The following was read:  Then it's

3               your testimony that Ms. McCollum

4               was responsible for this and that

5               she never informed you of this in

6               any way?  Answer:  No.)

7   A.   I meant to say yes.  I am so sorry about

8        that.  I'll listen to the question.

9   Q.   Okay.  This is entitled -- and I'll just

10       read it -- attachment to response relating

11       to item number six, bank overdrafts.  Could

12       you tell me what item six you're referring

13       to in there in Plaintiff's Exhibit Number

14       2?

15               MR. TRAWICK:  Well, you said

16               item -- this reads item five.

17               MR. JACOBS:  I'm sorry.  It is.  I

18               looked at it upside down and

19               wrong.

20  Q.   Is it item --

21               MR. TRAWICK:  Item five.

22  Q.   -- five of the EEOC response?

23  A.   Well, it actually is -- you know, your

63

1      question is regarding --

2  Q.   Yes.  What I want to know is what this

3      reference is to, to item five.

4  A.   Item five --

5                MR. TRAWICK:  On Plaintiff's

6                Exhibit 3.

7  Q.   Three.  What does that refer to in

8      Plaintiff's Exhibit 2?

9  A.   That refers to -- in the summary, it is

10      item five in the summary.

11  Q.   Okay.  And that was my error in looking at

12      it across the table upside down.

13                MR. TRAWICK:  That's okay.  You

14                just confused me.

15                MR. JACOBS:  Confused me, too.

16  Q.   Okay.  Your next statement was that she

17      overspent on inventory.  How did she

18      overspend on inventory?

19  A.   In January of -- in late December of 2004

20      and January of 2005, was the planned move

21      to the new product.  So in February of

22      2005, we had planned to reduce the material

23      purchasing for the older FlexWriter model

1    that we -- it would be -- the revisions I'm

2    talking about.

3        The plan was never followed through

4    with, and we ended up with materials of the

5    older revision model.  In other words, the

6    way the inventory was -- the mistaken

7    inventory resulted in the fact that --

8        We had had weekly meetings discussing

9    the fact that we would move to the new

10   model.  The new model would dictate a lot

11   of changes in parts.  We would subsequently

12   reduce the purchasing of the current model

13   parts so that at the end of January, we

14   would end up with a very low inventory

15   count.  In February of that month, we would

16   do a retooling -- I mean, February of that

17   year, we would do a retooling and start

18   back up in March with the planned product.

19       Ms. McCollum mistakenly purchased

20   excessive inventory to the amount that we

21   had to delay the release of the new product

22   immediately because the number of parts

23   that we had were three to four to five

66

1    would say that it was the fact that the

2    materials were received in and we were

3    dealing with the materials on our floor.  I

4    can't say, really, I had a document that

5    showed that.  It just -- we had the

6    availability of a lot of the older material

7    parts in our inventory.

8  Q.  All right.  Are you telling me, then, that

9    Ms. McCollum ordered materials based on the

10   blanket purchase orders that were in place?

11 A.  I'm not sure how the mistake may have been

12   made or was made.  What I was alluding to

13   is that I was under the impression that she

14   was executing the proper changes to reduce

15   our inventory down at that point, and that

16   was not executed properly.

17 Q.  Okay.  Did your logistics person have any

18   role in maintaining that inventory or

19   getting the right inventory?

20 A.  The individual at that point would receive

21   in the goods that would be issued based on

22   the purchase orders that were there.  That

23   individual would basically -- depending on

68

1       can't really pinpoint everything about all

2       of this.  But the fact of the matter was

3       Ms. McCollum's role was to control the

4       purchase documents to sufficiently decrease

5       our inventory to a low balance in January.

6   Q.  All right.

7   A.  That was not done.

8   Q.  Okay.  And was that a specific directive in

9       writing?

10  A.  We talked about it every week in a staff

11      meeting and discussed this progression.

12  Q.  So that was the management meeting?

13  A.  Yes.

14  Q.  Okay.  Was this one of the reasons that you

15      terminated Ms. McCollum?

16  A.  Yes.

17  Q.  The next item in your response there was

18      caused Amtren's checking accounts to be

19      overdrawn and failed to notify management.

20      Is that the one we've already talked

21      about?

22  A.  That is.  We've talked about that.

23  Q.  So that's the same as number -- as the

69

1     first one, failed to adequately perform her

2     responsibilities pertaining to the

3     accounting system?

4  A.  Yes.

5  Q.  Okay.  Which one or ones of Amtren's

6     vendors did Ms. McCollum not pay?

7  A.  Ms. McCollum in -- toward the end of

8     February, the beginning of March, several

9     vendors contacted me directly and stated to

10    me that their -- they said --

11        The two primary vendors are Brundidge

12    Electronics Corporation in Brundidge,

13    Alabama, and Carter & Carter Manufacturing

14    in Lacey's Spring, Alabama.  They're our

15    two largest vendors.  We have done business

16    with them for years.

17        They contacted me with concern over

18    payments to their account.

19 Q.  Okay.

20 A.  Basically, we were approaching a limit of

21    terms with them that they -- we were

22    exceeding the credit limit is what we were

23    approaching.

70

1   Q.   All right.  How did they contact you?

2   A.   By phone.

3   Q.   Do you have records of when they contacted

4       you with those phone calls?

5   A.   Unh-unh (negative response).  I do not.

6   Q.   What specifically did they tell you when

7       they called you?

8   A.   Just that they were concerned about the

9       payments to their accounts.

10   Q.   Are you telling me they said they had not

11       been paid?

12   A.   They -- really, more likely that the amount

13       of money that -- we weren't paying against

14       their account enough to decrease the amount

15       we owed them.  In other words, the

16       outstanding amount was growing.

17   Q.   Okay.  Was that outstanding amount

18       reflected in the weekly recaps that you

19       got?

20   A.   Not completely.

21   Q.   Was it partially?

22   A.   Partially.

23   Q.   Were the company's accounts, cash accounts

71

1        sufficient to make larger payments at that

2        time?

3  A.   They should have been.

4  Q.   Well, were they?

5  A.   At that time, this would be -- I would say

6        there should have been adequate cash to pay

7        the accounts.

8  Q.   All right.  Do you know whether there was

9        adequate cash or not?

10  A.   To the best of my knowledge, there was

11       adequate cash there.

12  Q.   If Ms. McCollum were to represent that

13       there was not adequate cash to pay more,

14       you would say that was not true?

15  A.   Not correct.  That's really not -- Let me

16       see.  Let me go -- basically, the cash

17       planning of the company was Ms. McCollum's

18       responsibility.  We had a line of credit

19       and we had a checking account and we had

20       materials.  Totally responsible.  Totally

21       responsible for issuing the checks.  So the

22       problem occurs in that the cash position

23       was also being reported there, too.  The

72

```
 1        line of credit.  So it's difficult for me
 2        to state one item without looking --
 3        discussing the other ones, see, because she
 4        reported the entire -- both situations to
 5        me.
 6   Q.   All right.
 7   A.   So we -- according to the plans, going back
 8        to the planned migration of the product,
 9        meaning the older revision to the newer
10        revision, there was plenty of cash and a
11        line of credit available to pay all vendors
12        timely.
13   Q.   All right.  What would we have to look at
14        to verify that there was enough cash or
15        that there was not enough cash available?
16               MR. TRAWICK:  Well, you're
17                  limiting your question to
18                  cash.  I think his answer
19                  includes the line of credit
20                  also.
21   Q.   Well, then, I'll back up.  What were all of
22        the things that we would have to look at to
23        determine whether there was sufficient
```

74

1    come from the bank statements, too.

2    Q.    Okay.

3    A.    I believe that that would -- again, I'm not

4          completely well versed at how you would

5          check that, but I believe that would be the

6          way to do it.

7    Q.    What did you look at to make your

8          determination that that was the cause, that

9          she didn't pay the vendors, and there was

10         plenty of cash available?

11   A.    Well, the -- my result -- this statement

12         results from the fact that when I was

13         made --

14             The vendors contacted me.  I did

15         research into this to look into it.  At

16         that time, I guess the information showed

17         that we had really just overspent in

18         several areas, including the inventory.  So

19         my issue with Ms. McCollum at that time was

20         the incorrect execution of it or even

21         sharing with us this, you know, that this

22         was an issue that was arising.

23             Am I answering the question?

75

Q.   Well, what I'm trying to determine,
     Mr. Lamberth, is sort of what you said.
     You said at the time, you researched this.
     I'm trying to find out what you researched,
     what did you look at, what would I have to
     go back and look at to verify whether what
     you say you saw was, in fact, true.

A.   I would say that I verified the accounts
     payable that was being informed to me.  And
     some of these reports that I'm getting we
     have not been able to locate as yet.  So
     what I was using was basically the
     information shared from the weekly to show
     the outstanding accounts payable, which is
     the amount of money we owe the vendors.
     When I received a call like this, I did not
     know that that was growing.  So my research
     would have been to look into the accounts
     payable, which in March I began to see
     certain areas that concerned me.  That
     indicated to me that the information shared
     with me on a weekly basis was not exactly
     the position of the accounts payable we

76

1        owed our vendors.

2   Q.   If I were to look at or to have someone

3        knowledgeable to look at the accounts

4        payable, would I see the same things you

5        saw?

6   A.   The issue here is the weekly reporting to

7        me as her supervisor versus what was

8        actually in the system.  I do not know --

9        we have not been able to produce the weekly

10       reports completely yet, though we've

11       looked.  So the issue is the information

12       shared with me on a weekly basis versus the

13       position of the company.

14  Q.   So you don't have any evidence to back that

15       up at this time?

16                  MR. TRAWICK:  Object to the form.

17                  I don't think that's what he

18                  testified to.

19  Q.   Well, I mean --

20  A.   No.  We have evidence, yes.  Given time, we

21       can produce evidence.

22  Q.   Okay.  Well, what evidence do you have?

23  A.   The evidence will be I have some of the

78

1   A.   Relating to the inventory?

2   Q.   Yes, relating to that issue.

3   A.   No.

4   Q.   Do I understand you that you believe there

5       are other documents that you have not been

6       able to locate yet that would substantiate

7       that position?

8   A.   We have been through the files

9       extensively.  Unfortunately, I do not think

10      we will be able to locate a lot of these

11      documents.

12   Q.   When Ms. McCollum gave you weekly reports,

13      what did you do with them?

14   A.   Most of the time, she would take them back

15      with her.  Occasionally I would maybe keep

16      a copy of them, but not anything definite.

17   Q.   So you didn't have any regular

18      recordkeeping system?

19   A.   Not personally, I did not.  I relied on the

20      staff to do that.

21   Q.   Have you told me the basis for the

22      statement that she failed to notify

23      management that some of the vendors were

1     not being paid?  Is that what you were just

2     telling me about?

3  A.  Well, the -- probably the -- there is an

4     issue about the health insurance that would

5     have occurred where -- that is a vendor --

6     where the health insurance premium was not

7     being paid timely, and we received notice

8     of this.  Basically, during my research

9     during this period of investigating, I

10    discovered that our health insurance was

11    not being paid timely.  That's one.  Those

12    are probably the three most significant

13    ones.

14  Q.  What period of time was this investigation?

15  A.  Probably end of February through March,

16    first of April.

17  Q.  Okay.  During this time period that you

18    were doing this investigation, did you

19    discuss any of this with Ms. McCollum?

20  A.  I discussed with her weekly about getting

21    the accounts payable information to match

22    what exactly we owed.  I asked her weekly

23    to be certain that the accounts payable

1    A.    Yes, we had them reproduced.  That's the

2          only thing -- we went -- during the period

3          of time that I was doing research, I

4          couldn't find a substantial amount of

5          files, which led to me having to rely more

6          and more on the weekly summary sheets

7          provided.  So the issues we were not -- we

8          were not able to -- a lot of the documents

9          that -- well, the way the files were

10         arranged, the documents, it's very hard to

11         locate a lot of things.  We just couldn't

12         find some things.

13   Q.    When did you request those statements from

14         the bank?

15   A.    It would have been approximately end of

16         April, first of May.

17   Q.    Okay.  It was after Ms. McCollum was

18         terminated?

19   A.    Yes.

20   Q.    Okay.  Overpaid some vendor invoices.  What

21         does that refer to?

22   A.    That refers to specifically the Plextor

23         invoice where we had -- Ms. McCollum had

1    missed a price change on the product and

2    had overpaid the vendor.

3  Q.  Okay.  How did Plextor communicate to

4    Amtren any changes in its prices?

5  A.  Plextor's role as a vendor is to provide

6    any current price change that's applicable

7    during the period.  Ms. McCollum had issued

8    blanket orders that exceeded these

9    periods.  The proper way that would have

10    protected a price change would be to

11    footnote some notification of this.  Our

12    purchase documents did not.

13    The price change -- I noticed, myself,

14    that another vendor, a trade vendor was

15    selling the Plextor at a lower price.  I

16    made the statement in a weekly meeting, and

17    subsequently further review showed that

18    Plextor had made a price change somewhere

19    around the middle of October.  We had

20    requested Ms. McCollum to follow up on that

21    and to revise the purchase documents that

22    control the receipt of goods.  Apparently,

23    as this shows, she failed to change the

1    purchase documents, and the materials were

2    still received in at the higher price.

3    Also the payments were issued and the

4    checks signed from Ms. McCollum for the

5    payment of the higher price.

6  Q.  When did you discover that?

7  A.  That was discovered -- I would say that was

8    discovered somewhere around the first part

9    of -- that February time frame that we

10    were -- that I was beginning to review

11    things more carefully.

12        MR. TRAWICK:  In 2006?

13  A.  I'm sorry.  2005.  2005.

14        MR. TRAWICK:  Excuse me.

15  Q.  And did you report that to Ms. McCollum?

16  A.  That one I did discuss with Ms. McCollum,

17    and she assured me that it had been

18    corrected and that credits would be issued.

19  Q.  Okay.

20  A.  And they were not, by the way.

21  Q.  You never got credit for those?

22  A.  We sought credits after Ms. McCollum had

23    departed.  I sought credits with Plextor

```
 1          and recovered thousands of dollars.  And

 2          that is one of the documents I believe that

 3          is -- I think that we sought credit for the

 4          payment for the price change, or -- they

 5          weren't able to give us the whole amount.

 6          I believe they were able to give us several

 7          thousand dollars.

 8                    MR. TRAWICK:  It's in six.

 9     A.   I believe, since we don't have all the

10          documents here, that we did submit -- it's

11          hard for me to verify with what we have

12          here, but the Plextor documents were part

13          of our --

14                    MR. TRAWICK:  The Plextor

15                         documents were not part of the

16                         response to the EEOC.  I don't

17                         recall which documents off the

18                         top of my head because we

19                         produced quite a few documents

20                         in response to your request

21                         for production of documents.

22                         But there is a summary in the

23                         response to the EEOC regarding
```

90

1                          the issue of Plextor.

2    Q.    But there were no documents submitted to

3          the EEOC?

4    A.    That's correct.

5    Q.    All right.  You speak of the payroll tax

6          deposits.  Are there any documents other

7          than those that are attached to your EEOC

8          response, item number one?

9    A.    To the best of my knowledge, that was what

10         we had at that time, yes.

11   Q.    Okay.  Well, let's --

12                    MR. TRAWICK:  Again, we produced

13                    numerous documents in response

14                    to your request for

15                    production.  I know that's not

16                    a trick question.

17                    MR. JACOBS:  No, it's not.  And I

18                    would say that some of the --

19                    MR. TRAWICK:  You're asking him if

20                    that's all the documents, and

21                    without having the documents

22                    that we've produced to you, I

23                    think that's an unfair

91

1            question the way you phrased

2            it.

3    Q.   Are these all the ones you produced to the

4         EEOC?

5    A.   Yes, that is true.

6            MR. JACOBS:  Well, let's mark that

7               one as Plaintiff's Exhibit

8               Number 5.

9            (Plaintiff's Exhibit 5 was marked

10              for identification.)

11   Q.   And probably, to move this along, the next

12        couple of items are failed on several

13        occasions to timely respond to notices from

14        tax revenue departments, including the

15        Internal Revenue Service.  Caused Amtren to

16        receive penalties for late tax deposits.

17        Are those the same thing?

18   A.   Right.  They relate -- again, clarifying, I

19        don't know the extent of the documents we

20        provided, but they do relate to this item

21        number one that you just submitted here.

22   Q.   All right.  And the issue of the insurance

23        payments I believe we've already talked

93

1              (Plaintiff's Exhibit 6 was marked

2              for identification.)

3  Q.  Could you explain to me what you meant by

4      exceeded her authority on several

5      occasions.

6  A.  Primarily that would relate to the copier

7      lease where that -- we had discussed

8      obtaining a copier, and we did obtain a

9      copier, and she entered into a lease

10     agreement.  Even though the company had

11     discussed the fact that we would do that, I

12     was unaware that she had executed a lease.

13 Q.  Was that discussed in one of the management

14     meetings, getting a copier?

15 A.  The copier.  Not the execution of the lease

16     without an officer signing it.

17 Q.  Okay.

18              MR. JACOBS:  Let's mark this one

19              as Plaintiff's 7.

20              (Plaintiff's Exhibit 7 was marked

21              for identification.)

22 Q.  The next item refers to price decreases

23     from Plextor.  Have we discussed that?

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

94

1   A.   That was the item we talked about.

2   Q.   All right.  Which of her duties pertaining

3        to the purchase of MAS90 did she not

4        perform adequately?

5   A.   The integration of MAS90 was discussed

6        extensively at the end of 2004, and we had

7        generated a document to sit down and review

8        this process.  The undertaking would be

9        significant.  It was my understanding that

10       as Ms. McCollum moved forward with that,

11       she would seek integrated services, turnkey

12       integrated services from the vendors that

13       we were discussing.  She handled the

14       discussions with the vendors and sought the

15       bidding and was subsequently awarded the

16       bid.  At that time -- and it wasn't until

17       later did I know that we did not submit --

18       we did not obtain a fully integrated

19       package.  We obtained a package that was

20       partially integrated that we would

21       subsequently have to -- I guess the word is

22       enter the data on our own later to

23       completely fulfill it.

95

1    Q.    Did you ever see the agreement that was

2          signed regarding that system?

3    A.    I saw parts of the agreement.  I don't know

4          that I knew specifically about that.  It

5          was Ms. McCollum's responsibility.  For

6          Amtren's benefit, that had to be a fully

7          integrated system.  It was my understanding

8          with her we would obtain a turnkey fully

9          integrated system, and I subsequently

10         approved her to spend the moneys that we

11         did on that.  I do not recall looking

12         specifically at the details of the contract

13         to that extent.

14   Q.    Was there a specific amount of money that

15         you approved for her to spend?

16   A.    I don't think it was specific, but I think

17         we do -- we did discuss the numbers that we

18         ended up paying.  I don't know the exact

19         numbers, but I do think 20 or $30,000.  The

20         issue was not really the financial part so

21         much as to make sure it was turnkey; that

22         it was to be fully implemented.

23   Q.    Okay.  So if I can restate, and you tell me

96

1    if I'm wrong.  Is it fair to say that what

2    you're complaining of there is the fact

3    that she did not contract with Wilson,

4    Price for a completely installed and

5    implemented system?

6    A.   Yes.  That is a pretty fair assumption.

7    There are a lot of terms that have been

8    passed around about integration of MAS90.

9    The issue that we had was pretty much in

10    line with what you said.

11    Q.   Okay.  And is that also the basis for your

12    complaint, the next one, that she released

13    Wilson, Price prior to the complete and

14    satisfactory conversion to the new

15    accounting system?

16    A.   Yes.

17    Q.   Who was your technical assistance person

18    from Wilson, Price in implementation of

19    that system?

20    A.   Bobby Lake.

21    Q.   Okay.  Do you know if Bobby Lake ever

22    complained to Wilson, Price regarding any

23    lack of appropriate performance on the part

101

```
 1              to -- he did make -- there was a sizable
 2              mistake made in the costing of our product
 3              through the year.  At the end of the year,
 4              the initial report showed the mistake.
 5              Before we closed the year end and produced
 6              the documents, it was corrected.  So I
 7              would say yes, there was an error or
 8              omission on his part at that time.
 9              Subsequently we identified that and
10              discussed it with him and --
11      Q.      Corrected it?
12      A.      -- corrected it.
13      Q.      And I assume he did not get terminated?
14      A.      He got moved to a different position.  He
15              got -- he was removed entirely from his
16              accounting duties.
17      Q.      Okay.  What position was he moved to?
18      A.      Primarily purchasing -- well, the
19              production and logistics role.
20      Q.      Okay.  I believe that it's been indicated
21              in responses that Lisa McNamee took over
22              Ms. McCollum's duties when she was
23              terminated.
```

102

1    A.    That's correct.

2              MR. TRAWICK:  Well, I think our

3              responses were she took over

4              some of the duties, and later

5              Susan took over some as

6              Mr. Lamberth has testified

7              here today.

8    Q.    Okay.  What duties did Lisa McNamee take

9          over?

10   A.    Primarily the execution of the accounts

11         payable, accounts receivable.  She did the

12         accounting portions as far as the --

13         actually, the payroll, the accounts

14         payable, and the accounts receivable.

15   Q.    Putting information into --

16   A.    And mainly producing the documents --

17   Q.    Okay.

18   A.    She produced the checks for payment.  She

19         did everything -- she did not sign them,

20         but she did produce the checks for payment.

21   Q.    Okay.  Did she have the same responsibility

22         in reference to those blanket purchase

23         orders that you were talking about?

103

1    A.    In generating them, because of the

2          deficiencies of the system, we worked

3          together to try to correct some of those.

4    Q.    Okay.  And Susan Seeber, what duties did

5          she have when she came on board?

6    A.    She basically --

7                    MR. TRAWICK:  Other than what he's

8                    already testified to?

9                    MR. JACOBS:  Yes.

10   A.    That's primarily it.

11   Q.    Okay.

12                   MR. TRAWICK:  Unless you have

13                   something to add to what

14                   you've already testified to.

15                   THE WITNESS:  No.

16   Q.    Who at the company was responsible for

17         strategic planning?

18   A.    That probably would be myself.

19   Q.    Have you fired any management employees at

20         Amtren other than Ms. McCollum?

21   A.    You mean in the history of the company

22         or --

23   Q.    Yes.

107

1   Q.   Was she a full-time employee?

2   A.   Yes, she was.

3   Q.   And where did she -- what was her position?

4   A.   She was an assistant to me.

5   Q.   Who was responsible for filing your tax

6       payments and tax returns after Ms. McCollum

7       was terminated?

8   A.   That would have -- immediately after that,

9       it would have fallen into Ms. McCollum's

10      responsibilities -- I mean, Ms. McNamee's

11      responsibilities.  Yes.  Immediately upon

12      that, it would have been -- fallen to

13      Ms. McNamee.

14   Q.   When did you first become aware of what was

15      submitted as Defendant's Exhibit 5 at

16      Ms. McCollum's deposition?  I believe it's

17      Exhibit 5 also to this deposition.

18              MR. TRAWICK:  You have

19                 Defendant's --

20              MR. JACOBS:  I have Defendant's 5

21                 here.

22              MR. TRAWICK:  I don't have my copy

23                 of her deposition.  Can we

111

1   A.   They sent a letter of notice of
2        termination, immediate termination.
3   Q.   And I guess my question is, did they
4        actually terminate it?
5   A.   Upon receipt of that letter, we arranged
6        special circumstances and sent them an
7        express payment overnight.  It is my
8        understanding that Alabama has a protection
9        factor in there that allowed us to send
10       that check overnight, and they would
11       continue our coverage.  I'm not sure of the
12       exact -- how all that works.  But when we
13       discovered the notice and we made the --
14       contacted them, they assured us.  They
15       mandated that we catch the arrears payment
16       that had been collecting up front, so we
17       had to pay two payments immediately in
18       overnight payment.
19   Q.   Was Lisa McNamee ever terminated?
20   A.   No.
21   Q.   Did she leave the employ of Amtren at some
22        point?
23   A.   Yes.

118

1          MR. TRAWICK:  I'll be happy to do
2              that.  I have a couple of
3              questions.
4                  EXAMINATION
5    BY MR. TRAWICK:
6    Q.    Lisa McNamee is obviously female; is that
7          correct?
8    A.    That's correct.
9    Q.    And what is her race or ethnicity?  Is she
10         Korean?
11   A.    She's Korean.
12   Q.    And Susan Seeber.  Susan's obviously a
13         female?
14   A.    That's correct.
15   Q.    And I believe you hired Lisa and Susan; is
16         that correct?
17   A.    That's correct.
18   Q.    The females that currently work at Amtren,
19         did you hire them?  And I'm talking about
20         full time.
21   A.    Yes.  Full time, yes.  If I didn't hire, I
22         was in on the hiring process definitely and
23         on the approval process, yes.

119

1   Q.   Is it a fair statement that you could have

2        said no --

3   A.   Exactly.

4   Q.   -- on hiring any of the females who

5        currently work there?

6   A.   That's correct.

7   Q.   In the case of Lisa McNamee, did she get

8        additional duties after Ms. McCollum was

9        terminated and after you had a chance to

10       evaluate her job performance?

11   A.   Yes.  She basically performed the role of

12       the accounting person for several weeks,

13       and then her ability -- it was apparent

14       that she could move further in the role,

15       and so we moved her into the role of

16       accounting manager after observing her

17       efforts during this period after

18       Ms. McCollum was terminated.

19   Q.   In fact, I think you gave Ms. McNamee a

20       raise after you had an opportunity to

21       evaluate her job performance in her new

22       role; is that correct?

23   A.   That's correct.

120

1    Q.    Has Susan received a raise since she's been

2          employed?

3    A.    Yes.  She -- I think her starting pay was

4          around 40,000, and she's subsequently at

5          50,000 per year now.

6    Q.    Let me ask you about this cancellation of

7          Amtren's credit card processor.  You were

8          present during Ms. McCollum's deposition,

9          correct?

10   A.    Yes, sir.

11   Q.    Ms. McCollum seems to blame that on you.

12         Do you recall that testimony?

13   A.    Yes.

14   Q.    Tell me about how Amtren's credit card

15         processor got canceled.

16   A.    The merchant agreement account was

17         terminated over lack of payment of $118.  I

18         can't remember the exact amount.

19              The notification was submitted to

20         Amtren.  I had never been made aware of

21         that notification.  There is, apparently, a

22         time frame to respond to it.  We missed

23         that time frame, and Chase Manhattan

122

1        that we were pursuing other credit card

2        accounts, so I was unaware of the

3        termination.

4  Q.   Ms. McCollum testified or refused to admit

5        that this is a significant problem for

6        Amtren.  How would you characterize this

7        problem?

8  A.   It is significant, because every item that

9        we sell on the Internet is sold by credit

10       card.  Every purchase, every spare part has

11       to be sold by credit card.  In our sales

12       methods of today, I would say credit cards

13       probably would achieve, you know, a quarter

14       of our sales.  We subsequently have to use

15       third-party companies to do this now, you

16       know, at a higher rate of commission, I

17       guess, to the merchant account.

18  Q.   Ms. McCollum also in her testimony seemed

19       to blame you for the fact that Chase

20       Merchant Services could not deduct this

21       $118.41 from your bank account.  Is that

22       correct?

23  A.   No, that's not correct.  That's not

123

1    correct.  I was unaware of any errors in

2    back charging by Chase.  The separation of

3    accounts that Ms. McCollum had testified

4    where we had separated our accounts --

5    Chase Manhattan has an account they can

6    sweep -- apparently, they can deduct money

7    from once they deposit.  I was aware we did

8    separate the accounts.  I was not aware we

9    did not manage the dollar amount in those

10   accounts to sufficiently satisfy any back

11   charges being generated by Chase

12   Manhattan.

13        Any time a back charge is initiated, a

14   paper document is mailed to the company.

15   There is, I guess, a time frame there that

16   you can respond to the -- that -- you know,

17   the fact that they couldn't back charge.  I

18   guess it would be a -- miss a payment.

19  Q.  Was it Ms. McCollum's responsibility to

20       insure that this kind of problem didn't

21       happen?

22  A.  Yes.  In her role, she would have been

23       responsible to make sure there was timely

124

1      payment of the back charges.

2   Q.  Would notices to the company have gone to

3      Ms. McCollum?

4   A.  No.  The notice -- at that time, the notice

5      went to Mr. Fields.

6   Q.  Okay.

7   A.  Actually, let me clarify that.  The notice

8      was directed to her by matter of her

9      responsibility.  It wasn't addressed to

10      her.  Yes, all notices went to her, but

11      this notice -- this subsequent notice was

12      not addressed to her.

13   Q.  Okay.  I believe Ms. McCollum testified in

14      her deposition she couldn't refute

15      testimony that she received this notice.

16      It's your understanding that she did

17      receive this notice; is that correct?

18   A.  Yes.

19   Q.  Did she deny receiving this notice when you

20      talked with her about it?

21   A.  I'm not sure.  I don't think I discussed it

22      with her.  I didn't discuss it with her.

23      At that time, we were unaware of the

125

1    magnitude of it.  We were aware that we

2    had -- the account had terminated, but we

3    had not discovered that document that we

4    later showed.

5    Q.  But it was Ms. McCollum's responsibility to

6        insure that there were sufficient funds in

7        Amtren's accounts so that this problem

8        would not have happened; is that right?

9    A.  Right.  Separation of the accounts is her

10       responsibility to manage the funds.

11   Q.  Would it have been her responsibility to

12       know which bank accounts Chase Merchant

13       Services would have attempted to deduct

14       this from?

15   A.  Yes.

16   Q.  I want to direct your attention to

17       Plaintiff's Exhibit 2, page two,

18       paragraph -- or item number one.  This

19       document states that Amtren suffered

20       penalties of $3,008.66.  Is that what the

21       document states?

22   A.  Yes.

23   Q.  And is it correct that these penalties were

130

1    Q.    I believe in Ms. McCollum's deposition, she

2          testified she could not recall if she was

3          present during management meetings where

4          this issue was discussed.  Was Ms. McCollum

5          present when these issues with Plextor were

6          discussed?

7    A.    Yes.

8    Q.    And were they discussed with her?

9    A.    Yes.

10   Q.    Tell me about the company name Padus,

11         P-A-D-U-S.

12   A.    Padus is a critical vendor for us.  y □□□

13         make the software tool kit we use.  It's an

14         imbedded portion of our product.  They have

15         been a major part of our company since the

16         beginning.  We selected -- their software

17         and the software they generate that's

18         inside our software has provided tremendous

19         benefits because of the technology.

20   Q.    I believe Ms. McCollum testified in her

21         deposition that it was her responsibility

22         to insure that Padus was timely paid.  Is

23         that correct?

132

1    maybe at the end of 2004, our line of

2    credit was -- in fact, I don't think we had

3    much money borrowed on our line of credit,

4    and we had sufficient cash.  During the

5    periods of November, December, January,

6    February, March -- December of '04 and

7    January, February, March '05, the moneys

8    were basically expended and our line of

9    credit was drawn on maximum.  In fact, upon

10   Ms. McCollum's departure, I had to seek

11   immediate -- an immediate loan of $200,000

12   to pay down the vendors that had been aged

13   out, you know, aged out meaning that had

14   been -- that hadn't been paid.  I'm not

15   sure of the exact amount.  I believe it was

16   about 200,000, because the credit -- they

17   were basically one by one threatening to

18   cut off our credit.

19  Q.   Is it correct that Padus is an important

20       vendor that Amtren buys things from?

21  A.   The loss of the license from Padus would

22       shut us down because what we would have to

23       do is -- there's no quick way to engineer

133

1       another software package.  You would

2       literally be -- if they terminated their

3       license, we would have to stop shipping

4       product immediately.

5  Q.   So is it fair to say that it was essential

6       for Amtren's continued operation to keep

7       Padus paid timely and keep them happy?

8  A.   Absolutely.  Unlike other items that you

9       ship, you can -- materials are yours and

10      you can ship, when there's a license

11      involved, upon notice that a license is

12      terminated, you can no longer ship your

13      product.

14          MR. TRAWICK:  I think that's all I

15         have.

16

17       * * * * * * * * * * * *

18       FURTHER DEPONENT SAITH NOT

19       * * * * * * * * * * * *

20

21

22

23