IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JANICE McCOLLUM ) | |
|     **Plaintiff** ) | |
| ) | |
| v. ) | Case No. 2:-05-cv-1237-WKW |
| ) | |
| AMTREN, INC., ) | **(JURY DEMAND)** |
|     **Defendant** ) | |

**PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

COMES NOW THE PLAINTIFF, by and through undersigned counsel, and submits her response to the Defendants' Motion for Summary Judgment. There are material and substantial disputed matters of fact in this case, and the Motion is due to be denied.

**I.  FACTS RELEVANT TO THE MOTION**

A. <u>McCollum's initial employment and performance</u>. Janice McCollum, an Asian American woman, began her employment with Amtren, Inc. as accounting manager in January of 2004. (Dft. Brief at p. 5 ¶ 8)  McCollum earned a degree in accounting from Auburn University Montgomery in 1996, and previously held an accounting position with Thermalex, Inc.  (PX 1: Pltf. Depo. pp. 22:07-16)  McCollum was informed upon her hiring by Amtren's CEO, Kirk Lamberth, that she would have responsibilities in the company for accounting, projections and analysis, but he never permitted her to participate in the planning functions for the company.  (PX 1: Pltf. Depo. p. 28:02-05; p. 38:03-15; p. 40:15-23))  Her duties as accounting manager included responsibility for supervising the receipt and payment of accounts payable and receivable for the company; preparation and presentation to Lamberth of weekly reports of the

1

company's financial condition; and making payments for the company as instructed by Lamberth. (PX1: Pltf. Depo. pp. 38:06-39:23) Shortly after beginning work for Amtren, McCollum upgraded its accounting software program, and was charged by Lamberth with responsibility for selecting and implementing a new accounting software program to meet the company growing needs. (PX 2: Pltf. Aff. p.7, ¶ 12)

McCollum successfully performed her duties as accounting manager and received pay increases on April 19, 2004 and April 1, 2005. (Dft brief at p. 5 ¶ 11) She was informed by Lamberth that she was being promoted to Controller of the company in October 2004 and was officially given that title in January 2005. (Aff. p. 2, ¶ 4) Lamberth, nonetheless, never actually permitted McCollum to perform all of the duties normally associated with the position of Controller; instead he assigned Controller duties to his male business manager. (PX 1: Pltf. Depo. pp. 97:21-99:01; PX 2: Pltf. Aff p. 2, ¶ 4) McCollum's duties as Amtren's accounting manger were primarily administrative in nature: she was responsible for entering sales and other income to the company into the accounting system, but had no ability on her own to produce any income for the company by sales or loans; she was responsible for entering information regarding purchases of production equipment and supplies into the accounting system, but had no authority to manage the company's inventory of equipment and supplies or its production schedules; she produced and presented to Lamberth regular financial statements regarding the company's financial condition and prepared checks for his signature for payment of its obligations. McCollum always followed the instructions of the defendant's CEO in managing the company's accounting system and never made any payments or purchases without his authorization. (PX 2: Pltf. Aff. pp. 5-6, ¶ 10)

2

Although Amtren now claims in its defense against gender and racial discrimination that it has set forth several reasons that McCollum was incompetent and failed to adequately perform her duties (brief at p. 27, ¶ 1)), Lamberth wrote to his bank in March, 2005 that her leadership and performance in the accounting controls of the company was responsible, in part, for the positive future outlook of the company. ( PX 3: letter dated 3/30/05)

B.  Amtren's pretextual termination of McCollum.  Lamberth called McCollum into his office on April 8, 2006 and informed her that her employment was terminated. Lamberth informed McCollum that he was firing her because he "could not trust her." Lamberth had used this terminology previously when informing McCollum that he was terminating female employees. (PX 1: Pltf. Depo p. 45:16-46:20) Lamberth instructed McCollum to clean out her desk and vacate the company's premises.  McCollum sought legal assistance and filed her Charge of Discrimination with the regional EEOC office on or about May 20, 2005; and, she received a Notice of Right to Sue on or about October 6, 2005. (Record: Complaint)

In its response to the EEOC Amtren asserted a variety of pretextual "reasons" to justify Lamberth's termination of McCollum, and restates some of those allegations in its "Statement of Undisputed Facts" in this motion. (PX 4: Amtren EEOC response) McCollum disputes each of these allegations and shows below that they are factually untrue and/or rely upon events or information which was not known to Lamberth at the time of his decision to terminate McCollum.  Several also involve alleged errors for which similarly situated male, Caucasian employees were not terminated.

1.   Alleged "irregularities" in accounting area and remedial efforts.  Amtren

3

alleges in its EEOC response that its "management" detected "irregularities in the accounting area" and "conducted a careful internal review" in January 2005. Amtren further alleges that it "targeted" several areas for improvement and "worked with Ms. McCollum … to assist her in making corrections…" (PX 4: EEOC response p. 1, ¶ 6) Amtren makes claims in its brief (at p. 7, ¶ 21) that Lamberth became aware of problems "during the end of February, March, and the first part of April. Amtren has not proffered any evidence to support this allegation, and McCollum denies that Lamberth ever indicated that there was any problem with her performance until the date of her termination. (PX 2: Pltf. Aff. p. 1, ¶ 2)

      2.    <u>Alleged "performance improvement" efforts by Amtren management</u>. As noted above, Lamberth never informed McCollum of any alleged deficiencies in her job performance. He also did not engage in any "weekly review of progress" to address alleged deficiencies in her performance as claimed in the company's EEOC response. (PX 4: EEOC response p. 2 ¶ 1)  To the contrary, McCollum provided Lamberth with weekly reports of the company's income, expenses and shareholder's equity; and, he never indicated to her that there were any problems with the information he was being supplied. (PX 1: Pltf Depo. p. 38:06-39:23; PX 2: Pltf Aff. p. 6, ¶ 11)  Amtren's allegations that McCollum's weekly reports were incorrect or that she "…failed to enter numerous invoices each week or did not properly keep up with the vendor invoices…" is totally unsupported by any evidence to either the EEOC or to this Court. (PX 4: EEOC response p. 2 ¶ 3)

      3.    <u>Alleged "overspending" on inventory and other items</u>. Amtren alleged that McCollum had "overspent on inventory and other items by over $200,000" and that

4

Amtren's cash had been "drained" as a result. (PX 4: EEOC response p. 2 ¶ 2)  Amtren has offered no proof to support these allegations --- either to the EEOC or on this motion --- and McCollum denies the accusation.  McCollum did not have the authority within the company's management structure to independently manage inventory materials; she merely executed orders that were authorized by Amtren's production and materials managers.  (PX 2: Pltf Aff p. 4, ¶ 7)

4. <u>Plextor overpayment</u>.  Amtren alleged to the EEOC that McCollum had overpaid a vendor by more than $10,000 and that she refused to correct this after being told repeatedly to do so by Amtren's management.  Amtren states that this failure led to the decision to terminate McCollum's employment. (PX 4: EEOC response p. 2 ¶ 4) Amtren was notified by email that it would qualify for a lower price for certain computer internal drives as of October 18, 2004.  Lamberth did not inform McCollum of this reduction and she continued to pay the previous higher price for the drive when she received invoices from Plextor with that price.  McCollum learned of the price reduction in or around January 2005 and immediately notified Plextor that Amtren was taking a credit on current invoices to recoup the overpayment.(PX 2: Pltf. Aff. p. 2, ¶ 3) McCollum did not report this correction to Lamberth immediately but included it in her weekly reports to him on the company's financial condition.

5. <u>Padus nonpayment</u>.  Amtren alleges that McCollum did not make timely payments to one of its vendors, Padus, Inc.  McCollum disputes that there was any failure to make timely payments to Padus.  Lamberth's instructions to her were to allow invoices to age such that payments would be made when they were 45 days old but before they were 60 days overdue.  This policy was utilized as a cash flow management tool, as well

as a hedge against premature payment for disputed invoices. McCollum adhered to this policy as instructed by Lamberth. The invoice referred to by Amtren to the EEOC and as defendant's exhibit 4 on this motion, was less than 60 days old at the time of McCollum's termination.(PX 2: Pltf. Aff. pp. 2-3, ¶ 6) The email exchange between Padus and Amtren offered as exhibit 4 in support of this allegation is dated 20 days after McCollum's termination and could not have been considered by Lamberth in his termination decision on April 8, 2006.

    6.  <u>Supplier complaints</u>. Although Amtren's alleges in its brief that vendors began to complain that they were not being paid and threatened to stop doing business with the company, Amtren offers no evidence to support this accusation. McCollum denies that any communication regarding this was ever made to her by any vendor, and that Lamberth never informed her that any such complaints or threats had been received. Lamberth admitted in his deposition that he has no evidence other than his own hearsay statement to support this allegation. (PX 5: Amtren Depo. p. 76:08-78:11)

    7.  <u>Bank Overdraft Charges</u>. Amtren claims that McCollum was fired, in part, because she permitted overdraft charges to be incurred on its bank account. McCollum does not deny that the company incurred overdraft charges but states that the majority of the charges occurred after February of 2004 when Lamberth withdrew permission for the company's bank to automatically transfer funds to cover any shortage in its checking account. This was an important accounting tool because of the impossibility of knowing the exact dates and times that checks would clear the bank, and the automatic transfer of funds from the company's line of credit/money market accounts provided a safety net while allowing the company to earn interest on its unneeded funds.

In any event, Lamberth did not fire McCollum's white male predecessor as accountant when he allowed the company to incur bank overdraft charges. (PX 2: Pltf. Aff. p. 6, ¶ 10)

8. <u>Late payroll tax payments</u>. Amtren also claims that McCollum did not send payments to the IRS correctly. Amtren had serious problems with its payroll payments to both the state and the federal governments prior to McCollum's employment and she was able to make improvements to the process in the accounting system during her employment. (PX 2: Pltf. Aff. p. 5, ¶ 9) McCollum does not deny that there were still bugs in accounting system that she was working on correcting, but she can not assess the correctness of the claims made by Amtren without having copies of the 941 forms and all the payroll details that are associated with the 941's for the periods in question. Most of the correspondence offered as exhibits by Amtren is dated after her termination. (See DX 6-8) In any event, McCollum states that her white male predecessor as Accounting Manger was not terminated for making under and over payments of payroll taxes to the IRS or to the Alabama Department of Revenue. (PX 2: Pltf. Aff. p. 5, ¶ 9)

9. <u>Blue Cross/Blue Shield Payments</u>. McCollum disputes Amtren's allegation in its summary judgment brief that she failed to make timely payments to Blue Cross Blue Shield on behalf of the company. The purported "cancellation" letter proffered by the defendant (DX 11) is dated April 15, 2005 and states that Amtren's coverage was paid up through April 1, 2005. McCollum was terminated on April 8, 2005. Any missed payments after that date would be the responsibility of her replacement, who apparently was not terminated for failing to make timely payments.

10. <u>Credit Card Processing Company</u>. Amtren also claims in its brief (at

7

p.11, ¶31) that McCollum was responsible for the cancellation of Amtren's credit card processing company contract. Amtren offers no evidence in support of the allegation that McCollum was responsible for this cancellation. Defendant's exhibit 12 merely states that the contract was cancelled for nonpayment of $118.41 in processing fees and is dated October 7, 2004 – at approximately the same time that Lamberth informed McCollum he was promoting her to Controller with the company and prior to his assignment of co-authority to sign checks for the company. (PX 2: Pltf. Aff. p. 2, ¶ 4) McCollum states that this cancellation was actually due to Lamberth's withdrawal of authorization to the bank to automatically pay the company's processing fees, and that Lamberth never complained to her that she was at fault. (PX 2: Pltf. Aff. p. 4, ¶ 8) McCollum

    11.    <u>Copier Lease</u>. McCollum absolutely denies the allegation that she entered into an "unauthorized" lease for a copier for the company's offices, and testifies that Lamberth approved the contract prior to its execution. (PX 1: Pltf. Depo. p. 176:01-14) Amtren has not offered any evidence to support its allegation that the lease was not properly executed.

    12.    <u>MAS 90 Implementation</u>. Amtren asserts that McCollum failed to satisfactorily perform her duties regarding installation of the new MAS 90 accounting software system, and relies upon a number of conclusory allegations made by Lamberth in its deposition to support the claim. (brief at p. 15, ¶ 36) Neither Amtren nor Lamberth offer any admissible evidence to support this claim. McCollum negotiated the purchase of the new MAS 90 software with Mr. Bobby Lake of the Wilson Price firm in Montgomery in August 2004. (PX 6: letter of understanding dated August 20, 2004) The contract called for the purchase and installation of new software, along with the

8

purchase of technical assistance from Wilson Price as necessary to implement the software. (*Id.*) The software was installed and functioning by November 2004, and McCollum assumed responsibility for training additional Amtren staff on the system in order to save money for Amtren. Amtren retained the option of calling on Mr. Lake or other Wilson Price personnel if needed for further training or assistance with the software. (PX 2: Pltf. Aff. p.7, ¶ 13).

C. <u>Other evidence of the decision maker's bias in the workplace</u>. McCollum testifies that Lamberth engaged in sexually stereotypical behavior in the office. (PX 1: Pltf. Depo. pp. 95:04-96:17; pp. 103:09-22) Additionally, Amtren's former general manager, Mike Bishop, testifies that Amtren's CEO Lamberth made comments to him that demonstrate both gender and racial bias in the workplace. Bishop relates that Lamberth made the statement, "More than one woman is definitely trouble.", in reference to having women in the workplace. He also told Bishop that he would not allow a woman to work in the production part of the business at Amtren. Lamberth also told Bishop that he would not hire any black people. (PX 7: Bishop Aff. pp. 1-2, ¶ 2)

## II. SUMMARY JUDGMENT STANDARD

In order to prevail on a motion for summary judgment under Rule 56(b) of the Federal Rules of Civil Procedure, the moving party bears the burden of showing by reference to materials on file that there is no genuine issue as to material facts and that the movant is entitled to judgment as a matter of law. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144 (1970). When that burden is met, the nonmoving party must respond with a showing that there is indeed a material issue of fact that precludes summary judgment.

9

*Clark v. Coats & Clark,* 929 F.2d. 604, 608 (11th Cir. 1991) *{citing Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)*}.*

In an action claiming disparate treatment under the Civil Rights Acts of 1867 or 1964, 42 U.S.C. §§ 1981; 2000e *et. seq.*, a plaintiff must raise an inference of discrimination by establishing a *prima facie* case, and by presenting direct, circumstantial, and/or statistical evidence of discriminatory intent. *Corbin v. Southland Int'l Trucks*, 25 F.3d 1545, 1548 (11th Cir. 1994). Direct or statistical evidence establishes discriminatory intent with nothing more. Circumstantial evidence is evidence from which the finder of fact at trial may infer discriminatory intent and may be established according to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under the McDonnell Douglas scheme, if the defendant can articulate a legitimate, nondiscriminatory reason for its actions, the plaintiff must bring forth credible evidence that the defendant's articulated reason is unworthy of belief or pretextual, and that the impermissible discriminatory intent was a determinative factor in the decision. *St. Mary's Honor Court v. Hicks*, 113 S. Ct. 2742 (1993). However, an employer's true motivations are difficult to ascertain and are hardly ever suitable for disposition at the summary judgment stage. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913 (11th Cir. 1993). "Summary judgment is not a proper vehicle for resolving claims of employment discrimination which . . . turn on an employer's motivation and intent." *Delgado v. Lockheed-Georgia Co.,* 815 F.2d 641, 644 (11th Cir. 1987).

In a discrimination case, such as this one, in which the plaintiff/employee establishes a *prima facie* case and the defendant/employer proffers a nondiscriminatory

reason for its actions, the court must review all of the evidence, in the light most favorable to the nonmoving plaintiff/employee, to evaluate whether the jury could reasonably conclude that the employer's proffered reasons were not what actually motivated its conduct and that it, more likely than not, was motivated by the impermissible discriminatory factor. *Combs v. Plantation Patterns,* 106 F.3d 1519 (11th Cir. 1997).

Summary judgment is not appropriate except where there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Cummings v. DeKalb County*, 24 F.3d 1349, 1354 (11th Cir. 1994). Courts review all evidence and reasonable factual inferences are drawn in the light most favorable to the party opposing the motion. *Warren v. Crawford*, 927 F.2d 559, 561-2 (11th Cir. 1991). Issues of fact and sufficiency of evidence are properly reserved for the jury. The only issue to be considered by the judge at summary judgment is whether the plaintiff's evidence has placed material facts at issue. Accordingly,

> [T]he grant of summary judgment, though appropriate when evidence of discriminatory intent is totally lacking, <u>is generally unsuitable in Title VII cases in which the Plaintiff has established a prima facie case</u> because of the "elusive factual question" of intentional discrimination.

*Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 921 (11th Cir. 1993) (emphasis added) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). In reaching this conclusion, the *Hairston* court relied upon a major pronouncement from the U.S. Supreme Court on the importance of a plaintiff's right to cross examine the non-discriminatory reason the defendant articulates to rebut the plaintiff's prima facie case. *Hairston*, 9 F.3d 913, 919 (citing *St. Mary's Honor Center v. Hicks*, 113 S. Ct. 2742 (1993)). The "full and fair" opportunity for cross examination is not present via summary

11

judgment. The court must "avoid weighing conflicting evidence or making credibility determinations." *Id.*

The Supreme Court has recently reiterated and strengthened these standards by holding that court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S.Ct. 2097, 2110 (2000) (discussing standard for granting judgment as a matter of law under Fed.R.Civ.P. 50, which is the "same" as the standard for granting summary judgment under Rule 56). "[T]he court should give credence to the 'evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citations omitted). In other words, courts must consider the entire record, but "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 2102.

As shown in the fact section above, these standards were ignored in the instant motion. Defendant asks the Court to weigh evidence and make credibility determinations. Plainly disputed facts are presented as undisputed. In some instances, statements for which Defendant has no evidence at all are presented as undisputed facts and inferences are drawn in favor of the moving party, not the nonmoving party.

A.  <u>McCollum has established a prima facie case</u>.  There is no dispute that McCollum was a member of protected classes, i.e., female and Asian-American; that she was qualified for the position of accounting manager; or that she was subjected to an adverse employment action, termination, by Amtren. (Dft. brief at p. 22, ¶ b)  McCollum shows below that her termination was the result of discriminatory animus on the part of

12

Lamberth; that her similarly situated white male predecessor and other Amtren white male managers were not terminated for actions that Amtren utilizes in this motion to justify her termination; and, that the reason(s) proffered by Amtren to justify her termination are likely to be rejected by the jury as pretextual.

  B. <u>There is evidence of sex and race based animus on the part of the decision maker</u>.  McCollum offers evidence that defendant's decision maker, Lamberth, engaged in sexually stereo-typed behaviors in regard to her employment. (PX 1: Pltf. Depo. pp. 95:04-96:17; pp. 103:09-22) Additionally, Lamberth's former general manager testifies that Lamberth made direct statements of discriminatory intent based upon both sex and race. (PX 7: Bishop Aff. pp. 1-2, ¶ 2)  This is direct and circumstantial evidence of discriminatory animus on the part of the decision maker which, if accepted by the jury, prove that Amtren's termination of McCollum was in violation of Title VII. *Carter v. DecisionOne Corp.*, 122 F.3d 997, 1003 (11th Cir. 1997)

  C. <u>There is evidence that white male employees were not terminated for poor performance</u>. McCollum testifies that there were serious problems with late tax payments to the state and federal governments prior to her assumption of the position as accounting manger, but that her predecessor was not terminated as she was. (PX 2: Pltf. Aff. p. 5, ¶ 9) Nor was her white male predecessor terminated when he incurred bank overdraft charges. (PX 2: Pltf. Aff. p. 6, ¶ 10)  She also proffers testimony that a white male manager caused an inventory error which cost the company seventy thousand dollars, but was not terminated (PX 1: Pltf. Depo. pp. 57:11-23)  Summary judgment is not appropriate where there is evidence that similarly situated employees were not held to the same standards as the plaintiff. *Busby v. Orlando*, 931 F.2d 764 (11th Cir. 1991);

*Walker v. Nationsbank of Florida*, 53 F.3d 1548, 1564 (11th Cir. 1995)

  D. <u>There is record evidence from which the jury will infer that Amtren's asserted grounds for the termination of McCollum are pretextual</u>. Judge Johnson, in his special concurrence in *Walker v. Nationsbank of Florida*, 53 F.3d 1548, 1564 (11th Cir. 1995), set forth several methods by which a plaintiff may prove pretext by showing that the employer's proffered legitimate reason(s) *(1) had no basis in fact, (2) did not actually motivate the employment decision, or (3) were insufficient to motivate the employment decision.* (citing *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). <u>See also</u>: *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000)

  The Eleventh Circuit has established a variety of means by which a plaintiff may demonstrate that an employer's proffered reasons for an adverse action may be found by the fact finder to be a pretext for discrimination. The Court has recently held that justifications offered after a termination has taken place but that were not given to the employee at the time of the termination create an issue of fact for the jury. *Mock v. Bell Helicopter Textron, Inc.*, 2006 WL 2422835, C.A.11 (Fla.), 2006. The only reason for her termination given to McCollum by Lamberth related to a purported inventory error. After she filed her charge of discrimination with the EEOC and filed this lawsuit, Amtren posits a number of different *post hoc* "justifications" for its action which may be rejected by the jury as mere pretext.

  McCollum has shown ample evidence in her statement of facts above that dispute the facts underlying Amtren's "reasons" to justify her termination. Lamberth's justification that he legitimately believed McCollum to be incompetent when he fired her

14

on April 8, 2005, just a week after he had praised her skill in a letter written on March 30th lacks credibility. (SOF # A) Lamberth's failure to produce any evidence at all to support his contention that he had investigated McCollum's performance beginning in late January and worked with her to improve her performance prior to firing her lacks credibility. (SOF # C-2)  Amtren's failure to produce any evidence at all to support its contention that McCollum overspent on inventory lacks credibility. (SOF # C-3) Amtren's reliance on evidence in exhibits which could not have been known to Lamberth at the time of his action, or which is untrue lacks credibility.  (SOF ## C-4, 5, 7, 8, 9) Amtren's failure to produce any evidence that that suppliers made complaints about McCollum prior to her termination (SOF # C-6); or that she was responsible for the cancellation of the company's credit card processing account (SOF # C-10); or that she leased a copier for the business without authorization (SOF # C-11); or that McCollum failed to implement the new accounting software program (SOF # C-12), …all demonstrate a lack of credibility that the jury will lead the jury to infer that Amtren's proffered "legitimate, nondiscriminatory" reasons for McCollum's termination are but a pretext for discrimination.

### III. CONCLUSION

The plaintiff has shown by reference to material on file with this response, and to the record, that there are material and substantial issues of fact on her claims of gender and race discrimination against Amtren, Inc.. The defendant's motion for summary judgment is due to be denied.

Respectfully submitted this 20th day of December 2006.

                                             /S/ **JIMMY JACOBS**
                                             JIMMY JACOBS (JAC051)

                Attorney for Plaintiff
                143 Eastern Boulevard
                Montgomery, Alabama 36117
                (334) 215-1788

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing was transmitted to the Clerk of the Court for service upon counsel of record by the Court's CM/ECF system on this the 20th day of December, 2006.

                /s/**Jimmy Jacobs**
                JIMMY JACOBS (JAC051)

COUNSEL OF RECORD:

Clifton E. Slaten
G. R. Trawick
Slaten & O'Connor, P.C.
105 Tallapoosa Street, Ste. 101
Montgomery, Alabama 36104