# In The Matter Of:

PLAINTIFFS
EXHIBIT
_/_

*Janice McCollum v.*
*Amtren*

*Janice McCollum*
*October 25, 2006*

*Jennifer Davis, CSR*

Original File MCCOLLUM.v1, Pages 1-194

**Word Index included with this Min-U-Script®**

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

---

**Page 1**

[1]         IN THE UNITED STATES DISTRICT COURT
[2]         FOR THE MIDDLE DISTRICT OF ALABAMA
[3]                   NORTHERN DIVISION
[4]
[5]    CASE NUMBER
[6]    05-cv-0326-W
[7]    (JURY DEMAND)
[8]
[9]    JANICE McCOLLUM,
[10]        Plaintiff,
[11]    vs.
[12]    AMTREN, INC.,
[13]        Defendant.
[14]
[15]
[16]          DEPOSITION TESTIMONY OF:
[17]              JANICE McCOLLUM
[18]
[19]    October 25, 2006
[20]    9:00 a.m.
[21]
[22]    COURT REPORTER:
[23]    JENNIFER DAVIS, CSR

                Jennifer Davis, CSR
                  334-612-9967

---

**Page 2**

[1]              S T I P U L A T I O N
[2]        IT IS STIPULATED AND AGREED by and
[3]    between the parties through their respective
[4]    counsel that the deposition of JANICE
[5]    McCOLLUM, may be taken before Jennifer
[6]    Davis, Certified Shorthand Reporter and
[7]    Notary Public, State at Large, at the
[8]    offices of Slaten & O'Connor, 105 Tallapoosa
[9]    Street, Montgomery, Alabama, on October 25,
[10]    2006, commencing at approximately 9:00 a.m.
[11]        IT IS FURTHER STIPULATED AND AGREED
[12]    that the signature to and the reading of the
[13]    deposition by the witness is hereby waived,
[14]    the deposition to have the same force and
[15]    effect as if full compliance had been had
[16]    with all laws and rules of Court relating to
[17]    the taking of depositions.
[18]        IT IS FURTHER STIPULATED AND AGREED
[19]    that it shall not be necessary for any
[20]    objections to be made by counsel to any
[21]    questions, except as to form or leading
[22]    questions, and that counsel for the parties
[23]    may make objections and assign grounds at

                Jennifer Davis, CSR
                  334-612-9967

---

**Page 3**

[1]    the time of trial or at the time said
[2]    deposition is offered in evidence, or prior
[3]    thereto.
[4]
[5]                    I N D E X
[6]    EXAMINATION BY:                      PAGE NO.
[7]    MR. TRAWICK                          6-193
[8]    CERTIFICATE                          194
[9]
[10]                 INDEX OF EXHIBITS
[11]    EXHIBITS                            PAGE NO.
[12]    DX 1 - response to defendant's
                interrogatories               8
[13]
[14]    DX 2 - notice of deposition           9
[15]
         DX 3 - 3/30/05 letter                73
[16]
         DX 4 - charge of discrimination      90
[17]    DX 5 - IRS document                  117
[18]
         DX 6 - IRS document                 127
[19]
         DX 7 - IRS document                 134
[20]
         DX 8 - IRS document                 138
[21]
         DX 9 - IRS document                 139
[22]
         DX 10 - IRS document                143
[23]
         DX 11 - IRS document                145

                Jennifer Davis, CSR
                  334-612-9967

---

**Page 4**

[1]              INDEX OF EXHIBITS (continued)
[2]    EXHIBITS                             PAGE NO.
[3]    DX 12 - Blue Cross Blue Shield of
                Alabama group invoice         149
[4]
         DX 13 - Blue Cross Blue Shield of
                Alabama group invoice         150
[5]    DX 14 - Chase Merchant Services
                document                      159
[6]
[7]    DX 15 - lease agreement              176
[8]
         DX 16 - Wilson Price invoices        178
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
                Jennifer Davis, CSR
                  334-612-9967

---

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

Page 5

[1]                A P P E A R A N C E S
[2]
[3]    FOR THE PLAINTIFF:
[4]        JIMMY D. JACOBS, ESQUIRE
[5]        Attorney at Law
[6]        143 Eastern Boulevard
[7]        Montgomery, Alabama 36117
[8]
[9]
[10]   FOR THE DEFENDANT:
[11]       G.R. "RICK" TRAWICK, ESQUIRE
[12]       Slaten & O'Connor
[13]       Winter Loeb Building
[14]       105 Tallapoosa Street
[15]       Suite 101
[16]       Montgomery, Alabama  36104
[17]
[18]
[19]
[20]
[21]
[22]
[23]
                   Jennifer Davis, CSR
                    334-612-9967

Page 6

[1]        I, Jennifer Davis, a Certified
[2]   Shorthand Reporter of Millbrook, Alabama,
[3]   and a Notary Public for the State of Alabama
[4]   at Large, acting as Commissioner, certify
[5]   that on this date, pursuant to the Federal
[6]   Rules of Civil Procedure, and the foregoing
[7]   stipulation of counsel, there came before me
[8]   at the offices of Slaten & O'Connor, 105
[9]   Tallapoosa Street, Montgomery, Alabama,
[10]  commencing at approximately 9:00 a.m. on
[11]  October 25, 2006, JANICE McCOLLUM, witness
[12]  in the above cause, for oral examination,
[13]  whereupon the following proceedings were
[14]  had:
[15]
[16]        JANICE McCOLLUM,
[17]  having first been duly sworn, was examined
[18]  and testified as follows:
[19]        EXAMINATION
[20]  BY MR. TRAWICK:
[21]     Q.  State your name for the record,
[22]  please.
[23]     A.  Janice McCollum.

Page 7

[1]     Q.  Ms. McCollum, my name is Rick
[2]  Trawick.  I represent Amtren in the lawsuit
[3]  that you filed against that corporation, and
[4]  I will be asking you some questions today.
[5]  If you do not understand one of my
[6]  questions, let me know, and I will attempt
[7]  to rephrase that question.  If I ask you a
[8]  question and you answer the question, is it
[9]  fair to assume that you understood the
[10]  question?
[11]     A.  That would be fair.
[12]     Q.  Is there any reason that you
[13]  cannot truthfully and completely answer my
[14]  questions today?
[15]     A.  Not that I am aware of.
[16]     Q.  You're not taking any medication
[17]  or anything today that would hinder your
[18]  ability to answer my questions; is that
[19]  correct?
[20]     A.  Not that I'm aware of that would
[21]  hinder my abilities.
[22]        MR. TRAWICK:  Jimmy, you told me
[23]  that you would give me a signed copy of your

Page 8

[1]  interrogatories.
[2]        MR. JACOBS:  The only copy that
[3]  I have with me is the one that we sent.  I
[4]  can get that signed if we can make another
[5]  copy of it, or if you have a copy, we will
[6]  have her sign it.
[7]        MR. TRAWICK:  I have a copy.
[8]  Let me mark this as Defendant's Exhibit 1.
[9]  It is pages one through six of the
[10]  plaintiff's response to defendant's
[11]  interrogatories.
[12]        (Whereupon, a document was
[13]  marked as Defendant's Exhibit 1 and is
[14]  attached to the original transcript.)
[15]        MR. TRAWICK:  Is that document a
[16]  complete copy of the plaintiff's response to
[17]  defendant's interrogatories?
[18]        MR. JACOBS:  It appears to be to
[19]  me, except that she needs to sign.
[20]     Q.  (By Mr. Trawick)  Have you had
[21]  an opportunity to review those responses,
[22]  Ms. McCollum?
[23]     A.  Yes.

**Page 9**

[1]    Q.  If you will go ahead and sign
[2]  those.
[3]    A.  (Witness complies.)
[4]        MR. TRAWICK:  Let's have this
[5]  document marked as Defendant's Exhibit 2.
[6]        (Whereupon, a document was
[7]  marked as Defendant's Exhibit 2 and is
[8]  attached to the original transcript.)
[9]    Q.  (By Mr. Trawick)  Ms. McCollum,
[10]  let me show you what has been marked as
[11]  Defendant's Exhibit 2, which is a copy of
[12]  the notice of deposition that I provided to
[13]  your lawyer in this case.  Have you seen a
[14]  copy of that document?
[15]    A.  Yes.
[16]    Q.  This notice of deposition
[17]  requests that you produce certain documents
[18]  at this deposition, and essentially those
[19]  documents are any documents pertaining to
[20]  the allegations made in your lawsuit against
[21]  the defendant in this case, and/or any
[22]  documents pertaining to former employers or
[23]  current employers.  Your lawyer has

**Page 10**

[1]  provided, in response to the defendant's
[2]  request for production of documents, certain
[3]  documents.  Unfortunately, those documents
[4]  are not numbered, so I can't tell you how
[5]  many pages that he has produced.  Do you
[6]  have any additional documents to produce
[7]  today?
[8]    A.  Not that I'm aware of.
[9]    Q.  You would know which documents
[10]  you have in your possession; is that
[11]  correct?
[12]    A.  Okay.  No.
[13]    Q.  No, you would not know which
[14]  documents you have in your possession?
[15]    A.  Ask the question again.
[16]    Q.  Do you have additional documents
[17]  pertaining to the allegations of the lawsuit
[18]  against the defendant in this case, other
[19]  than the documents that have been previously
[20]  produced?
[21]    A.  No.
[22]    Q.  Tell the Court where you
[23]  currently live.

**Page 11**

[1]    A.  790 Red Eagle Road, Prattville,
[2]  Alabama, 36067.
[3]    Q.  Are you married?
[4]    A.  Yes.
[5]    Q.  What is your husband's name?
[6]    A.  John McCollum.
[7]    Q.  I assume he lives with you; is
[8]  that correct?
[9]    A.  Yes.
[10]    Q.  Do you have any children?
[11]    A.  Yes.
[12]    Q.  Tell me their names and ages.
[13]    A.  Christina Lane, 17.
[14]    Q.  Does she live with you?
[15]    A.  Yes.
[16]    Q.  L-A-N-E?
[17]    A.  Yes.
[18]    Q.  Any other children?
[19]    A.  Are you – what's your
[20]  definition of children?  That live with me?
[21]    Q.  If you have any children, I
[22]  would like to know their names and their
[23]  ages.

**Page 12**

[1]    A.  Okay.  That's my only child.
[2]    Q.  Do you have any stepchildren?
[3]    A.  Yes.
[4]    Q.  Tell me their names.
[5]    A.  Brian McCollum.
[6]    Q.  How old is Brian?
[7]    A.  25, I believe.
[8]    Q.  Where does Brian live?
[9]    A.  In Montgomery.  Stephanie and
[10]  Brittany McCollum, 21.
[11]    Q.  Are they twins?
[12]    A.  Yes.
[13]    Q.  Where do they live?
[14]    A.  Montgomery.
[15]    Q.  Any other stepchildren?
[16]    A.  No.
[17]    Q.  Does John's ex-wife live in
[18]  Montgomery?
[19]    A.  Yes.
[20]    Q.  What is her name?
[21]    A.  Dixie McCollum.
[22]    Q.  Is she remarried?
[23]    A.  Yes.

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

---

**Page 13**

[1]   Q.   Do you know her husband's name?
[2]   A.   Bill, I believe, Moore.
[3]   Q.   Does he live in Montgomery?
[4]   A.   Yes.
[5]   Q.   Does Brian live with his mother?
[6]   A.   No.
[7]   Q.   Do Stephanie and Brittany live
[8]  with their mother?
[9]   A.   Yes.
[10]   Q.   Do you know if Brian is
[11]  employed?
[12]   A.   Yes.
[13]   Q.   Do you know where he works?
[14]   A.   Yes.
[15]   Q.   Where?
[16]   A.   Turner Supply.
[17]   Q.   Do you know if Stephanie
[18]  McCollum is employed?
[19]   A.   Yes.
[20]   Q.   Where does she work?
[21]   A.   Aliant Bank.
[22]   Q.   Do you know if Brittany McCollum
[23]  is employed?

---

**Page 14**

[1]   A.   Yes.
[2]   Q.   Where?
[3]   A.   Do not know.
[4]   Q.   Where is your husband, John
[5]  McCollum, employed?
[6]   A.   Turner Supply.
[7]   Q.   What is his position there?
[8]   A.   Branch manager.
[9]   Q.   Is Christina employed?
[10]   A.   Yes.
[11]   Q.   Where does she work?
[12]   A.   Webb Eye Care.
[13]   Q.   Has she graduated from high
[14]  school?
[15]   A.   No.
[16]   Q.   Where does she go to high
[17]  school?
[18]   A.   Prattville High School.
[19]   Q.   Do you have any additional
[20]  relatives living in Alabama?
[21]   A.   Mother, Kim Saffold.
[22]   Q.   Spell the last name.
[23]   A.   S-A-F-F-O-L-D.

---

**Page 15**

[1]   Q.   S-A-F?
[2]   A.   F-O-L-D.
[3]   Q.   Where does she live?
[4]   A.   Jackson's Gap, Alabama.
[5]   Q.   Any other relatives?
[6]   A.   Kim Hines.
[7]   Q.   Spell the last name.
[8]   A.   H-I-N-E-S.  Jackson's Gap.
[9]   Q.   Kim --
[10]   A.   Mother is Saffold.
[11]   Q.   And Hines?
[12]   A.   Sister.  Sally Joines.
[13]   Q.   Again, spell the last name,
[14]  please.
[15]   A.   J-O-I-N-E-S.  Sister.
[16]   Q.   Where does she live?
[17]   A.   Prattville.
[18]   Q.   Is she married?
[19]   A.   Yes.
[20]   Q.   What is her husband's name?
[21]   A.   Bob Joines.
[22]   Q.   Is Sally Joines employed?
[23]   A.   Yes.

---

**Page 16**

[1]   Q.   Where?
[2]   A.   Wal-Mart.
[3]   Q.   In Prattville?
[4]   A.   Yes.
[5]   Q.   Is Bob Joines employed?
[6]   A.   Yes.
[7]   Q.   Where?
[8]   A.   Wal-Mart.
[9]   Q.   In Prattville?
[10]   A.   Yes.
[11]   Q.   Any other relatives?
[12]   A.   No.
[13]   Q.   No cousins, no aunts, no uncles?
[14]   A.   Not in Alabama.
[15]   Q.   This question is limited to
[16]  Alabama.
[17]   A.   Okay.
[18]   Q.   Are you currently employed?
[19]   A.   Yes.
[20]   Q.   Where are you employed?
[21]   A.   Southeast Wood.
[22]   Q.   What is that?  What kind of
[23]  company is it?

---

Jennifer Davis, CSR

Min-U-Script®

(4) Page 13 - Page 16

Page 17

[1] A. it's a manufacturer -- treated
[2] lumber company. Manufacturer of treated
[3] lumber.
[4] Q. Does it sell lumber to the
[5] general public or to wholesalers?
[6] A. It sells its treated lumber --
[7] it has no sales. It actually has no sales.
[8] It uses a contract with GP, Georgia Pacific,
[9] to treat their lumber. They don't own any
[10] inventory.
[11] Q. What is your position there?
[12] A. Accountant.
[13] Q. How long have you worked at
[14] Southeast Wood?
[15] A. For approximately a year and a
[16] half.
[17] Q. What is your salary?
[18] A. 63,000.
[19] Q. Since starting employment with
[20] Southeast Wood, have you received any
[21] raises?
[22] A. Yes.
[23] Q. What was your starting salary

Page 18

[1] with Southeast?
[2] A. 60,000.
[3] Q. When did you receive a raise?
[4] A. I received one, I believe it
[5] was, October 2005. And I received another
[6] one, October 2006.
[7] Q. What was your salary in October
[8] 2005 after the raise?
[9] A. 60,900.
[10] Q. And what was your salary in
[11] October 2006 after the raise?
[12] A. 63,000.
[13] Q. Did you work anywhere between
[14] the time that you were terminated from
[15] Amtren and you began your employment at
[16] Southeast Wood?
[17] A. No.
[18] Q. Did you look for a job?
[19] A. What time period are you
[20] speaking of?
[21] Q. The time when you were
[22] unemployed.
[23] A. Did I look for a job?

Page 19

[1] Q. Yes.
[2] A. Yes, I did.
[3] Q. Tell me the steps you followed
[4] in seeking employment after you left
[5] Amtren.
[6] A. I applied to positions that I
[7] saw in the Montgomery Advertiser.
[8] Q. Which positions were those?
[9] A. I don't recall them all.
[10] Q. Do you recall any of them?
[11] A. They were accounting positions.
[12] Q. Do you recall the names of any
[13] of the companies where you completed an
[14] application for a position?
[15] A. No.
[16] Q. Did you do anything else?
[17] A. I went to several websites,
[18] Career Builder, Monster, looking for work;
[19] told friends and neighbors that I was
[20] looking for work.
[21] Q. Did you go to any employment
[22] agencies?
[23] A. I don't recall.

Page 20

[1] Q. Do you have any documents which
[2] would help refresh your recollection as to
[3] whether or not you contacted any employment
[4] agencies?
[5] A. Not that I recall.
[6] Q. Did you do any other thing or
[7] take any additional steps to find employment
[8] after you left Amtren before you started
[9] working at Southeast Wood?
[10] A. Not that I can think of.
[11] Q. Did you collect unemployment
[12] during that period of time?
[13] A. Yes.
[14] Q. How much unemployment did you
[15] collect?
[16] A. I don't recall the exact number
[17] of weeks. It must have been probably three
[18] to six or seven, but I don't recall exactly.
[19] Q. Do you recall the amount of the
[20] unemployment compensation?
[21] A. Not exactly, no.
[22] Q. Give me your best estimate,
[23] then.

Page 21

[1]     A.   Two hundred dollars.
[2]     Q.   Weekly?
[3]     A.   Weekly, estimated.
[4]     Q.   Do you have any documents that
[5]   indicate how much unemployment compensation
[6]   you received?
[7]     A.   Probably so in a tax file.
[8]          MR. TRAWICK:   Can we get a copy
[9]   of that?
[10]         MR. JACOBS:   I'm going to object
[11]   to relevance, but I think we can provide
[12]   that to you.  Unemployment is not countable
[13]   in mitigation.
[14]         MR. TRAWICK:   That's an issue we
[15]   will address later.  I'm just asking if you
[16]   will provide what she received.
[17]    Q.   (By Mr. Trawick)  Tell me your
[18]   post high school education.
[19]    A.   I have a BS, BA from Auburn
[20]   University at Montgomery.
[21]    Q.   When did you receive that
[22]   degree?
[23]    A.   1996.

Page 22

[1]     Q.   Did you have a major other than
[2]   business?
[3]     A.   Accounting.
[4]     Q.   Are you a certified public
[5]   accountant?
[6]     A.   No.
[7]     Q.   Where did you work prior to
[8]   starting with Amtren?
[9]     A.   Thermalex.
[10]    Q.   Can you spell that for me?
[11]    A.   T-H-E-R-M-A-L-E-X.
[12]    Q.   What kind of company is that?
[13]    A.   It's a manufacturer of aluminum
[14]   extrusions.
[15]    Q.   Here in Montgomery?
[16]    A.   Yes.
[17]    Q.   Did you start with that company
[18]   after you received your degree in accounting
[19]   from AUM?
[20]    A.   No.
[21]    Q.   Did you start before?
[22]    A.   I'm sorry.  Did I start after?
[23]    Q.   After you received your degree

Page 23

[1]   from Auburn in Montgomery?
[2]     A.   Yes.
[3]     Q.   What was your position with that
[4]   company?
[5]     A.   I was the cost accounting
[6]   manager.
[7]     Q.   I forgot to ask you this.  Tell
[8]   me your supervisor at Southeast Wood.
[9]     A.   Donald King.
[10]    Q.   What's Donald King's position?
[11]    A.   Controller.
[12]    Q.   Who was your supervisor at
[13]   Thermalex?
[14]    A.   Diane Headley.  It's Diane
[15]   Phillips now.
[16]    Q.   Diane Headley Phillips?
[17]    A.   It's Diane Phillips now.  It was
[18]   Diane Headley at that time.
[19]    Q.   I assume she got a divorce.
[20]    A.   Married.
[21]    Q.   What was her position?
[22]    A.   CFO.
[23]    Q.   So the record is clear, what

Page 24

[1]   does CFO stand for?
[2]     A.   Chief financial officer.
[3]     Q.   Why did you leave Thermalex?
[4]     A.   They were going through a
[5]   downsizing, and their staffing had been
[6]   greatly reduced.
[7]     Q.   Were you laid off?
[8]     A.   No.
[9]     Q.   You voluntarily left?
[10]    A.   Yes, I did.
[11]    Q.   Why did you leave?  Was there a
[12]   reason that you voluntarily left prior to
[13]   being laid off?
[14]         MR. JACOBS:   Object to the form.
[15]    Q.   Do you understand the question?
[16]    A.   Ask it again.
[17]    Q.   Is there a reason that you
[18]   voluntarily left Thermalex prior to being
[19]   laid off?
[20]    A.   I was not laid off.
[21]    Q.   I understand that.
[22]    A.   Okay.
[23]    Q.   You said you voluntarily left.

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

Page 25

[1]  A.  Correct.
[2]  Q.  Why did you voluntarily leave
[3]  Thermalex?
[4]  A.  Because I thought I might be
[5]  laid off.
[6]  Q.  Did you have another position to
[7]  go to?
[8]  A.  Yes.
[9]  Q.  Which one?
[10]  A.  Amtren.
[11]  Q.  Had you accepted a position with
[12]  Amtren before you resigned from Thermalex?
[13]  A.  I did.
[14]  Q.  Tell me about how you learned
[15]  about the position at Amtren.
[16]  A.  Newspaper ad.
[17]  Q.  What process did you go through
[18]  to apply for this job?
[19]  A.  I sent a resume.
[20]  Q.  To whom?
[21]  A.  To Amtren.
[22]  Q.  Do you recall any particular
[23]  person, or was it just addressed to the

Page 26

[1]  corporation?
[2]  A.  I don't recall.
[3]  Q.  If you will, just generally tell
[4]  me, from the time you sent the resume to
[5]  Amtren in response to the ad in the
[6]  newspaper and the time that you were offered
[7]  the position, what process was followed in
[8]  your employment.
[9]  A.  Okay.  Please restate that
[10]  question.
[11]  Q.  From the time you sent the
[12]  resume to Amtren until you were offered a
[13]  position, just tell me the process that was
[14]  followed for you — by you to obtain that
[15]  job.
[16]  A.  I received a call from Kirk
[17]  Lamberth.
[18]  Q.  Lamberth?
[19]  A.  I believe it was a call.  Hold
[20]  on a minute.  There was contact by Kirk
[21]  Lamberth to me to set up a telephone
[22]  interview.  Are you asking me how I received
[23]  the position?  What happened and how did I

Page 27

[1]  receive the position?
[2]  Q.  Yes.
[3]  A.  Okay.  Contacted me to set up a
[4]  telephone interview.  I went through a
[5]  telephone interview with him, and then I
[6]  went through a formal interview with him.  I
[7]  don't recall how much time it took exactly
[8]  before he called me and offered me the
[9]  position.
[10]  Q.  Did you interview with anyone
[11]  else at Amtren?
[12]  A.  Not that I recall.
[13]  Q.  And when did you start working
[14]  for Amtren?
[15]  A.  I believe it was —
[16]  Q.  The month and year would be
[17]  sufficient.
[18]  A.  Okay.  January of 2004.
[19]  Q.  And what position did you accept
[20]  with Amtren?
[21]  A.  Accounting manager.
[22]  Q.  What was your understanding of
[23]  your duties as the accounting manager at

Page 28

[1]  Amtren?
[2]  A.  My understanding would be to
[3]  perform the accounting functions for that
[4]  business, help with projections, and help
[5]  with some analysis.
[6]  Q.  Anything else?
[7]  A.  Not that I can think of.
[8]  Q.  What do you mean by perform
[9]  accounting functions for the business?
[10]  A.  I mean, produce financial
[11]  statements, book journal entries.
[12]  Q.  Let me ask you to assume that
[13]  the person reading this deposition is not an
[14]  accountant.
[15]  A.  Okay.
[16]  Q.  I'm not an accountant.  It will
[17]  help if you explain what you mean by journal
[18]  entries and things like that.
[19]  A.  Journal entries, those would be
[20]  entries that would be made to the accounting
[21]  system by way of a double entry system,
[22]  debits and credits.
[23]  Q.  Accounts receivable and accounts

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

Page 29

[1] payable, things like that?

[2] **A.** Yes.

[3] **Q.** What type of accounting system

[4] was in place at Amtren when you started?

[5] **A.** Peachtree.

[6] **Q.** Explain what Peachtree is.

[7] **A.** The system that they had was

[8] basically a small accounting-type,

[9] bookkeeping package.

[10] **Q.** Is it computerized?

[11] **A.** It was PC based, yes.

[12] **Q.** Anything else that you did as an

[13] accounting function for the company?

[14] **A.** Not that I can think of right

[15] now.

[16] **Q.** Did you have responsibility for

[17] dealing with tax issues?

[18] **A.** I don't understand. What type

[19] of tax issues?

[20] **Q.** Payroll taxes, filing tax

[21] returns, making the payments on behalf of

[22] the company to the IRS, the Alabama

[23] Department of Revenue, those types of

Page 30

[1] issues.

[2] **A.** I had responsibility regarding

[3] payroll taxes.

[4] **Q.** What were your responsibilities

[5] regarding payroll taxes?

[6] **A.** Basically remitting the payroll

[7] taxes to the proper departments.

[8] **Q.** State and federal?

[9] **A.** Yes. And filling out the

[10] remittal form, the 941, and I don't recall

[11] the payroll form for the state.

[12] **Q.** The 941 is a federal form?

[13] **A.** Yes.

[14] **Q.** Any other accounting-type

[15] functions that you recall?

[16] **A.** Not that I recall.

[17] **Q.** Did you have any responsibility

[18] for making payments on behalf of the company

[19] for insurance?

[20] **A.** Accounts payable.

[21] **Q.** Insurance would be an accounts

[22] payable of the company?

[23] **A.** Yes.

Page 31

[1] **Q.** What type of insurance? Health

[2] Insurance for the employees, for example?

[3] **A.** Yes.

[4] **Q.** Any other type of insurance?

[5] Liability insurance for the company?

[6] **A.** Not that I recall.

[7] **Q.** But you do recall having to make

[8] payments to, I assume, to Blue Cross Blue

[9] Shield for insurance for the employees?

[10] **A.** Yes, I do recall that.

[11] **Q.** When you first started working

[12] with the company, did you have the authority

[13] to write checks to accomplish these

[14] accounting functions?

[15] **A.** No.

[16] **Q.** At some point in time, did you

[17] receive that authority?

[18] **A.** Yes.

[19] **Q.** How long after you started

[20] working for Amtren?

[21] **A.** I don't recall.

[22] **Q.** A couple of months, three

[23] months?

Page 32

[1] **A.** I don't recall.

[2] **Q.** Prior to receiving the authority

[3] to write the checks to perform these

[4] accounting functions, who had the authority

[5] to write the checks?

[6] **A.** I can only make an assumption

[7] that it was only Mr. Lamberth, but that's

[8] only an assumption. I would have to see the

[9] bank documents.

[10] **Q.** You didn't have any

[11] responsibility for completing the check

[12] other than the signature, that type of

[13] function?

[14] **A.** Okay. Please restate that

[15] question.

[16] **Q.** Did you have any responsibility,

[17] for example, completing the check to Blue

[18] Cross Blue Shield — I assume it is paid on

[19] a monthly basis — including the dollar

[20] amount in the check and taking the check to

[21] Mr. Lamberth to get Mr. Lamberth to sign it?

[22] **A.** Yes.

[23] **Q.** So you knew, then, that

Page 33

[1] Mr. Lamberth signed the checks prior to you
[2] having authority; is that correct?
[3] **A.** Yes.
[4] **Q.** It would have been your
[5] responsibility, then, to actually complete
[6] the checks, except for the signature, on
[7] these accounts payable?
[8] **A.** Restate that.
[9] **Q.** Is it correct that it was your
[10] responsibility to complete the check on
[11] these accounts payable to include the dollar
[12] amount and then take that check to
[13] Mr. Lamberth to be signed?
[14] **A.** Yes.
[15] **Q.** Is that true, also, for payments
[16] made to the IRS and to the State Department
[17] of Revenue for payroll taxes?
[18] **A.** To complete the check?
[19] **Q.** Yes.
[20] **A.** Yes.
[21] **Q.** At some point in time, did you
[22] -- when you received the authority to sign
[23] checks on behalf of the company, did you

Page 34

[1] perform that entire function?
[2] **A.** I performed that function, and
[3] then all the checks were reviewed by
[4] Mr. Lamberth.
[5] **Q.** Did he countersign the checks or
[6] just review them?
[7] **A.** Reviewed them.
[8] **Q.** Tell me the process that you
[9] followed to obtain Mr. Lamberth's review of
[10] the checks for accounts payable.
[11] **A.** There were accounts -- the check
[12] register list, that was reviewed. That was
[13] given to Mr. Lamberth when an accounts
[14] payable run was performed.
[15] **Q.** Okay. Is it correct that
[16] accounts payables were also payments made to
[17] the vendors that the company dealt with?
[18] **A.** Yes.
[19] **Q.** Just so the record is clear,
[20] Amtren would purchase products from other
[21] companies and have to pay those companies
[22] for those products, and that would be an
[23] accounts payable; is that correct?

Page 35

[1] **A.** Yes.
[2] **Q.** It was your responsibility to
[3] ensure that those companies were paid; is
[4] that correct?
[5] **A.** It was my responsibility to make
[6] sure they were paid? I'm not sure. You
[7] know, that's a big scope. That's a really
[8] big scope.
[9] **Q.** Tell me what your responsibility
[10] was, then, regarding accounts payable
[11] accounts from which --
[12] **A.** To prepare the check.
[13] **Q.** Let me finish my question. Tell
[14] me what your responsibility was in regards
[15] to accounts payable in ensuring that the
[16] companies from which Amtren purchased
[17] products were paid.
[18] **A.** What was my responsibility? My
[19] responsibility would have been to prepare
[20] the check, produce the check, provide
[21] Mr. Lamberth with a check register, and then
[22] mail the check.
[23] **Q.** Any other responsibilities?

Page 36

[1] **A.** Not that I can recall.
[2] **Q.** I assume the vendors submitted
[3] an invoice to the company; is that correct?
[4] **A.** That would be correct.
[5] **Q.** Did you have any duty regarding
[6] the invoice that was submitted to Amtren?
[7] **A.** Yes.
[8] **Q.** Tell me what those duties --
[9] **A.** The invoice would have been put
[10] into the system.
[11] **Q.** Who would put it into the
[12] system?
[13] **A.** You know, there for a while -- I
[14] don't recall the exact time period. I did
[15] it for a while, and then we had a clerical
[16] person do it.
[17] **Q.** Who was the clerical?
[18] **A.** I can't remember exactly their
[19] names. They would put the invoices into the
[20] system.
[21] **Q.** Who supervised the temp?
[22] **A.** Myself and Kirk Lamberth.
[23] **Q.** When you testified, put the

Page 37

[1] invoice into the system, that would be enter
[2] it into the accounting system?
[3]    A.  Yes.
[4]    Q.  Was there a time during your
[5] employment that you reassumed those duties
[6] from the temp?
[7]    A.  I can't recall. I don't recall
[8] that.
[9]    Q.  Any other type of accounting
[10] function duties that you had?
[11]    A.  Not that I can think of right
[12] now.
[13]    Q.  What information would be
[14] included on the check register that you
[15] provided to Mr. Lamberth?
[16]    A.  That would contain the name of
[17] the vendor. You know, I really would need
[18] to see the check registers. I don't know
[19] exactly. I know it would have the name of
[20] the vendor and, also, the amount of the
[21] check and the check number. But I can't
[22] recall every item on the check register.
[23]    Q.  Did you generate the check

Page 38

[1] register from the accounting system?
[2]    A.  Yes.
[3]    Q.  You testified that one of your
[4] duties, also, was to help with projections.
[5] What do you mean by that?
[6]    A.  I would provide Mr. Lamberth
[7] with weekly reports that would help -- let
[8] me rephrase that. I don't believe I said --
[9] when I was first employed there, I was told
[10] that I would play a larger role with some of
[11] the projections. But what I actually did
[12] was provide Mr. Lamberth with weekly reports
[13] that showed the financial position of the
[14] company -- or estimated financial position
[15] of the company.
[16]    Q.  What type of information would
[17] be included on the weekly reports?
[18]    A.  It was basically -- I would need
[19] to see them all to see exactly what all was
[20] on the reports.
[21]    Q.  You are an accountant. You know
[22] what a financial projection is; correct?
[23]    A.  I would still need to see the

Page 39

[1] reports to know exactly --
[2]    Q.  You don't have any recollection
[3] of --
[4]    A.  I would rather not answer the
[5] question unless I had the reports.
[6]    Q.  You don't have that option. I'm
[7] asking you to tell me what type of
[8] information was included on the financial
[9] projections and these weekly reports that
[10] you provided for Mr. Lamberth.
[11]    A.  Okay. Basically, income
[12] statement and a balance sheet.
[13]    Q.  Would it also include
[14] information about the assets and liabilities
[15] of the company?
[16]    A.  That would be on the balance
[17] sheet.
[18]    Q.  Anything else on the balance
[19] sheet other than information about the
[20] assets and liabilities?
[21]    A.  Shareholders' equity.
[22]    Q.  Anything else?
[23]    A.  That's it.

Page 40

[1]    Q.  What was the purpose of these
[2] weekly reports?
[3]    A.  So that Mr. Lamberth would be
[4] informed of the financial position of the
[5] company.
[6]    Q.  Where did you obtain the
[7] information that was included in these
[8] weekly reports?
[9]    A.  From the accounting system.
[10]    Q.  Was it your responsibility to
[11] extract that information from the accounting
[12] system?
[13]    A.  Yes.
[14]    Q.  You also testified that it was
[15] one of your duties to help with analysis.
[16] What do you mean by that?
[17]    A.  When I was first employed --
[18] when I first signed on with Mr. -- with
[19] Amtren, I was told that I would be able to
[20] help with analysis. He had told me he
[21] needed someone to help him with some brain
[22] power to help run the company, although I
[23] did very little analysis.

Page 41

[1]  Q.  What did you do?
[2]  A.  I don't recall exactly.  It
[3]  wasn't much.
[4]  Q.  As an accountant, what does help
[5]  with analysis mean to you?
[6]  A.  That would, to me, mean help
[7]  with analysis of the financial position of
[8]  the company to make decisions.
[9]        THE WITNESS:  I need to get
[10]  something to drink.  Would that be all
[11]  right?
[12]        MR. TRAWICK:  Let's take a
[13]  minute.
[14]        (Brief recess.)
[15]  Q.  (By Mr. Trawick)  During the
[16]  time that you worked with Amtren, did anyone
[17]  else perform those accounting functions that
[18]  you testified about?
[19]  A.  Yes.
[20]  Q.  Who?
[21]  A.  There were some clerical or
[22]  temps.  I don't recall all of their names.
[23]  Q.  Was there any other accountant,

Page 42

[1]  though, that performed these accounting
[2]  functions?
[3]  A.  Not that I recall.
[4]  Q.  Well, Ms. McCollum, you worked
[5]  at Amtren, and you have brought this
[6]  lawsuit.
[7]  A.  Yes.
[8]  Q.  You would recall whether or not
[9]  there was another accountant there.
[10]  A.  David Fields is an accountant.
[11]  He was there.
[12]  Q.  Tell me what David Fields did.
[13]  A.  You know, I wasn't his
[14]  supervisor.  I really didn't know all of his
[15]  functions.
[16]  Q.  Do you know any of his
[17]  functions?
[18]  A.  He was in production, I believe.
[19]  The production manager.
[20]  Q.  Did he have anything to do with
[21]  the accounting functions you've testified
[22]  about?
[23]  A.  I don't really recall.  You

Page 43

[1]  know, I would have to think about that one.
[2]  Q.  Well, take your time and think
[3]  about it, then, Ms. McCollum.
[4]  A.  At what period of time?
[5]  Q.  During the time that you worked
[6]  there, did you work with David Fields in
[7]  performing any of these accounting
[8]  functions?
[9]  A.  I may have asked him some
[10]  questions because I believe he performed
[11]  functions before I was there.
[12]  Q.  During the time that you worked
[13]  there, did he perform any of the accounting
[14]  functions that you previously testified
[15]  about?
[16]  A.  Not that I recall.
[17]  Q.  Is that something you'd recall?
[18]  A.  I'm sorry?
[19]  Q.  Ms. McCollum, you have brought
[20]  this lawsuit.  I'm sure you've thought about
[21]  this lawsuit a lot, and I'm sure you
[22]  prepared for this deposition.  Now, my
[23]  question is very simple.  During the time

Page 44

[1]  that you worked with Amtren, did David
[2]  Fields perform any of these accounting
[3]  functions that you previously testified
[4]  about?
[5]  A.  Not that I recall.
[6]  Q.  Did anyone else perform any of
[7]  these accounting functions that you
[8]  previously testified about?
[9]  A.  I've already answered the
[10]  question.
[11]  Q.  Well, answer it again.
[12]        THE WITNESS:  Do I have to
[13]  answer the question twice --
[14]        MR. TRAWICK:  Yes, you do.
[15]        MR. JACOBS:  Go ahead and tell
[16]  him again.
[17]  A.  There were clerical people that
[18]  performed some of those functions.
[19]  Q.  Any other accountants?
[20]  A.  Not that I recall.
[21]  Q.  Who was your immediate
[22]  supervisor during the time that you worked
[23]  at Amtren?

Page 45

[1]  A.  Kirk Lamberth.
[2]  Q.  Was there a controller during
[3] the time that you worked at Amtren?
[4]  A.  That I reported to?
[5]  Q.  Yes.
[6]  A.  No.
[7]  Q.  Was there a controller that you
[8] didn't report to?
[9]  A.  No.
[10]  Q.  Tell me the reasons you left
[11] Amtren.
[12]  A.  I did not voluntary leave
[13] Amtren.
[14]  Q.  You were terminated?
[15]  A.  Yes.
[16]  Q.  When were you terminated?
[17]  A.  April.
[18]  Q.  April of 2005?
[19]  A.  Yes.
[20]  Q.  Were you given any reasons why
[21] you were terminated?
[22]  A.  The one mainly that I recall is
[23] because Mr. Lamberth had stated that he did

Page 46

[1] not trust me, which he had told me that on
[2] several occasions when terminating other
[3] female employees, that he did not trust
[4] them.
[5]  Q.  What was your understanding of
[6] his meaning that he didn't trust you?
[7]  A.  That he didn't trust me.
[8]  Q.  Did you ask for a reason why he
[9] didn't trust you?
[10]  A.  I don't recall asking for a
[11] reason.
[12]  Q.  Was there anyone present other
[13] than you and Mr. Lamberth when you were
[14] terminated?
[15]  A.  No.
[16]  Q.  I believe you testified he had
[17] previously made statements to you that he
[18] did not trust other females when he
[19] terminated them; is that correct?
[20]  A.  That's correct.
[21]  Q.  Was anyone else present when he
[22] allegedly made these statements?
[23]  A.  No.

Page 47

[1]  Q.  Who was he making reference to?
[2]  A.  I can't remember all of their
[3] names. I would need to see the payroll
[4] records.
[5]  Q.  Do you remember any of their
[6] names?
[7]  A.  I don't recall. Melody is the
[8] only name that I can recall, but there were
[9] others.
[10]  Q.  Do you remember Melody's last
[11] name?
[12]  A.  No.
[13]  Q.  Did you ask Mr. Lamberth why he
[14] made the statement he didn't trust these
[15] female employees?
[16]  A.  No, I didn't.
[17]  Q.  Did you ask for any other
[18] explanation from Mr. Lamberth as to why you
[19] were being terminated?
[20]  A.  Not that I recall.
[21]  Q.  In Defendant's Exhibit 1, you
[22] were asked to identify any errors that you
[23] made in the performance of your job duties.

Page 48

[1] Do you recall that?
[2]  A.  I'm sorry. What was that?
[3]  Q.  In the interrogatories that we
[4] submitted to you, which your responses are
[5] identified as Defendant's Exhibit 1, we
[6] asked that you identify any errors that you
[7] made in the performance of your job duties.
[8] Do you recall that?
[9]  A.  You asked me to identify any
[10] errors.
[11]  Q.  Yes.
[12]  A.  I assume, if it's in there.
[13]  Q.  Let me just direct your
[14] attention to paragraph seven.
[15]  A.  Okay.
[16]  Q.  Take a minute and read it and
[17] your response.
[18]  A.  (Witness reviews document.)
[19] Okay.
[20]  Q.  Is it your testimony that the
[21] only error that you made in the performance
[22] of your job duties was this one payment
[23] error regarding Plextor?

Page 49

[1]  A. Can you restate the question?
[2]  Q. Did you make any errors in the
[3]  performance of your job duties at Amtren,
[4]  other than the one error that you have
[5]  identified in paragraph seven of your
[6]  responses to the defendant's interrogatories
[7]  pertaining to a payment error to Plextor?
[8]  A. Not that I recall.
[9]  Q. Does that imply that there were
[10] errors that you may have forgotten about?
[11] A. It's just not that I can recall.
[12] Q. Tell me about this error that
[13] was made to Plextor.
[14] A. I would need to see all of the
[15] documents, the original invoice, the payment
[16] to Plextor, the accounts payable aging, in
[17] order to fully give you all the information.
[18] Q. Ms. McCollum, I'm asking you
[19] what you recall about this payment error.
[20] A. Okay. What I recall is that
[21] there was a pricing change that I was not
[22] aware of, notified of. This pricing change
[23] is only sent to OEM.

Page 50

[1]  Q. What is OEM?
[2]  A. Original equipment
[3]  manufacturer. That's right. Notified
[4]  through an e-mail of a pricing change. I
[5]  never received that e-mail. So basically
[6]  the vendor was paid at the higher price. I
[7]  caught the error when I was going through
[8]  the accounts payables and the checks once I
[9]  was notified about the pricing, and then I
[10] corrected the error.
[11] Q. Did you bring this to anyone's
[12] attention at Amtren?
[13] A. No. I found the error. I
[14] corrected the error.
[15] Q. Who received the e-mail
[16] regarding the notification of the price
[17] change?
[18] A. For the OEM price changes? I
[19] know Mr. Lamberth received that e-mail, but
[20] I don't know who all it encompasses or who
[21] all it had encompassed.
[22] Q. Was this an e-mail from the
[23] vendor to Mr. Lamberth? Is that your

Page 51

[1]  testimony?
[2]  A. I believe it was an e-mail from
[3]  the sales rep from Plextor.
[4]  Q. Do you know who the sales rep
[5]  was?
[6]  A. No. I don't recall his name.
[7]  Q. Well, was that price change
[8]  reflected on the invoice that Amtren
[9]  received?
[10] A. No.
[11] Q. Who did you speak with at
[12] Plextor about the incorrect invoice?
[13] A. I don't recall their name.
[14] Q. It's your testimony you didn't
[15] bring this to Mr. Lamberth's attention that
[16] a vendor had submitted a false invoice to
[17] the company to be paid?
[18]     MR. JACOBS: Object to the form.
[19] Q. Go ahead and answer.
[20]     MR. JACOBS: Answer if you can.
[21] Q. It's a very simple question.
[22] A. Ask it again, then.
[23]     MR. JACOBS: My only concern was

Page 52

[1]  the words false invoice.
[2]     MR. TRAWICK: Ms. McCollum has
[3]  testified that the vendor, Plextor,
[4]  submitted an invoice at a higher price and
[5]  she paid that invoice at the higher price.
[6]  Q. (By Mr. Trawick) My question
[7]  is, if there had been a price change,
[8]  shouldn't the invoicing have reflected the
[9]  price change?
[10] A. You would have to take that up
[11] with Plextor.
[12] Q. Well, at some point in time,
[13] Ms. McCollum, you testified that you caught
[14] that error and you paid it at the lower
[15] price; is that correct?
[16] A. At some point in time, I caught
[17] the error, then I corrected it.
[18] Q. How did you correct the error,
[19] then?
[20] A. I would have to have the checks,
[21] the invoices, AR, the AP, and all of that.
[22] My belief, as I recall, is that I took a
[23] credit off of another invoice for the

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

---

Page 53

[1] difference. But, there again, I would need
[2] to see the documentation.
[3] **Q.** And it's your testimony that the
[4] vendor submitted an invoice at the higher
[5] price, which was incorrect, and you did not
[6] bring this to the attention of Mr. Lamberth;
[7] is that correct?
[8] **A.** That would be correct. I must
[9] state I did not know that at the time,
[10] either.
[11] **Q.** Did not know what?
[12] **A.** That — let me rephrase that.
[13] The price on the invoice was paid at the
[14] invoice price; the error was later caught; I
[15] corrected it.
[16] **Q.** Is it correct that the price on
[17] the invoice that you paid was at the higher
[18] price and not the lower price?
[19] **A.** Yes.
[20] **Q.** Therefore, the invoice was
[21] incorrect. Is that a fair statement?
[22] **A.** I would say.
[23] **Q.** And it's your testimony that you

---

Page 55

[1] to think about it. I believe so. I would
[2] like to see it on the documentation.
[3] **Q.** I'm asking you what you recall
[4] today, Ms. McCollum.
[5] **A.** Okay. That's all I recall.
[6] **Q.** What dollar amount was the error
[7] involving?
[8] **A.** I'd need to see. I'm not sure
[9] exactly what it was.
[10] **Q.** Several thousand dollars?
[11] **A.** Yeah. Uh-huh.
[12] **Q.** Would you agree that an error in
[13] a price invoice from the vendor that
[14] resulted in the company paying several
[15] thousand dollars more than it should have is
[16] a significant error?
[17] **A.** No.
[18] **Q.** I'm not asking if it is a
[19] significant error on your part. I'm asking
[20] if you would agree that it's a significant
[21] error on the price —
[22] **A.** I would not agree.
[23] **Q.** Let me finish my question — the

---

Page 54

[1] spoke with someone at Plextor about this
[2] incorrect invoice?
[3] **A.** I did.
[4] **Q.** And you do not recall the name
[5] of the person who you spoke with; is that
[6] correct?
[7] **A.** That's correct.
[8] **Q.** And you testified that the error
[9] was caught. How was the error caught?
[10] **A.** From what I recall, after I was
[11] — I realized that the price should have
[12] been the lower price, and I reviewed — I
[13] did a review of checks and that sort of
[14] thing, and I saw that the — it was at the
[15] higher price, so I corrected it.
[16] **Q.** How did you learn that the price
[17] should have been lower?
[18] **A.** I don't recall all the steps. I
[19] just don't recall them all.
[20] **Q.** You don't recall how you learned
[21] that the price should have been lower?
[22] **A.** I believe it was through
[23] Mr. Lamberth, but I don't really — I've got

---

Page 56

[1] price of the vendor.
[2] **A.** Okay. Say it again, please.
[3] **Q.** Would you agree that an invoice
[4] that had the wrong price, which caused the
[5] company to pay several thousand dollars more
[6] than it should have, was a significant error
[7] on the part of the vendor?
[8] **A.** A significant error on the part
[9] of the vendor? Probably.
[10] **Q.** And you didn't bring this to the
[11] attention of Mr. Lamberth; is that correct?
[12] **A.** I believe I have stated that I
[13] found the error; I corrected the error; I
[14] did not tell Mr. Lamberth about it at that
[15] particular time.
[16] **Q.** Did all future invoices from
[17] this vendor contain the new price which was
[18] lower?
[19] **A.** I don't know. I'd have to see
[20] invoices.
[21] **Q.** Do you recall making any other
[22] payments to this vendor that —
[23] **A.** I'd have to see them.

---

Page 57

[1] **Q.** That's not my question.
[2] Ms. McCollum. Listen to my question. It's
[3] a very simple question.
[4] **A.** Okay.
[5] **Q.** Do you recall after this —
[6] after making payment to this vendor at the
[7] incorrect price, any other invoices that
[8] were received from this same vendor that
[9] contained the incorrect price?
[10] **A.** I don't recall.
[11] **Q.** In response to the
[12] interrogatory, you state that other male and
[13] white employees, who held a professional
[14] position such as myself, were not treated in
[15] the same manner. What do you mean by that
[16] statement?
[17] **A.** I mean that other male
[18] employees, for example, David Fields, who
[19] made an error — an inventory error — was
[20] not terminated. There are three engineers
[21] that work there, male, who have made
[22] mistakes and errors costing the company.
[23] They have not been terminated.

Page 58

[1] **Q.** Anyone else?
[2] **A.** Not that I recall.
[3] **Q.** How did you learn of David
[4] Fields making the inventory error?
[5] **A.** Through Mr. Lamberth and other
[6] employees.
[7] **Q.** What did Mr. Lamberth tell you
[8] about this?
[9] **A.** That David Fields made a large
[10] inventory error.
[11] **Q.** Did he tell you anything else?
[12] **A.** Not that I recall.
[13] **Q.** When was this error made?
[14] **A.** I don't know.
[15] **Q.** Before you were terminated, I
[16] assume?
[17] **A.** Yes.
[18] **Q.** When you left Amtren, was David
[19] still employed?
[20] **A.** Yes.
[21] **Q.** Do you know if David has
[22] subsequently been terminated?
[23] **A.** Yes, I believe he has.

Page 59

[1] **Q.** How did you learn of David's
[2] termination?
[3] **A.** I don't recall. I don't
[4] remember exactly how.
[5] **Q.** When Mr. Lamberth allegedly had
[6] this conversation with you about David
[7] Fields, did you ask what type of inventory
[8] error?
[9] **A.** I don't recall.
[10] **Q.** Do you know what type of
[11] inventory error David made?
[12] **A.** I believe it was on some — I'm
[13] not sure exactly. I'm not sure exactly.
[14] **Q.** Do you recall anything else
[15] about the conversation with Mr. Lamberth
[16] regarding this error that David Fields made?
[17] **A.** I don't recall.
[18] **Q.** Yes or no. Do you recall
[19] anything else about the conversation with
[20] Mr. Lamberth regarding the error that you
[21] contend —
[22] **A.** I cannot —
[23] **Q.** Let me finish my question.

Page 60

[1] Ms. McCollum. This lady can't take both of
[2] us talking at the same time.
[3] **A.** Okay.
[4] **Q.** Do you recall anything else
[5] about the conversation with Mr. Lamberth
[6] wherein you allege that he told you about
[7] this error that David Fields made?
[8] **A.** No.
[9] **Q.** Are you aware of any other
[10] errors that David Fields made?
[11] **A.** I don't recall.
[12] **Q.** Do you know if the error that
[13] David Fields made cost the company any
[14] money?
[15] **A.** Seventy thousand dollars.
[16] **Q.** How do you know it cost the
[17] company seventy thousand dollars?
[18] **A.** That is what I was told.
[19] **Q.** Told by whom?
[20] **A.** Kirk Lamberth.
[21] **Q.** So you do remember something
[22] else about the conversation?
[23] **A.** Yes, sir.

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

Page 61

[1]    Q.  Do you recall anything else?
[2]    A.  No.
[3]    Q.  How did it cost the company
[4]  seventy thousand dollars?
[5]    A.  I'm not sure.
[6]    Q.  You didn't ask?
[7]    A.  I don't recall.
[8]    Q.  Who were the three engineers
[9]  that made mistakes?
[10]   A.  I believe Steve, Mike —
[11]   Q.  Do you know Steve's last name?
[12]   A.  No. I don't know. I can't
[13]  remember any of them's last name. Steve,
[14]  Mike, and there's a John.
[15]   Q.  Steve, Mike, and John are —
[16]   A.  Uh-huh.
[17]   Q.  Let me finish my question.
[18]  Steve, Mike, and John are the three
[19]  engineers that you are referring to?
[20]   A.  Yes, I am.
[21]   Q.  What type of error did Steve
[22]  make?
[23]   A.  They had — I believe Steve had

Page 62

[1]  shut down the production line because of a
[2]  product — what he thought was a product
[3]  defect.
[4]    Q.  Anything else?
[5]    A.  Not that I recall.
[6]    Q.  How did you learn that Steve had
[7]  shut down the production line because of a
[8]  production defect?
[9]    A.  I don't remember who told me
[10]  about that.
[11]   Q.  Do you know whether or not there
[12]  was a product defect?
[13]   A.  No, I don't.
[14]   Q.  Do you know whether it was
[15]  proper or improper to shut down the
[16]  production line because of a production
[17]  defect?
[18]   A.  No, I don't.
[19]   Q.  What type of error did Mike
[20]  make?
[21]   A.  All three of them would be the
[22]  same. It's basically the same thing as far
[23]  as shutting the production line down.

Page 63

[1]    Q.  So it's your testimony that they
[2]  shut the production line down on more than
[3]  one occasion, or they were all involved in
[4]  this one occasion —
[5]    A.  I don't remember —
[6]    Q.  Let me finish my question,
[7]  Ms. McCollum. It will help the court
[8]  reporter.
[9]    A.  Uh-huh.
[10]   Q.  Is it your testimony that Steve,
[11]  Mike, and John shut down the production line
[12]  on one occasion or more than one occasion?
[13]   A.  It would be more than one
[14]  occasion.
[15]   Q.  And is it your testimony that
[16]  all three of them were involved in shutting
[17]  the production line down on each of these
[18]  occasions?
[19]   A.  I don't recall.
[20]   Q.  How did you learn of Mike's
[21]  alleged error of shutting down the
[22]  production line?
[23]   A.  Someone told me, but I don't

Page 64

[1]  remember who they are or who that was.
[2]    Q.  How did you learn of Mike's
[3]  error of shutting down the production line?
[4]    A.  I believe somebody told me. I
[5]  don't know exactly who it was.
[6]    Q.  Is it a fair statement that you
[7]  have no firsthand knowledge about the
[8]  production line being shut down and whether
[9]  or not there was a product defect?
[10]   A.  No.
[11]   Q.  That's not correct? You do have
[12]  firsthand knowledge?
[13]   A.  I'm sorry. Ask the question
[14]  again.
[15]   Q.  Is it correct that you have no
[16]  firsthand knowledge about the production
[17]  line being shut down and whether or not
[18]  there was a product defect which caused —
[19]   A.  Yes.
[20]   Q.  — the production line to be
[21]  shut down? Is that a correct statement?
[22]   A.  I did not know if the product
[23]  defect was there or not. That is a correct

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

---

Page 65

[1] statement.
[2]    Q. Let me rephrase the question.
[3] Is it correct that you have no firsthand
[4] knowledge about the production line being
[5] shut down?
[6]    A. Did I see the production line
[7] being shut down? Is that what you're asking
[8] me?
[9]    Q. Yes.
[10]    A. No, I didn't.
[11]    Q. Is it correct you have no
[12] firsthand knowledge about whether or not
[13] there was a product defect which caused the
[14] production line to be shut down?
[15]    A. Say that one more time.
[16]    Q. Is it correct you have no
[17] firsthand knowledge about whether or not
[18] there was a product defect which caused the
[19] production line to be shut down?
[20]    A. Yes.
[21]    Q. Were Mike, Steve, and John
[22] employed when you left?
[23]    A. Yes.

---

Page 66

[1]    Q. Do you know if they're still
[2] employed?
[3]    A. No.
[4]    Q. Did you have any conversations
[5] with Mr. Lamberth about these three
[6] engineers and their alleged errors?
[7]    A. Not that I recall.
[8]    Q. Any other employees who you
[9] allege made errors and were not treated in
[10] the same manner as you?
[11]    A. Not that I can think of at this
[12] moment.
[13]    Q. Well, you've thought about this
[14] for a long time, Ms. McCollum; is that
[15] correct?
[16]    A. Not that I can think of.
[17]    Q. Listen to my question,
[18] Ms. McCollum. Have you thought about this
[19] issue for a long time, since the filing of
[20] your lawsuit?
[21]    A. Yes.
[22]    Q. And at this time, you cannot
[23] think of any other individuals who made

---

Page 67

[1] errors who were treated differently than
[2] you; is that correct?
[3]    A. That is correct. I cannot think
[4] of anyone else at this time.
[5]    Q. This payment error to Plextor
[6] that you have previously testified about,
[7] did you discuss it with anyone other than
[8] Mr. Lamberth?
[9]    A. Not that I can recall.
[10]    Q. At the time of this error that
[11] was made in the payment of Plextor, was Lisa
[12] working there?
[13]    A. I do not know.
[14]    Q. Was there a time that Lisa
[15] started working there that you do recall?
[16]    A. I know that she did work there.
[17]    Q. Just for the record, Lisa
[18] McNamee?
[19]    A. I know that she did work there
[20] or does there, and I did work with her. I
[21] don't recall the specific time.
[22]    Q. You don't recall if she was
[23] working there when this payment error to

---

Page 68

[1] Plextor was made; is that correct?
[2]    A. That's correct.
[3]    Q. In Defendant's Exhibit 1, you
[4] state that in December of 2004, Mr. Lamberth
[5] hired Jerry Weisenfeld and gave him the
[6] title of business manager. Do you recall
[7] that?
[8]    A. Yes.
[9]    Q. When was Mr. Weisenfeld hired?
[10]    A. I don't know the exact date.
[11]    Q. Late December of 2004 is what
[12] you stated.
[13]    A. Okay.
[14]    Q. Does that sound about right?
[15]    A. That sounds about right.
[16]    Q. What was Mr. Weisenfeld's duties
[17] when he started Amtren?
[18]    A. I was not his supervisor. I
[19] don't know all of his duties.
[20]    Q. Do you know any of his duties?
[21]    A. Not firsthand. I wasn't his
[22] supervisor.
[23]    Q. Is it a correct statement that

---

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

Page 69

[1] you have no firsthand knowledge of what
[2] duties Mr. Weisenfeld performed for Amtren?
[3]     A.  Only the duties that I saw him
[4] perform, I guess.
[5]     Q.  What duties did you see him
[6] perform?
[7]     A.  Let's see. I believe there for
[8] a while he was going to -- he helped Kirk
[9] with banking, with various customers.
[10] Before my termination, he was working with
[11] the Mas90 system.
[12]     Q.  Anything else?
[13]     A.  That's all I can think of now.
[14]     Q.  What do you mean by help Kirk
[15] with banking?
[16]     A.  He was involved with banking,
[17] with negotiating -- I assume negotiating
[18] with the bank.
[19]     Q.  You said you saw him perform
[20] these duties. What did you see?
[21]     A.  Them having a meeting with the
[22] banker.
[23]     Q.  Anything else?

Page 70

[1]     A.  Not that I can think of right
[2] now.
[3]     Q.  Were you present in this meeting
[4] with the banker?
[5]     A.  No.
[6]     Q.  Is it a fair statement that your
[7] knowledge of Mr. Weisenfeld helping Kirk
[8] with banking is limited to seeing him in a
[9] meeting with Kirk and a banker?
[10]     A.  Also, I believe there was a
[11] letter that Kirk had written that was
[12] presented to that banker -- I would have to
[13] see the letter -- I believe at that same
[14] meeting.
[15]     Q.  Did you see this letter?
[16]     A.  Yeah.
[17]     Q.  What was the letter about?
[18]     A.  I would have to see it again to
[19] recall.
[20]     Q.  Do you recall anything today
[21] about what this letter was about?
[22]     A.  I remember it stating -- having
[23] very high compliments of my accounting

Page 71

[1] abilities and the accounting system I had
[2] put in.
[3]     Q.  Was that Mas90, the accounting
[4] system?
[5]     A.  I believe, if I recall
[6] correctly.
[7]     Q.  Did you put in any other
[8] accounting system other than Mas90?
[9]     A.  Yeah, sure did. I put in
[10] Peachtree for manufacturing, and I believe
[11] one other integrated system.
[12]     Q.  You previously testified that
[13] when you started working at Amtren, the
[14] accounting system was Peachtree. Is that
[15] different from Peachtree for manufacturing?
[16]     A.  Yes, it is.
[17]     Q.  Do you recall the name of the
[18] other accounting system that you put in?
[19]     A.  It was still Peachtree. It was
[20] just a different version of it.
[21]     Q.  This letter that you testified
[22] about that was presented to the banker, did
[23] you prepare that letter?

Page 72

[1]     A.  No.
[2]     Q.  Did you receive a copy of that
[3] letter?
[4]     A.  Yes.
[5]     Q.  Who sent you a copy of the
[6] letter?
[7]     A.  Kirk.
[8]     Q.  Do you still have a copy of the
[9] letter?
[10]     A.  Yes.
[11]     Q.  Was it produced?
[12]         THE WITNESS:  Was it produced?
[13]     A.  I'm sure it was.
[14]         MR. TRAWICK:  If it wasn't
[15] produced, it should have been produced.
[16]         MR. JACOBS:  We gave you
[17] everything we have. Can we go off the
[18] record a minute?
[19]         (Off-the-record discussion.)
[20]     Q.  (By Mr. Trawick)  Let me show
[21] you what has been marked as Defendant's
[22] Exhibit 3. Is that a copy of the letter you
[23] have previously testified about?

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

Page 73

[1]        (Whereupon, a document was
[2]    marked as Defendant's Exhibit 3 and is
[3]    attached to the original transcript.)
[4]        A. Yes.
[5]        Q. How many meetings did you
[6]    observe between Kirk, Jerry, and a banker?
[7]        A. One.
[8]        Q. You previously testified that
[9]    you saw Jerry perform duties with various
[10]    customers. What were those duties?
[11]        A. I'm not exactly sure.
[12]        Q. What did you see?
[13]        A. Meetings with the customers.
[14]        Q. Anything else?
[15]        A. That's basically it, that I can
[16]    think of. Mainly meetings with the
[17]    customers.
[18]        Q. Do you know what these meetings
[19]    were about?
[20]        A. No, I do not know what they were
[21]    all about.
[22]        Q. Is it a fair statement you have
[23]    no firsthand knowledge of what these

Page 74

[1]    meetings were about between Jerry and
[2]    customers of --
[3]        A. I would not.
[4]        Q. Again, if you would let me
[5]    finish my question.
[6]        A. It's a little hard to do. I'm
[7]    trying.
[8]        Q. Is it correct that you have no
[9]    firsthand knowledge about these meetings
[10]    between Jerry and customers of Amtren?
[11]        A. I don't recall exactly what they
[12]    were all about.
[13]        Q. That's not my question,
[14]    Ms. McCollum. Listen to my question.
[15]        A. Okay.
[16]        Q. Is it correct you do not have
[17]    any firsthand knowledge about these meetings
[18]    between Jerry and the customers of Amtren?
[19]        A. There may have been some about
[20]    products. That's about all I would know,
[21]    about some of the products or --
[22]        Q. Were you present in any of these
[23]    meetings?

Page 75

[1]        A. That's really hard to remember
[2]    that far back.
[3]        Q. Yes or no?
[4]        A. You know, I may have been. I
[5]    may have been.
[6]        Q. Do you recall anything about
[7]    those meetings?
[8]        A. There may have been some product
[9]    reviews or maybe meetings between him and
[10]    the customers that were -- I just don't
[11]    really know all of them. I can't tell you.
[12]        Q. I'm asking what you recall
[13]    today, Ms. McCollum. If you don't recall
[14]    anything, just tell me you don't recall
[15]    anything.
[16]        A. I can't recall what they were
[17]    all about.
[18]        Q. And you don't know whether you
[19]    were present at any of these meetings or
[20]    not. Is that a fair statement?
[21]        A. I probably was present at some
[22]    of them, but I just don't remember all of
[23]    them.

Page 76

[1]        Q. What transpired at these
[2]    meetings that were comptroller-type duties
[3]    or controller-type duties?
[4]        A. I don't remember. I just don't
[5]    remember.
[6]        Q. Sitting here today, is it a fair
[7]    statement that you do not recall any
[8]    controller-type duties that were discussed
[9]    during these meetings that Jerry had with
[10]    customers?
[11]        A. I don't recall.
[12]        Q. Listen to my question. Is it a
[13]    fair statement, sitting here today you do
[14]    not recall any controller-type duties that
[15]    Jerry performed during these meetings with
[16]    these customers?
[17]        A. Yes.
[18]        Q. What controller-type duties did
[19]    Kirk -- strike that. What controller type
[20]    duties did Jerry perform during the meeting
[21]    with the banker?
[22]        A. I wasn't in the meeting. I
[23]    would not know.

Page 77

[1]    Q.  Is it a fair statement that
[2]  sitting here today you are not aware of any
[3]  controller-type duties that Jerry performed
[4]  during this meeting that you observed
[5]  between Jerry, Kirk, and the banker?
[6]    A.  Could you ask that again,
[7]  please?
[8]    Q.  Is it a fair statement that you
[9]  are not aware of any controller-type duties
[10]  that Jerry performed during the meeting that
[11]  you observed between Jerry, Kirk, and the
[12]  banker?
[13]    A.  I am not aware. I was not in
[14]  the meeting.
[15]    Q.  So you are not aware of any
[16]  controller-type duties that Jerry performed?
[17]    A.  I'm not aware of any duties. I
[18]  wasn't in the meeting.
[19]    Q.  You previously stated that
[20]  before you were terminated, Jerry worked
[21]  with Mas90. Do you recall that testimony?
[22]    A.  Yes.
[23]    Q.  For the record, what is Mas90?

Page 78

[1]    A.  It is a fully integrated
[2]  computer software system for manufacturing.
[3]    Q.  Were the accounting functions
[4]  for Amtren part of this system?
[5]    A.  Yes.
[6]    Q.  Did Amtren change over from
[7]  Peachtree to Mas90?
[8]    A.  Yes.
[9]    Q.  When did that take place?
[10]    A.  Somewhere between September and
[11]  December of 2004.
[12]    Q.  What duties did Jerry perform
[13]  with regard to Mas90?
[14]    A.  From what I recall, him and
[15]  Bobby Lake, the Mas90 consultant, were going
[16]  over, basically, how the -- I believe the
[17]  security portion and the functions, you
[18]  know, how the whole system works, the
[19]  accounts payable, the receivables, and
[20]  Mr. Lake -- Bobby Lake -- was training Jerry
[21]  on how to do that, from my understanding.
[22]    Q.  Did you work with Bobby Lake?
[23]    A.  Yes, I did.

Page 79

[1]    Q.  On the implementation of Mas90?
[2]    A.  Yes.
[3]    Q.  Who did Bobby Lake work for?
[4]    A.  Wilson Price.
[5]    Q.  Were you present in any meetings
[6]  between Jerry and Bobby Lake on implementing
[7]  Mas90?
[8]    A.  No, not that I recall.
[9]    Q.  Do you have any firsthand
[10]  knowledge about what transpired between
[11]  Jerry Weisenfeld and Bobby Lake during these
[12]  meetings?
[13]    A.  Yes. I saw them meeting over
[14]  the Mas90, and I believe I asked Bobby Lake
[15]  and Jerry -- or I may have asked Jerry what
[16]  they were reviewing, and he was telling me
[17]  they were basically reviewing the system,
[18]  and Bobby was training him on the system.
[19]    Q.  Did Bobby train you on the
[20]  system?
[21]    A.  Bobby was our consultant that
[22]  helped me install the system.
[23]    Q.  That's not quite my question.

Page 80

[1]  Did Bobby train you on the system?
[2]    A.  When you say train, he helped me
[3]  install it. I'm not sure that I would agree
[4]  with the word train.
[5]    Q.  Was he supposed to train you on
[6]  how the system operated?
[7]    A.  He was supposed to help me
[8]  install it.
[9]    Q.  He was not supposed to train
[10]  you, then, on how the system operated; is
[11]  that correct?
[12]    A.  Basically, he showed me how the
[13]  different functions worked within the
[14]  accounting software.
[15]    Q.  Would you consider that
[16]  training?
[17]    A.  I guess I might.
[18]    Q.  How did it differ than what
[19]  training Jerry provided -- Bobby provided to
[20]  Jerry?
[21]    A.  I don't know. I don't have full
[22]  extensive knowledge of what all he -- Bobby,
[23]  you know, worked with Jerry. I mean, I

Page 81

[1] don't have the extensive knowledge of what
[2] all he showed him.
[3]    **Q.** You previously testified you saw
[4] Bobby and Jerry meeting about Mas90, and you
[5] asked Jerry about these meetings. Do you
[6] recall that testimony?
[7]    **A.** Yes. Uh-huh.
[8]    **Q.** What did Jerry tell you about
[9] the meeting?
[10]    **A.** That Bobby was showing him how
[11] to use the Mas90 system.
[12]    **Q.** How did that differ, then, from
[13] what Bobby showed you, if at all?
[14]    **A.** I don't know. I don't know how
[15] to answer that question.
[16]    **Q.** To your knowledge, was there any
[17] difference in what Bobby did with Jerry and
[18] what Bobby did with you?
[19]    **A.** I don't know.
[20]    **Q.** It's a very simple question,
[21] Ms. McCollum. Do you have any knowledge
[22] that the training that Bobby provided to you
[23] on Mas90 was any different than the training

Page 82

[1] that Bobby provided to Jerry on Mas90?
[2]    **A.** Other than the system was
[3] already installed, so I guess he wouldn't
[4] have provided installation. But I don't
[5] really know.
[6]    **Q.** Is it correct that Bobby
[7] provided assistance on installing the system
[8] to you?
[9]    **A.** Yes.
[10]    **Q.** Did you ask Jerry, why are you
[11] meeting with Bobby about Mas90 and being
[12] trained on the system?
[13]    **A.** I don't recall asking.
[14]    **Q.** Do you know why Bobby trained
[15] Jerry on the system?
[16]    **A.** No.
[17]    **Q.** Other than the training that
[18] Bobby gave to Jerry on the system, did Jerry
[19] have any duties pertaining to Mas90?
[20]    **A.** Not that I recall.
[21]    **Q.** Is it a correct statement that,
[22] to your knowledge, Jerry Weisenfeld did not
[23] have any controller-type duties pertaining

Page 83

[1] to Mas90?
[2]    **A.** Not that I recall.
[3]    **Q.** Let me direct your attention to
[4] Defendant's Exhibit 3. Did you have any
[5] discussions with Kirk Lamberth about this
[6] letter?
[7]    **A.** I don't recall.
[8]    **Q.** Do you know who prepared this
[9] letter?
[10]    **A.** Kirk Lamberth.
[11]    **Q.** How do you know that?
[12]    **A.** He signed it. He also gave me a
[13] copy of it.
[14]    **Q.** How do you know he prepared it,
[15] other than his signature?
[16]    **A.** You mean – are you asking me
[17] did I watch him type it? No, I --
[18]    **Q.** Yes.
[19]    **A.** No, I did not.
[20]    **Q.** What's the purpose of
[21] Defendant's Exhibit 3, or what was the
[22] purpose of Defendant's Exhibit 3, if you
[23] know?

Page 84

[1]    **A.** What was the purpose of it?
[2]    **Q.** Right.
[3]    **A.** You need to ask the defendant.
[4]    **Q.** I'm asking you, Ms. McCollum.
[5] Do you know why Kirk Lamberth provided this
[6] letter to the vice president of MidSouth
[7] Bank?
[8]    **A.** I can't answer for him.
[9]    **Q.** I'm not asking you to answer for
[10] Kirk Lamberth, Ms. McCollum. I'm asking you
[11] to answer for you.
[12]    **A.** Okay. No, I'm not sure. I'm
[13] not real sure.
[14]    **Q.** Let me direct your attention
[15] again to Defendant's Exhibit 1. In your
[16] complaint, you allege that you observed
[17] gender bias in Mr. Lamberth's employment
[18] actions and his comments about women in the
[19] workplace, and you provided a response to
[20] that interrogatory asking for what the acts
[21] were.
[22]    **A.** What the what was?
[23]    **Q.** The actions.

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

Page 85

[1]    A.  The actions.  Okay.
[2]    Q.  Let me give you an opportunity
[3]  to review your answer.
[4]    A.  (Witness reviews document.)
[5]  Okay.
[6]    Q.  In your answer, you state you
[7]  were expected to make coffee on a number of
[8]  occasions.  Did anyone else make coffee?
[9]    A.  Probably.
[10]    Q.  Any males make coffee?
[11]    A.  In what time frame?
[12]    Q.  Any time frame that you worked
[13]  there.
[14]    A.  Let's see.  Maybe after the
[15]  coffee service, but I don't really --
[16]    Q.  Did you ever observe any males
[17]  at Amtren, during the time that you worked
[18]  there, make coffee?
[19]    A.  Yes.
[20]    Q.  Did you observe any males make
[21]  coffee during meetings?
[22]    A.  I don't recall.
[23]    Q.  May have, but you just don't

Page 86

[1]  recall?
[2]    A.  Uh-huh.
[3]    Q.  Did you ever observe
[4]  Mr. Lamberth making coffee?
[5]    A.  Probably.
[6]    Q.  Okay.  You further state that
[7]  you were directed by Mr. Lamberth to order
[8]  and serve lunch when we had employee
[9]  lunches.  What do you mean by serve lunch?
[10]    A.  Basically set all of it up.
[11]    Q.  What do you mean by set all of
[12]  it up?
[13]    A.  The food, the plates, the
[14]  silverware, that sort of thing.
[15]    Q.  Was it served buffet style?
[16]    A.  Most of the time, yes.
[17]    Q.  And the lunch was ordered from
[18]  restaurants?
[19]    A.  Yes.
[20]    Q.  So is it correct you picked up
[21]  the phone and placed an order for an
[22]  employee lunch?
[23]    A.  I did do that.

Page 87

[1]    Q.  Anyone else ever order lunches
[2]  for the staff or for business meetings?
[3]    A.  Probably.  I don't know who they
[4]  were.
[5]    Q.  Any males?
[6]    A.  May have.
[7]    Q.  You make the statement that male
[8]  management employees were never assigned
[9]  such duties nor was such an expectation of
[10]  their employment by Mr. Lamberth.
[11]    A.  Okay.  Say that again, please.
[12]  Where is that?
[13]    Q.  It's in your answer.
[14]    A.  Okay.  Which one?  I'm sorry.
[15]  Unless you want me to read --
[16]    Q.  In your response to
[17]  interrogatory number four, you make the
[18]  statement, male management employees were
[19]  never assigned such duties, nor were such an
[20]  expectation of employment by Mr. Lamberth.
[21]  Did I read that correctly?
[22]    A.  Yes.
[23]    Q.  Do you stand by that statement?

Page 88

[1]    A.  I do.
[2]    Q.  I think you just testified other
[3]  male employees made coffee, other male
[4]  employees ordered lunch.  How did that
[5]  differ from what you did?
[6]    A.  I said they may have, you know.
[7]  How did that differ?
[8]    Q.  Yes.
[9]    A.  When coffee was not made when we
[10]  had customers or guests, Mr. Lamberth became
[11]  very irate at me.
[12]    Q.  What did he do?
[13]    A.  He became irate, angry at me.
[14]    Q.  What did he say?
[15]    A.  I don't recall exactly his
[16]  words.  It was more of his actions.  Things
[17]  like, you know, no coffee's made, or just
[18]  very angry and his tone of voice.  He became
[19]  angry at me, not other male employees.
[20]    Q.  Did you ever have any
[21]  discussions with Mr. Lamberth about this?
[22]    A.  No.  I did what he asked me to
[23]  do.

Page 89

[1]     Q.   It's a fair statement you never
[2]   told Mr. Lamberth, I don't think I should be
[3]   making coffee, and I shouldn't be ordering
[4]   lunch?
[5]     A.   That's a fair statement.
[6]     Q.   You didn't tell Mr. Lamberth
[7]   that, then? Is that your testimony?
[8]     A.   Right. I did not tell him that,
[9]   no. Is that what you're asking?
[10]    Q.   Yes. Did you tell Mr. Lamberth,
[11]  I don't think I should be making coffee; I
[12]  don't think I should be ordering lunch?
[13]    A.   No.
[14]    Q.   And, to your knowledge, you
[15]  don't have any knowledge as to whether or
[16]  not any other male employees made coffee or
[17]  ordered lunch; is that correct?
[18]    A.   I said they may have.
[19]    Q.   Let me show you what has been
[20]  marked as Defendant's Exhibit 4, which
[21]  appears to be a copy of the charge of
[22]  discrimination that you filed with the Equal
[23]  Employment Opportunity Commission.

Page 90

[1]         (Whereupon, a document was
[2]   marked as Defendant's Exhibit 4 and is
[3]   attached to the original transcript.)
[4]     A.   Uh-huh.
[5]     Q.   Is that your handwriting?
[6]     A.   The signature?
[7]     Q.   Yes.
[8]     A.   Yes.
[9]     Q.   The date on that is May 19,
[10]  2005; is that correct?
[11]    A.   Uh-huh.
[12]    Q.   At the time you filed this, did
[13]  you have a lawyer?
[14]        THE WITNESS:  Both you and I put
[15]  that together.
[16]    A.   Uh-huh.
[17]    Q.   Is it correct that your
[18]  attorney, Mr. Jacobs, assisted you in
[19]  drafting this document?
[20]    A.   Yes.
[21]    Q.   In this document, you have
[22]  alleged that the cause of discrimination is
[23]  based upon color. What do you mean by that?

Page 91

[1]     A.   I am an Asian.
[2]     Q.   Korean?
[3]     A.   Yes.
[4]     Q.   And you have also alleged sex,
[5]   which is obviously female; is that correct?
[6]     A.   Correct.
[7]     Q.   And you also allege national
[8]   origin. What is your national origin you
[9]   are contending you were discriminated
[10]  against?
[11]    A.   Asian.
[12]    Q.   Again, Korean?
[13]    A.   Uh-huh.
[14]    Q.   You know Lisa McNamee, don't
[15]  you?
[16]    A.   Yes.
[17]    Q.   Is she part Korean?
[18]    A.   I believe she is.
[19]    Q.   And is it correct that she was
[20]  hired at Amtren while you were still working
[21]  there?
[22]    A.   Yes.
[23]    Q.   And I believe you previously

Page 92

[1]   testified that Lisa -- you worked with Lisa;
[2]   is that correct?
[3]     A.   Yes.
[4]     Q.   Did you supervise Lisa?
[5]     A.   To some extent.  Both
[6]   Mr. Lamberth and myself.
[7]     Q.   Do you know who hired Lisa?
[8]     A.   Myself and Mr. Lamberth.
[9]     Q.   Did you have the authority to
[10]  hire Lisa without Mr. Lamberth's approval?
[11]    A.   No.
[12]    Q.   Is it a correct statement, then,
[13]  that Mr. Lamberth had the authority to hire
[14]  new employees at Amtren?
[15]    A.   Yes.
[16]    Q.   When you left Amtren, was Lisa
[17]  still working there?
[18]    A.   Yes.
[19]    Q.   When you worked with Lisa, what
[20]  were Lisa's duties?
[21]    A.   Data entry.
[22]    Q.   Into Mas90?
[23]    A.   Into whatever system was there.

Page 93

[1]   **Q.** Do you recall if Mas90 was —
[2]   **A.** I believe it was, but I would
[3]   need to look at all those to make sure.
[4]   Whatever accounting system, it's data entry.
[5]   **Q.** What type of data would she
[6]   enter into the accounting system?
[7]   **A.** Invoices.
[8]   **Q.** Anything else?
[9]   **A.** I don't remember everything.
[10]  But I know it was invoices, customer
[11]  purchase orders.
[12]  **Q.** Anything else?
[13]  **A.** Not that — it was mostly —
[14]  distribution of mail.
[15]  **Q.** I didn't make myself very
[16]  clear. Any other type of date entry that
[17]  Lisa did into the accounting system other
[18]  than invoices and customer purchase orders?
[19]  **A.** I thought you said what her
[20]  duties were.
[21]  **Q.** I did first. But you said data
[22]  entry, and I'm asking you about what type of
[23]  data did she enter into the system, and you

Page 94

[1]   told me invoices and customer purchase
[2]   orders. And my question now is, any other
[3]   type of data that she entered into the
[4]   system?
[5]   **A.** Not that I can recall.
[6]   **Q.** Do you recall if Lisa was there
[7]   when this error with Plextor was made and
[8]   caught by you?
[9]   **A.** I don't.
[10]  **Q.** What other type of duties did
[11]  Lisa perform other than data entry?
[12]  **A.** Mail distribution and answering
[13]  the phone.
[14]  **Q.** Anything else that you recall?
[15]  **A.** Not that I recall right now.
[16]  **Q.** Did she perform duties as
[17]  assigned by you?
[18]  **A.** Yes, she would.
[19]  **Q.** Do you recall any other duties
[20]  that you may have assigned her?
[21]  **A.** No, not that I can recall right
[22]  offhand.
[23]          **MR. TRAWICK:** Let's go off the

Page 95

[1]   record.
[2]          (Off-the-record discussion.)
[3]          (Lunch recess.)
[4]   **Q.** (By Mr. Trawick) Ms. McCollum,
[5]   let me direct your attention to Defendant's
[6]   Exhibit 4, which is a copy of the charge of
[7]   discrimination that you filed. In the
[8]   factual part of the charge you state,
[9]   Mr. Lamberth began to give me sexually
[10]  stereotypical duties, e.g., ordering lunch.
[11]  Previously you've testified about ordering
[12]  lunch and making coffee and setting up for
[13]  the lunches. Anything else you're referring
[14]  to as sexually stereotypical duties?
[15]  **A.** Not that I can think of.
[16]  **Q.** You go on to state that you were
[17]  troubled by these assignments and comments
[18]  made by the company president. What
[19]  comments are you making reference to?
[20]  **A.** He made a comment that he was a
[21]  chauvinist and that he knew it all. We were
[22]  invited to a luncheon with the two people
[23]  from Walker Personnel, both female. I asked

Page 96

[1]   Mr. Lamberth if he would like to attend. He
[2]   stated for me just to take Jerry Weisenfeld,
[3]   that he was a chauvinist and he knew it all,
[4]   and he did not want to attend to lunch.
[5]   **Q.** Was anyone present when
[6]   Mr. Lamberth allegedly made these
[7]   conversations?
[8]   **A.** Other than myself?
[9]   **Q.** Yes.
[10]  **A.** No.
[11]  **Q.** What did you understand
[12]  Mr. Lamberth to mean by the comment he knew
[13]  it all?
[14]  **A.** It is my belief that he meant he
[15]  really didn't have time to go to lunch with
[16]  women, and he knew everything and it
[17]  wouldn't benefit him.
[18]  **Q.** What was the purpose of this
[19]  luncheon with Walker Personnel?
[20]  **A.** They just called and asked us to
[21]  go to lunch because we were doing business
[22]  with them.
[23]  **Q.** And did Mr. Lamberth say that he

Page 97

[1] didn't want to go to lunch because the
[2] representatives from Walker Personnel were
[3] female?
[4]    A. He said what I just stated.
[5]    Q. So it is correct that he did not
[6] state that he did not want to go to lunch
[7] because he would be going to lunch with
[8] females; is that correct?
[9]    A. That would be correct.
[10]    Q. You go on to state in your
[11] charge that in December of 2004 Mr. Lamberth
[12] hired a man who was given the title of
[13] business manager. Who are you making
[14] reference to?
[15]    A. Jerry Weisenfeld.
[16]    Q. You go on to state, I believe he
[17] terminated me because of my sex and color or
[18] nationality; I am Asian-American. What
[19] facts are you relying upon to make that
[20] statement?
[21]    A. I was treated differently than
[22] other male employees; that my duties were
[23] more female stereotypical. When I was first

Page 98

[1] brought on board with Amtren, I was told
[2] that I would have more of the
[3] responsibilities of helping run the business
[4] and that sort of thing. And it is my
[5] belief, because I am female, that he hired
[6] Mr. Weisenfeld, because he is male, to do
[7] those duties.
[8]    Q. To do what duties?
[9]    A. The duties that I was told that
[10] I would have as far as the accounting
[11] functions and the planning, that sort of
[12] thing.
[13]    Q. You're going to have to list
[14] those duties for me.
[15]    A. List my duties?
[16]    Q. No. You just testified -- and
[17] I'll have the court reporter read it back if
[18] you want. But you testified you believe
[19] that Mr. Lamberth hired Jerry to do those
[20] duties that you thought you were going to
[21] do. I'm simply asking you what duties are
[22] you making reference to?
[23]    A. I am making reference to

Page 99

[1] controller-type duties.
[2]    Q. What are they?
[3]    A. Accounting functions.
[4]    Q. What accounting functions? That
[5] doesn't tell me anything.
[6]    A. Accounts payable, accounts
[7] receivable, software system, planning for
[8] the future of the company, analysis. Those
[9] type duties.
[10]    Q. What functions pertaining to
[11] accounts payable are you making reference to
[12] that you did not perform?
[13]    A. I'm sorry?
[14]    MR. TRAWICK: Read the question
[15] back and read her answer.
[16]    (The requested portion of the
[17] record, page 97, lines 16-23, and page 98,
[18] lines 1-14, were read by the reporter.)
[19]    Q. (By Mr. Trawick) Okay. What
[20] duties? You said accounting --
[21]    A. Okay. For example, this meeting
[22] that I was not included in to re-evaluate
[23] the line of credit planning, that was a

Page 100

[1] meeting held between the banker,
[2] Mr. Lamberth, and Jerry Weisenfeld. I am
[3] controller at that point in time. I feel
[4] like I should have been in that meeting.
[5]    Q. Anything else? You mention
[6] accounting functions, dealing with accounts
[7] payable.
[8]    A. Any accounting function. It is
[9] my belief that Mr. Weisenfeld, like I said,
[10] was hired to basically replace me.
[11]    Q. And what facts are you relying
[12] upon for that statement, or is that just
[13] your opinion?
[14]    A. Well, here's one. This is a
[15] meeting between a banker and Mr. Lamberth,
[16] the president of the company, and --
[17]    Q. Defendant's Exhibit 3?
[18]    A. Number 3.
[19]    Q. Anything else? You have said
[20] Defendant's Exhibit 3.
[21]    A. Yes. Also, he was receiving
[22] training -- additional training on the Mas90
[23] system, which was my responsibility. The

Page 101

[1] Amtren -- Mr. Lamberth chose to pay Wilson
[2] Price extra money to train Mr. Weisenfeld
[3] when I could have easily shown him those
[4] functions and that system.
[5]     Q. Anything else?
[6]     A. Not that I recall.
[7]     Q. Okay. So we have the meeting
[8] that took place in March 2005. It's
[9] referenced in Defendant's Exhibit 3. We
[10] have that Jerry Weisenfeld received training
[11] from Bobby Lake on Mas90. Anything else?
[12]     A. Not that I can think of right
[13] now.
[14]     Q. Okay. So there's nothing
[15] dealing with the accounts payable, accounts
[16] receivable, et cetera, that you previously
[17] testified about?
[18]     A. It's my belief that Jerry
[19] Weisenfeld was to take my place. Accounts
[20] payable was part of my responsibility,
[21] therefore it would be part of his.
[22]     Q. Do you have any facts upon which
[23] you base that opinion, other than the two

Page 102

[1] things you just told me?
[2]     A. That is my belief.
[3]     Q. Do you have any facts to support
[4] that belief other than the two things you
[5] told me, one being this meeting in March
[6] 2005 with the banker, and that Jerry
[7] Weisenfeld received training on Mas90?
[8]     A. Not at this time.
[9]     Q. Okay. You go on to state that
[10] Lamberth hired six women, only one is still
[11] with the company. Who are those six women?
[12]     A. I don't recall their names. I
[13] don't know their names. I would need to see
[14] payroll records.
[15]     Q. You don't recall any of the
[16] names?
[17]     A. Lisa McNamee, for one.
[18]     Q. And she was still with the
[19] company when you left?
[20]     A. Yes.
[21]     Q. Any of the other five, do you
[22] recall their names?
[23]     A. No, not right at this time.

Page 103

[1]     Q. And is it your testimony that
[2] those five women who you cannot recall their
[3] name at this time were not with the company
[4] when you left; is that correct?
[5]     A. As far as I can remember. I
[6] can't remember all of it. But as far as I
[7] can remember, they were not except for Lisa
[8] McNamee.
[9]     Q. Are you contending that
[10] Mr. Lamberth fired these five women because
[11] they are women after he hired them?
[12]     A. Yes.
[13]     Q. What facts do you base that
[14] opinion upon?
[15]     A. What he had told me, that he did
[16] not trust me, he also told me that after
[17] firing two, I believe. I don't recall
[18] exactly how many of the other women. They
[19] were doing a fine job. They were doing just
[20] fine, and they were terminated. So I can
[21] only assume that they were terminated due to
[22] their sex.
[23]     Q. Is it your testimony that

Page 104

[1] Mr. Lamberth told you that these two women,
[2] who you can't identify --
[3]     A. Not without the payroll records.
[4]     Q. You can't identify them today;
[5] is that correct?
[6]     A. Not without the payroll records.
[7]     Q. That's not my question,
[8] Ms. McCollum. Do you know their names
[9] today?
[10]     A. No. I can't recall them.
[11]     Q. Then is it your testimony that
[12] these two women who you contend were fired,
[13] Mr. Lamberth said they were doing a good
[14] job? Is that your testimony?
[15]     A. I don't recall him saying that.
[16]     Q. Okay. He didn't say that, then,
[17] to your recollection?
[18]     A. He didn't say that to me
[19] directly.
[20]     Q. Who did he say it to?
[21]     A. He said it, I believe, to other
[22] people. He would be saying what a good job
[23] they're doing.

Page 105

[1]   Q. To whom did he say that?
[2]   A. I believe -- I can't remember
[3]   exactly who all. Other employees in the
[4]   office.
[5]   Q. So you can't name any --
[6]   A. And I heard that he said they
[7]   were doing a good job.
[8]   Q. Who did you hear it from?
[9]   A. I heard him talking to other
[10]  people saying what he -- that they were
[11]  doing a good job.
[12]  Q. Ms. McCollum, you just confused
[13]  me.
[14]  A. Okay. Well, you're confusing
[15]  me, too. I'm sorry.
[16]  Q. You are the one testifying, and
[17]  I'm asking you a simple question. Did you
[18]  hear Mr. Lamberth say these two women that
[19]  you contend were fired because they are
[20]  women were doing a fine job?
[21]  A. I do recall, now that I think
[22]  about it. Melody. He told me that she was
[23]  doing a good job, and then the next thing I

Page 106

[1]   know, she's fired.
[2]   Q. Was anyone else present when
[3]   Mr. Lamberth allegedly told you that Melody
[4]   was doing a good job?
[5]   A. I don't remember. I don't think
[6]   so, though.
[7]   Q. Do you know the reason she was
[8]   fired?
[9]   A. It is my belief because she's a
[10]  woman.
[11]  Q. Do you have any facts to support
[12]  that belief?
[13]  A. Just what I have already told
[14]  you.
[15]  Q. What is that? You haven't told
[16]  me any facts other than the fact that she's
[17]  a woman.
[18]  A. Mr. Lamberth said that she was
[19]  doing a good job. Then a few -- I don't
[20]  even know. Not a day or two later, he had
[21]  fired her. Now, what other reason would he
[22]  have to fire her?
[23]  Q. I'm asking you.

Page 107

[1]   A. And I told you what my belief
[2]   was.
[3]   Q. And I'm asking you if you have
[4]   any facts to support that belief. Is your
[5]   answer no?
[6]   A. My answer is not at this time.
[7]   Q. All right. What's the name of
[8]   the other woman that you contend was fired
[9]   and was doing a good job?
[10]  A. I don't know. I don't remember
[11]  her name.
[12]  Q. Now, is it your testimony that
[13]  Mr. Lamberth told you this other woman, who
[14]  you cannot recall her name, was doing a good
[15]  job?
[16]  A. I don't really remember.
[17]  Q. I think you used the word doing
[18]  a fine job.
[19]  A. I don't really remember.
[20]  Q. So sitting here today, you can't
[21]  say yes or no Mr. Lamberth made that
[22]  statement, she's doing a fine job, regarding
[23]  this other woman?

Page 108

[1]   A. Sitting here today, I cannot.
[2]   Q. Is it your testimony you have no
[3]   firsthand knowledge of the reason that
[4]   Melody left Amtren?
[5]   A. I have no firsthand knowledge?
[6]   Q. Is that correct?
[7]   A. I was there when Mr. Lamberth
[8]   terminated Melody. I was there when he said
[9]   what a nice job she was doing.
[10]  Q. Were you present when he told
[11]  her she was being terminated?
[12]  A. No, I was not present.
[13]  Q. My question, then -- if you will
[14]  listen carefully -- do you have any
[15]  firsthand knowledge of the reasons that Ms.
[16]  Melody was terminated?
[17]  A. No. I wasn't present when she
[18]  was terminated.
[19]  Q. My question is not limited to
[20]  were you present when he terminated her. My
[21]  question is a little bit broader than that.
[22]  It is, do you have any firsthand knowledge
[23]  of the reasons she was terminated?

Page 109

[1]  **A.** And my answer is I wasn't
[2]  present when he terminated her. I do not
[3]  know why he terminated her.
[4]  **Q.** And you have no firsthand --
[5]  **A.** Other than what I believe.
[6]  **Q.** -- knowledge who was -- okay.
[7]  You go on to state in this charge that one
[8]  woman was pregnant and Mr. Lamberth
[9]  terminated her.
[10]  **A.** Yes.
[11]  **Q.** Who was that?
[12]  **A.** I don't recall her name. She
[13]  worked for the temp agency. She was a young
[14]  black woman. She had not worked there for
[15]  very long when Mr. Lamberth terminated her.
[16]  **Q.** You said she worked for the temp
[17]  agency. She really didn't work for Amtren,
[18]  then.
[19]  **A.** Well, she did work. She was a
[20]  temp to hire.
[21]  **Q.** Do you have any firsthand
[22]  knowledge of the reasons she stopped working
[23]  at Amtren as a temporary employee through, I

Page 110

[1]  assume it was, Walker Personnel?
[2]  **A.** Yes.
[3]  **Q.** Okay.
[4]  **A.** I was told that she was not --
[5]  no longer needed.
[6]  **Q.** Who told you that?
[7]  **A.** Kirk Lamberth.
[8]  **Q.** Did he tell you why she was no
[9]  longer needed?
[10]  **A.** I don't recall exactly why.
[11]  **Q.** Okay. But you state in your
[12]  charge that she was terminated because she
[13]  was pregnant; is that correct?
[14]  **A.** He made the comment that -- when
[15]  I notified Mr. Lamberth that she was
[16]  pregnant, he made the comment, well, didn't
[17]  she know that before she started working
[18]  here.
[19]  **Q.** Well, do you dispute
[20]  Mr. Lamberth's opinion that she was no
[21]  longer needed?
[22]  **A.** Not my decision.
[23]  **Q.** That's not my question. My

Page 111

[1]  question is, do you dispute Mr. Lamberth's
[2]  opinion that she was no longer needed as a
[3]  temp -- temporary employee?
[4]  **A.** You know, I don't know quite
[5]  what you mean by that question. Are you
[6]  saying did I think -- was it my belief she
[7]  was needed or not needed?
[8]  **Q.** Yes.
[9]  **A.** I don't know.
[10]  **Q.** Okay. You go on to state only
[11]  three of the employees of Amtren were female
[12]  at the time I left the company. Who were
[13]  those three employees other than Lisa?
[14]  **A.** There was Lisa and --
[15]  **Q.** That's Lisa McNamee; is that
[16]  correct?
[17]  **A.** Yes. And she was a part-time
[18]  web designer, and I don't recall her name.
[19]  I don't recall the third person's name.
[20]  **Q.** How many male employees worked
[21]  at Amtren when you left?
[22]  **A.** Approximately 15 or 16.
[23]  **Q.** What did the 15 or 16 males do?

Page 112

[1]  **A.** I would -- I can only give you
[2]  some estimates.
[3]  **Q.** Well, we know Kirk worked there;
[4]  correct?
[5]  **A.** Uh-huh.
[6]  **Q.** Is he one of the 15 or 16 males
[7]  you are making reference to?
[8]  **A.** No, he really isn't.
[9]  **Q.** We know that Jerry was working
[10]  there.
[11]  **A.** Uh-huh.
[12]  **Q.** Is he one of the 15 or 16?
[13]  **A.** Yes.
[14]  **Q.** Who else?
[15]  **A.** David Fields. Then there were
[16]  some production -- there were the three
[17]  engineers, Steve, Mike, and John. That's
[18]  all the names I can recall without the
[19]  payroll records.
[20]  **Q.** Okay. It's my understanding
[21]  that they have, like, one building where
[22]  management-type people work in and another
[23]  building where they actually produce the

**Page 113**

[1] product; is that correct?

[2] A. It wasn't always that way when I

[3] was there.

[4] Q. How was it then?

[5] A. It was all in one building when

[6] I was there. Maybe those changes have come

[7] forth since.

[8] Q. Okay. Is it a correct

[9] statement, other than Jerry, David, Steve,

[10] Mike, and John, you don't know what these

[11] other males did?

[12] A. Some of them were in production,

[13] some of them were in customer service.

[14] Q. You go on to state, since

[15] leaving the company, I have learned that

[16] Lamberth expressed his bias against women

[17] and persons of color to other management

[18] staff. Who told you that?

[19] A. Mike Bishop.

[20] Q. Is this the Mike you couldn't

[21] remember his last name a minute ago, the

[22] engineer?

[23] A. No.

**Page 114**

[1] Q. Mike Bishop is someone else?

[2] A. Yes.

[3] Q. Did Mike Bishop work at Amtren?

[4] A. Yes.

[5] Q. What was his position?

[6] A. He was, I believe, the

[7] operations manager.

[8] Q. Who else?

[9] A. Who else what?

[10] Q. Anyone else tell you this?

[11] A. No.

[12] Q. Is Mike Bishop still employed at

[13] Amtren?

[14] A. No.

[15] Q. Why did he leave?

[16] A. He quit, but I'm not sure of all

[17] the reasons.

[18] Q. What did Mike Bishop tell you?

[19] A. He just said that he was moving

[20] on to own his own business.

[21] Q. Let me rephrase that question.

[22] A. Uh-huh.

[23] Q. What did Mike Bishop tell you to

**Page 115**

[1] cause you to make this statement that

[2] Lamberth expressed bias against women and

[3] persons of color?

[4] A. That he had --

[5] Q. He who?

[6] A. Mike Bishop had heard Kirk

[7] Lamberth make racial slurs.

[8] Q. Did he tell you what racial

[9] slurs?

[10] A. No, he did not.

[11] Q. Did you ask?

[12] A. I believe I did.

[13] Q. And you -- what did Mike tell

[14] you when you asked?

[15] A. He didn't tell me what he said.

[16] Q. Did he tell you he couldn't

[17] recall?

[18] A. He just didn't tell me.

[19] Q. What else did Mike tell you that

[20] he heard Kirk say?

[21] A. That's all I can remember at

[22] this time.

[23] Q. Have you ever heard Kirk make

**Page 116**

[1] any racial slurs?

[2] A. Not that I recall.

[3] Q. And Mike Bishop is the only

[4] person that you were making reference to

[5] when you make the statement you've learned

[6] that he -- that Lamberth expressed bias to

[7] other management staff; is that correct?

[8] A. Yes.

[9] Q. In response to my question about

[10] the reasons you think you were terminated,

[11] because of your sex and color, you stated

[12] you were treated differently than the other

[13] males. You previously answered that

[14] question. Is there anything else that you

[15] want to add to that, as to how you were

[16] treated differently than males?

[17] A. Not at this time.

[18] Q. And you also testified that your

[19] duties were more female stereotypical.

[20] You've testified about that previously as

[21] far as ordering lunch, et cetera. Anything

[22] else other than what you've already told me?

[23] A. Not at this time.

Page 117

[1]    Q.  Well, does that mean at some
[2]  later time you're going to have something
[3]  else, Ms. McCollum?  The purpose of this
[4]  deposition is to find out what you contend
[5]  was done to you wrong.  Now, your response,
[6]  not at this time, implies that there may be
[7]  something at some later time.  I'm trying to
[8]  find out at this point in time, is there
[9]  anything else regarding these duties that
[10]  you consider was female stereotypical?
[11]    A.  Not at this point in time.
[12]    MR. TRAWICK:  Let's mark this as
[13]  Defendant's Exhibit 5.
[14]    (Whereupon, a document was
[15]  marked as Defendant's Exhibit 5 and is
[16]  attached to the original transcript.)
[17]    Q.  Let me show you what has been
[18]  marked as Defendant's Exhibit 5, which are
[19]  documents numbered 0012, 13, and 14 that
[20]  were produced to your lawyer by the
[21]  defendant in this case.  Take a look at
[22]  those documents.
[23]    A.  (Witness reviews documents.)

Page 118

[1]    Q.  What are those documents?
[2]    A.  It appears to me -- well, what
[3]  it is, it's just a statement from the
[4]  Internal Revenue Service stating a penalty,
[5]  federal tax liability -- for federal tax
[6]  liability.
[7]    Q.  For Amtren?
[8]    A.  I don't see where it's directed
[9]  to Amtren.  I don't know.
[10]    Q.  Have you seen these documents
[11]  before?
[12]    A.  I believe I have.
[13]    Q.  Tell me what context you saw
[14]  these documents in.
[15]    A.  I believe it was in the
[16]  paperwork that was requested by my lawyer.
[17]    Q.  When you performed your duties
[18]  at Amtren, did you see these documents?
[19]    A.  I don't know.  I may have.  I
[20]  don't know.  I mean, you're asking me to
[21]  remember.  I don't know.
[22]    Q.  Let me ask you this question,
[23]  then.  During the time that you were

Page 119

[1]  responsible for making the tax payments, the
[2]  payroll taxes on behalf of Amtren, were
[3]  there any penalties assessed against Amtren?
[4]    A.  You know, I would have to see
[5]  all the documentation.  I mean, I -- I know
[6]  that there was -- when I first started
[7]  there, there was a penalty for failure of
[8]  not paying state payroll taxes for three
[9]  months.  But that would not have been -- I
[10]  mean, I wasn't even there then.
[11]    Q.  You learned about that after you
[12]  started working for Amtren; is that correct?
[13]    A.  Yes.
[14]    Q.  Is it your testimony that you
[15]  cannot recall, during the time that you
[16]  worked there and the time that you were
[17]  responsible for making the tax payments on
[18]  behalf of Amtren, any penalty being
[19]  assessed?
[20]    A.  There may have been, but I would
[21]  not be able to answer that question fully
[22]  without looking at all the documentation.
[23]  Do I recall any penalty at all?  Is that

Page 120

[1]  your question?
[2]    Q.  That's my question.  Yes.
[3]    A.  Probably, yes.
[4]    Q.  Probably?
[5]    A.  Uh-huh.  Yes.
[6]    Q.  Tell me what you recall about
[7]  the penalty that was assessed against
[8]  Amtren.
[9]    A.  There was a penalty for the
[10]  three months of state taxes that was not
[11]  filed.
[12]    Q.  And I think you testified that
[13]  was before you got there; is that correct?
[14]    A.  I saw the -- no.  Well, the
[15]  three months that weren't filed happened
[16]  before I got there.
[17]    Q.  You told me about that.
[18]    A.  Okay.
[19]    Q.  Now, during the time that you
[20]  were there and the time that you were
[21]  responsible for making the payroll taxes to
[22]  the IRS and to the state, were there any
[23]  penalties assessed against Amtren?

Page 121

[1]   A.   Yes, I believe so.
[2]   Q.   Tell me about those penalties.
[3]   A.   Okay. I just don't recall all
[4]   what they were. I know that there were. I
[5]   don't know exactly which form it was or
[6]   which tax it was. I mean, I just don't
[7]   recall.
[8]   Q.   Who was responsible for making
[9]   those payroll taxes?
[10]   A.   That would be myself.
[11]   Q.   And it's your testimony that you
[12]   don't recall anything about those penalties
[13]   being assessed against Amtren, even though
[14]   it was your responsibility, other than the
[15]   fact that the penalties were assessed?
[16]   A.   There were penalties assessed.
[17]   I don't recall --
[18]   Q.   More than one? On more than one
[19]   occasion; is that correct?
[20]   A.   I believe so, but I don't recall
[21]   which form it was, which tax it was.
[22]   Q.   I'm not asking you that. I'm
[23]   asking you was it your responsibility to

Page 122

[1]   make those payments in a timely fashion?
[2]   A.   Yes.
[3]   Q.   Did you fail to make those
[4]   payments in a timely fashion and, thus, a
[5]   penalty was assessed?
[6]   A.   No.
[7]   Q.   Why was the penalty assessed,
[8]   then?
[9]   A.   I would need to see the
[10]   documentation. I'm not sure.
[11]   Q.   You don't know; is that correct?
[12]   A.   I'm not sure.
[13]   Q.   And you're saying it wasn't
[14]   your --
[15]   A.   I don't see Amtren's name on
[16]   there at all.
[17]   Q.   You've previously testified that
[18]   on more than one occasion penalties were
[19]   assessed against Amtren, either by the state
[20]   or by the federal government for late tax
[21]   payments; is that correct?
[22]   A.   I'm not sure what the penalties
[23]   were for. I know there were some

Page 123

[1]   penalties. I know the state was due two or
[2]   three months of nonpayment of payroll
[3]   taxes.
[4]        MR. TRAWICK: Excuse me a
[5]   minute.
[6]        (Off-the-record discussion.)
[7]   Q.   (By Mr. Trawick) Ms. McCollum,
[8]   you would agree that a penalty of several
[9]   thousand dollars is a significant penalty?
[10]   A.   Yes, I would.
[11]   Q.   And these -- you've already
[12]   testified that these penalties were assessed
[13]   during the time that you had the
[14]   responsibility for making the payroll taxes;
[15]   is that correct?
[16]   A.   That's not correct. I don't
[17]   know when the penalties were assessed. I
[18]   don't know. I just know that there were
[19]   some. I don't -- you're referring to
[20]   this --
[21]   Q.   No, I'm not referring to
[22]   Defendant's Exhibit 5. You testified
[23]   previously that penalties were assessed

Page 124

[1]   against Amtren during the time that you were
[2]   responsible for making the payroll tax
[3]   payments to the federal government and to
[4]   the state government; correct?
[5]   A.   There were penalties assessed.
[6]   Q.   Okay. It was on more --
[7]   A.   I do not know if it was for
[8]   payroll taxes or for which tax it was for.
[9]   There were a number of taxes.
[10]   Q.   Let me rephrase the question,
[11]   then.
[12]   A.   Uh-huh.
[13]   Q.   During the time that you worked
[14]   for Amtren, were there ever any penalties
[15]   assessed for the late payment of payroll
[16]   taxes or the incorrect payment of payroll
[17]   taxes?
[18]   A.   I'm not sure. I mean, there
[19]   were penalties, but I'm not sure which tax
[20]   it was for.
[21]   Q.   Was someone else responsible for
[22]   making tax payments, then, other than you?
[23]   A.   Tax payments is pretty broad.

---

**Page 125**

[1] Are you saying payroll tax payments? I was
[2] responsible –
[3]    **Q.** Ms. McCollum, you just testified
[4] that during the time that you worked at
[5] Amtren, there were penalties assessed
[6] regarding taxes.
[7]    **A.** Yes. But I don't know which tax
[8] it was.
[9]    **Q.** And my question is, was anyone
[10] else responsible for ensuring that those
[11] taxes were paid timely or paid correctly,
[12] other than you?
[13]    **A.** Not – it was just me.
[14]    **Q.** We've established that, then.
[15]    **A.** Okay.
[16]    **Q.** And is it your testimony that
[17] sitting here today you have no recollection
[18] of the reasons those penalties were
[19] assessed?
[20]    **A.** Not at this time.
[21]    **Q.** All right. Is it your
[22] testimony, Ms. McCollum, that these
[23] penalties were not the result of your errors

**Page 126**

[1] and omissions?
[2]    **A.** I don't know what penalty you're
[3] talking about.
[4]    **Q.** Ms. McCollum, you testified –
[5]    **A.** That there were penalties.
[6]    **Q.** Yes. And my question is, is it
[7] your testimony those penalties were not
[8] assessed because of your errors and
[9] omissions?
[10]    **A.** I'm not sure. I would have to
[11] look at the paperwork.
[12]    **Q.** Ms. McCollum, this is not a
[13] difficult question.
[14]    **A.** Uh-huh.
[15]    **Q.** You're obviously a very
[16] intelligent woman, and you've previously
[17] testified that penalties being assessed are
[18] something that is significant.
[19]    **A.** Yes.
[20]    **Q.** And it's your testimony you
[21] don't know if these penalties were assessed
[22] because of something you failed to do or
[23] not?

**Page 127**

[1]    **A.** I'm just not sure.
[2]    **Q.** Then it could be because of your
[3] duties?
[4]    **A.** It could be.
[5]    **Q.** Okay. You just don't have any
[6] recollection of the facts as to why these
[7] penalties were assessed; is that correct?
[8]    **A.** Like I said, it could have
[9] been. I just would need to see it.
[10]    **Q.** Let me show you what's been
[11] marked as Defendant's Exhibit 6, which are
[12] documents number 0297, 298, and 299, which
[13] were produced to your lawyer.
[14]       (Whereupon, a document was
[15] marked as Defendant's Exhibit 6 and is
[16] attached to the original transcript.)
[17]    **A.** Okay.
[18]    **Q.** Take a look at those documents.
[19]    **A.** (Witness reviews documents.)
[20] Okay.
[21]    **Q.** You would agree that that's --
[22] strike that. Tell me what those documents
[23] are that are marked as Defendant's Exhibit

**Page 128**

[1] 6.
[2]    **A.** It's a notice saying that they
[3] have changed the balances in the federal tax
[4] deposits for the quarter, and this would be
[5] for tax period December 31, 2004.
[6]    **Q.** And why would there be changes
[7] made by the IRS? Let me ask you this
[8] question, then. Strike that. Did you
[9] receive this document when you were employed
[10] at Amtren?
[11]    **A.** I may have. I received many
[12] documents. I can't pinpoint exactly.
[13]    **Q.** I think, as Mr. Lamberth pointed
[14] out just a second ago, Defendant's Exhibit 6
[15] and Defendant's Exhibit 5 go together.
[16] Would you agree with that?
[17]    **A.** Let's see. Deposits
[18] insufficient – yes, it appears that it
[19] does.
[20]    **Q.** Okay. During the time that you
[21] worked with Amtren, do you recall receiving
[22] the documents, Defendant's Exhibit 6 and 5?
[23]    **A.** Yes, I believe I did.

---

Page 129

[1] **Q.** Defendant's Exhibit 6 states, we
[2] changed your tax return because we found a
[3] calculation error. Did I read that
[4] correctly?
[5] **A.** Yes.
[6] **Q.** Who is responsible for filing
[7] the returns that these documents,
[8] Defendant's Exhibit 5 and 6, apply to?
[9] **A.** I was responsible.
[10] **Q.** And as a result of the
[11] calculation error or the errors in those
[12] documents, is it correct that Amtren was
[13] assessed a penalty of $1,012.05?
[14] **A.** According to this letter, they
[15] were. I wonder if they paid that penalty.
[16] **Q.** Who would have been responsible
[17] for paying it?
[18] **A.** Well, let's see. This right
[19] here — sometimes you can do some things.
[20] This right here is a 941, probably not due
[21] until January 31st. This is dated March
[22] 14th, 2005. So I was terminated on April
[23] 8th. So that notice was just before my

Page 130

[1] termination.
[2] **Q.** But you agree that this notice
[3] that's identified as Defendant's Exhibits 5
[4] and 6 pertain to the time that you had
[5] responsibility for performing these duties;
[6] is that correct?
[7] **A.** Yes.
[8] **Q.** And you will agree that because
[9] you failed to perform your duties correctly,
[10] Amtren was assessed a penalty of $1,012.05;
[11] is that correct?
[12] **A.** I would not agree with that.
[13] **Q.** Why was Amtren assessed that
[14] penalty, then?
[15] **A.** According to this, it was
[16] because of a calculation error. But that
[17] could be a lot of different things. For one
[18] thing, if I recall correctly, this right
[19] here, when I received this notice, most of
[20] it was due to the fact that the incorrect
[21] week numbers were listed on the 941. But
[22] again, I would have to see the 941s to be
[23] able to —

Page 131

[1] **Q.** Who was responsible for filling
[2] out the 941s?
[3] **A.** I was.
[4] **Q.** Would you agree that,
[5] apparently, the 941s were filled out
[6] incorrectly?
[7] **A.** Yes. But it was corrected.
[8] **Q.** It was corrected by the IRS and
[9] a penalty was assessed; is that correct?
[10] **A.** That is incorrect.
[11] **Q.** Well, who corrected it then?
[12] **A.** I believe I did.
[13] **Q.** It's your testimony that you
[14] submitted an incorrect IRS form and the IRS
[15] notified you that Amtren is being assessed
[16] this penalty because you submitted an
[17] incorrect form?
[18] **A.** And when I called the Internal
[19] Revenue Service, we determined, I believe,
[20] that it was the weeks that were incorrect
[21] and — I don't believe Amtren ever paid the
[22] penalty.
[23] **Q.** That's not my question. Listen

Page 132

[1] to my question. I think the testimony is
[2] going to show they had to pay it, but that's
[3] not material at this point. You will agree
[4] — strike that. Is it correct that this
[5] penalty was assessed because of an error you
[6] made in filing the forms on behalf of
[7] Amtren?
[8] **A.** It would appear to be.
[9] **Q.** When you received the documents
[10] identified as Exhibits 5 and 6, did you
[11] inform Mr. Lamberth of this problem?
[12] **A.** Yes, I believe did.
[13] **Q.** What did you tell him?
[14] **A.** To the best of my memory, that
[15] there was a penalty; that I was researching
[16] it and would try to correct it. But I don't
[17] recall — I do believe I informed him about
[18] it, though.
[19] **Q.** Was anyone present when you told
[20] him about this?
[21] **A.** No.
[22] **Q.** Did you correct this error
[23] before you left?

Page 133

[1] A. I believe I did. I believe I
[2] did.
[3] Q. Whose handwriting is this on the
[4] first page of Defendant's Exhibit 6 that has
[5] some numbers, 94-11342?
[6] A. I have no idea.
[7] Q. That's not your handwriting?
[8] A. No.
[9] Q. Is this 185 here your
[10] handwriting?
[11] A. It doesn't look like it.
[12] Q. Let me direct your attention to
[13] document number 0298, which is a part of
[14] Defendant's Exhibit 6. This indicates a
[15] balance due of $1,556.56; is that correct?
[16] A. That is what this says, yes.
[17] Q. Do you know what that dollar
[18] amount represents?
[19] A. I'm not real sure. I would have
[20] to study the 941.
[21] Q. It is your testimony that you
[22] took care of this before you left; is that
[23] correct?

Page 134

[1] A. I said I believe I did.
[2] Q. Let me show you what has been
[3] marked Defendant's Exhibit 7. Documents
[4] number 0302 and 0303. Have you ever seen
[5] these documents before?
[6] (Whereupon, a document was
[7] marked as Defendant's Exhibit 7 and is
[8] attached to the original transcript.)
[9] A. (Witness reviews documents.)
[10] I'm not sure.
[11] Q. What is the date —
[12] A. I probably did.
[13] Q. What's the date of the document
[14] up in the right-hand corner?
[15] A. 4/18/2005.
[16] Q. You would agree that that amount
[17] identified in the document, Defendant's
[18] Exhibit 6, is the same amount in — strike
[19] that. You would agree that the amount in
[20] which the IRS is demanding payment in
[21] Defendant's Exhibit 7 of $1,594.56 is the
[22] same amount here, plus the additional
[23] penalty that's added here for it not being

Page 135

[1] paid here as in Defendant's Exhibit 6?
[2] A. This is 1556 plus 271. So, no,
[3] they don't agree.
[4] Q. Is the penalty that's identified
[5] in Defendant's Exhibit 7, the penalty that
[6] you think you took care of prior to leaving?
[7] A. I'm not sure.
[8] Q. What period is this penalty —
[9] strike that. Let me direct your attention
[10] to Defendant's Exhibit 7. What notice does
[11] this tax period indicate? What is the tax
[12] period that this notice indicates it applies
[13] to?
[14] A. It says here tax period
[15] 12/31/2004.
[16] Q. May I see the document?
[17] A. Sure.
[18] Q. Is it correct that during the
[19] tax period ending December 31, 2004 you were
[20] responsible for making the tax payments to
[21] the IRS?
[22] A. On the 941s, yes.
[23] Q. Does this apply to a 941?

Page 136

[1] A. Yes.
[2] Q. Defendant's Exhibit 7 applies to
[3] a 941; is that correct?
[4] A. Is that 7?
[5] Q. Yes.
[6] A. Yes.
[7] Q. Is it correct that Defendant's
[8] Exhibit 7 indicates that these taxes were
[9] not paid timely?
[10] A. I really don't know what it's
[11] trying to indicate. I can't tell.
[12] Q. You would agree that that notice
[13] indicates that there's an interest and
[14] penalty because the taxes were not timely
[15] paid; is that correct?
[16] A. That's what the notice says, our
[17] records indicate you haven't paid the amount
[18] you owe.
[19] Q. It is your responsibility for
[20] making certain those taxes were being paid
[21] during that time frame; is that correct?
[22] A. Yes.
[23] Q. Would you agree that that was an

Page 137

[1] error on your part?

[2]    A.  No.

[3]    Q.  Why was it not an error?

[4]    A.  I need to see all the forms and

[5] see exactly what happened before I would

[6] make that statement on my part.

[7]    Q.  Is it your testimony that you do

[8] not recall the circumstances under -- why

[9] the taxes were not paid for the tax period

[10] ending December 31, 2004?

[11]    A.  I don't recall.  But that's what

[12] that notice says.

[13]         MR. JACOBS:  Rick, can we take a

[14] short break?

[15]         MR. TRAWICK:  Sure.

[16]         (Brief recess.)

[17]    Q.  (By Mr. Trawick)  Let me show

[18] you what has been marked Defendant's Exhibit

[19] 8 that is -- consists of documents 0024, 25,

[20] 26, and 27 that have been produced to your

[21] attorney and ask if you've seen those

[22] documents before.

[23]         (Whereupon, a document was

Page 138

[1] marked as Defendant's Exhibit 8 and is

[2] attached to the original transcript.)

[3]    A.  Probably in the package

[4] documents.

[5]    Q.  Do you know what those documents

[6] are?

[7]    A.  This shows -- this is a notice.

[8] I mean, it's a notice from the IRS.

[9]    Q.  Have you seen documents like

[10] this before?

[11]    A.  I've seen documents like this,

[12] yes.

[13]    Q.  You would agree this is for the

[14] tax period ending March 31, 2005; is that

[15] correct?

[16]    A.  Yes.

[17]    Q.  And is it correct that for the

[18] tax period ending March 31, 2005 you were

[19] responsible for filing the taxes on behalf

[20] of Amtren?

[21]    A.  Yes.

[22]    Q.  Would you agree that this

[23] indicates that the tax returns that you

Page 139

[1] filed were not correct?

[2]    A.  May I see that document?

[3]    Q.  Sure.

[4]    A.  Please ask your question again.

[5]    Q.  Would you agree that documents

[6] identified as Defendants's Exhibit 6

[7] indicate that the IRS is telling Amtren that

[8] the tax documents you filed were not

[9] correct?

[10]    A.  That's what it's saying, yes.

[11]    Q.  Let me show you what's been

[12] marked as Defendant's Exhibit 9, which is

[13] also document number 0030.  Take a second

[14] and look at that document.

[15]         (Whereupon, a document was

[16] marked as Defendant's Exhibit 9 and is

[17] attached to the original transcript.)

[18]    A.  (Witness reviews document.)

[19] Okay.

[20]    Q.  What is the tax period that that

[21] document references?

[22]    A.  March 31, 2004.

[23]    Q.  Tax period ending on March 31,

Page 140

[1] 2004?

[2]    A.  That's what it says, yes.

[3]    Q.  Do you recall receiving that

[4] document?

[5]    A.  I may have, yes.

[6]    Q.  In fact, the date of the notice

[7] of the document is April 12, 2004; is that

[8] correct?

[9]    A.  Yes.

[10]    Q.  Is it also correct that these

[11] type of documents would have gone to you at

[12] Amtren?

[13]    A.  Yes.

[14]    Q.  Is it also correct that this

[15] document indicates that -- this document,

[16] meaning Defendant's Exhibit 9, indicates

[17] that the tax documents that you filed on

[18] behalf of Amtren were incorrect?

[19]    A.  No.  I believe all this document

[20] states is they could not identify the tax

[21] period -- that's all -- on the remittance.

[22] It's not saying anything was incorrect.

[23]    Q.  Who was responsible for

Page 141

[1] indicating the tax period on the federal tax
[2] deposit?
[3]    A. You know, I would have to see
[4] the records, but I believe at that point in
[5] time, It was the bank, MidSouth Bank in
[6] Dothan.
[7]    Q. Did you bring this to the
[8] attention of Mr. Lamberth?
[9]    A. I don't recall.
[10]    Q. Is this something you would have
[11] typically brought to his attention or should
[12] have brought to his attention?
[13]    A. I may have. I may not have. I
[14] don't think that would have been a – all I
[15] it's saying is they couldn't identify the
[16] tax period. That's all it's saying.
[17]    Q. Is this something you should
[18] have brought to the attention of
[19] Mr. Lamberth?
[20]    A. Maybe so.
[21]    Q. Yes or no? It's a simple
[22] question.
[23]    A. Yes.

Page 142

[1]    Q. Did you bring it to his
[2] attention?
[3]    A. I don't recall. I probably did.
[4]    Q. And it's your testimony that
[5] this was an error on the bank's part, not
[6] your part; is that correct?
[7]    A. I'm not sure.
[8]    Q. Could have been an error on your
[9] part?
[10]    A. Probably not. Not during that
[11] time period, no.
[12]    Q. Why not?
[13]    A. Because I didn't remit the tax
[14] during that time. I mean, I didn't actually
[15] fill out the form.
[16]    Q. Who filled out the form?
[17]    A. I believe it was the bank.
[18]    Q. When did you stop filling out
[19] the form?
[20]    A. I don't remember. I'll have to
[21] look at the records to –
[22]    Q. Then how do you know it wasn't
[23] during this time frame if you don't remember

Page 143

[1] when you stopped filling out the form?
[2]    A. I said I don't believe it was.
[3]    Q. So could have been?
[4]    A. Could have been.
[5]    Q. Let me show you what's been
[6] marked as Defendant's Exhibit 10. Take a
[7] look at that document.
[8]       (Whereupon, a document was
[9] marked as Defendant's Exhibit 10 and is
[10] attached to the original transcript.)
[11]    A. (Witness reviews document.)
[12] Uh-huh.
[13]    Q. Do you recall receiving that
[14] document?
[15]    A. I probably did.
[16]    Q. Okay. What's that document
[17] indicate?
[18]    A. Can I see this one?
[19]    Q. Sure. This one meaning
[20] Defendant's Exhibit 9?
[21]    A. Yes.
[22]    Q. Okay.
[23]    A. Okay. Indicates they could not

Page 144

[1] determine the tax period once again.
[2]    Q. On another document? On another
[3] tax return; is that correct?
[4]    A. Payroll tax remittance. Yes.
[5]    Q. Is this something you should
[6] have brought to the attention of
[7] Mr. Lamberth?
[8]    A. Yes. Sure.
[9]    Q. Is it correct that you do not
[10] know whether or not you filled out the tax
[11] form that Defendant's Exhibit 10 applies to
[12] or the bank?
[13]    A. I'm pretty sure it wasn't me.
[14]    Q. Why's that?
[15]    A. I had just started that January
[16] of 2004. That's dated March 2004. The bank
[17] was, I believe, doing it at that time.
[18]    Q. Okay. And it's your testimony
[19] you don't recall when you started doing it;
[20] is that correct?
[21]    A. That's correct.
[22]    Q. Let me show you what's been
[23] marked Defendant's Exhibit 11, which is also

Page 145

[1] document 0032. Do you recall receiving this
[2] document?
[3]         (Whereupon, a document was
[4] marked as Defendant's Exhibit 11 and is
[5] attached to the original transcript.)
[6]     A. I probably did.
[7]     Q. Is it correct that this document
[8] is notifying you that there's a problem with
[9] the tax return that was filed on behalf --
[10]     A. Again, it was the same thing.
[11] They just couldn't determine the tax
[12] period --
[13]     Q. Who did you talk with at the
[14] bank about this problem?
[15]     A. I don't remember. I don't
[16] remember talking to the bank about it. I
[17] don't know. I just don't recall. It was a
[18] long time ago.
[19]     Q. You would agree that this is a
[20] significant problem that's identified in
[21] Defendant's Exhibits 9, 10, and 11, that tax
[22] returns are not being filed correctly?
[23]     A. I would agree that it is an

Page 146

[1] issue that needed to be corrected if the IRS
[2] couldn't determine the tax periods.
[3]     Q. Okay. And you don't recall
[4] whether or not you filed those returns or
[5] whether or not the bank filed those returns;
[6] is that correct?
[7]     A. The remittance, that would be
[8] correct. I do not recall, but I believe it
[9] was the bank. Excuse me. Let me retract
[10] that, because I had just started working
[11] there.
[12]     Q. And you don't recall talking to
[13] the bank about this problem?
[14]     A. I don't remember.
[15]     Q. Is it correct you did not recall
[16] at this time discussing this issue with the
[17] bank?
[18]     A. I don't really remember, but I
[19] may have.
[20]     Q. You previously testified that it
[21] was your responsibility during the time that
[22] you were at Amtren to make the payments on
[23] behalf of Amtren to Blue Cross Blue Shield;

Page 147

[1] is that correct?
[2]     A. Yes.
[3]     Q. Were there ever any problems
[4] with those payments?
[5]     A. Not that I would consider major
[6] problems. They were all paid.
[7]     Q. What were the minor problems,
[8] then?
[9]     A. Well, I don't -- in my opinion,
[10] there weren't any as far as payment.
[11]     Q. Were the payments always on
[12] time?
[13]     A. They were in a timely fashion.
[14]     Q. That's not my question. Do you
[15] want me to repeat my question?
[16]     A. They were made in a timely
[17] fashion.
[18]     Q. Were they made by the date that
[19] they were due?
[20]     A. I believe they were.
[21]     Q. Were the insurance payments made
[22] in advance of the time period -- let me
[23] rephrase that. It's a bad question. Were

Page 148

[1] the insurance payments made monthly or
[2] quarterly?
[3]     A. I believe it was monthly.
[4]     Q. Is it correct that, for example,
[5] the payment for the month of March would
[6] have been due in February?
[7]     A. I'm not really sure exactly when
[8] it would have been due. I would need to see
[9] an invoice.
[10]     Q. You don't recall one way or the
[11] other?
[12]     A. To the best of my recollection,
[13] it would have been due by the 10th of the
[14] month that it was covering, or the 5th. I
[15] don't exactly remember, but it was not -- to
[16] the best of my knowledge, you know, if it
[17] was to cover the month of March, it would
[18] have been due March 1st.
[19]     Q. Let me show you what's been
[20] marked as Defendant's Exhibit 12. Do you
[21] recall receiving this document from Blue
[22] Cross Blue Shield?
[23]         (Whereupon, a document was

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

---

Page 149

[1] marked as Defendant's Exhibit 12 and is
[2] attached to the original transcript.)
[3]     A.   Yes, I believe so.
[4]     Q.   Does this indicate that the
[5] payment has not been made on time?
[6]     A.   This does have a previous
[7] balance on it.
[8]     Q.   So your testimony previously
[9] that the payments were made on time is
[10] incorrect; is that correct?
[11]     A.   According to this document,
[12] that's what would appear to be so.
[13]     Q.   Do you have reason to dispute
[14] that document?
[15]     A.   No, I don't. But the document
[16] does indicate -- see, this portion was
[17] probably already paid because I wrote only
[18] to pay this amount, the current portion
[19] due. So the checks were probably crossed up
[20] in the mail. This document process date is
[21] 3/18. So the check was probably crossed up
[22] in the mail. I have a notation. This is my
[23] handwriting.

---

Page 150

[1]     Q.   Only pay the amount of $6,810;
[2] is that correct?
[3]     A.   Yeah, because the other portion
[4] had already been paid. The amount past due
[5] had already been paid.
[6]     Q.   So it wasn't timely made, then;
[7] is that correct?
[8]     A.   Okay.
[9]     Q.   All right. Let me show you
[10] what's been marked as Defendant's Exhibit
[11] 13. Do you recall receiving this document?
[12]         (Whereupon, a document was
[13] marked as Defendant's Exhibit 13 and is
[14] attached to the original transcript.)
[15]     A.   No.
[16]     Q.   Does this document indicate that
[17] the March payment was not made timely?
[18]     A.   I don't believe so. Huh-uh.
[19] No. That's not what it's saying.
[20]     Q.   What's it saying, then?
[21]     A.   This says that there was an
[22] adjusted previous balance of $7,980, and the
[23] current amount due is $6,810. This process

---

Page 151

[1] date is 4/15/05. I was terminated on 4/8.
[2] Now, may I say one other thing? Exhibit
[3] Number 12 indicates that it was entered on
[4] 4/11. This is my handwriting to pay that.
[5] Again, I was terminated on 4/8.
[6]     Q.   But you would agree that
[7] Defendant's Exhibit 12 applies to a payment
[8] that was due in March that wasn't received?
[9]     A.   Let's see. That's what the
[10] document says, but it was probably already
[11] paid. That's why I told them just to pay
[12] that portion.
[13]     Q.   Again, if it had been timely
[14] paid, this document would not have been
[15] generated; is that correct?
[16]     A.   Okay. Well, you'll have to ask
[17] Blue Cross Blue Shield.
[18]     Q.   Is it your testimony that you
[19] believe this document was generated by Blue
[20] Cross even though they received a payment
[21] with a previous balance of $6,960?
[22]     A.   What could have happened was the
[23] check was crossed up in the mail. They may

---

Page 152

[1] have had the payment and didn't have time to
[2] post it. It happens in accounting all of
[3] the time.
[4]     Q.   It's your testimony, then, it
[5] was made on time; is that correct?
[6]     A.   I think I've already answered
[7] that question.
[8]     Q.   Answer it again.
[9]     A.   I'm not sure. I would have to
[10] see the check date.
[11]     Q.   Let me show you again
[12] Defendant's Exhibit 13. The process date of
[13] this document is April 5, 2005. Would you
[14] agree with that?
[15]     A.   The process date is April 15,
[16] 2005. I was terminated on 4/8.
[17]     Q.   What's this date over here in
[18] the left-hand corner?
[19]     A.   Amount applied to this invoice
[20] -- this is the process -- this says that
[21] this $6,960 was processed on 4/5, when that
[22] payment was received on 4/5.
[23]     Q.   Which made it late?

---

Page 153

[1]  A.  I believe that's what it says.
[2]  Q.  Okay. Thank you. Isn't it
[3] correct, Ms. McCollum, that you instructed
[4] Lisa McNamee to hold payments and make
[5] payments to Blue Cross during the grace
[6] period and not to make them on time?
[7]  A.  No.
[8]  Q.  You deny that, then?
[9]  A.  Yes.
[10]  Q.  So if Ms. McNamee testified to
[11] that, she would be lying; is that correct?
[12]  A.  I answered your question. I'm
[13] not going to say if Ms. McNamee lies or not.
[14]  Q.  It's my understanding that she
[15] is going to testify that you instructed her
[16] to do that.
[17]  A.  That's fine. It's my testimony
[18] that I didn't.
[19]  Q.  Okay. Do you recall the
[20] circumstances under which Amtren's credit
[21] card processor with Chase Visa was
[22] cancelled?
[23]  A.  Yes.

Page 154

[1]  Q.  What were the circumstances
[2] surrounding that?
[3]  A.  What I recall was charge backs
[4] that occurred — excessive charge backs, and
[5] those charge backs resulted in the credit
[6] card processor basically blackballing
[7] Amtren. The charge backs occurred because
[8] Mr. Lamberth sold three systems to somebody
[9] in a Middle East country and took three bad
[10] credit cards and processed those credit —
[11] under his instruction, I processed those
[12] credit cards. The credit card company then
[13] blackballed us because of excessive charge
[14] backs.
[15]  Q.  When were those systems sold and
[16] to whom?
[17]  A.  I'm not really sure. I know I
[18] don't have the exact date, and I would have
[19] to see all the documentation and the credit
[20] cards and everything.
[21]  Q.  Just so the record is clear,
[22] tell me what a credit card processor is.
[23]  A.  It is my knowledge that,

Page 155

[1] basically, they take your credit cards as
[2] their customer and charge the money and
[3] process it to your account.
[4]  Q.  Did you have any involvement
[5] with this?
[6]  A.  Yes, I did.
[7]  Q.  Tell me your involvement.
[8]  A.  I processed some of the credit
[9] cards for payment of the systems.
[10]  Q.  Which ones did you process?
[11]  A.  You know, I don't know. I
[12] believe American Express, and — I'm not
[13] sure of them all.
[14]  Q.  Just so the record is clear, who
[15] had the credit cards that were being
[16] processed?
[17]  A.  What do you mean? What period
[18] of time or — I don't know.
[19]  Q.  You testified that —
[20]  A.  Are you talking about the bad
[21] credit cards?
[22]  Q.  You testified that — it's my
[23] understanding your testimony is that this

Page 156

[1] was cancelled because of excessive charge
[2] backs.
[3]  A.  Yes.
[4]  Q.  Just so the record is clear,
[5] what do you mean by these excessive charge
[6] backs?
[7]  A.  Charge backs that occurred
[8] through the, I believe it was, three systems
[9] that Mr. Lamberth sold to some Middle
[10] Eastern country or people from that area
[11] because the credit cards were no good.
[12]  Q.  What do you mean no good?
[13]  A.  They were no good. I don't know
[14] if they were stolen or what, but they were
[15] not good credit cards.
[16]  Q.  Just so the record is clear, is
[17] it your testimony that Mr. Lamberth sold
[18] some products of Amtren?
[19]  A.  Uh-huh.
[20]  Q.  To three different individuals
[21] or companies?
[22]  A.  I really don't know if it was
[23] three different companies or individuals. I

Page 157

[1] know they were from the Middle East or some
[2] third world country.
[3]    Q.   So you are going to retract the
[4] three systems?
[5]    A.   No. I believe it was three
[6] systems.
[7]    Q.   Just so the record is clear,
[8] it's your testimony that Mr. Lamberth sold
[9] three systems to someone in a Middle Eastern
[10] country.
[11]    A.   In a third world country.
[12]    Q.   In a third world country.
[13]    A.   Or something like that.
[14]    Q.   And they paid with these -- paid
[15] for these systems with a credit card?
[16]    A.   Correct.
[17]    Q.   And you don't recall which
[18] credit card?
[19]    A.   No.
[20]    Q.   And these credit cards were no
[21] good?
[22]    A.   That's correct.
[23]    Q.   And when the charges on the

Page 158

[1] credit cards were processed, Chase Visa
[2] determined that the credit cards were no
[3] good; is that correct?
[4]    A.   I believe so.
[5]    Q.   And because the credit cards
[6] were no good, Chase Visa charged it back to
[7] Amtren; is that correct?
[8]    A.   Yes.
[9]    Q.   Do you know when those three
[10] systems were sold?
[11]    A.   I don't recall.
[12]    Q.   Do you recall when you received
[13] notification of the charge backs?
[14]    A.   I saw the charge backs coming
[15] through the bank system when I checked the
[16] bank accounts on-line.
[17]    Q.   Do you remember when that was?
[18]    A.   No.
[19]    Q.   Well, do you recall when the
[20] credit card processor was cancelled?
[21]    A.   Not exactly, no. Just before I
[22] left. I don't remember exactly when.
[23]    Q.   Let me show you what's been

Page 159

[1] marked as Defendant's Exhibit 14, which is
[2] also document 0040. Do you recall receiving
[3] this document?
[4]        (Whereupon, a document was
[5] marked as Defendant's Exhibit 14 and is
[6] attached to the original transcript.)
[7]    A.   Yes.
[8]    Q.   Whose handwriting is on that
[9] document?
[10]    A.   Mine.
[11]    Q.   Okay. Is it correct that this
[12] document is from Chase Merchant Services
[13] notifying Amtren that the merchant services
[14] account has been cancelled?
[15]    A.   Yeah, I believe that's what it
[16] -- let's see. Yes.
[17]    Q.   it's your testimony that this
[18] was cancelled because of excessive charge
[19] backs?
[20]    A.   From my understanding, yes.
[21]    Q.   This notice states that it's
[22] being cancelled because of an overdue unpaid
[23] charge of $118.41; is that correct?

Page 160

[1]    A.   Yes, that's what it says.
[2]    Q.   Who was responsible for paying
[3] this $118.41?
[4]    A.   The $118.41 would have been
[5] drafted from our bank accounts, and that's
[6] the way the credit card processors collected
[7] their fees. So they would have been drafted
[8] by the bank accounts by the credit card
[9] processor. After this transaction with the
[10] fraudulent credit card companies, I believe,
[11] under Mr. Lamberth's instruction, he signed
[12] bank cards so that you couldn't debit
[13] certain accounts or take money from them.
[14] It happened to be the account that the
[15] credit card companies used to debit those
[16] fees. They were unable to debit those fees.
[17]    Q.   So it's your testimony that it
[18] was Mr. Lamberth's fault that this $118.41
[19] was not paid?
[20]    A.   I'm saying that he changed the
[21] debits on the accounts, and the credit card
[22] company could not debit the accounts.
[23]    Q.   Did you receive any notices

Page 161

[1] prior to receiving Defendant's Exhibit 14
[2] that there's an unpaid charge of $118.41?
[3]    A.  You know, I don't recall.  I
[4] don't remember.  I apparently tried to do
[5] something.  My handwriting and notes are all
[6] over this.
[7]    Q.  You would agree, would you not,
[8] that typically Chase Merchant Services
[9] provides some notification of an unpaid
[10] charge prior to cancelling the account?
[11]    A.  I would assume that they
[12] should.  I don't know if they did.
[13]    Q.  When did you discuss this with
[14] Mr. Lamberth?
[15]    A.  I don't remember the exact time,
[16] but just as soon as I found out.
[17]    Q.  Did you find out before or when
[18] you received Defendant's Exhibit 14?
[19]    A.  I believe when I received
[20] Defendant's Exhibit 14.
[21]    Q.  Tell me about your conversation
[22] with Mr. Lamberth when you received
[23] Defendant's Exhibit 14.

Page 162

[1]    A.  All I recall is that I did
[2] notify him about what was going on with the
[3] credit card processors.  You know, that's
[4] about all I can exactly remember.  I know
[5] that we eventually, I think, even contacted
[6] you about it.
[7]    Q.  You and I have never spoken
[8] prior to this deposition, Ms. McCollum.
[9]    A.  We haven't.
[10]    Q.  No, we haven't.
[11]    A.  It was somebody from this firm.
[12] I'm sorry.  You're right.  I believe it was
[13] somebody from this firm.
[14]    Q.  Is it correct that your
[15] testimony is prior to receiving Defendant's
[16] Exhibit 14, you did not know of any problems
[17] with this account with Chase Merchant
[18] Services?
[19]    A.  I don't remember any.
[20]    Q.  You would agree that this is a
[21] pretty significant problem?
[22]    A.  I would agree it is a problem.
[23] Yes.

Page 163

[1]    Q.  It's a very significant problem,
[2] is it not?
[3]    A.  I would agree it is a problem.
[4]    Q.  Well, it's not a significant
[5] problem?  Just a problem?
[6]    A.  I would agree it is a problem.
[7]    Q.  Okay.  And it's your testimony
[8] that prior to receiving Defendant's Exhibit
[9] 14 you had no information that there was a
[10] problem?
[11]    A.  I don't recall.
[12]    Q.  You may have received some
[13] information?
[14]    A.  May have.
[15]    Q.  All right.  Then when
[16] Mr. Lamberth testifies that you failed to
[17] notify him about this, you can't refute
[18] that; is that correct?
[19]    A.  Please restate that question.
[20]    Q.  It is my understanding there
[21] will be testimony that you received notice
[22] regarding a problem with this account prior
[23] to receiving Defendant's Exhibit 14 and that

Page 164

[1] you failed to notify anyone regarding the
[2] problem.  Is it your testimony you can't
[3] refute that because you just don't know?
[4]    A.  Right.  I don't remember.
[5]        MR. TRAWICK:  Let's take a
[6] break.
[7]        (Brief recess.)
[8]    Q.  (By Mr. Trawick)  Ms. McCollum,
[9] let me direct your attention back to
[10] Defendant's Exhibit 14.  Is it correct that
[11] Amtren had an account with Chase Merchant
[12] Services to process credit cards?  Is that
[13] an accurate statement?
[14]    A.  It was — you know, I would have
[15] to see all the documentation because there
[16] was an agreement through Web Master and
[17] several other things.  I don't know if it
[18] was Chase.  I just don't know.  The credit
[19] card processing companies are massive.
[20]    Q.  I understand, but —
[21]    A.  That letter is from Chase
[22] Merchant Services.
[23]    Q.  And it's your testimony you

Page 165

[1] don't know if Amtren had an account with
[2] Chase that was cancelled?
[3]   A. According to that Exhibit
[4] Number 14, that would appear to be the case.
[5]   Q. Did you have any involvement
[6] with Chase prior to receiving Defendant's
[7] Exhibit 14?
[8]   A. I don't recall if I did. I may
[9] have. Well, when you say -- I'm sure I
[10] processed a credit card. If they were the
[11] processors, then it would have gone through
[12] their processing.
[13]   Q. It's your testimony, then, that
[14] you just don't recall one way or the other
[15] if you had any duties that related to Chase
[16] Merchant Services?
[17]   A. I did process some credit cards,
[18] and it probably did go through the Chase
[19] Merchant Services processing department, I
[20] assume.
[21]   Q. Tell me what that means.
[22]   A. That means running the credit
[23] card through and receiving payment.

Page 166

[1]   Q. What did you do?
[2]   A. Ran the credit card through and
[3] completed the transaction so that we would
[4] receive payment.
[5]   Q. Just so the record is clear, so
[6] the Judge who is reading this will
[7] understand, when a company would charge --
[8] purchase something from Amtren and charge it
[9] to a credit card, would that go to Chase
[10] Merchant Services and Chase Merchant
[11] Services would do something with Amtren's
[12] checking account?
[13]   A. I'm not sure exactly. I would
[14] need to see all that. How the transactions
[15] work normally, what happens is that you run
[16] a credit card, your processor --
[17]   Q. What do you mean by running a
[18] credit card?
[19]   A. Entering credit card numbers --
[20] you know, the credit card number, et cetera,
[21] the amount.
[22]   Q. Give me an example of what you
[23] did.

Page 167

[1]   A. Okay. Let's say there was
[2] something for, you know, a purchase that was
[3] made.
[4]   Q. By whom?
[5]   A. By a customer.
[6]   Q. From Amtren?
[7]   A. Yes. I would, upon receiving
[8] the credit card information, enter that
[9] information.
[10]   Q. Into what?
[11]   A. I believe it was manual at one
[12] time. I don't recall what time period -- at
[13] one time, it was a manual thing. Sometimes
[14] I had to call it. I just don't remember
[15] exactly.
[16]   Q. You would manually enter it into
[17] what?
[18]   A. I'm not sure. I don't
[19] remember. I'm sorry. I really don't. Some
[20] of the transactions were called in through
[21] the telephone to get the approval.
[22]   Q. You would call whom?
[23]   A. I don't remember. There's

Page 168

[1] probably a 1-800 number somewhere.
[2]   Q. You would call Chase Merchant
[3] Services?
[4]   A. I just don't recall.
[5]   Q. These charge backs that you
[6] testified about, were there other charge
[7] backs prior to the three systems being sold
[8] to this third world country?
[9]   A. There may have been. I don't
[10] recall. But those are the three that stand
[11] out in my recollection.
[12]   Q. Is it correct that when there's
[13] a charge back, Chase Merchant Services looks
[14] to Amtren to pay that charge back?
[15]   A. Or whoever -- I would assume
[16] whoever, the credit card processor, would
[17] look to their customer whom they process
[18] that credit card for for payment of that
[19] charge back. Yes. I don't know if it's
[20] Chase Merchant or the credit card company.
[21]   Q. Would look to Amtren to pay that
[22] charge back?
[23]   A. Yes.

Page 169

[1]  Q.  What was the process by which
[2]  Amtren would bay that charge back?
[3]  A.  I'm not sure.
[4]  Q.  Did you ever receive any
[5]  documentation that either Chase Merchant
[6]  Services or a credit card company had made a
[7]  draft on Amtren's checking accounts for a
[8]  charge back?
[9]  A.  Okay.  That may be the way they
[10]  got it through the bank.  Yeah.  You're
[11]  right.  I'm sorry.
[12]  Q.  It is correct that those kinds
[13]  of documents came to you, and you were
[14]  advised of that since you were responsible
[15]  for the checking accounts?
[16]  A.  I was responsible for the
[17]  checking account, and I assume those
[18]  documents would have come to me, yes.
[19]  Q.  So even though you don't recall
[20]  at the present time other than there were
[21]  some charge backs, you would have been
[22]  notified through some documentation that
[23]  either Chase Merchant Services or a credit

Page 170

[1]  card processing company had attempted to
[2]  deduct some money from Amtren's checking
[3]  account because of a charge back; is that
[4]  correct?
[5]  A.  I would assume they would notify
[6]  me, yes.
[7]  Q.  Are you testifying they could
[8]  have deducted money from Amtren's checking
[9]  accounts and you wouldn't have known
[10]  anything about it?
[11]  A.  They couldn't have done it if
[12]  somebody didn't give them authorization, and
[13]  that would have been Kirk Lamberth.
[14]  Q.  Okay.  Assuming they had
[15]  authorization, is it your testimony that
[16]  they could have deducted the money and you
[17]  would not have known through any
[18]  documentation that the money was deducted
[19]  from the account?
[20]  A.  I would know the money was
[21]  deducted from the account, because I
[22]  reconciled the bank statement.  So I'd know
[23]  if money was deducted from the account.

Page 171

[1]  Q.  You would get some kind of
[2]  documentation from whoever deducted the
[3]  money from the account that we deducted X
[4]  amount of dollars and here's the reason we
[5]  deducted X amount of dollars; is that
[6]  correct?
[7]  A.  I would assume so.
[8]  Q.  And you routinely received such
[9]  documentation, did you not?
[10]  A.  I probably did.
[11]  Q.  Ms. McCollum, this is nuts.
[12]  Strike that.  Is it your testimony that
[13]  sitting here today, you don't recall what
[14]  your duties were regarding the balancing of
[15]  checking accounts and whether or not you
[16]  received any documentation from companies
[17]  that they were deducting money from Amtren's
[18]  checking account?
[19]  A.  No, that is not my testimony.
[20]  Q.  Is it correct, then, that you
[21]  routinely received documentation from Chase
[22]  Merchant Services or other processing
[23]  companies that money was being deducted from

Page 172

[1]  Amtren's checking account?
[2]  A.  I don't recall receiving the
[3]  exact documentation.  I would have known the
[4]  money was deducted because I reconciled the
[5]  bank accounts.
[6]  Q.  How would you have known the
[7]  money was deducted?
[8]  A.  Because I reconciled the bank
[9]  accounts.
[10]  Q.  You would get some kind of
[11]  document indicating that money was deducted
[12]  from the account, would you not?
[13]  A.  I may have.
[14]  Q.  How --
[15]  A.  I mean, I'm just saying, I may
[16]  have.  But it would have been deducted from
[17]  the account.  When you reconciled the bank
[18]  statement, you would see the money being
[19]  removed and by whom.
[20]  Q.  Would there be any notification
[21]  other than the bank statement that you
[22]  received from the bank?
[23]  A.  There may have been.

Page 173

[1]      Q.   What kind of documentation would
[2]  that have been, then?
[3]      A.   I would assume a notice of some
[4]  sort, you know. I'm not really sure.
[5]      Q.   You just don't recall ever
[6]  receiving a notice, then, that money was
[7]  being deducted?
[8]      A.   I said I may have.
[9]      Q.   Okay. Were there ever occasions
[10] when the Chase Merchant Services attempted
[11] to deduct the money from Amtren's checking
[12] account and there was not money in there
[13] sufficient for that deduction?
[14]     A.   That may have been possible. I
[15] just don't know. I would have to see the
[16] bank account.
[17]     Q.   You don't recall any specific
[18] incident when that happened?
[19]     A.   I don't recall.
[20]     Q.   Whose responsibility would it
[21] have been to ensure that there was enough
[22] money in that account to cover that
[23] deduction?

Page 174

[1]      A.   It was my responsibility to
[2]  maintain the checking account, if that's
[3]  what you're asking.
[4]      Q.   And it would have been your
[5]  responsibility to ensure that there were
[6]  sufficient funds in that account to cover
[7]  any deductions that Chase Merchant Services
[8]  may have made?
[9]      A.   I don't believe that would have
[10] been all my responsibility.
[11]     Q.   Whose responsibility would it
[12] have been?
[13]     A.   There's a lot of factors
[14] involved. You just can't sit there and say
[15] -- there's just a lot of factors involved.
[16]     Q.   What factors?
[17]     A.   Ask the question again. I'm
[18] getting tired. I'm sorry.
[19]     Q.   So am I.
[20]     A.   Okay. And I'm trying to
[21] remember. This was two years ago. It's
[22] been a long time.
[23]     Q.   We've established that this was

Page 175

[1]  a significant problem -- or at least a
[2]  problem. You wouldn't say it was
[3]  significant. But it was at least a problem
[4]  that Amtren encountered.
[5]      A.   Yes, it was a problem. The
[6]  credit card processing was definitely a
[7]  problem.
[8]      Q.   And my question is, prior to
[9]  receiving Defendant's Exhibit 14, were there
[10] occasions when you received notification
[11] from Chase Merchant Services that they
[12] attempted to deduct money from Amtren's
[13] account to process charges when there was
[14] not sufficient funds in that account?
[15]     A.   I may have.
[16]     Q.   But you don't recall that?
[17]     A.   I don't.
[18]     Q.   Even though it was a problem?
[19]     A.   Right.
[20]     Q.   Let me show you what's been
[21] marked as Defendant's Exhibit 15 and ask you
[22] if you recall seeing that document.
[23]          (Whereupon, a document was

Page 176

[1]  marked as Defendant's Exhibit 15 and is
[2]  attached to the original transcript.)
[3]      A.   Yes, I do.
[4]      Q.   Tell me about that document.
[5]      A.   It's a lease agreement for a
[6]  copier.
[7]      Q.   Did you get approval to enter
[8]  into this lease agreement?
[9]      A.   Yes.
[10]     Q.   Who gave you that approval?
[11]     A.   Mr. Lamberth.
[12]     Q.   When did he give you that
[13] approval?
[14]     A.   Prior to me turning in the
[15] agreement.
[16]     Q.   Okay. During the time that you
[17] were responsible for Amtren's checking
[18] accounts, were there occasions when the
[19] checking accounts did not have sufficient
[20] funds in the accounts and there were charges
[21] to Amtren because of insufficient funds?
[22]     A.   Yes.
[23]     Q.   Tell me about that.

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

---

Page 177

[1]  A. I'm not really sure. I couldn't
[2] elaborate on that. I would have to look and
[3] see exactly what the insufficient — the
[4] balances were and insufficient funds were
[5] for.
[6]  Q. Whose responsibility was it to
[7] ensure that the checking accounts did not
[8] have insufficient funds?
[9]  A. I guess it was mine.
[10]  Q. You would agree that that was an
[11] error, then?
[12]  A. (No response.)
[13]  Q. You may think it's funny, but I
[14] don't think it's funny.
[15]  A. I know you don't. That's okay.
[16]  Q. Did you advise Mr. Lamberth that
[17] Amtren was receiving insufficient funds
[18] charges because of a lack of funds in the
[19] checking accounts?
[20]  A. I'm sure. I don't remember.
[21] I'm sure I did, you know. He had access to
[22] the on-line records. I just don't remember,
[23] but I'm sure I did.

---

Page 178

[1]  Q. Let me show you what's been
[2] marked as Defendant's Exhibit 16, document
[3] 0042 through 0048. Have you seen those
[4] documents before?
[5]  (Whereupon, a document was
[6] marked as Defendant's Exhibit 16 and is
[7] attached to the original transcript.)
[8]  A. Yes. I believe these are the
[9] ones —
[10]  THE WITNESS: Didn't we receive
[11] these in the packet?
[12]  Q. (By Mr. Trawick) Let me
[13] rephrase that question. Do you recall
[14] receiving those documents during the time
[15] you worked at Amtren?
[16]  A. I couldn't have received those.
[17]  Q. You could have received —
[18]  A. I could not have received
[19] those. And I believe I did receive these.
[20]  Q. You received document numbers
[21] 0042, 0043, and 0044 and 0045; is that
[22] correct?
[23]  A. Yes, I believe I did.

---

Page 179

[1]  Q. And it's your testimony you did
[2] not receive document numbers 0046,  47, and
[3] 48; is that correct?
[4]  A. Yes.
[5]  Q. Who would have received these
[6] documents?
[7]  A. I don't know.
[8]  Q. Is it correct that documents 46
[9] through 48 are invoices?
[10]  A. 46 through 48, yes, that's what
[11] it appears to be.
[12]  Q. Is it correct that you would
[13] have been responsible for paying these
[14] invoices?
[15]  A. Not those.
[16]  Q. Why not these?
[17]  A. That's after my termination
[18] date.
[19]  Q. That's correct. Is it correct
[20] that documents 42, 43, 44 deal with the
[21] purchase of the Mas90 system?
[22]  A. I'm not sure what that is. I
[23] believe that's what this is. Mas90, yeah.

---

Page 180

[1] But I don't know what that code means, that
[2] code that's on there.
[3]  Q. Mas90?
[4]  A. Okay. Yes.
[5]  Q. I believe you previously
[6] testified that Bobby Lake was the person at
[7] Wilson Price who, for lack of a better word,
[8] trained you on Mas90?
[9]  A. He was the consultant that
[10] helped us install Mas90, yes.
[11]  Q. Okay. Was there an occasion
[12] when you informed Mr. Lake that his services
[13] were no longer needed?
[14]  A. I don't remember, you know,
[15] telling him that, that his services were no
[16] longer needed.
[17]  Q. Did Amtren have a contract with
[18] Wilson Price for a certain amount of
[19] technical services on installing Mas90?
[20]  A. Yes.
[21]  Q. Did you ever reduce that amount
[22] of technical service?
[23]  A. I don't know. I may have to

---

Jennifer Davis, CSR

Min-U-Script®

(4=5) Page 177 - Page 180

Page 185

[1] payable accounts?

[2]  A.  Sure, uh-huh.

[3]  Q.  And it's my understanding that

[4] Padus -- is that the way you pronounce it?

[5]  A.  I believe that's right. Padus.

[6]  Q.  Would send invoices to Amtren to

[7] be paid?

[8]  A.  Yes.

[9]  Q.  I believe it was your

[10] responsibility to ensure that those invoices

[11] were timely paid?

[12]  A.  Yes.

[13]  Q.  Were there ever any problems

[14] with Amtren making timely payments to Padus?

[15]  A.  When you say timely payments,

[16] what are the terms?

[17]  Q.  What do you mean by timely

[18] payments?

[19]  A.  We tried to pay all of our

[20] vendors within 45 days. Sometimes that

[21] worked out, and sometimes it didn't. It

[22] depended on cash flow.

[23]  Q.  Now, my question is, were there

Page 186

[1] problems with making timely payments to

[2] Padus?

[3]  A.  There may have been. I don't

[4] remember.

[5]  Q.  You don't recall any?

[6]  A.  I mean, I don't know. I would

[7] have to see the documents.

[8]  Q.  Well, were there lots of

[9] accounts that there were problems with

[10] making timely payments to?

[11]  A.  No, not in my opinion.

[12]  Q.  Then, if there was a problem

[13] with Padus, you should remember that, then;

[14] is that correct?

[15]  A.  Maybe I should. It's two years

[16] ago. I don't.

[17]  Q.  However, you do recall that

[18] there were problems with making timely

[19] payments to some of the accounts payable of

[20] Amtren; is that correct?

[21]  A.  No, I don't recall that. We

[22] tried to pay everybody in 45 days. You

[23] know, that was our terms.

Page 187

[1]  Q.  Were the accounts paid within 45

[2] days?

[3]  A.  We tried to.

[4]  Q.  Does that mean that sometimes --

[5]  A.  I'm not going to sit here and

[6] say we paid every account in 45 days,

[7] because I don't know.

[8]  Q.  Do you know who Elisabetta

[9] Benetollo is?

[10]  A.  Does she work for Padus?

[11]  Q.  Yes. It's spelled

[12] E-L-I-S-A-B-E-T-T-A, B-E-N-E-T-O-L-L-O.

[13]  A.  Okay.

[14]  Q.  Do you recall her?

[15]  A.  I believe I do.

[16]  Q.  I spelled it for the court

[17] reporter, not you.

[18]  A.  I know that.

[19]  Q.  Did you ever have any problems

[20] with -- strike that. Do you recall

[21] discussing any problems with Ms. Benetollo

[22] about problems getting the invoices paid to

[23] Padus?

Page 188

[1]  A.  I don't remember the specifics.

[2] I would need to see the documents.

[3]  Q.  What do you remember generally?

[4]  A.  I remember talking to her, I

[5] believe. I don't know every piece of the

[6] conversation.

[7]  Q.  Well, do you recall generally

[8] what the problem was or problems were?

[9]  A.  I don't know if there was a

[10] problem.

[11]  Q.  You just don't know --

[12]  A.  If it's regarding payment. Like

[13] I said, we tried to pay everyone in 45 days.

[14]  Q.  Did you ever talk with

[15] Mr. Lamberth about problems with not paying

[16] everyone in 45 days?

[17]  A.  No, not that I remember.

[18] Mr. Lamberth was all for paying everybody in

[19] 45 days.

[20]  Q.  Was it your responsibility --

[21] strike that. Did you have any

[22] responsibility with the processing of orders

[23] from Amtren's customers?

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

Page 189

[1]   A.  Yes.
[2]   Q.  Tell me what those duties were.
[3]   A.  Putting the purchase order into
[4] the software system.
[5]   Q.  Where did you obtain the
[6] information that was put into Mas90?
[7]   A.  Through the customer purchase
[8] order.
[9]   Q.  Were there occasions when the
[10] purchase customer order did not reflect a
[11] price increase at Amtren?
[12]   A.  Not that I'm aware of.
[13]   Q.  You're not aware of any occasion
[14] where you accepted purchase orders at the
[15] lower incorrect price and placed those
[16] purchase orders into Mas90 at the lower
[17] price and the products were shipped at a
[18] lower price?
[19]   A.  No.
[20]   Q.  No one ever talked with you
[21] about that; is that correct?
[22]   A.  That's correct.
[23]   Q.  Were there ever occasions when

Page 190

[1] you entered incorrect information into Mas90
[2] about the purchase orders and that incorrect
[3] information was brought to your attention by
[4] either the vendor or someone at Amtren?
[5]   A.  I'm sorry.  I'm not sure what
[6] you're talking about.
[7]   Q.  Were there occasions when you
[8] entered incorrect information into Mas90
[9] about purchases?
[10]   A.  If I did, I didn't know it was
[11] incorrect at the time.
[12]   Q.  When would you have learned that
[13] it was incorrect, then?
[14]   A.  I don't know.  You're going to
[15] have to be more specific and tell me what it
[16] was that was supposedly entered incorrectly.
[17]   Q.  To your knowledge -- strike
[18] that.  You don't recall ever entering any
[19] incorrect information into Mas90 regarding
[20] purchase orders?
[21]   A.  Yeah.  Not at the time I entered
[22] it.  I don't recall that, no.
[23]   Q.  Well, even though you might not

Page 191

[1] have known it at the time you entered it,
[2] did you learn later that it was incorrect?
[3]   A.  Regarding what specific
[4] incident?
[5]   Q.  Any purchase orders.
[6]   A.  I may have.
[7]   Q.  What do you recall about that?
[8]   A.  Not much.  I really don't know
[9] what you're talking about.  I'm sorry.  I
[10] don't.  You're going to have to be more
[11] specific and give me a specific incident.
[12]   Q.  Ms. McCollum, I'm not the one
[13] that entered into Mas90.
[14]   A.  No.  But you're asking the
[15] questions, so you're going to have to be
[16] more specific.
[17]   Q.  Well, I'm asking if there were
[18] occasions when you entered incorrect
[19] information into Mas90 about purchase orders
[20] and later found out it was incorrect.  Yes
[21] or no?
[22]   A.  I may have.
[23]   Q.  Okay.  Do you recall any facts

Page 192

[1] about those instances?
[2]   A.  The only one I can think of is
[3] that Plextor one.  That's all I can think
[4] of.
[5]   Q.  Nothing else?
[6]   A.  No.
[7]   Q.  Were there occasions when
[8] vendors of Amtren refused to ship materials
[9] because they hadn't been paid within the 45
[10] days?
[11]   A.  Not that I'm aware of.
[12]   Q.  What is a product billed
[13] materials assembly?  Do you know?
[14]   A.  Yes.
[15]   Q.  Tell me what it is.
[16]   A.  It is a bill of material.  It is
[17] basically sort of a guide, if you will, on
[18] the parts needed to build a specific --
[19] manufacture a specific unit.  It is a list
[20] of materials needed.  It's just a guide of
[21] materials.
[22]   Q.  Did you have any responsibility
[23] for entering bills of materials into Mas?

Page 193

[1]    A.   Yes.

[2]    Q.   Were there occasions when you

[3]  incorrectly entered the bills of materials

[4]  into Mas?

[5]    A.   Might have been.  But those

[6]  systems that Amtren manufactures has

[7]  anywhere from fifty to a hundred parts

[8]  listed on it.  So there may have been.

[9]    Q.   However, today you don't recall

[10]  any specific incidents?

[11]    A.   I don't recall a specific

[12]  incident, no.

[13]        MR. TRAWICK:  Let's take a short

[14]  break.  I'm about finished.

[15]        (Brief recess.)

[16]        MR. TRAWICK:  I don't think I

[17]  have anything else.  That's it.

[18]

[19]

[20]        3:55 p.m.

[21]

[22]

[23]    FURTHER THE DEPONENT SAITH NOT

Page 194

[1]              C E R T I F I C A T E

[2]

[3]  STATE OF ALABAMA)

[4]  COUNTY OF ELMORE)

[5]

[6]        I hereby certify that the above and

[7]  foregoing deposition was taken down by me in

[8]  stanotype, and the questions and answers

[9]  thereto were transcribed by means of

[10]  computer-aided transcription, and that the

[11]  foregoing represents a true and correct

[12]  transcript of the deposition given by said

[13]  witness upon said hearing.

[14]        I further certify that I am neither

[15]  of counsel nor of kin to the parties to the

[16]  action, nor am I in anywise interested in

[17]  the result of said cause.

[18]

[19]

[20]              Jennifer Davis, CSR

[21]

[22]  My Commission expires

[23]  October 11, 2010