PLAINTIFFS
EXHIBIT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| JANICE McCOLLUM | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 2:-05-cv-1237-WKW |
| | ) | |
| AMTREN, INC., | ) | (JURY DEMAND) |
| Defendant | ) | |

### AFFIDAVIT OF JANICE McCOLLUM

Before me, the undersigned authority, a Notary Public in and for the State of Alabama and the County of Montgomery, personally appeared Janice McCullom, who is known to me and who being first duly sworn, deposes and says as follows:

1)    My name is Janice McCullom.  I am the plaintiff in this action; of more than nineteen years of age; a resident of Alabama; and make this statement from my personal knowledge.  I understand that my statement may be used as evidence in my lawsuit against Amtren, Inc.

2)    There is no truth to Amtren's claims that Lamberth became aware at "the end of February, March and early April" of problems with my job performance and that he discussed these problems with me. (brief at ¶21)  I was never informed of any problems or concerns with my work until Lamberth called me in on April 8, 2005, and informed me that I was being fired.  When I questioned him as to the reason for firing me, he told me that he could not trust me.  He then referred to an overpayment for some drives purchased by Amtren from Plextor that I had discovered and corrected.  He did not want to discuss my explanation for this error and

1

informed me that I had thirty minutes to gather my things, turn in my keys, and leave the premises.

3) In fact this overpayment occurred because I was not informed by Mr. Lamberth when he received an email from Plextor which decreased the price for the drives. When invoices were received for drives purchased which listed the old, higher price, I paid them. I later discovered that the price had been reduced and I deducted the overpayment from pending invoices due to Plextor and made certain that future invoices were at the reduced price. I found and corrected this overpayment in or about January of 2005. I do not know why Mr. Lamberth would have waited until April 8, 2005 to accuse me of wrongdoing other than that he had someone go through the accounts in an effort to try to find some pretext for terminating me.

4) Despite some sexist comments and actions, Mr. Lamberth seemed very pleased with my work performance. He gave me a raise a few months after I was hired. He verbally informed me that he was promoting me to Controller of the company in or around October of 2004. He authorized me to research and select a new, improved accounting software program for implementation in the company. He granted me co-authority to sign company checks in or around November of 2004. In January of 2005, I was formally promoted to the Controller position and received a $10,000 bonus. Although, Mr. Lamberth never permitted me to fully assume all of the duties normally associated with the Controller

2

position, he never gave me any indication that he was unhappy with my work

5)    Amtren claims that Lisa McNamee replaced me as accounting manager. (brief at ¶¶ 42, 43) This is not possible. I hired Ms. McNamee as a temporary employee to assist in clerical duties, mainly data input. She does not have an accounting degree, and she did not have sufficient accounting experience at the time to assume the role of accounting manager when I was terminated. Amtren required the Accounting Manager to have 3 to 5 years experience as an accountant with responsibility for maintaining the accounting system, and with cost management and procurement control experience. (See Ex. A: Amtren ad) Ms. McNamee's resume clearly shows that she could not meet these qualifications, and she did not gain that experience in the two months she worked under me at Amtren. (See Ex B: McNamee resume)

6)    Amtren also falsely accuses me of "problems" in paying invoices in a timely fashion. (brief at ¶¶ 21, 22) Mr. Lamberth instructed me, as a matter of company policy, to allow outstanding invoices to age for at least 45 days and to try to pay them within 60 days. I followed this instruction as well as the company's cash flow would allow. The defendant's exhibit regarding payments to Padus which purports to support this allegation is dated three weeks after I was terminated and refers to an invoice that has not been produced. Assuming that the invoice in question was dated in mid-February as the exhibit indicates, payment

3

would not have been due under Amtren's 45-60 day payment policy prior to the date of my termination. (See DX 4)  There were no complaints from Padus regarding nonpayment of their invoices during the time I was employed as Amtren's accounting manager.

7)    Amtren has made an unsubstantiated claim that I was responsible for overspending on inventory and for ordering the wrong type of materials for future production.(brief at ¶ 34) My role in the inventory system was to try to maintain adequate inventory based upon the company's past performance and projections given to me by the production manager and sales manager.  I was never informed of any problems regarding my work in this area, and Amtren has offered no proof of any overspending on my part.

8)    Mr. Lamberth also accuses me of being responsible for the cancellation of Amtren's credit card processing contract.  This is not true. The credit card contract was cancelled because the bank would not pay charges presented by the credit card company.  The bank had previously paid these charges automatically when presented, but Mr. Lamberth withdrew this authorization following an incident in which some fraudulent credit card transactions were made.  He wanted to make sure that there would not be any further fraudulent transactions, but the practical effect of the this action was that the bank would no longer pay the credit company for processing fees on the account.  Following this action in October of 2004, I devoted a great deal of time to obtaining a

replacement company for Amtren, but each required us to paid higher fees because Amtren had had its previous contract cancelled. In any case, Mr. Lamberth never complained to me that the loss of the contract was my fault. The first time I ever heard this accusation (or any of the others) was after I filed my EEOC complaint.

9)     Amtren accuses me of not making payments to the IRS correctly. Amtren had serious problems with its payroll payments to both the state and the federal governments when I became Accounting Manager. I was able to make good progress in correcting this problem during my tenure, but the accounting system still had bugs that generated errors in some instances. I can not assess the correctness of the claims made by Amtren without having copies of the 941 forms and all the payroll details that are associated with the 941's for the periods in question. In any event, my white male predecessor as Accounting Manger was not terminated for making under and over payments of payroll taxes to the IRS or to the Alabama Department of Revenue.

10)     Amtren claims that one of the reasons I was fired was because of overdraft charges incurred on its bank account. First of all, Mr. Lamberth never mentioned that this was a problem to me. Amtren had overdraft charges on its account prior to my employment and we incurred some during my employment. Many, if not most, of these charges were reversed by the bank when they automatically transferred funds from Amtren's line of credit or its money market accounts. The majority of the

5

charges attributed to me occurred after February of 2004 when Mr. Lamberth withdrew permission for the company's bank to automatically transfer funds to cover any shortage in its checking account. This was an important accounting tool because of the impossibility of knowing the exact dates and times that checks would clear the bank, and the automatic transfer of funds from the company's line of credit/money market accounts provided a safety net while allowing the company to earn interest on its unneeded funds. In any event, Lamberth did not fire my white male predecessor when he allowed the company to incur bank overdraft charges.

11)    My duties as Amtren's accounting manger were primarily administrative in nature. I was responsible for entering sales and other income to the company into the accounting system, but had no ability to produce any income for the company by sales or loans. I was responsible for entering information regarding purchases of production equipment and supplies into the accounting system, but had no authority to manage the company's inventory of equipment and supplies or its production schedules. I prepared and presented to Lamberth regular financial statements regarding the company's financial condition and prepared checks for his signature for payment of its obligations. I always followed the instructions of Mr. Lamberth in managing the company's accounting system and never made any payments or purchases without his authorization.

6

12)    Mr. Lamberth has made a number of false statements regarding the implementation of the new MAS90 accounting software system. As I stated in my deposition, I selected the new software and oversaw its installation. I contracted with a local accounting firm, Wilson Price, to purchase the software and for technical assistance in installing it so that it would work with Amtren's manufacturing system. This was accomplished by the end of 2004, and I saved the company some money by relieving Wilson Price's representative from responsibility for continuing to train Amtren staff and assuming this additional duty my self. Mr. Lambert never indicated to me that there was any problem with the implementation of the system and praised my "tight financial control" in March 2005. (See Ex. B: Lamberth letter dated March 30, 2005)  It is not plausible that Amtren would have had "tight financial control" without a properly functioning accounting software system.

FURTHER SAITH AFFIANT NOT.

_Janice McCollum_
JANICE McCOLLUM

SWORN to and SUBSCRIBED before me on this the 19th day of December, 2006.

NOTARY PUBLIC
My commission expires _2/13/08_

{Seal}

7

EXHIBIT







**NEED HOLIDAY CASH?**

EARN UP TO $500 A WEEK HOLIDAY CA

Montgomery Advertiser

AN EQUAL OPPORTUNITY EMPLOYER

Instructor - Level 1

alacare
HOME HEALTH
& HOSPICE

**Registered Nurse**
**Care Manager**

Alacare Home Health & Hospice is currently
seeking candidates for a Care Manager to
be responsible for assurance of quality
management for our Southern area
branches. Qualified individuals must have a
current Alabama nursing license; five years
general nursing required inclusive of three
years home health experience. Quality
Assurance chart audit or home health case
management experience is required. We
offer a competitive salary and an exemplary
benefits package including mileage
reimbursement. Interested applicants may
apply on-line, email send or fax current
resume to:

RN Care Manager Candidate

VANGUARD



**EXTRA**  **CASH BACK!**

**$1,250 TOTAL CASH BACK** OR **$24**

**FINAL DA**

TWENTY-FIFTH 25 ANNIVERSARY

OFFERS END JANUARY 2

'04 TACOMA  '04 COROLLA

Feb. 23. 2005 11:05AM 3342654138                    420 MSP

EXHIBIT _B_

# Lisa M. McNamee



███████@aol.com

| | |
|---|---|
| **Objective** | To develop and utilize my experience and skills in an Administrative field. |

**Experience**   5/03-1/05          Feather River Plastic Surgery,      Yuba City, CA
**Administrative Assistant**
   • Patient Billing, Claims, Accounts Receivable, Deposits and
     Collections.
   • Scheduled Appointments, Pre-Ops and Surgeries.
   • Answered Questions and gave Quotes on Surgical Procedures.

   11/02-2/03          TruGreen Chemlawn              Jacksonville, FL
**Appointment Scheduler (Temporary)**
   • Called customers to schedule yard, tree or shrub service.
   • Updated customer Information as needed.

   1/99-11/02          Dixie Egg Company              Jacksonville, FL
**Administrative Assistant**
   • Clerical office tasks including A/R, A/P, Inventory, Billing, Purchase
     Orders, End of Month Closings and tracking Customer Sales in
     spreadsheets.
   • Territory Manager promoting Eggland's Best product in area grocery
     stores as well as generic egg products at local commissaries.
   • Worked Food Shows and Diabetic Conferences.
   • Assisted in developing new divisions of the company and training
     employees.

**Skills**       Excellent Customer Service, Multiple Phone Lines, 13,500 KSPH,
                 40 WPM, AS400 Rumba System, Lynx Medical Software, Windows XP,
                 Microsoft Word, Excel and Outlook.

**Education**    1996 Florida Community College Jacksonville      Jacksonville, FL
                 High School Diploma

McCollum v Amtren 0063
Amtren Documents