AMTREN
corporation



June 29, 2005

Bernice Williams-Kimbrough, District Director
US Equal Employment Opportunity Commission
Birmingham District Office
Ridge Park Place
1130 22nd Street, South
Birmingham, AL 35205

RE: EEOC Charge Number 130-2005-04748 /
Ms. Janice McCollum, Person Filing Charge

Pursuant to the charge of discrimination, AMTREN Corporation offers this reply to substantiate that the termination of Ms. McCollum was due solely as a result of inadequate work performance.

AMTREN does not discriminate and considers each decision regarding employment placement and/or termination without regard to sex, race or national origin. As a matter of record, the current staff member, Ms Lisa McNamee, who assumed the responsibility for the duties that Ms. McCollum performed while employed by AMTREN, is a person of the same sex, race and national origin. Ms McNamee worked in a supporting accounting role and was promoted into Ms. McCollum's duties a few weeks after Ms. McCollum's dismissal.

Over the course of a six-month period, Ms. McCollum's work performance declined rapidly. The start of this performance decrease coincided with two major areas of responsibilities with which Ms. McCollum was charged, one being the implementation of a new accounting system and the other being the authority given to Ms. McCollum to sign corporate checks. Ms. McCollum assumed these additional tasks/duties on or around October 2004.

Unfortunately, the additional duties allowed Ms. McCollum to directly make or cause many costly mistakes without detection for several months. In addition, many of Ms. McCollum mistakes were not detected until after her employment ended.

AMTREN provides profit-sharing bonuses at the end of each year. At the end of 2004, when Ms. McCollum was reviewed for this bonus, AMTREN's management was not aware of any irregularities in the accounting area and instead was under the impression that the accounting area was operating smoothly. Based on the limited summary information that was provided in whole by Ms. McCollum, AMTREN presented her with a bonus.

During January 2005, AMTREN's management detected several irregularities in the accounting area, and AMTREN's management conducted a careful internal review. By the end of January several problems in the accounting area were targeted for improvement. AMTREN worked with Ms. McCollum in an attempt to assist her in making corrections to the areas targeted for improvement. During this period, Ms. McCollum's work performance consistently failed to improve.



Even though AMTREN's management was made aware that Ms. McCollum's work performance for 2004 was, in fact, inadequate versus being worthy of bonus compensation, AMTREN allowed Ms. McCollum's bonus to be paid out over the first 10 weeks of 2005. Rather than rescinding the bonus, AMTREN instead focused efforts to improve the accounting area with the goal of helping Ms. McCollum to improve her performance. As it turned out, either Ms. McCollum could not recognize or failed to respond to these accounting irregularities even with weekly review of progress by AMTREN management.

By the end of March 2005, Ms. McCollum overspent on inventory and other items by over $200,000 – a mistake through which Ms. McCollum drained AMTREN's cash. AMTREN also discovered several more areas of concern in March. And during the first week of April, AMTREN's trade vendors began to call about not being paid. Ms. McCollum never informed AMTREN management of these calls.

AMTREN's management received a weekly report of Accounts Payable, and the reports that were being compiled and provided by Ms. McCollum did not accurately report the total payables. Ms. McCollum had either failed to enter numerous invoices each week or did not properly keep up with the vendor invoices that effectively produced inaccurate reports on the payables liability of AMTREN.

During this period AMTREN's management discovered that Ms. McCollum had mistakenly overpaid a vendor by over $10,000 even after being told repeatedly to correct the charges from this vendor. AMTREN's management decided that it was in the best to release Ms. McCollum from her duties.

I have compiled a list of irregularities, mistakes, and inadequate information submittals for duties that were under the direct and singular control of Ms. McCollum. We have included copies of material to support several of items below.

1- Payroll tax deposits in the last quarter of 2004 and the first quarter of 2005 were late for almost every weekly period that deposits were made by Ms. McCollum. This resulted in $3,008.66 in penalties. One tax deposit was missed altogether and was not picked up until the next quarter. To compound the late deposits, Ms. McCollum had failed to respond to an initial inquiry regarding tax period ending 12-31-2004. The IRS generated an urgent letter notifying AMTREN that our failure to respond to the previous notice may result in a levy on assets. [Attachment Included]

2- Ms. McCollum failed to make full payment for AMTREN's monthly premium. AMTREN received notice that the company Health Insurance was cancelled for lack of payment. To make matters worse, Ms. McCollum instructed Ms. McNamee to only pay a portion of the amount outstanding and allow the premium payments to be paid in arrears. There was no entry into the accounting payables on any outstanding balances due to AMTREN's health provider. [Attachment Included]

3- Failure to pay or inform AMTREN management of a missed payment in the amount of $118 to AMTREN's Credit Card processor (Chase Visa) caused the termination of AMTREN's ability to accept credit cards. To compound this mistake, Ms. McCollum informed management that AMTREN was required to change card processors due to the new accounting software platform. She then attempted to

AMTREN
corporation

locate a new card processor, but based on Chase Visa's termination of AMTREN's account, AMTREN was refused service with new processors. Ms. McCollum then informed management that AMTREN could not obtain a new card processor due to charge backs that occurred in the early part of 2004. AMTREN's management felt that Chase Visa's action was improper since they accepted our card charges until October 2004. AMTREN's attorney was brought in to attempt to correct this matter with Chase Visa. Our attorney's attempts were not successful. It was not until Ms. McCollum left AMTREN that AMTREN's management discovered in Ms. McCollum files the attached record of termination for non-payment from Chase Visa. The letter from Chase Visa serving notice of termination was addressed to David Fields. Ms. McCollum was responsible for distribution of the company mail and apparently opened mail addressed to Mr. Fields. Mr. Fields will attest that he did not receive the notice of cancellation letter from Chase Visa. [Attachment Included]

4- Ms. McCollum entered into a lease contract with a copier company with her signature. Ms. McCollum did not have the authority to bind AMTREN into contractual agreements. Ms. McCollum never informed AMTREN management that this contract was being executed. [Attachment Included]

5- AMTREN has been in business for over 12 years and to the best of my knowledge we have never had an overdraft charge on our corporate checking account. Over the course of 6 months, Ms. McCollum caused 41 Bank Overdrafts that resulted in Overdraft charges totaling $1230. AMTREN management was never informed on any of these overdrafts.

6- AMTREN has a pre-negotiated price adjustment for CD & DVD drives with Plextor Corporation. In late October 2004, AMTREN discovered that some retail merchants were selling Plextor Drives for less than AMTREN was paying Plextor. A subsequent internal review determined that AMTREN had mistakenly missed a recent price decrease from Plextor. Ms. McCollum was informed of this, and she informed AMTREN management that she was proceeding to obtain corrected pricing. This matter was discussed several times in AMTREN's weekly management meeting, and Ms. McCollum indicated each time that all pricing had been corrected. This was incorrect, and, in fact, AMTREN continued to pay $122 versus the new price of $89 until January 2005. Ms. McCollum did not adjust the vendor purchase agreement and even accepted the vendor's high-priced invoices, entered them for payment, allowed them to age 40 days and then wrote, signed and mailed the corporate check including this large overpayment.

7- An incomplete integration of MAS90 (NEW INTEGRATED SOFTWARE SYSTEM) was costly to AMTREN. AMTREN contracted with Wilson Price IT for a turnkey installation for MAS90 (NEW INTEGRATED SOFTWARE SYSTEM) at fixed bid cost of $28,000. Wilson Price IT was released by Ms McCollum after they spent less that than 40 hours of the 120-hour integration allotment. This resulted in an incomplete and inaccurate conversion to the new accounting system. AMTREN management was never made aware of this dismissal before Wilson Price IT completed their integration. The normal billing rate for these integration charges is $125 per hour. The 80 hours of time that Ms. McCollum dismissed amounted to $10,000. Wilson Price IT was immediately re-engaged after Ms. McCollum's dismissal to complete the integration of the MAS90 system. As a result of the



inefficient process to correct the MAS90 installation, AMTREN will be forced to pay considerably more than the $10,000 that was lost due to early dismissal. AMTREN estimates that the costs to complete the MAS90 will exceed $15,000. This additional $15,000 of costs is a direct result of Ms. McCollum's inadequate performance with the implementation of this software platform.

8- Ms. McCollum was responsible for accepting and entering orders from customers into the accounting system. AMTREN discovered that she had accepted orders from customers with a lower and incorrect price. These orders were shipped, invoiced and paid by these customers. These customers refused to accept any changes to their orders stating that AMTREN accepted and invoiced with the lower amounts, so they considered the matter closed. This mistake cost AMTREN over $5,000.

9- Ms. McCollum elected to change our standard accounting practice from standard costs to average costs without seeking approval from AMTREN management or conducting an open meeting and review with staff on how this change in accounting would impact AMTREN's operations. AMTREN discovered this mistake and inquired to Wilson Price IT about this practice. They stated that average costs accounting are not used by any manufacturers. This caused major problems with AMTREN's cost accounting for each product.

10- Ms. McCollum generated numerous Purchase Orders/Contracts that were for larger dollar amounts than the vendor quotes reflected. When questioned about this mistake, Ms. McCollum stated that most vendors corrected this for her.

11- Ms. McCollum lacked control in MAS90 (NEW INTEGRATED SOFTWARE SYSTEM) to forecast inventory and/or cash requirements resulted in excess inventory that resulted in AMTREN using all of its line of credit.

12- Allowing our accounts payable to extend beyond our agreed-upon 45-day maximum caused many vendors to freeze shipments of raw materials to AMTREN.

13- Ms. McCollum incorrectly entered product bill of material assemblies in MAS90 (NEW INTEGRATED SOFTWARE SYSTEM) that resulted in loss of accuracy in our cost accounting for each product. This mistake also caused incorrect gross margins that produced inaccurate profit and loss reports.

14- Providing incorrect costing information resulted in AMTREN producing product pricing and accepting orders for products that were for less than our actual costs.

15- There was a failure to balance and reconcile bank statements in MAS90 (NEW INTEGRATED SOFTWARE SYSTEM).

AMTREN CORPORATION
5320 Perimeter Pkwy • Montgomery, AL 36116 • (866) 2AMTREN Toll Free • (334) 280-7100 Tel • (334) 280-7105 Fax
Corporate Website • www.amtren.com



AMTREN Corporation's employees are treated fairly and with respect. AMTREN may be a small business but we operated as we were a big business. We experience almost zero turn over in staffing.

AMTREN is committed to providing the best possible working environment for all of our employees. Our success is based the combined efforts.

AMTREN can provide more information as may be needed to further support our position that Ms. McCollum's termination was due to inadaqaute job performance.

Respectfully,
AMTREN CORPORATION

Charles K Lamberth
President