PLAINTIFFS
EXHIBIT
5



# DEPOSITION OF KIRK LAMBERTH

## November 15, 2006

## Pages 1 through 135

# CONDENSED TRANSCRIPT AND CONCORDANCE
# PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
566 South Perry Street
Post Office Box 62
Montgomery, AL 36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

Case 2:05-cv-01237-WKW-WC    Document 21-6    Filed 12/20/2006    Page 2 of 35

Deposition of Kirk Lamberth    McCollum vs. Amtren    November 15, 2006

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

JANICE McCOLLUM,

 Plaintiff,

Vs.    CIVIL ACTION NO.
     05-cv-0326-W

Amtren, Inc.,

 Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF KIRK LAMBERTH, taken

pursuant to stipulation and agreement before

Patricia G. Starkie, Registered Diplomate Reporter,

CRR, and Commissioner for the State of Alabama at

Large, in the Law Offices of Slaten & O'Connor, 105

Tallapoosa Street, Montgomery, Alabama, on

Wednesday, November 15, 2006, commencing at

approximately 10:05 a.m.

\* \* \* \* \* \* \* \* \* \* \* \* \*

**Page 2**

APPEARANCES

FOR THE PLAINTIFF:
Mr. Jimmy D. Jacobs
Attorney at Law
143 Eastern Boulevard
Montgomery, Alabama

FOR THE DEFENDANT:
Mr. G. R. "Rick" Trawick
SLATEN & O'CONNOR
Attorneys at Law
105 Tallapoosa Street
Montgomery, Alabama

ALSO PRESENT:

Ms. McCollum

\* \* \* \* \* \* \* \* \* \* \* \* \*

EXAMINATION INDEX
KIRK LAMBERTH
BY MR. JACOBS ......... 5
BY MR. TRAWICK ......... 118

**Page 3**

EXHIBIT INDEX
PLAINTIFF'S EXHIBITS
1   Amtren's responses to Plaintiff's   28
  discovery requests

2   Five-page letter to the EEOC from Mr.   57
  Lamberth
3   Attachment to PX-2 relating to item five   58
  (bank overdrafts)

4   Attachment to PX-2 relating to item two   80
  (health insurance premium payments)
5   Attachment to PX-2 relating to item one   91
  (Late Payroll Tax Deposits)

6   Attachment to PX-2 relating to item   93
  three (Credit Card Processor
  Cancellation due to lack of payment)

7   Attachment to PX-2 relating to item four   93
  (Lease of Copier)
8   Form 941 - penalty and interest (Also   108
  marked DX-5 to McCollum deposition)

\* \* \* \* \* \* \* \* \* \* \* \* \*

STIPULATION

It is hereby stipulated and agreed by and
between counsel representing the parties that the
deposition of:
   KIRK LAMBERTH
is taken pursuant to the Federal Rules of Civil

**Page 4**

Procedure and that said deposition may be taken
before Patricia G. Starkie, Registered Diplomate
Reporter, CRR, and Commissioner for the State of
Alabama at Large, without the formality of a
commission;

  That objections to questions other than
objections as to the form of the question need not
be made at this time but may be reserved for a
ruling at such time as the said deposition may be
offered in evidence or used for any other purpose
by either party provided for by the Statute.

  It is further stipulated and agreed by and
between counsel representing the parties in this
case that the filing of said deposition is hereby
waived and may be introduced at the trial of this
case or used in any other manner by either party
hereto provided for by the Statute regardless of
the waiving of the filing of the same.

  It is further stipulated and agreed by and
between the parties hereto and the witness that the
signature of the witness to this deposition is
hereby waived.

\* \* \* \* \* \* \* \* \* \* \* \* \*

Deposition of Kirk Lamberth                McCollum vs. Amtren                November 15, 2006

Page 5

1        KIRK LAMBERTH
2        The witness, after having first been duly
3    sworn to speak the truth, the whole truth and
4    nothing but the truth testified as follows:
5            EXAMINATION
6    BY MR. JACOBS:
7    Q.  Mr. Lamberth, we met earlier when your
8        attorney took Ms. McCollum's deposition.  I
9        know that you are familiar with the
10       process.  Have you ever given a deposition
11       before today?
12   A.  No.
13   Q.  Have you ever participated in a deposition
14       before the one --
15   A.  In writing, years ago.  I did do that.  But
16       the way that worked, they submitted
17       something, we reviewed it and sent it back.
18   Q.  Okay.  Was that in connection with your
19       employment?
20   A.  No, it was a former employer.
21   Q.  I'm sorry?
22   A.  A former employer of mine.
23   Q.  Okay.  Well, that's really what I meant,

Page 6

1        was it in connection with your employment.
2            Who was that --
3    A.  That was with Sony Corporation.
4    Q.  Sony?
5    A.  S-O-N-Y, yes.  Sony.
6    Q.  And when were you employed with Sony?
7    A.  The years were 1986 to 1992, I think were
8        the dates.
9    Q.  Okay.  Were you employed in Dothan?
10   A.  Yes, I was, uh-huh (positive response).
11   Q.  What was your position with the company?
12   A.  At Sony I was there -- there were several
13       positions.  The last position?
14   Q.  Yes, that would be fine.
15   A.  I was director of engineering for a
16       division.
17   Q.  And I have a feeling that I know what that
18       plant does, but what -- do they make tapes?
19   A.  Manufactured videotapes and computer
20       disks.  It was called the floppy disk.  It
21       was a three and a half inch.  That's the
22       two areas they produced or the two
23       products.

Page 7

1    Q.  That's my home town, so I have a little
2        familiarity with that plant and what they
3        did years ago.  I thought it had to do with
4        manufacture of tape.
5            What is your position with Amtren?
6    A.  I am the president.
7    Q.  Okay.  Is Amtren a public corporation?
8    A.  No, it is not.
9    Q.  All right.  Are you the sole owner?
10   A.  Yes.
11   Q.  When was the company begun?
12   A.  Amtren Corporation was -- the company was
13       incorporated in 1995.  There was a
14       three-year period where we were another
15       entity.  So 1992 was when I founded the
16       basic company.  From 1992 to 1995 we
17       operated under another company name because
18       we were on a different path.  In 1995 we
19       changed direction, and basically we
20       separated the two -- there were two groups
21       at that time, and we separated them, and I
22       took product development.  The name Amtren
23       was developed and we incorporated in

Page 8

1        October of -- I believe it was in '95 as
2        Amtren.
3    Q.  All right.  So Amtren as a business entity
4        came into being in 1995?
5    A.  1995, correct.
6    Q.  Okay.  And it grew out of another entity --
7    A.  It did.
8    Q.  -- that was prior to that?
9    A.  It did.
10   Q.  Does that other entity still function?
11   A.  No, it does not.
12   Q.  Could you tell me what Amtren does.
13   A.  Amtren is classified as a manufacturer in
14       that we manufacture CD and DVD duplication
15       systems.
16   Q.  Okay.  And I'm going to try to explain that
17       to you, and if you would, tell me if I
18       understand it.
19   A.  All right.
20   Q.  You would manufacture machines that would
21       make multiple copies of an original, either
22       data or music or whatever?
23   A.  Yes.  It is -- that's exactly right.  The

2 (Pages 5 to 8)

**Page 9**

1    exception is you can also take straight
2    from your PC the information. So you can
3    bring an original work into the machine
4    like a xerox -- like a photocopy, and you
5    can also submit work to it from your PC.
6    Q. If a friend of mine recorded a CD or what
7        we used to call an album and had a master,
8        then you would manufacture machines that
9        could reproduce that, the copies that could
10       be sold?
11   A. Right.
12   Q. Is that right?
13   A. That is exactly right.
14   Q. Okay. That's what I thought it was, but I
15       wanted to be sure.
16           What raw inputs are necessary for
17       Amtren to operate?
18   A. Raw inputs would be -- there would be --
19       depending on the area, of course, there
20       would be --
21           And let me clarify raw. You mean like
22       reporting, weekly reporting, this kind
23       of -- you mean --

**Page 10**

1    Q. No. Really, what I mean is what sort of
2        supplies -- or perhaps you could just
3        describe suppliers that you would have to
4        have in order to --
5    A. Can I say materials?
6    Q. Yes.
7    A. Do you mean materials?
8    Q. Materials, yeah.
9    A. All right. Materials are provided -- and
10       there are probably three categories of
11       materials. The materials are purchased
12       parts, which would be items that are
13       specified from, you know, certain vendors
14       and purchased.
15           Then there would be parts that would be
16       built from vendors to our specifications.
17       Those could be sheet metal or plastic,
18       molded parts.
19           The third is usually PC boards and
20       those type. Those are also designed and
21       built to our specifications and populated.
22   Q. And what was the last thing you said?
23   A. That's pretty much it.

**Page 11**

1    Q. What kind of board?
2    A. The PC -- the circuit boards.
3    Q. Okay. I'm sorry.
4    A. Circuit boards, the internal controllers.
5    Q. Okay. Are there any soft materials that
6        you have to have in order to produce your
7        product?
8    A. Can you explain soft, make sure --
9    Q. Yes. I was hoping that that would explain
10       it. Are there any processes or software
11       that you would have to purchase or lease or
12       whatever in addition to raw materials?
13   A. For the product itself?
14   Q. Yes.
15   A. Primarily for the product?
16   Q. For you to produce the product that you
17       then sell.
18   A. Two things I want to clarify. We actually
19       purchase software as a material for our
20       product.
21   Q. Okay.
22   A. That's different. We don't -- we just --
23       if I can, it's XP, Windows XP. It goes

**Page 12**

1    with our systems. There's an option to
2    provide -- that we provide the operating
3    system. That's a material.
4        Now, is that related -- are you
5    asking -- or software related to
6    running the app?
7    Q. Yes. Is there any software that you have
8    to have or other processes that you have to
9    lease or license in order to produce what
10   you produce? And I would assume Windows XP
11   would be one of those things, because you
12   put it in the machine.
13   A. Right.
14   Q. As a raw material.
15   A. Not have to, but, yes, we do -- we do elect
16   to use certain packages to -- and I guess
17   it's probably because it's more required
18   for business operations than anything
19   else. So we do, you know, use a couple --
20   primarily we use I would say probably a
21   couple of packages. Couple of them are the
22   Microsoft Office type packages, and the
23   other would be an accounting package.

Case 2:05-cv-01237-WKW-WC    Document 21-6    Filed 12/20/2006    Page 5 of 35

Deposition of Kirk Lamberth                    McCollum vs. Amtren                    November 15, 2006

Page 13

1  Q. And we're going to talk I'm sure this
2     morning some about Peachtree and the
3     MAS90. And I'm not sure that's how y'all
4     pronounce it, but that's --
5  A. Well, that's right. Those two are the way
6     we refer to those.
7  Q. Over on the production side, it would be
8     the Microsoft Office type application?
9  A. Exactly.
10 Q. And then I would assume for your internal
11    business operations, you're also using
12    something like Microsoft Office or
13    Enterprise or something of that nature?
14 A. Generally Office, just the Excel and Word
15    documents within Office.
16 Q. Okay. What is your -- taking '95 as a
17    baseline, what has been your rate of growth
18    in production?
19 A. Dollars or volume?
20 Q. Either one.
21 A. I'll have to think a minute about that. I
22    can say it's been substantial. For a
23    period -- if I can just use a couple of

Page 14

1     periods here. From '95 through '98,
2     minimal growth.
3  Q. Okay.
4  A. '98 to 2001, significant, you know, sharp
5     growth. So from '98 to 2001, it was
6     substantial growth, a lot more than before.
7  Q. Are you talking about 25 percent a year or
8     more growth?
9  A. Let me think just a minute. So I've got --
10    Not quite that sharp during those periods.
11    Cumulative yes, probably for that period.
12    Cumulative. Probably from '98 to '01, it
13    probably could be 25 percent; maybe as much
14    as 35 percent.
15 Q. Okay.
16 A. Maybe on an annual basis, that would be ten
17    or so, 15.
18    From '02 to the current, we've had
19    substantial growth.
20 Q. Better than 50 percent?
21 A. Probably 25 per year.
22 Q. Okay.
23 A. I'm not sure how that relates totally.

Page 15

1     Now, we slowed down a little bit in the
2     last two years, though, so I would say that
3     you probably are talking about 30 to 40
4     percent growth per year.
5     Then in 2005, we slowed down
6     substantially, and we've -- so the end of
7     2005 is probably flat compared to previous
8     years. 2006 is picking back up some.
9  Q. Was there any external cause of that 2005
10    slow down, something in the industry?
11 A. It was primarily the -- there were a couple
12    of reasons. The most significant was
13    delayed release of a planned product.
14    We had planned a product release for
15    2004 and 2005. It was delayed. This delay
16    caused that.
17 Q. Was there any particular cause for the
18    delay?
19 A. No single cause.
20 Q. Okay. Were there more than three causes?
21 A. Yes. There -- to try to clarify that.
22    When you release a new product -- we have
23    not released a new product since 2001.

Page 16

1     There were a lot of areas that we had
2     planned well to do that were not executed.
3     There are probably three categories. A
4     couple that I would mention would be the
5     proper execution of material changeover.
6     You have an old model to a new model. So
7     you have to plan the materials that will
8     not be used from the old model to be --
9     reduce the inventory. Then you have to
10    plan the materials for the new model, and
11    you have a changeover plan. That's kind of
12    an operational mode.
13    Then the other item is the design, that
14    the designers do, our R&D people. So a
15    secondary item that relates to this is that
16    when you release a new revision, some of
17    the designs are not fully complete, so it
18    takes additional time to work out some of
19    the -- I may call them bugs. It's not
20    software only, but it's sometimes the
21    hardware doesn't fit right. So I would say
22    it's probably a combination of the two
23    items.

Page 17

1  Q. Okay. Has that product now been released?
2  A. Yes, it has.
3  Q. And you are back on track with the
4     substantial growth?
5  A. Yes, we are. This year we would -- the
6     product was formally released last
7     November. That would be -- let's see.
8     We're in '06, so that would be November of
9     '05. And it is -- I would say it's --
10    we've experienced 30 to 40 percent growth
11    in that product this year.
12 Q. How many people are employed by Amtren?
13 A. I was going to count them this morning. I
14    forgot. I don't know the whole number.
15        MR. TRAWICK: Are you asking
16        today?
17 A. Today?
18 Q. I was asking generally today, but we can go
19    back specifically.
20 A. Can I use a rough number?
21 Q. Sure.
22 A. I think it's about 20. I'm not...
23 Q. And is that more or less than when Janice

Page 18

1     was employed there, that 20?
2  A. I think it's less, but I'd have to verify
3     that. I can't remember exactly the
4     number. Now, I am using full time, but on
5     occasion we do use contractors or
6     temporary. And that's what -- your
7     question --
8  Q. Was to full-time employees.
9  A. Right.
10 Q. In breaking down that roughly 20 -- and I'm
11    not going to hold you to that number --
12    about how many are engineers?
13 A. Twenty-five percent roughly. I think four
14    operate in that department completely, so
15    it would be a little less than 25.
16 Q. Are the engineers responsible for inventory
17    control and production?
18 A. Not responsible for it.
19 Q. Okay. How many people would be involved in
20    inventory control?
21 A. One person.
22 Q. One person?
23 A. Yes.

Page 19

1  Q. Purchasing?
2  A. Purchasing, same person.
3  Q. Same person?
4  A. Yes.
5  Q. Do you have a separate shipping department?
6  A. We do not have a shipping department. It's
7     usually a shared duty.
8  Q. Okay. Would the person who also does
9     inventory and purchasing do shipping as
10    well?
11 A. Yes.
12 Q. Who else would be involved in shipping by
13    position or title, not by name?
14 A. What happens now is generally we pull from
15    the management staff when we need it for
16    that. If there's a shipment going out,
17    generally there's -- including myself, if
18    needed, and others will just assist with
19    the shipping of the product.
20        The primary person that's mentioned,
21    the inventory and logistics person,
22    prepares the shipment as far as they can,
23    and then we have additional people that

Page 20

1     will help with the finalization of it.
2     It's not assigned specifically. It's
3     usually as we can -- you know, as we can
4     find people.
5  Q. What is your primary product now that you
6     sell?
7  A. It's the CD and DVD duplicator.
8  Q. Since I have never seen one of those, is
9     that larger than a kitchen microwave?
10 A. Yes. There's three levels of the product.
11    One is the level that is under two
12    thousand. It would probably be smaller
13    than that. It would be similar to -- maybe
14    similar to a microwave.
15 Q. Okay.
16 A. Then the levels -- two levels above that
17    are substantially larger. They would be
18    similar to your office copier without the
19    stand. They would be 45 to 50 pounds.
20 Q. And you have a staff that actually
21    manufactures those?
22 A. Yes, we do.
23 Q. How many people are involved in

Deposition of Kirk Lamberth                    McCollum vs. Amtren                    November 15, 2006

---

**Page 21**

1  manufacture?
2  A. Let me count, because I want to try -- I'm
3      not going -- again, I'm going to use a
4      number that I just -- I think it's going to
5      be six or seven.
6  Q. Okay. Now, do the engineers do any of the
7      manufacturing work?
8  A. Their responsibility does not do that, but
9      they do assist from time to time.
10 Q. Okay. And to sort of get a picture in my
11     head, once a unit is produced, I would
12     assume it's boxed somehow, and your
13     manufacturing people would do that and move
14     it to some location to be sold?
15 A. We have an assembly line process. At the
16     end of the line it's quality checked, and
17     then it goes into a carton and is closed
18     up, yes.
19 Q. How many people are currently involved in
20     management with Amtren?
21 A. Currently? Five. Let me count...
22     MR. TRAWICK: To keep from
23     confusing the court reporter,

**Page 22**

1      if you verbalize your
2      thoughts, she takes it down.
3      THE WITNESS: Sorry about that.
4      My apologies.
5  A. I'm going to say five.
6  Q. Okay. And I'm assuming that you are one of
7      those?
8  A. Yes, that's correct.
9  Q. You are the president and CEO?
10 A. That's correct.
11 Q. Who are the other four?
12 A. By name, Bobby Lake, Susan Seeber, Derrick
13     Garrett --
14 Q. Derrick?
15 A. D-E-R-R-J-C-K, Garrett, G-A-R-R-E-T-T, and
16     Michael Rogers.
17 Q. What is Bobby Lake's title?
18 A. His title is general manager. There's a
19     secondary title with that, too, controller.
20 Q. Is Susan Seeber --
21 A. Seeber.
22 Q. Seeber?
23 A. Yes, uh-huh (positive response).

**Page 23**

1  Q. What's her title?
2  A. Accounting manager.
3      Let me clarify that. It's accounting
4      and business management.
5  Q. And Derrick Garrett?
6  A. Service manager.
7  Q. And Michael Rogers?
8  A. He's the logistics and inventory manager.
9  Q. Is he that person that we were talking
10     about that would purchase and --
11 A. Exactly.
12 Q. -- do inventory control and so on?
13 A. Yes.
14 Q. Okay. And typically service manager to me
15     means something in a retail setting, but
16     what does your service manager do?
17 A. Our service manager receives calls from the
18     customer. He manages a small group,
19     there's only two in it, but they're the
20     calls that come in from the customer with
21     issues regarding the systems.
22 Q. Okay.
23 A. Questions that -- you know, it's service

**Page 24**

1      calls similar to if you would call a
2      manufacturer for help with a product.
3  Q. And the accounting manager?
4  A. Susan?
5  Q. Yes.
6  A. What was your question?
7  Q. What specifically does she do?
8  A. Susan is responsible for the accounts
9      payable, the accounts receivable, the
10     basically matching the purchase orders with
11     the packing lists. I would say primarily
12     any accounting duty up and to the
13     production of -- in fact, I guess all
14     accounting areas. She also manages the
15     front office, too, anybody in the front
16     office.
17 Q. Okay. Does she do like monthly income
18     statements?
19 A. Yes, she does.
20 Q. Financial statements for the end of the
21     year?
22 A. Yes, she does. Those are nonaudited, just
23     output type reports. And she does,

Page 25

1  actually, some of them weekly.
2  Q.  Okay.  Is she also responsible for writing
3     checks?
4  A.  Yes, she is.
5  Q.  Making payments to Blue Cross Blue Shield?
6  A.  Yes, she is.
7  Q.  And tax payments?
8  A.  Yes, she is.
9  Q.  Is she a CPA?
10  A.  No, she is not.
11  Q.  To try to shorten things a little bit, I'm
12     going to say I think the general manager is
13     responsible for everything; is that right?
14  A.  The general manager in the role is -- yes,
15     operations and -- I call it the front
16     office, if you will.  It would be the
17     service and the purchasing and the
18     accounting areas, yes.
19  Q.  Okay.
20  A.  I think that's correct.
21  Q.  And how is that role different from that of
22     controller?
23  A.  The controller title in Mr. Lake's

Page 26

1  situation is because he is the CPA, and he
2  does review our accounting output; thus,
3  the title is, if you will, a co-title to
4  allow that role to be a double check for
5  the accounting system.
6  Q.  Okay.  When was Bobby Lake employed as
7     general manager and/or controller?
8  A.  I believe the dates are somewhere -- we can
9     verify this.  It would be January or
10     February of this year.  We can verify the
11     exact date if you want to.  I do know it
12     was the beginning of this year.
13  Q.  Okay.  How about Susan Seeber?
14  A.  I believe her role -- it would be in the
15     fall of last year.  It would be somewhere
16     around October -- again -- September,
17     October, I believe.
18  Q.  Was Susan Seeber hired into the position of
19     accounting manager or --
20  A.  Yes, she was.
21  Q.  Okay.  And I want to ask the same question
22     about Bobby Lake.  Was he hired as general
23     manager or did he have some other position

Page 27

1  before that?
2  A.  No, he was hired in as general manager.
3  Q.  Okay.  What about Derrick Garrett?  How
4     long has he been with you?
5  A.  Again, I'm going to estimate 2003.  Late
6     2003, early 2004.
7  Q.  And Michael Rogers?
8  A.  Spring of 2006.  Exact month, I would
9     estimate May.
10  Q.  Who did Mr. Rogers replace?
11  A.  At the time of his employment?
12  Q.  Yes.
13  A.  Wayne Crabtree.
14  Q.  And who did Derrick Garrett replace?
15  A.  The position did not -- it's a growth
16     position.  It did not exist.
17  Q.  New position?
18  A.  Yes.
19  Q.  And whom did Susan Seeber replace?
20  A.  Lisa McNamee.
21  Q.  And Bobby Lake?
22  A.  New position.
23  Q.  Do you recall the date that Janice McCollum

Page 28

1  was initially employed?
2  A.  The dates of her employment?
3  Q.  Yes.
4  A.  January of 2004 through April of 2005.
5  Q.  Okay.  Who was responsible for hiring her?
6  A.  I was.
7         (Plaintiff's Exhibit 1 was marked
8          for identification.)
9  Q.  If you would look at -- I'll represent to
10     you this is Amtren's responses to
11     Ms. McCollum's discovery requests.  Have
12     you ever signed a copy of this?
13         MR. TRAWICK:  Yes.
14  A.  Yes.
15         MR. TRAWICK:  We can get you a
16     signed copy.
17         MR. JACOBS:  I'm not sure that I
18     have one.
19         MR. TRAWICK:  My recollection is
20     we sent this to you and told
21     you we would supplement with a
22     signed copy.
23         MR. JACOBS:  That you would get a

Page 29

1       signed copy? All right.
2 Q. If you would look at the response to number
3     two, I asked for some information regarding
4     Ms. McCollum's pay.
5 A. Okay.
6 Q. And the response that her pay was 60,000,
7     was that salary?
8 A. To the best of my knowledge, that was her
9     salary. Again, I --
10 Q. Was that her initial pay when she was hired?
11 A. No, it was not.
12 Q. What was she hired at, what rate of pay?
13 A. I'm going to give a range. I'm not sure of
14     an exact number. I think it was somewhere
15     around 40, 45,000. I don't know exactly,
16     but in that range.
17 Q. Was there a specific formula or ratio of
18     any kind that was attached to her position
19     in terms of a bonus?
20 A. The bonus for that period or --
21     Explain that a little bit further.
22 Q. She was basically employed for a year.
23 A. Uh-huh (positive response).

Page 30

1 Q. And I note in the response that she got a
2     $10,000 bonus.
3 A. Uh-huh (positive response).
4 Q. And what I'm trying to find out, what I'm
5     trying to ask and not doing it very well, I
6     suppose, is was her bonus set up according
7     to some formula as a percentage of sales
8     or -- how was it arrived at?
9 A. The bonus is a merit bonus, and it's -- the
10     bonus that you're discussing --
11     If it's the $10,000 bonus, then I can
12     explain a little bit.
13 Q. Right.
14 A. That's a merit bonus. At the end of each
15     year, based on the company's performance,
16     we award a merit bonus. This bonus is --
17     the management staff as a whole is
18     reviewed, and each individual receives part
19     of this bonus. The bonus is based on our
20     profits.
21 Q. Okay. And was that divided according to
22     some preset percentage?
23 A. It is not a preset percentage each year.

Page 31

1     Generally the management staff receives a
2     general -- similar amount, and the
3     production workers receive a lesser but
4     similar amount.
5 Q. Similar amount? Okay. Is that amount at
6     the end of a year entirely discretionary
7     with you?
8 A. Yes, it is.
9 Q. Okay. Did Ms. McCollum's position carry
10     with it the payment of any insurance
11     benefits, health insurance or life
12     insurance?
13 A. I can't remember specifically her scenario,
14     but we do pay health insurance, a part of
15     the premium for health insurance, and
16     provide -- I don't think at that time we
17     provided life insurance. But I do know
18     that if an employee elects to be part of
19     it, then the premium for the employee is
20     matched, and we do provide that.
21 Q. Okay. How about any type of 401(k) plan or
22     retirement plan?
23       MR. TRAWICK: You're asking for

Page 32

1     the plaintiff?
2 Q. I'm asking for Ms. McCollum.
3 A. There was none allocated for Ms. McCollum
4     during that period. The allocation of that
5     plan is executed during the first quarter
6     of the next year, and so I would say no,
7     she was not -- there was no contribution
8     made to a plan on her behalf.
9 Q. Had she remained employed throughout the
10     first quarter of 2005, would a contribution
11     have been made?
12 A. No.
13 Q. Okay. Was a contribution made for any
14     other employees in 2005?
15 A. No.
16 Q. Let me then move forward to now. What is
17     the salary of Susan Seeber?
18 A. Again, $50,000 is an estimate. I believe
19     it's $50,000 per year.
20 Q. But you're not certain of that?
21 A. I'm fairly certain of that.
22 Q. Does she receive any health insurance
23     benefits?

Case 2:05-cv-01237-WKW-WC    Document 21-6    Filed 12/20/2006    Page 10 of 35

Deposition of Kirk Lamberth                McCollum vs. Amtren                        November 15, 2006

**Page 33**

1  A.  I don't know if she has elected to. That
2      is something an employee can elect to.
3      Again, it falls under the similar
4      guidelines of if an employee elects to, we
5      participate in payment of half their
6      premium.
7  Q.  Okay. Is there any provision for life
8      insurance?
9  A.  Honestly, we have a plan of a couple of
10     items. I'm not sure what all is in them.
11     I know there is an accidental, like if
12     you're injured. I think life insurance is
13     in that plan. I do not know who all
14     participates in that plan, but there is an
15     option for that. I'm going to have to say
16     I'll have to look into it. I just can't be
17     certain on that one. I'm not sure what she
18     participates in.
19 Q.  Okay. How about 401(k) or retirement plan?
20 A.  There is a -- of course, as she --
21         Are you asking were any contributions
22     made on her behalf?
23 Q.  I suppose my first question is, is there a

**Page 34**

1      plan that she's eligible to be a
2      participant in?
3  A.  Depending on the profits of the company, it
4      would be similar that I discussed earlier.
5      Each person would participate.
6  Q.  Okay. So depending on the profitability of
7      the company, there could be a bonus and a
8      contribution to a retirement plan?
9  A.  Yes.
10 Q.  Were there any bonuses or retirement
11     contributions in 2005?
12 A.  No.
13 Q.  Okay. I believe that's the year you told
14     me business was --
15 A.  Right. Right. I'm going to verify -- I'm
16     going to say no, but I'm almost certain
17     that we -- because of the condition, we --
18     there was no contribution made to the
19     profit sharing or any bonusing. I'm going
20     to -- I don't think so. Again, that --
21     sometimes -- I can't remember exactly, but
22     I'm going to say I don't think so.
23 Q.  Would the same general principle apply to

**Page 35**

1      all of your management and production
2      leaders that you discussed earlier, that
3      the management people could get a similar
4      percentage and that your production people
5      would get a lesser but similar percentage?
6  A.  Yes.
7  Q.  Would that apply to both bonus and the
8      retirement contribution?
9  A.  No. The retirement contribution is
10     controlled by the salary. Participation is
11     by the salary.
12 Q.  Okay. But if you did not have a good year,
13     there might not be --
14 A.  Right. To clarify that, the company does
15     allocate the amount of money to that.
16 Q.  Okay.
17 A.  Which is then divided up based on the
18     salary.
19 Q.  Okay. What is Bobby Lake's salary?
20 A.  At this time? Let me think. I believe
21     it's 120,000.
22 Q.  And does he participate in the health
23     insurance program?

**Page 36**

1  A.  Again, I --
2  Q.  I guess I really want to know --
3  A.  It's available to him. Is that what you --
4      Yes, it's available to him. I'm not sure
5      if he participate or not.
6  Q.  But in the event he does, the company would
7      pay half his premium?
8  A.  Exactly.
9  Q.  Okay. Tell me what Ms. McCollum's duties
10     were when she was initially hired.
11 A.  She was basically in the accounting
12     manager's position. The accounts payable,
13     the payroll, the accounts receivable. And
14     to some degree, her duties also had the --
15     she issued or -- I can't remember what she
16     did exactly, but she issued purchase orders
17     or assisted with the issue of purchase
18     orders.
19 Q.  If materials were needed for the production
20     process, would your inventory control type
21     person be one who would initiate obtaining
22     those materials?
23 A.  The way we would plan it is a guideline for

Deposition of Kirk Lamberth

McCollum vs. Amtren

November 15, 2006

Page 37

1    needs that we try to establish, and then
2    those needs are met with issuing blanket
3    purchase orders. Blanket purchase orders
4    are over a length of time, and they allow
5    delivery of certain parts on a schedule.
6    Generally, Ms. McCollum issued these POs.
7    The materials individuals would update her
8    on shortages or overages, I guess, in the
9    case it does happen, or I guess in some
10   cases when there's a yield loss if there
11   are parts that are received wrong.
12   Q.  I'm going to talk here a little bit more
13       than I want to, but, again, trying to
14       understand. I have read of something
15       called just-in-time management. Is that
16       what you attempt to do with your –
17   A.  That's very much what we attempt to do.
18   Q.  So Ms. McCollum would be the person who
19       would send the purchase order out based on
20       what someone else told her the need was, or
21       what was her role?
22   A.  Her role at that period would be-- I
23       believe she at that time issued the

Page 38

1    purchase order based on -- she would
2    discuss -- we had a weekly meeting, and --
3    or if we didn't have a weekly meeting, she
4    would discuss with the logistics person the
5    requirements, and then she would issue the
6    blanket orders on that behalf.
7    Q.  And could you tell me just – could you
8        tell me in a simple sort of way what a
9        blanket order is?
10   A.  A blanket order is a purchase agreement for
11       delivery of parts over time. So rather
12       than one document saying a certain number
13       of parts delivered at one time, it's a
14       document that has multiple deliveries,
15       delivered over time.
16   Q.  Okay. Would it be something that would
17       authorize up to a certain amount --
18   A.  Yes.
19   Q.  -- over a period of time?
20   A.  That's exactly what it is.
21   Q.  Okay. I noticed in our discussion thus
22       far, I don't believe there has been any
23       mention of a sales force. Do you have a

Page 39

1    specialized sales division?
2    A.  That's my role primarily, but we sell
3        through distributors.
4    Q.  Okay. When Ms. McCollum was hired as
5        accounting manager, who was her
6        supervisor?
7    A.  I was.
8    Q.  At any time during her employment, did she
9        have any other supervisor other than you?
10   A.  No.
11   Q.  I think the answer is obvious, but who in
12       the company would be in the best position
13       to know about Janice's performance as
14       accounting manager?
15   A.  I would.
16   Q.  Were there any personality conflicts
17       between Ms. McCollum and other management
18       staff?
19   A.  Not that I was aware of.
20   Q.  How did you come to hire Ms. McCollum? How
21       did you learn about her?
22   A.  She responded to an ad we placed in the
23       paper, Montgomery Advertiser, and she

Page 40

1    submitted her resume. We talked to her,
2    Q.  Okay. Did you then interview her after
3        that?
4    A.  Yes, I did.
5    Q.  Did you contact any references or other
6        persons before you made a decision to hire
7        her?
8    A.  I can't recall in her case specifically.
9        Generally, we do ask for a couple of
10       references. I can't remember exactly what
11       I did in her case.
12   Q.  Okay.
13   A.  She did have a -- because her -- if I can
14       say, there was an automatic reference. Her
15       husband did work next door.
16   Q.  Okay. That's a different company?
17   A.  Uh-huh (positive response). Yes. I'm
18       sorry.
19   Q.  Okay. So did you feel like you knew her or
20       knew of her?
21   A.  No. Only thing is that was one --
22   Q.  One of the things you remember about --
23   A.  Right. Considering her for employment,

**Page 41**

1  yes.
2  Q. Did you do any kind of check of her
3  educational background?
4  A. I did not.
5  Q. And you don't recall whether you talked to
6  any of her former employers?
7  A. I do not.
8  Q. Okay.
9  A. I do think that there was -- if I'm not
10  mistaken, I think she was employed at that
11  time, and there was some concern over --
12  with her current employment over sharing
13  too much information, risking the current
14  job.
15  Q. At Amtren is there any formalized process
16  for evaluating employees?
17  A. There's nothing formal.
18  Q. Okay. Is that wholly up to your
19  discretion?
20  A. At that time, it was.
21  Q. Okay. How has that changed since that
22  time?
23  A. I'm not wholly. There are more individuals

**Page 42**

1  that try to look at someone's productivity
2  or someone's contribution.
3  Q. Specifically in the role of accounting
4  manager, currently who would evaluate that
5  person? You and --
6  A. I would still do that. Let me clarify
7  that. For any of the management staff that
8  report directly to me, they are solely my
9  responsibility still, and they maintain
10  that.
11  Q. Okay. Have the reporting lines changed
12  since Ms. McCollum left your employment?
13  A. No.
14  Q. All of the management people still report
15  directly to you?
16  A. Yes.
17  Q. Okay. You've told me a couple of things
18  that she did. I believe you've mentioned
19  ordering -- issuing purchase orders. Could
20  you sort of tell us what her job was as
21  accounting manager?
22  A. Day to day?
23  Q. Yes.

**Page 43**

1  A. I would say her job was to manage the
2  accounting system: Receipt of invoices
3  from vendors. Matching those invoices to
4  purchase orders and packing lists,
5  generating the payment for those,
6  generating the check for those, signing the
7  check, and even putting it in the envelope
8  and processing it for mail.
9  On the AR side -- excuse me -- accounts
10  receivable side, she would issue the
11  statements from Amtren to our customers.
12  On the payroll side, she would issue the
13  payroll on a weekly basis. She was also
14  responsible for paying tax deposits
15  weekly. She was responsible for
16  submission -- in the accounting role,
17  submission of the statements that the --
18  the reporting that has to go to the state
19  and the federal agencies.
20  I think that pretty much sums it up.
21  Q. Okay. Did she get additional duties as she
22  was employed other than those you've
23  described?

**Page 44**

1  A. Yes, but if I can back up. Some of the
2  duties I just mentioned, she was -- they
3  were provided at the end versus the
4  beginning.
5  Q. At the beginning?
6  A. And around October of -- let's see --
7  September, October of 2004, she received
8  the authority to sign checks and to
9  completely control the disbursement of our
10  funds.
11  Q. What reports did she provide to you on a
12  regular basis?
13  A. There's a report that we call recap report
14  that was a weekly recap that she would
15  summarize the basic parts of the company as
16  far as cash, the money we owed vendors,
17  accounts payable, the money that's owed us,
18  accounts receivable, the position on our
19  line of credit.
20  Additionally, the form would have maybe
21  some forecasting in it; you know, based on
22  the current open orders, this may be the
23  potential income.

Deposition of Kirk Lamberth          McCollum vs. Amtren          November 15, 2006

Page 45

1  Q. I was going to ask you what you meant by
2     forecasting, but is that what you meant?
3  A. Yes. Basically, at that point you look at
4     the open orders, and you just look at the
5     revenue that's going to be obtained from
6     the open orders.
7  Q. All right. You were present during her
8     deposition, and there was some discussion
9     of time lines for payment of liabilities or
10    obligations of the company. What was the
11    guideline that she operated under?
12 A. For payments of vendors or payments of --
13 Q. If they were separate guidelines, if you
14    could tell me vendors first.
15 A. Well, to clarify, one, any guideline from
16    an agency like a federal or a state would
17    generally be within the terms that they set
18    forth.
19 Q. Okay.
20 A. For vendor payments, the guidelines were 30
21    to 45 days upon receipt of payment. There
22    are some exceptions to those, which are the
23    general expenses which are paid kind of

Page 47

1     believe it is called check writing report,
2     weekly report.
3  Q. Okay. Did she have any responsibility for
4     sales?
5  A. Not to my knowledge, not directly.
6  Q. How about production?
7  A. Not directly.
8  Q. Inventory control?
9  A. Yes.
10 Q. What were her responsibilities for
11    inventory control?
12 A. Janice performed the inventory review when
13    they physically counted the inventory, so
14    you would say that she verified the
15    inventory count on a periodic basis. I
16    think it was quarterly.
17 Q. Okay. Did she ever discover any
18    discrepancies or problems there?
19 A. Did she report -- you're asking me
20    something different. Did she report to me
21    that she discovered any discrepancies? I
22    can't answer specifically.
23 Q. Okay. Did she ever report any to you?

Page 46

1     differently based on what they are. The
2     health insurance is paid based on a
3     statement type thing. The utility bills
4     are paid a little bit different. But the
5     trade vendors were paid on a cycle that I
6     believe was 45 days at that time.
7  Q. Were there occasions in the cash flow of
8     the company that there were not always
9     funds available to pay everyone within 45
10    days?
11 A. Yes.
12 Q. After Ms. McCollum had authority to sign
13    checks, were the checks in any way
14    presented to you before they were issued?
15 A. I can't recall the exact process, but she
16    did give -- there is a report, but I do not
17    think I saw the exact checks. I think
18    instead I saw a check writing report.
19 Q. Would you get that on a weekly basis or
20    daily?
21 A. It would probably come -- I think as part
22    of that -- weekly, depending on the pay
23    cycle, she would attach that -- and I

Page 48

1  A. No.
2  Q. Were there any that you are aware of that
3     were not reported to you?
4  A. Yes.
5  Q. What was that?
6  A. Just talking about specific inventory
7     items, right?
8  Q. I'm talking --
9  A. Let me back up and state that I can't give
10    you specifics on that. And I want to be
11    careful and answer your exact question. I
12    was saying in general in making a
13    statement, so --
14       Go back and ask me one more time. Let
15    me make sure I'm being very specific.
16 Q. It was my understanding that you were
17    telling me that her responsibilities in the
18    area of inventory control were what I'll
19    call an audit process.
20 A. Exactly.
21 Q. A verification process.
22 A. Right.
23 Q. Tell me exactly what she was supposed to

Case 2:05-cv-01237-WKW-WC    Document 21-6    Filed 12/20/2006    Page 14 of 35

Deposition of Kirk Lamberth                McCollum vs. Amtren                November 15, 2006

Page 49

1    do.
2    A.   She would basically go into -- she would
3         work with production and schedule it. She
4         would go in there with the production
5         staff. We would stall production. They
6         would count all the parts. She would then
7         return to her office and sit down and enter
8         all the corrections into the system. What
9         she would then report is an outage of
10        inventory. What -- did not isolate
11        individual outages per part. So she would
12        indicate a -- I guess a gross outage.
13             What I indicated in errors were that as
14        we discovered, when she was making the
15        gross adjustments, she was just basically
16        taking the plus and minuses and giving me a
17        net result. When some of the swing of the
18        inventory count was significant, I was not
19        being reported that.
20   Q.   Did she have any other responsibilities as
21        far as inventory control was concerned?
22   A.   Not actually control. That would be it.
23   Q.   Okay. This process of reporting to you a

Page 50

1         net instead of specific discrepancies I
2         guess I'll call them, when did that occur?
3    A.   Basically, at the close of each quarter.
4    Q.   Okay. So at the close of each quarter,
5         there was some failure on her part to
6         report to you an accurate inventory
7         figure?
8    A.   I can't say it's a failure on her part to
9         report to me, no. What I'm saying is you
10        asked me about reports. She reported to me
11        the gross adjustments. I then made the
12        statement about how they were summed up.
13        The discovery of those errors were not --
14        you know, we -- during that process, it was
15        basically just a reporting. It's
16        reported. I can't say at that time that we
17        were aware of anything as far as problems
18        on that.
19   Q.   Okay. As of the date of her termination,
20        were you aware of any problems of that
21        nature?
22   A.   Yes.
23   Q.   What problem were you aware of?

Page 51

1    A.   That our inventory was a lot higher than we
2         had planned for, basically; that the
3         inventory was significantly high.
4    Q.   What was the role of your logistics person
5         in maintaining the inventory?
6    A.   To receive the parts in, to identify on the
7         receiver of the packing lists the receipt
8         of the parts, to submit those to
9         Ms. McCollum, and to -- in some ways, they
10        would work together to identify shortages
11        or overages.
12   Q.   Okay. Did he provide any kind of report to
13        you regarding that?
14   A.   No, not on a formal basis.
15   Q.   Okay. Did that person participate in the
16        management meetings you were talking about
17        on a weekly basis?
18   A.   Yes.
19   Q.   Did that individual have responsibility for
20        ordering the parts that were needed?
21   A.   If I remember the role, the role was
22        divided. There were some orders that this
23        individual may issue, and then there were

Page 52

1         some orders that Ms. McCollum issued on her
2         own. I don't remember the exact guidelines
3         for that dividing.
4    Q.   Okay. Did that individual ever have any
5         problems with his or her reporting?
6    A.   Not during -- you're talking about during
7         this time frame of Ms. McCollum's
8         employment?
9    Q.   Yes.
10   A.   No.
11   Q.   How about later? Has the person in that
12        position ever had any problems with
13        carrying out their job function?
14   A.   I will say that the later reports are
15        detailed reports, are part counts.
16   Q.   Has the reporting process been changed?
17   A.   I would say not changed. Just more
18        information provided with the report.
19   Q.   Prior to Ms. McCollum's termination, had
20        there been any direction given to her to
21        provide more information?
22   A.   Yes.
23   Q.   Who gave her that --

Page 53

1   A. I gave her that.
2   Q. How did you do that?
3   A. I asked for more information be provided
4       during the weekly summaries that she was
5       providing.
6   Q. Okay. And when you say you asked, was that
7       verbal or in writing?
8   A. It was verbal.
9       MR. JACOBS: I'd like to take a
10          short break.
11      (Brief recess.)
12  Q. (Mr. Jacobs continuing) Mr. Lamberth, did
13      Ms. McCollum have a written job
14      description?
15  A. No. I don't recall. I don't think we ever
16      did. As a whole, we don't do job
17      descriptions.
18  Q. That was going to be my next question.
19      Does anyone in the company have a job
20      description, a written one?
21  A. No.
22  Q. In your response to our discovery
23      request -- I'm going to ask you about a

Page 54

1   series of things and reasons that you gave
2   for terminating Ms. McCollum.
3       One of those things was you allege that
4   she failed to adequately perform her
5   responsibilities pertaining to Amtren's
6   accounting system.
7       MR. TRAWICK: You're reading from
8           paragraph number eight on page
9           four?
10      MR. JACOBS: I believe so, yes.
11          We're going to be drawing from
12          that for the next period of
13          time.
14      THE WITNESS: What page?
15      MR. TRAWICK: Four.
16  Q. Page four, number eight.
17      What responsibilities did she fail to
18      adequately perform?
19  A. For?
20  Q. The accounting system.
21  A. The accounting system? Like the day-to-day
22      activity or the --
23  Q. I honestly don't know. I'm reading your

Page 55

1   response to you and telling you -- asking
2   you to tell me what responsibilities she
3   adequately failed to perform.
4   A. The accounting system -- basically, there
5       were several areas that -- you know, in the
6       accounting system, this is -- you're not
7       really pertaining to the software or
8       anything, you're talking about the
9       duties -- we're talking about the duties,
10      you're basically saying now?
11  Q. I don't know what I'm talking about. I'm
12      asking you about your --
13      MR. TRAWICK: I think he's just
14          asking you to explain this
15          answer.
16  Q. Yes.
17  A. Okay. I can clarify that the system in
18      that statement was a process, so I can
19      explain her deficiencies in that. When I
20      mean system, I mean a system like our
21      entire process.
22      Several areas that she did. One is
23      that she did overdraw at our -- on our bank

Page 56

1   account. We had never had that before. I
2   was unaware of that. I was never made
3   aware of that, and Amtren had adequate
4   funds for the transactions.
5       She issued the checks -- signed the
6   checks, disbursed the checks, and then
7   pulled money from our money market account
8   to our checking account incorrectly. And
9   then they would basically, apparently, not
10  be covered, and we would pay for those
11  penalties with overdraft charges.
12  Q. Was this a particular transaction you're
13      talking about, or was this more than one
14      transaction?
15  A. No, it was more than one transaction. If
16      I'm not mistaken, it was several. It
17      amounted to several thousand dollars in
18      overdraft charges.
19  Q. Could you identify those transactions for
20      me?
21  A. Could I identify them?
22  Q. Yes.
23  A. I believe that -- I don't know if we

Page 57

1     provided a list or not. I'm not sure.
2   Q. Let me represent to you that I haven't seen
3     a list.
4   A. Well, I guess we will have to -- I believe
5     that there is a list in this. Hang on.
6     There is a list in here.
7        MR. TRAWICK: I think the last
8        page.
9   A. It is in the --
10       MR. TRAWICK: We produced this to
11       you.
12  A. Right. It is the last page of this.
13  Q. And that would be the last page of your
14     response to the EEOC?
15  A. That's correct.
16  Q. All right.
17  A. Regarding the --
18  Q. If we could mark this as Plaintiff's
19     Exhibit 2.
20       (Plaintiff's Exhibit 2 was marked
21       for identification.)
22       MR. TRAWICK: Plaintiff's Exhibit
23       2 will be this five-page

Page 58

1     letter to the EEOC signed by
2     Kirk?
3        MR. JACOBS: Right.
4        (Plaintiff's Exhibit 3 was marked
5        for identification.)
6        MR. JACOBS: And then Plaintiff's
7        Exhibit 3 will be the
8        attachment relating to item
9        five.
10  Q. Is that the one you're referring to, bank
11     overdrafts, Mr. Lamberth?
12  A. Yes.
13  Q. If you would, explain that sheet to me.
14  A. This sheet is a summary that outlines just
15     the transactions on our checking account
16     for these periods of time regarding this
17     activity. We -- I had never really
18     experienced overdrafts before, so when we
19     discovered this, we just produced this
20     document as a summary document to represent
21     the number of NSFs which are identified in
22     there.
23  Q. First of all, when was this document

Page 59

1     generated, this summary?
2   A. I would say it would be on or around the
3     date of this letter.
4   Q. Okay.
5   A. June 29th of 2005.
6   Q. Let me just look at the very first item
7     there, 10/26/2004. It says,
8     reversal/credit, and then it has the number
9     30 over there. Could you explain to me
10     what that represents?
11  A. I'm not sure what that means. The only
12     part of this document that I'm probably
13     going to be -- that I focused on or --
14     would be the NSF charges.
15  Q. Okay. And there are a series of those from
16     10/29 of 2004 to 4/13/2005.
17        If you would, take the first one of
18     those, 10/25, and tell me what that
19     represents.
20  A. You mean the NSF?
21  Q. Yes. Yes, the NSF.
22  A. It's my understanding that that is a charge
23     for nonsufficient funds for a check

Page 60

1     presented at our bank without proper funds
2     in the account.
3   Q. What does the dash 30 mean?
4   A. I think that that is a charge to our -- for
5     the overdraft charge.
6   Q. Okay. You're not sure what that is?
7   A. I'm -- on that one, I think that is. It
8     states NSF fee. I'm pretty certain that
9     that's a charge from the bank to us for the
10     overdraft.
11  Q. Okay. Is it my understanding, then, that
12     these other items on here other than NSF
13     fees don't represent errors of any kind
14     that you're referring to as --
15  A. Not to my knowledge. I think that was a
16     summary document that was produced that had
17     other information on it. We were primarily
18     for this attachment focused on the NSF fee
19     portion.
20  Q. Okay. And who generated this report?
21  A. I did.
22  Q. You did?
23  A. Uh-huh (positive response).

Deposition of Kirk Lamberth                      McCollum vs. Amtren                      November 15, 2006

Page 61

1    Q. How did you generate this report?
2    A. This report was pulled from our -- if I'm
3        not -- basically, it was produced as an
4        export from our on-line banking system, I
5        guess, log in.
6    Q. Okay. Did you have at that time open
7        access to your on-line accounts?
8            MR. TRAWICK: At which time?
9    Q. In 2004 and 2005.
10   A. I had access to it. I did not use it,
11       though.
12   Q. Okay. And it's your testimony that you
13       never had NSFs before?
14   A. Not to that magnitude, nor were they not
15       reported to me.
16   Q. Okay. Then it's your testimony that
17       Ms. McCollum was responsible for this and
18       that she never informed you of this in any
19       way?
20   A. No.
21   Q. Okay.
22            MR. TRAWICK: Wait. Read the
23            question back and read his

Page 62

1            answer.
2            (The following was read: Then it's
3            your testimony that Ms. McCollum
4            was responsible for this and that
5            she never informed you of this in
6            any way? Answer: No.)
7    A. I meant to say yes. I am so sorry about
8        that. I'll listen to the question.
9    Q. Okay. This is entitled -- and I'll just
10       read it -- attachment to response relating
11       to item number six, bank overdrafts. Could
12       you tell me what item six you're referring
13       to in there in Plaintiff's Exhibit Number
14       2?
15            MR. TRAWICK: Well, you said
16            item -- this reads item five.
17            MR. JACOBS: I'm sorry. It is. I
18            looked at it upside down and
19            wrong.
20   Q. Is it item --
21            MR. TRAWICK: Item five.
22   Q. -- five of the EEOC response?
23   A. Well, it actually is -- you know, your

Page 63

1        question is regarding --
2    Q. Yes. What I want to know is what this
3        reference is to, to item five.
4    A. Item five --
5            MR. TRAWICK: On Plaintiff's
6            Exhibit 3.
7    Q. Three. What does that refer to in
8        Plaintiff's Exhibit 2?
9    A. That refers to -- in the summary, it is
10       item five in the summary.
11   Q. Okay. And that was my error in looking at
12       it across the table upside down.
13            MR. TRAWICK: That's okay. You
14            just confused me.
15            MR. JACOBS: Confused me, too.
16   Q. Okay. Your next statement was that she
17       overspent on inventory. How did she
18       overspend on inventory?
19   A. In January of -- in late December of 2004
20       and January of 2005, was the planned move
21       to the new product. So in February of
22       2005, we had planned to reduce the material
23       purchasing for the older FlexWriter model

Page 64

1        that we -- it would be -- the revisions I'm
2        talking about.
3            The plan was never followed through
4        with, and we ended up with materials of the
5        older revision model. In other words, the
6        way the inventory was -- the mistaken
7        inventory resulted in the fact that --
8            We had had weekly meetings discussing
9        the fact that we would move to the new
10       model. The new model would dictate a lot
11       of changes in parts. We would subsequently
12       reduce the purchasing of the current model
13       parts so that at the end of January, we
14       would end up with a very low inventory
15       count. In February of that month, we would
16       do a retooling -- I mean, February of that
17       year, we would do a retooling and start
18       back up in March with the planned product.
19            Ms. McCollum mistakenly purchased
20       excessive inventory to the amount that we
21       had to delay the release of the new product
22       immediately because the number of parts
23       that we had were three to four to five

16 (Pages 61 to 64)

Deposition of Kirk Lamberth    McCollum vs. Amtren    November 15, 2006

---

**Page 65**

1    months worth of inventory.
2    Q. How did you discover that?
3    A. The discovery of that was very difficult to
4    do because it was tied to the purchase
5    order documents that are on blanket
6    orders. So the blanket orders are an
7    underway -- an in-process document. The
8    plan was to revise those documents so that
9    the materials are depleted, so there was --
10    some of the documents were apparently not
11    changed, so the older parts continued to
12    arrive. So it wasn't like it was one
13    moment we looked and saw that it was
14    there. It was over a period of time.
15    Q. Okay. When did you first become aware of
16    that?
17    A. Well, obviously, the inventory -- the
18    excessive inventory was realized probably
19    February -- end of January, February, maybe
20    the middle of February.
21    Q. And what documents did you see that brought
22    that to your attention?
23    A. I can't really say what document, but I

---

**Page 66**

1    would say that it was the fact that the
2    materials were received in and we were
3    dealing with the materials on our floor. I
4    can't say, really, I had a document that
5    showed that. It just -- we had the
6    availability of a lot of the older material
7    parts in our inventory.
8    Q. All right. Are you telling me, then, that
9    Ms. McCollum ordered materials based on the
10    blanket purchase orders that were in place?
11    A. I'm not sure how the mistake may have been
12    made or was made. What I was alluding to
13    is that I was under the impression that she
14    was executing the proper changes to reduce
15    our inventory down at that point, and that
16    was not executed properly.
17    Q. Okay. Did your logistics person have any
18    role in maintaining that inventory or
19    getting the right inventory?
20    A. The individual at that point would receive
21    in the goods that would be issued based on
22    the purchase orders that were there. That
23    individual would basically -- depending on

---

**Page 67**

1    the -- I guess it would be -- that position
2    could not dictate immediately on that.
3    That position was really more of a check-in
4    of the purchase documents. So if the
5    purchase documents dictated that a certain
6    part arrive at a certain time, and that
7    purchase document was never changed, their
8    verification was part received based on the
9    purchase document. Ms. McCollum's role was
10    the purchase document.
11    Q. Who was that individual at that time?
12    A. The receiver? That was David Fields.
13    Q. David Fields?
14    A. Uh-huh (positive response).
15    Q. And to be sure that I'm clear, David Fields
16    had no responsibility for management of the
17    inventory as far as ordering the right
18    materials and making sure they were there?
19    A. Yes. They worked hand in hand on that.
20    Q. All right.
21    A. But during this period you mentioned,
22    the -- Mr. Fields -- Now, to the best of my
23    knowledge. Remember, the mistake -- I

---

**Page 68**

1    can't really pinpoint everything about all
2    of this. But the fact of the matter was
3    Ms. McCollum's role was to control the
4    purchase documents to sufficiently decrease
5    our inventory to a low balance in January.
6    Q. All right.
7    A. That was not done.
8    Q. Okay. And was that a specific directive in
9    writing?
10    A. We talked about it every week in a staff
11    meeting and discussed this progression.
12    Q. So that was the management meeting?
13    A. Yes.
14    Q. Okay. Was this one of the reasons that you
15    terminated Ms. McCollum?
16    A. Yes.
17    Q. The next item in your response there was
18    caused Amtren's checking accounts to be
19    overdrawn and failed to notify management.
20    Is that the one we've already talked
21    about?
22    A. That is. We've talked about that.
23    Q. So that's the same as number -- as the

---

Page 69

1 first one, failed to adequately perform her
2 responsibilities pertaining to the
3 accounting system?
4 A. Yes.
5 Q. Okay. Which one or ones of Amtren's
6 vendors did Ms. McCollum not pay?
7 A. Ms. McCollum in -- toward the end of
8 February, the beginning of March, several
9 vendors contacted me directly and stated to
10 me that their -- they said --
11     The two primary vendors are Brundidge
12 Electronics Corporation in Brundidge,
13 Alabama, and Carter & Carter Manufacturing
14 in Lacey's Spring, Alabama. They're our
15 two largest vendors. We have done business
16 with them for years.
17     They contacted me with concern over
18 payments to their account.
19 Q. Okay.
20 A. Basically, we were approaching a limit of
21 terms with them that they -- we were
22 exceeding the credit limit is what we were
23 approaching.

Page 70

1 Q. All right. How did they contact you?
2 A. By phone.
3 Q. Do you have records of when they contacted
4 you with those phone calls?
5 A. Unh-unh (negative response). I do not.
6 Q. What specifically did they tell you when
7 they called you?
8 A. Just that they were concerned about the
9 payments to their accounts.
10 Q. Are you telling me they said they had not
11 been paid?
12 A. They -- really, more likely that the amount
13 of money that -- we weren't paying against
14 their account enough to decrease the amount
15 we owed them. In other words, the
16 outstanding amount was growing.
17 Q. Okay. Was that outstanding amount
18 reflected in the weekly recaps that you
19 got?
20 A. Not completely.
21 Q. Was it partially?
22 A. Partially.
23 Q. Were the company's accounts, cash accounts

Page 71

1 sufficient to make larger payments at that
2 time?
3 A. They should have been.
4 Q. Well, were they?
5 A. At that time, this would be -- I would say
6 there should have been adequate cash to pay
7 the accounts.
8 Q. All right. Do you know whether there was
9 adequate cash or not?
10 A. To the best of my knowledge, there was
11 adequate cash there.
12 Q. If Ms. McCollum were to represent that
13 there was not adequate cash to pay more,
14 you would say that was not true?
15 A. Not correct. That's really not -- Let me
16 see. Let me go -- basically, the cash
17 planning of the company was Ms. McCollum's
18 responsibility. We had a line of credit
19 and we had a checking account and we had
20 materials. Totally responsible. Totally
21 responsible for issuing the checks. So the
22 problem occurs in that the cash position
23 was also being reported there, too. The

Page 72

1 line of credit. So it's difficult for me
2 to state one item without looking --
3 discussing the other ones, see, because she
4 reported the entire -- both situations to
5 me.
6 Q. All right.
7 A. So we -- according to the plans, going back
8 to the planned migration of the product,
9 meaning the older revision to the newer
10 revision, there was plenty of cash and a
11 line of credit available to pay all vendors
12 timely.
13 Q. All right. What would we have to look at
14 to verify that there was enough cash or
15 that there was not enough cash available?
16     MR. TRAWICK: Well, you're
17     limiting your question to
18     cash. I think his answer
19     includes the line of credit
20     also.
21 Q. Well, then, I'll back up. What were all of
22 the things that we would have to look at to
23 determine whether there was sufficient

Case 2:05-cv-01237-WKW-WC    Document 21-6    Filed 12/20/2006    Page 20 of 35

Deposition of Kirk Lamberth                McCollum vs. Amtren                November 15, 2006

Page 73

1    resources available?
2    A.  What you would look at is the cash position
3        and the line of credit position beginning,
4        say, in October -- September, October of
5        the previous year and try to watch that
6        through this period that you're talking
7        about.
8    Q.  Okay. And what would we have to look at in
9        order to be able to do that? Bank
10       statements?
11   A.  I believe the bank statements would tell
12       you the transactions and the position, but
13       then we would also have to look at the --
14       probably an inventory sheet that would show
15       the inventory amounts as well.
16   Q.  Okay. Anything else we would need to look
17       at?
18   A.  I can't -- you know, that's asking
19       something I'm not completely familiar with,
20       how to completely do that.
21   Q.  Are there any documents related to the use
22       or availability of the line of credit?
23   A.  Well, I would imagine that would probably

Page 74

1    come from the bank statements, too.
2    Q.  Okay.
3    A.  I believe that that would -- again, I'm not
4        completely well versed at how you would
5        check that, but I believe that would be the
6        way to do it.
7    Q.  What did you look at to make your
8        determination that that was the cause, that
9        she didn't pay the vendors, and there was
10       plenty of cash available?
11   A.  Well, the -- my result -- this statement
12       results from the fact that when I was
13       made --
14            The vendors contacted me. I did
15       research into this to look into it. At
16       that time, I guess the information showed
17       that we had really just overspent in
18       several areas, including the inventory. So
19       my issue with Ms. McCollum at that time was
20       the incorrect execution of it or even
21       sharing with us this, you know, that this
22       was an issue that was arising.
23            Am I answering the question?

Page 75

1    Q.  Well, what Im trying to determine,
2        Mr. Lamberth, is sort of what you said.
3        You said at the time, you researched this.
4        I'm trying to find out what you researched,
5        what did you look at, what would I have to
6        go back and look at to verify whether what
7        you say you saw was, in fact, true.
8    A.  I would say that I verified the accounts
9        payable that was being informed to me. And
10       some of these reports that I'm getting have
11       have not been able to locate as yet. So
12       what I was using was basically the
13       information shared from the weekly to show
14       the outstanding accounts payable, which is
15       the amount of money we owe the vendors.
16       When I received a call like this, I did not
17       know that that was growing. So my research
18       would have been to look into the accounts
19       payable, which in March I began to see
20       certain areas that concerned me. That
21       indicated to me that the information shared
22       with me on a weekly basis was not exactly
23       the position of the accounts payable we

Page 76

1    owed our vendors.
2    Q.  If I were to look at or to have someone
3        knowledgeable to look at the accounts
4        payable, would I see the same things you
5        saw?
6    A.  The issue here is the weekly reporting to
7        me as her supervisor versus what was
8        actually in the system. I do not know --
9        we have not been able to produce the weekly
10       reports completely yet, though we've
11       looked. So the issue is the information
12       shared with me on a weekly basis versus the
13       position of the company.
14   Q.  So you don't have any evidence to back that
15       up at this time?
16            MR. TRAWICK: Object to the form.
17            I don't think that's what he
18            testified to.
19   Q.  Well, I mean --
20   A.  No. We have evidence, yes. Given time, we
21       can produce evidence.
22   Q.  Okay. Well, what evidence do you have?
23   A.  The evidence will be I have some of the

Page 77

1    forms. We're continuing to look for them,
2    the reports. We actually have -- we've
3    located several. I do believe that there
4    are -- and I'll have to refer -- I think
5    that we can definitely show this, because
6    the information is not something that just
7    was not completely apparent.
8    Q.  What documents have you turned over to me
9    as Ms. McCollum's attorney that would show
10   that?
11   A.  Well, this would be in our response. Let
12   me see if I put anything --
13         MR. TRAWICK: Don't verbalize your
14   thoughts.
15   A.  I can't say at this time. I know that, to
16   answer your question, we submitted all of
17   the material that we had in response to
18   your request for information. If we had it
19   at that time, it would have been submitted.
20   Q.  Okay.
21   A.  I can't answer.
22   Q.  Have you discovered any additional
23   documents since then?

Page 78

1    A.  Relating to the inventory?
2    Q.  Yes, relating to that issue.
3    A.  No.
4    Q.  Do I understand you that you believe there
5    are other documents that you have not been
6    able to locate yet that would substantiate
7    that position?
8    A.  We have been through the files
9    extensively. Unfortunately, I do not think
10   we will be able to locate a lot of these
11   documents.
12   Q.  When Ms. McCollum gave you weekly reports,
13   what did you do with them?
14   A.  Most of the time, she would take them back
15   with her. Occasionally I would maybe keep
16   a copy of them, but not anything definite.
17   Q.  So you didn't have any regular
18   recordkeeping system?
19   A.  Not personally, I did not. I relied on the
20   staff to do that.
21   Q.  Have you told me the basis for the
22   statement that she failed to notify
23   management that some of the vendors were

Page 79

1    not being paid? Is that what you were just
2    telling me about?
3    A.  Well, the -- probably the -- there is an
4    issue about the health insurance that would
5    have occurred where -- that is a vendor --
6    where the health insurance premium was not
7    being paid timely, and we receivednotice
8    of this. Basically, during my research
9    during this period of investigating, I
10   discovered that our health insurance was
11   not being paid timely. That's one. Those
12   are probably the three most significant
13   ones.
14   Q.  What period of time was this investigation?
15   A.  Probably end of February through March,
16   first of April.
17   Q.  Okay. During this time period that you
18   were doing this investigation, did you
19   discuss any of this with Ms. McCollum?
20   A.  I discussed with her weekly about getting
21   the accounts payable information to match
22   what exactly we owed. I asked her weekly
23   to be certain that the accounts payable

Page 80

1    information matched every invoice received
2    by the company the date of the receipt.
3    Q.  Did you ever go to her and say,
4    Ms. McCollum, this doesn't match?
5    A.  Yes.
6    Q.  Okay. And when did you do that?
7    A.  Toward the period of March, there were a
8    couple of times when the information just
9    didn't appear to be -- to include
10   everything, the accounts payable
11   information that she had reported.
12   Q.  You say it didn't appear to. Were there
13   specific things that you pointed out to her
14   and said, explain this to me?
15   A.  No, I did not.
16   Q.  Okay. Attachment two to your EEOC
17   response, to item number two, we'll mark
18   as -- I think it's Plaintiff's 4.
19         (Plaintiff's Exhibit 4 was marked
20   for identification.)
21   Q.  Are those the documents that you rely on
22   for your statement that she failed to pay
23   health insurance premiums timely?

Deposition of Kirk Lamberth    McCollum vs. Amtren    November 15, 2006

Page 81

1  A. Yes.
2  Q. Are there any other documents to
3     substantiate that accusation that you're
4     aware of?
5  A. Not that I'm aware of.
6  Q. The next item that I have on my list is
7     accounts payable reports and other
8     accounting reports were not accurate.
9     Which reports were not accurate?
10 A. Those reports relate to the weekly summary
11    reports that she's provided.
12 Q. Did you attach any of those to your
13    response to the EEOC?
14 A. No, sir.
15 Q. Have you supplied us with any such
16    reports?
17 A. Any we located, we did. A lot of those
18    reports were the ones we have yet to
19    locate.
20 Q. What reports were not -- what accounting
21    reports were not accurate?
22 A. The accounts payable position, which means
23    the invoices that were being entered into

Page 82

1     our system.
2  Q. Do you have any of those reports here with
3     you today?
4  A. Do I have any of those reports with me?
5  Q. Yes.
6  A. No.
7  Q. In our deposition notice we asked you to
8     bring anything to support or substantiate
9     those things. You didn't bring anything
10    with you?
11       MR. TRAWICK: Well, the deposition
12          notice appears to cover the
13          same things you've requested
14          in your request for production
15          of documents. We produced
16          quite a few documents in
17          response to your request for
18          production which you haven't
19          included in Plaintiff's
20          Exhibit 1. We also responded
21          that there were numerous
22          documents that we would make
23          available at the offices of

Page 83

1     Amtren. You haven't been out
2     to see any of those
3     documents. We didn't bring
4     any of those documents today.
5        MR. JACOBS: I need to get out
6           there next week, then
7  Q. You didn't bring anything other --
8  A. As Mr. Trawick pointed out, there were
9     substantial documents supplied with this.
10    I didn't bring any additional documents.
11 Q. All right. In Plaintiff's Exhibit Number
12    1, item number 11, we asked that you
13    produce copies of all documents taken into
14    consideration or referred to in the
15    decision making process that led up to her
16    termination, and you reference those that
17    are Bates stamped 12 through 62. Are those
18    the documents that would be responsive to
19    those concerns? That would be about 50
20    pages.
21       MR. TRAWICK: Are you asking if he
22          has any other documents
23          today? I don't understand

Page 84

1     what you're asking.
2        MR. JACOBS: Well, I'm asking if
3           those are the documents that
4           he's referring to that were
5           supplied that would be
6           responsive to this question
7           about what accounts payable
8           reports were not --
9        MR. TRAWICK: Why don't you show
10          him the documents?
11       MR. JACOBS: Well, I didn't bring
12          them all with me either.
13       MR. TRAWICK: I don't know how he
14          can answer the question
15          without seeing the documents.
16          You're asking him are those
17          all the documents?
18       MR. JACOBS: Yes.
19       THE WITNESS: But there are no
20          documents.
21       MR. TRAWICK: He didn't bring
22          them.
23 Q. But you supplied them. Were there any

Case 2:05-cv-01237-WKW-WC    Document 21-6    Filed 12/20/2006    Page 23 of 35
November 15, 2006
Deposition of Kirk Lamberth                McCollum vs. Amtren

Page 85

1  documents that you have that you did not
2  supply included in Bates stamps numbers 12
3  through 62?
4        MR. TRAWICK: At the time, those
5        documents that we produced
6        were all that we located. If
7        we locate additional
8        documents, we'll supplement
9        that. He's made reference to
10       additional documents that were
11       in Ms. McCollum's possession
12       when she was employed there
13       that we cannot find at this
14       present time.
15             Kirk hasn't mentioned
16       this, but there are bank
17       statements that were in
18       Ms. McCollum's possession
19       during the time that she was
20       employed there that we can't
21       find.
22  Q.  Have you sought to have the bank reproduce
23       those statements for you?

Page 86

1  A.  Yes, we had them reproduced. That's the
2       only thing -- we went -- during the period
3       of time that I was doing research, I
4       couldn't find a substantial amount of
5       files, which led to me having to rely more
6       and more on the weekly summary sheets
7       provided. So the issues we were not -- we
8       were not able to -- a lot of the documents
9       that -- well, the way the files were
10      arranged, the documents, it's very hard to
11      locate a lot of things. We just couldn't
12      find some things.
13  Q.  When did you request those statements from
14       the bank?
15  A.  It would have been approximately end of
16       April, first of May.
17  Q.  Okay. It was after Ms. McCollum was
18       terminated?
19  A.  Yes.
20  Q.  Okay. Overpaid some vendor invoices. What
21       does that refer to?
22  A.  That refers to specifically the Plextor
23       invoice where we had -- Ms. McCollum had

Page 87

1  missed a price change on the product and
2  had overpaid the vendor.
3  Q.  Okay. How did Plextor communicate to
4       Amtren any changes in its prices?
5  A.  Plextor's role as a vendor is to provide
6       any current price change that's applicable
7       during the period. Ms. McCollum had issued
8       blanket orders that exceeded these
9       periods. The proper way that would have
10      protected a price change would be to
11      footnote some notification of this. Our
12      purchase documents did not.
13           The price change -- I noticed, myself,
14      that another vendor, a trade vendor was
15      selling the Plextor at a lower price. I
16      made the statement in a weekly meeting, and
17      subsequently further review showed that
18      Plextor had made a price change somewhere
19      around the middle of October. We had
20      requested Ms. McCollum to follow up on that
21      and to revise the purchase documents that
22      control the receipt of goods. Apparently,
23      as this shows, she failed to change the

Page 88

1  purchase documents, and the materials were
2  still received in at the higher price.
3  Also the payments were issued and the
4  checks signed from Ms. McCollum for the
5  payment of the higher price.
6  Q.  When did you discover that?
7  A.  That was discovered -- I would say that was
8       discovered somewhere around the first part
9       of -- that February time frame that we
10      were -- that I was beginning to review
11      things more carefully.
12           MR. TRAWICK: In 2006?
13  A.  I'm sorry. 2005. 2005.
14           MR. TRAWICK: Excuse me.
15  Q.  And did you report that to Ms. McCollum?
16  A.  That one I did discuss with Ms. McCollum,
17      and she assured me that it had been
18      corrected and that credits would be issued.
19  Q.  Okay.
20  A.  And they were not, by the way.
21  Q.  You never got credit for those?
22  A.  We sought credits after Ms. McCollum had
23      departed. I sought credits with Plextor

Page 89

1  and recovered thousands of dollars. And
2  that is one of the documents I believe that
3  is -- I think that we sought credit for the
4  payment for the price change, or -- they
5  weren't able to give us the whole amount.
6  I believe they were able to give us several
7  thousand dollars.
8         MR. TRAWICK: It's in six.
9  A.  I believe, since we don't have all the
10 documents here, that we did submit -- it's
11 hard for me to verify with what we have
12 here, but the Plextor documents were part
13 of our --
14        MR. TRAWICK: The Plextor
15        documents were not part of the
16        response to the EEOC. I don't
17        recall which documents off the
18        top of my head because we
19        produced quite a few documents
20        in response to your request
21        for production of documents.
22        But there is a summary in the
23        response to the EEOC regarding

Page 90

1  the issue of Plextor.
2  Q.  But there were no documents submitted to
3  the EEOC?
4  A.  That's correct.
5  Q.  All right. You speak of the payroll tax
6  deposits. Are there any documents other
7  than those that are attached to your EEOC
8  response, item number one?
9  A.  To the best of my knowledge, that was what
10 we had at that time, yes.
11 Q.  Okay. Well, let's --
12        MR. TRAWICK: Again, we produced
13        numerous documents in response
14        to your request for
15        production. I know that's not
16        a trick question.
17        MR. JACOBS: No, it's not. And I
18        would say that some of the --
19        MR. TRAWICK: You're asking him if
20        that's all the documents, and
21        without having the documents
22        that we've produced to you, I
23        think that's an unfair

Page 91

1         question the way you phrased
2         it.
3  Q.  Are these all the ones you produced to the
4  EEOC?
5  A.  Yes, that is true.
6         MR. JACOBS: Well, let's mark that
7         one as Plaintiff's Exhibit
8         Number 5.
9         (Plaintiff's Exhibit 5 was marked
10        for identification.)
11 Q.  And probably, to move this along, the next
12 couple of items are failed on several
13 occasions to timely respond to notices from
14 tax revenue departments, including the
15 Internal Revenue Service. Caused Amtren to
16 receive penalties for late tax deposits.
17 Are those the same thing?
18 A.  Right. They relate -- again, clarifying, I
19 don't know the extent of the documents we
20 provided, but they do relate to this item
21 number one that you just submitted here.
22 Q.  All right. And the issue of the insurance
23 payments I believe we've already talked

Page 92

1  about in connection with another item?
2  A.  Yes.
3  Q.  Failed on several occasions to make timely
4  entries into Amtren's accounting systems.
5  Could you explain that one for me?
6  A.  That relates to the accounts payable issue
7  we covered earlier with invoices being
8  received and being entered.
9  Q.  Okay. Failed to timely inform management
10 of her errors and omissions. Which errors
11 and omissions are we talking about?
12 A.  Primarily the excess -- the excess
13 inventory was caused by the purchase orders
14 not being revised and the Plextor purchase
15 order not being revised.
16 Q.  Okay. The credit card merchant agreement.
17 That's the attachment to item number three
18 here?
19 A.  Yes.
20 Q.  Okay.
21        MR. JACOBS: We'll mark that one
22        as Plaintiff's Exhibit Number
23        6.

Page 93

1    (Plaintiff's Exhibit 6 was marked
2    for identification.)
3  Q. Could you explain to me what you meant by
4    exceeded her authority on several
5    occasions.
6  A. Primarily that would relate to the copier
7    lease where that -- we had discussed
8    obtaining a copier, and we did obtain a
9    copier, and she entered into a lease
10   agreement. Even though the company had
11   discussed the fact that we would do that, I
12   was unaware that she had executed a lease.
13 Q. Was that discussed in one of the management
14   meetings, getting a copier?
15 A. The copier. Not the execution of the lease
16   without an officer signing it.
17 Q. Okay.
18   MR. JACOBS: Let's mark this one
19   as Plaintiff's 7.
20   (Plaintiff's Exhibit 7 was marked
21   for identification.)
22 Q. The next item refers to price decreases
23   from Plextor. Have we discussed that?

Page 94

1  A. That was the item we talked about.
2  Q. All right. Which other duties pertaining
3    to the purchase of MAS90 did she not
4    perform adequately?
5  A. The integration of MAS90 was discussed
6    extensively at the end of 2004, and we had
7    generated a document to sit down and review
8    this process. The undertaking would be
9    significant. It was my understanding that
10   as Ms. McCollum moved forward with that,
11   she would seek integrated services, turnkey
12   integrated services from the vendors that
13   we were discussing. She handled the
14   discussions with the vendors and sought the
15   bidding and was subsequently awarded the
16   bid. At that time -- and it wasn't until
17   later did I know that we did not submit --
18   we did not obtain a fully integrated
19   package. We obtained a package that was
20   partially integrated that we would
21   subsequently have to -- I guess the word is
22   enter the data on our own later to
23   completely fulfill it.

Page 95

1  Q. Did you ever see the agreement that was
2    signed regarding that system?
3  A. I saw parts of the agreement. I don't know
4    that I knew specifically about that. It
5    was Ms. McCollum's responsibility. For
6    Amtren's benefit, that had to be a fully
7    integrated system. It was my understanding
8    with her we would obtain a turnkey fully
9    integrated system, and I subsequently
10   approved her to spend the moneys that we
11   did on that. I do not recall looking
12   specifically at the details of the contract
13   to that extent.
14 Q. Was there a specific amount of money that
15   you approved for her to spend?
16 A. I don't think it was specific, but I think
17   we do -- we did discuss the numbers that we
18   ended up paying. I don't know the exact
19   numbers, but I do think 20 or $30,000. The
20   issue was not really the financial part so
21   much as to make sure it was turnkey; that
22   it was to be fully implemented.
23 Q. Okay. So if I can restate, and you tell me

Page 96

1    if I'm wrong. Is it fair to say that what
2    you're complaining of there is the fact
3    that she did not contract with Wilson,
4    Price for a completely installed and
5    implemented system?
6  A. Yes. That is a pretty fair assumption.
7    There are a lot of terms that have been
8    passed around about integration of MAS90.
9    The issue that we had was pretty much in
10   line with what you said.
11 Q. Okay. And is that also the basis for your
12   complaint, the next one, that she released
13   Wilson, Price prior to the complete and
14   satisfactory conversion to the new
15   accounting system?
16 A. Yes.
17 Q. Who was your technical assistance person
18   from Wilson, Price in implementation of
19   that system?
20 A. Bobby Lake.
21 Q. Okay. Do you know if Bobby Lake ever
22   complained to Wilson, Price regarding any
23   lack of appropriate performance on the part

Deposition of Kirk Lamberth                    McCollum vs. Amtren

Page 97

1  of Ms. McCollum?
2  A.  I'm unaware.  I don't know.
3  Q.  During the time that Ms. McCollum was
4  employed by you, were there any reports to
5  you from Wilson, Price that her performance
6  was less than adequate?
7  A.  I don't think so.  I don't think so.
8  Q.  Okay.  When you hired Bobby Lake, were you
9  aware that your contract forbade the hiring
10  of any person from Wilson, Price who was
11  involved in implementing that contract for
12  a period of 180 days?
13        MR. TRAWICK:  Object to the form.
14        Are you stating that's what
15        the contract states?
16        MR. JACOBS:  Yes.
17  Q.  I'm asking you if you were aware there was
18  a restriction in your contract with Wilson,
19  Price that you could not hire any of their
20  employees who were involved in that
21  contract for a time period after completion
22  of the contract.
23  A.  Of how many days?

Page 98

1  Q.  I believe it was -- I believe it was 180
2  days.
3        Eighteen months.  I'm sorry.
4  A.  Those items were discussed with Wilson,
5  Price when Bobby's employment was sought.
6  So we were aware, yes, but the items were
7  discussed with Wilson, Price.
8  Q.  Whom did you discuss it with at Wilson,
9  Price?
10  A.  I basically -- I personally don't think I
11  discussed with anybody anything.  I think
12  Mr. Lake -- it was his responsibility to
13  review that.
14  Q.  Okay.  But Amtren was a signatory to the
15  contract?
16  A.  I'll have to see the contract that you're
17  talking about.  You're talking about for
18  that -- the Wilson, Price contract?
19  Q.  Yes.
20  A.  How can I answer that without seeing it?  I
21  mean, I would say we entered into an
22  agreement, yes, to purchase MAS90.  I do
23  not recall the details of the contract, to

Page 99

1  that nature.
2  Q.  Okay.
3  A.  Does that -- that's the best I can answer.
4  Q.  Okay.  I'm going to ask you about some
5  individuals now.  Jerry Weisenfeld is the
6  first one.  What was Jerry Weisenfeld's
7  title?
8  A.  His title, I believe, was business manager
9  or business management.  It was more of a
10  business expansion role.
11  Q.  Okay.  Was his job different from the
12  person who now has the title of business
13  manager?
14  A.  Oh, yes, completely.
15  Q.  Okay.
16  A.  Yes.  His role -- to clarify,
17  Mr. Weisenfeld's role was sales and
18  vendor -- large account relations.  We have
19  a lot of large accounts.  His role on the
20  business side was really not the inner
21  workings, but more about sales, to assist
22  in sales, development of strategic
23  relationships with some of our larger

Page 100

1  accounts.
2  Q.  Did he have any responsibility for the
3  MAS90 system?
4  A.  No, he did not have any responsibility.
5  Q.  Did he have any responsibilities for
6  banking?
7  A.  No, no direct responsibilities for banking.
8  Q.  Did he have an indirect responsibility?
9  A.  No, I don't think so.
10  Q.  Okay.
11  A.  You know, his role did overlap in certain
12  areas, but he didn't have any direct
13  responsibility for banking.
14  Q.  And was it Mike Bishop you told me was the
15  logistics person?
16  A.  No, David Fields.
17  Q.  David Fields.  Okay.
18        Did David Fields ever make any large
19  mistakes in inventory?
20  A.  Pertaining to what period?  The period --
21  Q.  During the time he was employed by Amtren.
22  A.  In a previous position.  It wasn't his
23  mistake as an individual, but we did have

Deposition of Kirk Lamberth          McCollum vs. Amtren          November 15, 2006

Page 101

1  to -- he did make -- there was a sizable
2  mistake made in the costing of our product
3  through the year. At the end of the year,
4  the initial report showed the mistake.
5  Before we closed the year end and produced
6  the documents, it was corrected. So I
7  would say yes, there was an error or
8  omission on his part at that time.
9  Subsequently we identified that and
10  discussed it with him and --
11  Q. Corrected it?
12  A. -- corrected it.
13  Q. And I assume he did not get terminated?
14  A. He got moved to a different position. He
15  got -- he was removed entirely from his
16  accounting duties.
17  Q. Okay. What position was he moved to?
18  A. Primarily purchasing -- well, the
19  production and logistics role.
20  Q. Okay. I believe that it's been indicated
21  in responses that Lisa McNamee took over
22  Ms. McCollum's duties when she was
23  terminated.

Page 102

1  A. That's correct.
2       MR. TRAWICK: Well, I think our
3       responses were she took over
4       some of the duties, and later
5       Susan took over some as
6       Mr. Lamberth has testified
7       here today.
8  Q. Okay. What duties did Lisa McNamee take
9  over?
10  A. Primarily the execution of the accounts
11  payable, accounts receivable. She did the
12  accounting portions as far as the --
13  actually, the payroll, the accounts
14  payable, and the accounts receivable.
15  Q. Putting information into --
16  A. And mainly producing the documents --
17  Q. Okay.
18  A. She produced the checks for payment. She
19  did everything -- she did not sign them,
20  but she did produce the checks for payment.
21  Q. Okay. Did she have the same responsibility
22  in reference to those blanket purchase
23  orders that you were talking about?

Page 103

1  A. In generating them, because of the
2  deficiencies of the system, we worked
3  together to try to correct some of those.
4  Q. Okay. And Susan Seeber, what duties did
5  she have when she came on board?
6  A. She basically --
7       MR. TRAWICK: Other than what he's
8       already testified to?
9       MR. JACOBS: Yes.
10  A. That's primarily it.
11  Q. Okay.
12       MR. TRAWICK: Unless you have
13       something to add to what
14       you've already testified to.
15       THE WITNESS: No.
16  Q. Who at the company was responsible for
17  strategic planning?
18  A. That probably would be myself.
19  Q. Have you fired any management employees at
20  Amtren other than Ms. McCollum?
21  A. You mean in the history of the company
22  or --
23  Q. Yes.

Page 104

1  A. Well, I would say yes.
2  Q. Okay. Who else have you fired?
3  A. Mr. Fields.
4  Q. Why was Mr. Fields fired?
5  A. Basically, his job performance. Inadequate
6  job performance.
7  Q. Any others?
8  A. Mr. Traywick.
9       MR. TRAWICK: Not me.
10  A. I'm sorry. Len Traywick.
11       MR. TRAWICK: I haven't been fired
12       yet.
13  Q. What was that person's position?
14  A. Len was -- Len was there a short time
15  frame. He was there for production,
16  primarily production, but he failed to be
17  productive, basically, and his job
18  performance failed to meet expectations of
19  the company.
20  Q. Is it true that when you fired
21  Ms. McCollum, you told her that you
22  couldn't -- you were firing her because you
23  couldn't trust her?

26 (Pages 101 to 104)

Page 105

1  A.  Not entirely, no. I didn't make the
2  statement, that's why I'm firing you, no.
3  We sat down and discussed the deficiencies
4  of these items we've discussed here.
5  Q.  And to be sure I'm clear, you went over
6  each of these items with her when you
7  terminated her?
8  A.  Actually, no. The exit interview -- being
9  a small business, I prepared for the exit
10  interview with a list of items that we had
11  located during this few months of
12  discovery. I sat down with her to discuss
13  those, and we only got through a few, and
14  that basically -- I think it pretty much --
15  she knew where we were going, and we
16  just -- I moved on. I did not --
17  It would be a given, you know, that any
18  of those items on there, to my opinion,
19  were sufficient enough for dismissal. So
20  even though the additional documents were
21  there, after I got through the first few, I
22  didn't continue on with the rest of them.
23  Q.  Were there any other females that you

Page 106

1  terminated in 2004, 2005?
2  A.  Terminated?
3  Q.  Yes.
4  A.  No. Let me verify that, make sure. 2004,
5  2005. Full-time employees?
6  Q.  Full time or part time.
7  A.  If that doesn't include contract workers,
8  no. No one else.
9  Q.  Were there any contract workers that you
10  terminated?
11  A.  Well, contract workers are temporary. I
12  mean, they're hired on need and
13  occasionally released when the need is not
14  there. So, yes, I believe there was one
15  during this period.
16  Q.  Okay. Do you recall who that was?
17  A.  Not by name.
18  Q.  Let me tell you, I have heard the name in
19  Ms. McCollum's position of Melody or
20  Melanie.
21  A.  No. Melanie, she resigned.
22  Q.  Okay. And she was not terminated?
23  A.  No. She resigned.

Page 107

1  Q.  Was she a full-time employee?
2  A.  Yes, she was.
3  Q.  And where did she -- what was her position?
4  A.  She was an assistant to me.
5  Q.  Who was responsible for filing your tax
6  payments and tax returns after Ms. McCollum
7  was terminated?
8  A.  That would have -- immediately after that,
9  it would have fallen into Ms. McCollum's
10  responsibilities -- I mean, Ms. McNamee's
11  responsibilities. Yes. Immediately upon
12  that, it would have been -- fallen to
13  Ms. McNamee.
14  Q.  When did you first become aware of what was
15  submitted as Defendant's Exhibit 5 at
16  Ms. McCollum's deposition? I believe it's
17  Exhibit 5 also to this deposition.
18  MR. TRAWICK:  You have
19  Defendant's --
20  MR. JACOBS:  I have Defendant's 5
21  here.
22  MR. TRAWICK:  I don't have my copy
23  of her deposition. Can we

Page 108

1  take a break, let me get my
2  copy?
3  (Plaintiff's Exhibit 8 was marked
4  for identification.)
5  (Brief recess.)
6  Q.  (Mr. Jacobs continuing) Mr. Lamberth, I've
7  given you a copy of what was marked as
8  Defendant's Exhibit 5 at Ms. McCollum's
9  deposition. I'd like to ask you, when did
10  you become aware of that document?
11  A.  I don't really recall the exact date of
12  this.
13  MR. TRAWICK:  Now, in the
14  Plaintiff's Exhibit 8, you've
15  included Defendant's Exhibit 5
16  to Ms. McCollum's deposition
17  and Defendant's Exhibit 6 to
18  her deposition. I'm not sure
19  exactly what you're asking
20  him.
21  MR. JACOBS:  I was asking about
22  5. I didn't really mean to
23  include 6, although it's a

Case 2:05-cv-01237-WKW-WC    Document 21-6    Filed 12/20/2006    Page 29 of 35

November 15, 2006
Deposition of Kirk Lamberth                    McCollum vs. Amtren

**Page 109**

1          similar type of document.
2    A.  I don't know if it's the exact tax notice,
3         but I did -- during this period of review,
4         we did discover an unposted notice in the
5         accounting area that had -- showed a
6         penalty that I was unaware of. I don't
7         know if the exact document or not.
8              MR. JACOBS: And I'm going to take
9              Number 6 off of the back of
10             this. I really didn't intend
11             to include that. I just made
12             a mistake in handing it to
13             him.
14   Q.  So you believe that you got that prior to
15        the time that she was terminated?
16   A.  I can't say if this same exact document.
17        I'm not sure of that. But I will tell you
18        that I discovered a notice from the IRS on
19        a late penalty that I was unaware of.
20   Q.  All right. Prior to Ms. McCollum's
21        employment with Amtren, had there ever been
22        any 941's that were paid late, taxes that
23        were paid late or penalties incurred?

**Page 110**

1    A.  I don't know about the 941, but we had --
2         there were some occasions where we did have
3         penalties on the payroll, late.
4    Q.  Okay. Have you had any since she was
5         terminated?
6    A.  I can't answer that completely. To the
7         best of my knowledge, if we had any, it
8         would have been during the period
9         immediately following Ms. McCollum's
10        departure because we did not have all the
11        information to subsequently track where we
12        were. But since taking -- moving several
13        months beyond that, when we properly track
14        and document what we needed to do, we've
15        not paid any. So I don't know the exact
16        time there as to when.
17   Q.  In the time period prior to her employment
18        where there were some late payments and
19        some penalties, was the person who was
20        responsible for that terminated?
21   A.  No.
22   Q.  Did Blue Cross Blue Shield actually
23        terminate your health insurance coverage?

**Page 111**

1    A.  They sent a letter of notice of
2         termination, immediate termination.
3    Q.  And I guess my question is, did they
4         actually terminate it?
5    A.  Upon receipt of that letter, we arranged
6         special circumstances and sent them an
7         express payment overnight. It is my
8         understanding that Alabama has a protection
9         factor in there that allowed us to send
10        that check overnight, and they would
11        continue our coverage. I'm not sure of the
12        exact -- how all that works. But when we
13        discovered the notice and we made the --
14        contacted them, they assured us. They
15        mandated that we catch the arrears payment
16        that had been collecting up front, so we
17        had to pay two payments immediately in
18        overnight payment.
19   Q.  Was Lisa McNamee ever terminated?
20   A.  No.
21   Q.  Did she leave the employ of Amtren at some
22        point?
23   A.  Yes.

**Page 112**

1    Q.  What is the position held by Amy Holley?
2    A.  She is a -- I would classify Amy as a
3         part-time support, office staff support.
4             Let me ask you. During this period now
5         or the time of Ms. McCollum?
6    Q.  Let me ask now.
7    A.  Now? As a support person.
8    Q.  Okay.
9    A.  She supports in a couple of areas, pretty
10        much where they need her.
11   Q.  What was her position during the time
12        Ms. McCollum was employed?
13   A.  I think she was the receptionist, and she
14        worked with Ms. McCollum on accounting
15        entry duties.
16   Q.  Okay. Have you ever been terminated from a
17        job?
18   A.  From a -- yes, from a company I owned part
19        of.
20   Q.  You were a part owner of the company?
21   A.  Yes. It was -- I guess I was 25 years old
22        and had started -- 25, 26 -- started a
23        business. The business owners and myself

Case 2:05-cv-01237-WKW-WC    Document 21-6    Filed 12/20/2006    Page 30 of 35
November 15, 2006
Deposition of Kirk Lamberth          McCollum vs. Amtren

Page 113

1  didn't agree, so, yes. To answer your
2  question, there was -- I was terminated
3  from that venture.
4  Q. Okay. I assume you weren't a majority
5  owner.
6  A. Well, I wouldn't have been. Exactly. I
7  was a minority holder, and that made that
8  pretty easy.
9  Q. And that's the only position?
10  A. Yes.
11  Q. If you'll give me five minutes, then we are
12  very close to being done. Let me stop and
13  think.
14  (Brief recess.)
15  Q. (Mr. Jacobs continuing) Mr. Lamberth, I am
16  very nearly through. I suppose that one
17  thing that I would like to ask you is you
18  made reference to other documents that you
19  have at the company that I can come see
20  that will support what you've said. What
21  kind of documents are those?
22  A. Relating to which question are you talking
23  about?

Page 114

1  Q. You know, they're the documents that we
2  have not been able to locate. Well,
3  obviously, I can't come look at those.
4  A. Right. Right. The other documents, first,
5  since we don't have -- we submitted a lot
6  of documents with this item here. The
7  first thing I would offer is to let -- I
8  guess let us look through that and see if
9  we -- if we submitted it in there. I can't
10  recall since the document's not there.
11  MR. TRAWICK: Well, now, just so
12  the record is clear, you in
13  your request for production of
14  documents asked for a lot of
15  documents that we objected to,
16  and a lot of documents we said
17  are available. Now your
18  question is what documents
19  prove --
20  MR. JACOBS: Well, let me back up.
21  Q. What documents are available that we can
22  see that haven't been produced?
23  MR. TRAWICK: I think that's in

Page 115

1  our response. We've
2  identified documents that you
3  can see that are available at
4  the offices of Amtren that
5  we're not objecting to, or at
6  least we're objecting to and
7  without waiving our objection,
8  we'll make some available.
9  Some we just will continue to
10  object to, and you and I --
11  I'll be happy to discuss it
12  with you, and maybe we can
13  resolve my objection and
14  produce the documents without
15  a motion to compel.
16  MR. JACOBS: Well, for example, on
17  59, I asked for documents that
18  report or in any way refer to
19  or show inventory errors in
20  2002, 3, and 4.
21  MR. TRAWICK: Which number is
22  that?
23  MR. JACOBS: Number 59.

Page 116

1  MR. TRAWICK: Well, that's
2  something I'll be happy to
3  discuss with you. I'm not
4  going to discuss it at this
5  point in time.
6  MR. JACOBS: Okay. When --
7  MR. TRAWICK: After the
8  deposition, I'll be happy to
9  discuss it with you. I mean,
10  we produced some documents,
11  and some we objected to
12  because you didn't allege
13  pattern and practice. Those
14  are legal issues that you and
15  I will talk about.
16  MR. JACOBS: Are there other
17  documents of inventory errors
18  by the plaintiff that have not
19  been produced?
20  MR. TRAWICK: I will look at our
21  response, but I think the
22  answer to that is no.
23  MR. JACOBS: Okay. Well, it is

Page 117

1    unclear from this response,
2    without waiving the objection,
3    that they will be made
4    available --
5    MR. TRAWICK: I can tell you that
6    I'm not going to spring some
7    documents on you at the last
8    minute if that's what you're
9    asking.
10   MR. JACOBS: Well, that's one of
11   my concerns, obviously.
12   MR. TRAWICK: No. I don't
13   practice law that way. If
14   there's a document that we're
15   going to rely upon, and it
16   hasn't been produced, I'll
17   supplement it before motions
18   for summary judgment are due.
19   I think we've produced
20   everything.
21   MR. JACOBS: I believe that's all
22   that I have, but I would like
23   for us to discuss that issue.

Page 118

1    MR. TRAWICK: I'll be happy to do
2    that. I have a couple of
3    questions.
4    EXAMINATION
5    BY MR. TRAWICK:
6    Q. Lisa McNamee is obviously female; is that
7    correct?
8    A. That's correct.
9    Q. And what is her race or ethnicity? Is she
10   Korean?
11   A. She's Korean.
12   Q. And Susan Seeber. Susan's obviously a
13   female?
14   A. That's correct.
15   Q. And I believe you hired Lisa and Susan; is
16   that correct?
17   A. That's correct.
18   Q. The females that currently work at Amtren,
19   did you hire them? And I'm talking about
20   full time.
21   A. Yes. Full time, yes. If I didn't hire, I
22   was in on the hiring process definitely and
23   on the approval process, yes.

Page 119

1    Q. Is it a fair statement that you could have
2    said no --
3    A. Exactly.
4    Q. -- on hiring any of the females who
5    currently work there?
6    A. That's correct.
7    Q. In the case of Lisa McNamee, did she get
8    additional duties after Ms. McCollum was
9    terminated and after you had a chance to
10   evaluate her job performance?
11   A. Yes. She basically performed the role of
12   the accounting person for several weeks,
13   and then her ability -- it was apparent
14   that she could move further in the role,
15   and so we moved her into the role of
16   accounting manager after observing her
17   efforts during this period after
18   Ms. McCollum was terminated.
19   Q. In fact, I think you gave Ms. McNamee a
20   raise after you had an opportunity to
21   evaluate her job performance in her new
22   role; is that correct?
23   A. That's correct.

Page 120

1    Q. Has Susan received a raise since she's been
2    employed?
3    A. Yes. She -- I think her starting pay was
4    around 40,000, and she's subsequently at
5    50,000 per year now.
6    Q. Let me ask you about this cancellation of
7    Amtren's credit card processor. You were
8    present during Ms. McCollum's deposition,
9    correct?
10   A. Yes, sir.
11   Q. Ms. McCollum seems to blame that on you.
12   Do you recall that testimony?
13   A. Yes.
14   Q. Tell me about how Amtren's credit card
15   processor got canceled.
16   A. The merchant agreement account was
17   terminated over lack of payment of $118. I
18   can't remember the exact amount.
19       The notification was submitted to
20   Amtren. I had never been made aware of
21   that notification. There is, apparently, a
22   time frame to respond to it. We missed
23   that time frame, and Chase Manhattan

Case 2:05-cv-01237-WKW-WC    Document 21-6    Filed 12/20/2006    Page 32 of 35

Deposition of Kirk Lamberth    McCollum vs. Amtren    November 15, 2006

Page 121

1  terminated our agreement.
2  This termination resulted in us never
3  being able to receive -- use a Visa or
4  MasterCard as a corporation again. It's
5  actually, from what I understand, a
6  permanent blackball. Subsequently we used
7  a third party, Pay Pal, and they -- due
8  diligence was used to even use our services
9  because of this original termination.
10  The reason for the termination --
11  Ms. McCollum's testimony was that we had
12  limited the use -- I believe put limits on
13  the use of an account or something. The
14  basis of the mistake she made was that if
15  we just provided them the $118 in a timely
16  manner or allowed them to -- access to -- I
17  believe that may have been a back charge --
18  then the agreement would have stood. I was
19  never made aware of that, you know, in any
20  way, form, or fashion. At that time we
21  had -- I was informed that we needed to
22  change credit card accounts for other
23  purposes. So it was timed during a time

Page 122

1  that we were pursuing other credit card
2  accounts, so I was unaware of the
3  termination.
4  Q.  Ms. McCollum testified or refused to admit
5  that this is a significant problem for
6  Amtren. How would you characterize this
7  problem?
8  A.  It is significant, because every item that
9  we sell on the Internet is sold by credit
10  card. Every purchase, every spare part has
11  to be sold by credit card. In our sales
12  methods of today, I would say credit cards
13  probably would achieve, you know, a quarter
14  of our sales. We subsequently have to use
15  third-party companies to do this now, you
16  know, at a higher rate of commission, I
17  guess, to the merchant account.
18  Q.  Ms. McCollum also in her testimony seemed
19  to blame you for the fact that Chase
20  Merchant Services could not deduct this
21  $118.41 from your bank account. Is that
22  correct?
23  A.  No, that's not correct. That's not

Page 123

1  correct. I was unaware of any errors in
2  back charging by Chase. The separation of
3  accounts that Ms. McCollum had testified
4  where we had separated our accounts --
5  Chase Manhattan has an account they can
6  sweep -- apparently, they can deduct money
7  from once they deposit. I was aware we did
8  separate the accounts. I was not aware we
9  did not manage the dollar amount in those
10  accounts to sufficiently satisfy any back
11  charges being generated by Chase
12  Manhattan.
13  Any time a back charge is initiated, a
14  paper document is mailed to the company.
15  There is, I guess, a time frame there that
16  you can respond to the -- that -- you know,
17  the fact that they couldn't back charge. I
18  guess it would be a -- miss a payment.
19  Q.  Was it Ms. McCollum's responsibility to
20  insure that this kind of problem didn't
21  happen?
22  A.  Yes. In her role, she would have been
23  responsible to make sure there was timely

Page 124

1  payment of the back charges.
2  Q.  Would notices to the company have gone to
3  Ms. McCollum?
4  A.  No. The notice -- at that time, the notice
5  went to Mr. Fields.
6  Q.  Okay.
7  A.  Actually, let me clarify that. The notice
8  was directed to her by matter of her
9  responsibility. It wasn't addressed to
10  her. Yes, all notices went to her, but
11  this notice -- this subsequent notice was
12  not addressed to her.
13  Q.  Okay. I believe Ms. McCollum testified in
14  her deposition she couldn't refute
15  testimony that she received this notice.
16  It's your understanding that she did
17  receive this notice; is that correct?
18  A.  Yes.
19  Q.  Did she deny receiving this notice when you
20  talked with her about it?
21  A.  I'm not sure. I don't think I discussed it
22  with her. I didn't discuss it with her.
23  At that time, we were unaware of the

Case 2:05-cv-01237-WKW-WC    Document 21-6    Filed 12/20/2006    Page 33 of 35

Deposition of Kirk Lamberth          McCollum vs. Amtren          November 15, 2006

Page 125

1   magnitude of it. We were aware that we
2   had -- the account had terminated, but we
3   had not discovered that document that we
4   later showed.
5   Q.  But it was Ms. McCollum's responsibility to
6       insure that there were sufficient funds in
7       Amtren's accounts so that this problem
8       would not have happened; is that right?
9   A.  Right. Separation of the accounts is her
10      responsibility to manage the funds.
11  Q.  Would it have been her responsibility to
12      know which bank accounts Chase Merchant
13      Services would have attempted to deduct
14      this from?
15  A.  Yes.
16  Q.  I want to direct your attention to
17      Plaintiff's Exhibit 2, page two,
18      paragraph -- or item number one. This
19      document states that Amtren suffered
20      penalties of $3,008.66. Is that what the
21      document states?
22  A.  Yes.
23  Q.  And is it correct that these penalties were

Page 126

1   paid by Amtren because of errors of
2   Ms. McCollum?
3   A.  Yes. She was responsible for making the
4       deposits at that time or the reports.
5           There were two errors. One was a
6       reporting error and the other was the
7       timely deposit of the weekly tax
8       withholdings.
9   Q.  Let me direct your attention to item number
10      two. In response to Mr. Jacobs' questions,
11      you answered questions about Amtren's
12      health insurance. Is that with Blue Cross
13      Blue Shield?
14  A.  Yes, it is.
15  Q.  Ms. McCollum in her deposition testified
16      that David Fields' error cost Amtren
17      $70,000. I believe Mr. Jacobs asked you
18      about errors made by David Fields. Did
19      Mr. Fields' error cost Amtren $70,000?
20  A.  No, not in income. Not direct --
21      basically, it did not cause the loss of
22      that money. What it did, basically, was
23      the difference -- the preliminary -- the

Page 127

1   costing information for the products at the
2   end of the period showed that we had an
3   additional $70,000 of income available when
4   we did our preliminary close. At the
5   period when we adjusted everything for
6   final close, the error was picked up. So
7   there was basically a situation of a
8   reporting error is what it amounts to of
9   the preliminary document versus the final
10  document.
11  Q.  Ms. McCollum also testified she believes
12      Jerry Weisenfeld was hired to replace her.
13      Is that correct?
14  A.  That is not correct. Mr. Weisenfeld was
15      hired to basically -- the role that he was
16      hired into was a business management role,
17      but it was a business management role that
18      would basically expand our sales base. And
19      at that time we had considered partnering
20      with certain other companies on technology,
21      and it was a position to strategically
22      align some of those partnerships.
23      Technical partnerships, to clarify.

Page 128

1   Q.  Ms. McCollum also testified regarding a
2       letter which is marked as Defendant's
3       Exhibit 3 to her deposition. Her testimony
4       was something to the effect that in this
5       letter, you praised her accounting
6       abilities. Tell me about this letter
7       that's dated March 30th, 2005.
8   A.  That letter was a -- it's a letter for
9       renewing our credit with our bank. It's a
10      letter that we attempt to do, if not once,
11      twice a year. Just -- it's a health check
12      to provide to the bank.
13  Q.  This is a letter for the benefit of the
14      bank?
15  A.  It is. It is a letter that is a -- it's an
16      information letter is what it is.
17  Q.  It's not a letter where you're telling
18      Ms. McCollum she's doing a great job?
19  A.  No. In fact, statements in there are
20      statements that the company is in good
21      shape and that -- at that time, even when I
22      generated the information, I had no reason
23      to suspect the information Ms. McCollum was

Case 2:05-cv-01237-WKW-WC    Document 21-6    Filed 12/20/2006    Page 34 of 35

Deposition of Kirk Lamberth          McCollum vs. Amtren                    November 15, 2006

**Page 129**

1  providing was anything but true.
2  Q. Who was responsible for maintaining custody
3     of the hard copies of the checking accounts
4     that Amtren received?
5  A. Ms. McCollum.
6  Q. Did those go missing after she was
7     terminated or about the time she was
8     terminated?
9     Let me strike that and rephrase that.
10    After Ms. McCollum was terminated, did
11    Amtren attempt to find those hard copies of
12    the checking accounts?
13 A. Yes. In fact, I looked for several weeks
14    prior to terminating Ms. McCollum to try to
15    understand our position, and we could not
16    find any reconciled check statements or any
17    statements in any of our files. We later
18    requested from the bank those.
19 Q. In response to a question by Mr. Jacobs,
20    you testified about the problems and the
21    errors committed by Ms. McCollum regarding
22    Plextor. Do you recall that testimony?
23 A. Yes.

**Page 130**

1  Q. I believe in Ms. McCollum's deposition, she
2     testified she could not recall if she was
3     present during management meetings where
4     this issue was discussed. Was Ms. McCollum
5     present when these issues with Plextor were
6     discussed?
7  A. Yes.
8  Q. And were they discussed with her?
9  A. Yes.
10 Q. Tell me about the company name Padus,
11    P-A-D-U-S.
12 A. Padus is a critical vendor for us. y
13    make the software tool kit we use. It's an
14    imbedded portion of our product. They have
15    been a major part of our company since the
16    beginning. We selected -- their software
17    and the software they generate that's
18    inside our software has provided tremendous
19    benefits because of the technology.
20 Q. I believe Ms. McCollum testified in her
21    deposition that it was her responsibility
22    to insure that Padus was timely paid. Is
23    that correct?

**Page 131**

1  A. In fact, we -- there is no -- there is --
2     there was a notice from -- I believe it was
3     Padus, the second in charge of Padus,
4     Elizabeth -- I can't remember her last
5     name, Benito or something, that -- the
6     issues that had been going on for
7     Ms. McCollum when Ms. McCollum was handling
8     their account.
9  Q. I believe Ms. McCollum in her deposition
10    blamed the failure to timely pay Padus on
11    cash flow problems. Would you agree with
12    that testimony?
13 A. No.
14 Q. During this period of time, did Amtren have
15    a line of credit available to the company?
16 A. Let me clarify. Again, there's a series of
17    events that led to the depletion of that
18    amount of money. So backing up to --
19 Q. The depletion of the amount of money in
20    Amtren's checking accounts?
21 A. Well, the line of credit. In other words,
22    the -- under Ms. McCollum's management, our
23    line -- at the beginning of -- I would say

**Page 132**

1  maybe at the end of 2004, our line of
2  credit was -- in fact, I don't think we had
3  much money borrowed on our line of credit,
4  and we had sufficient cash. During the
5  periods of November, December, January,
6  February, March -- December of '04 and
7  January, February, March '05, the moneys
8  were basically expended and our line of
9  credit was drawn on maximum. In fact, upon
10 Ms. McCollum's departure, I had to seek
11 immediate -- an immediate loan of $200,000
12 to pay down the vendors that had been aged
13 out, you know, aged out meaning that had
14 been -- that hadn't been paid. I'm not
15 sure of the exact amount. I believe it was
16 about 200,000, because the credit -- they
17 were basically one by one threatening to
18 cut off our credit.
19 Q. Is it correct that Padus is an important
20    vendor that Amtren buys things from?
21 A. The loss of the license from Padus would
22    shut us down because what we would have to
23    do is -- there's no quick way to engineer

Page 133

1  another software package. You would
2  literally be -- if they terminated their
3  license, we would have to stop shipping
4  product immediately.
5  Q.  So is it fair to say that it was essential
6  for Amtren's continued operation to keep
7  Padus paid timely and keep them happy?
8  A.  Absolutely. Unlike other items that you
9  ship, you can -- materials are yours and
10  you can ship, when there's a license
11  involved, upon notice that a license is
12  terminated, you can no longer ship your
13  product.
14      MR. TRAWICK: I think that's all I
15      have.
16
17      * * * * * * * * * * * * *
18      FURTHER DEPONENT SAITH NOT
19      * * * * * * * * * * * * *
20
21
22
23

Page 135

1  examination of said witness by counsel for the
2  parties set out herein. The reading and signing of
3  same is hereby waived.
4      I further certify that I am neither of kin
5  nor of counsel to the parties to said cause nor in
6  any manner interested in the results thereof.
7      This 17th day of November 2006.
8
9
10
                _____
11              Patricia G. Starkie, Registered
                Diplomate Reporter, CRR, and
                Commissioner for the State
12              of Alabama at Large
13
14
15
16
17
18
19
20
21
22
23

Page 134

1      REPORTER'S CERTIFICATE
2  STATE OF ALABAMA:
3  MONTGOMERY COUNTY:
4      I, Patricia G. Starkie, Registered
5  Diplomate Reporter, CRR, and Commissioner for the
6  State of Alabama at Large, do hereby certify that I
7  reported the deposition of:
8      KIRK LAMBERTH
9  who was first duly sworn by me to speak the truth,
10  the whole truth and nothing but the truth, in the
11  matter of:
12      JANICE McCOLLUM,
13      Plaintiff,
14      vs.
15      AMTREN, INC.,
16      Defendant.
17      In The U.S. District Court
18      For the Middle District of Alabama
19      Northern Division
20      Case Number 05-CV-0326-W
21  on October 15, 2006.
22      The foregoing 133 computer printed pages
23  contain a true and correct transcript of the