# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

JANICE McCOLLUM,

      **Plaintiff,**

vs.

      Case No.  2:05-CV-1237-WKW

AMTREN, INC.,

      **Defendant.**

---

## DEFENDANT'S REPLY BRIEF TO PLAINTIFF'S CLAIMS

**COMES NOW** the Defendant, Amtren, Inc., ("Amtren") and replies as follows to Plaintiff's ("McCollum") Response to its Motion for Summary Judgment.

### I.    ARGUMENT

### A.    Plaintiff misstates the Summary Judgment Standard.

McCollum states in her Response to Amtren's Motion for Summary Judgement that:

"an employer's true motivations are difficult to ascertain and are hardly ever suitable for disposition at the summary judgment stage. *Hairston v. Gainesville Sun Pub. Co.,* 9 F. 3d 913 (11th Cir. 1993).  'Summary judgment is not a proper vehicle for resolving claims of employment discrimination which ... turn on an employer's motivation and intent.' *Delgado v. Lockheed-Georgia Co.,* 815 F. 2d 641, 644 (11th Cir. 1987)." *McCollum's Response, p. 10.*

In *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir. 2004), the Eleventh Circuit specifically rejected this part of McCollum's statement of the summary judgment standard:

"Before we turn to each of her claims, we reject Wilson's contention that 'summary judgment is especially questionable and should seldom be used in employment discrimination cases because they involve examination of motivation and intent.' In Champman v. AI Transport, 229 F. 3d 1012, 1026 (11th Cir. 2000)(en banc), we explained 'that the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be place on either side of the scale.' Id. at 1026."

## B.    McCollum has offered no direct evidence of discrimination.

Apparently, McCollum is confused as to the Eleventh Circuit's definition of direct evidence of discrimination. In the context of employment discrimination cases, it is well-settled that direct evidence is evidence which, if believed, proves the existence of a fact in issue, such as the existence of a discriminatory motive, without inference or presumption; if the evidence merely suggests that the employer acted with a discriminatory motive then it is circumstantial evidence, not direct evidence. *See, e.g., Wilson v. B/E Aerospace, Inc.,* 376 F. 3d 1079, 1096-87 (11th Cir. 2004); *Bass v. Bd. of County Comms.,* 256 F. 3d 1095, 1105 (11th Cir. 2001); *Standard v. A.B.E.L. Servs., Inc.,* 161 F. 3d 1318, 1330 (11th Cir. 1998); *Carter v. City of Miami,* 870 F. 2d 578, 582 (11th Cir. 1989); *Merritt v. Dillard Paper Co.,* 120 F. 2d 1181, 1189 (11th Cir. 1987); *Rollins v. TechSouth, Inc.,* 833 F. 2d 1525, 1528 n.6 (11th Cir. 1987). *See also, Jones v. Bessemer Carraway Medical Center,* 151 F. 3d 1321, 1323 n.11 (11th Cir. 1998)(noting comments "you black girls get away with everything," "you black girls make me sick, sometimes I feel like just hitting you in the head" are not direct evidence of discrimination in dismissal); *Burrell v. Bd. of Trustees of Georgia Military College,* 125 F. 3d 1390, 1393 (11th Cir. 1997)(holding statement made a year before employee's termination that employer wanted to hire a man for the position because too many

women filled officer positions did not constitute direct evidence in termination claim); *Carter v. City of Miami,* 870 F. 2d 578, 582 (11th Cir. 1989)(stating "little old Jewish lady" was not direct evidence of age discrimination, especially as it was not directed to plaintiff); *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F. 3d 1354, 1358 (11th Cir. 1999)(holding that alleged comment "even though women aren't typically in that type of position we'll see what happens when we throw your name out there to corporate" does not correlate with an intent to discriminate).

McCollum states Kirk Lamberth ("Lamberth"), the president of Amtren "engaged in sexually stero-typed behavior in regard to her employment. To support this statement, McCollum cites her deposition testimony at "pp. 95:04-96:17; pp. 103:09-22)." *See McCollum Response, p. 13.*

McCollum testified that Lamberth gave her duties of "ordering lunch, and making coffee and setting up for lunches." *See Depo. of McCollum, p. 95, lines 4-15.* However, McCollum admitted that Lamberth made coffee, other males made coffee, and other males ordered lunches. *See Depo. of McCollum, p. 85, lines 6-23; p. 86, lines 1-23; p. 87, lines 1-23; p. 88, lines 1-19.* In an attempt to minimize these facts, McCollum testified "when coffee was not made when we had customers or guests, Mr. Lamberth became very irate at me." *See Depo. of McCollum, p. 88, lines 9-19.* She admitted she does not recall any words he used and it was more "his actions" and "his tone of voice." *See Depo. of McCollum, p. 88, lines 9-19.*

Concomitantly, McCollum has submitted the affidavit of Mike Bishop ("Bishop") who states he heard Lamberth state "during a conversation about women in the workplace, that

3

'More than one woman is definitely trouble.'" He also states is his affidavit "Lamberth said 'I would never put a woman out there' during a discussion of whether we should have females working in the production area." Finally, he states "Lamberth also told me that he would not hire a black person. This remark occurred one day after I had interviewed several potential new employees, most of who were black." *See McCollum Response, pp. 9, 13.*

First, Bishop does not state when these statements were allegedly made; moreover, he admits none of the statements were about or directed toward McCollum. McCollum testified that Bishop, the former operations manager of Amtren, told her that he "had heard Kirk Lamberth made racial slurs" after she was terminated; however, he did not tell her what racial slurs were allegedly used by Lamberth. *Depo. of McCollum, p.* 113, lines 14-23; p. 114, lines 1-23; p. 115, lines 1-23. McCollum further testified she does not recall ever hearing Lamberth make any racial slurs. *Depo. of McCollum, p. 115, line 23; p. 116, lines 1-2.* On April 1, 2005, immediately before McCollum was terminated, Amtren had 24 employees: including 2 employees of Asian ancestry; 2 employees of African-American ancestry; and 3 females. *See Affidavit of Amy Holley.*

McCollum has submitted no evidence establishing that Lamberth ever refused to employ anyone because of their race or sex. Lamberth hired McCollum who is a female of Korean ancestry. *Depo. of Lamberth p. 27, line 23; Depo. of McCollum, p. 27, lines 13-23.* He hired Lisa McNanee ("McNanee") who is a female of Korean ancestry and replaced McCollum. *Depo. of Lamberth p. 118, lines 6-17.* He hired Susan Seeber, a female, who replaced Lisa McNanee, and who holds a management position at Amtren. *Depo. of Lamberth*

4

*p. 24, lines 3-16; p. 118, lines 15-17.*   McCollum admits other females were employed at Amtren when she was employed who were also hired by Lamberth.   *Depo. of McCollum, p. 102, lines 9-12; Depo. of Lamberth, p. 118, lines 18-23.*   The females currently working at Amtren were hired by Lamberth.   *Depo. of Lamberth, p. 118, lines 18-23.*

The management employees terminated by Lamberth, other than McCollum, include David Fields, for poor job performance, *see Depo. of Lamberth, p. 103, lines 19-23; p. 104, lines 1-6,* and Len Traywick, for poor job performance.   *See Depo. of Lamberth, p. 104, lines 7-19.*

Reviewing the evidentiary record as a whole, there is no evidence which, if believed, proves the existence of discrimination without inference or presumption.   Put another way, McCollum has pointed to nothing that constitutes direct, rather than circumstantial evidence that she was terminated because of her sex, race or national origin.

**B.      As a matter of law, McCollum has failed to establish her claim of sex, race or national origin discrimination.**

**1.      McCollum failed to prove her prima facie case of sex, race or national origin discrimination in her termination, as she was replaced by someone within her protected class.**

Interestingly, McCollum does not argue in her brief that she was replaced by someone outside of her protected class. *See McCollum's Response, p. 12-13.* However, in her affidavit she states McNamee could not have been promoted to the position of accounting manager after her termination because she "does not have an accounting degree" and "did not have sufficient accounting experience at the time to assume the role of accounting manager when I was

5

terminated". *See Exhibit 2, par. 5, p. 3, to McCollum's Response.* In her brief she argues that "her termination was the result of discriminatory animus on the part of Lamberth; that her similarly situated white male predecessor and other Amtren white male managers were not terminated for actions that Amtren utilizes in this [sic] motion to justify her termination; and, that the reason(s) proffered by Amtren to justify her termination are likely to be rejected by the jury as pretextual." *See McCollum's Response, p. 12-13.*

Clearly, a plaintiff may establish a *prima facie* case for a discharge-discrimination claim under Title VII by showing  that: (1) she is a member a protected class; (2) she was qualified for the position at issue; (3) she was discharged despite her qualification; and (4) she was subject to differential treatment, that is, she was either (a) replaced by someone who was not a member of the plaintiff's class or (b) a similarly situated employee who was not a member of the protected class engaged in nearly identical conduct and was not discharged. *Wilson, 376 F. 3d at 1087; Keel v. Roche,* 256 F. Supp. 2d 1269 (M.D. Ala. 2003) , *quoting Davis v. Qualico Miscellaneous Inc.,* 161 F. Supp. 2d 1314, 1319 (M.D. Ala. 2001).

First, it must be noted that McCollum elected to not take the deposition of  McNanee. Apparently, there is no dispute that McNamee is a female who is of Korean ancestry. *Depo. of Lamberth, p. 118, lines 6-11. Depo. of McCollum, p. 91, lines 14-18.*  When McNamee started working at Amtren, both Lamberth and McCollum supervised her. *Depo. of McCollum, p. 92, lines 4-6.*  During this time frame, McNamee's duties consisted, in part, of entering invoices, customer purchase orders and other data entry into Amtren's accounting system. *Depo. of McCollum, p. 92, lines 19-23; p. 93, lines 1-13.*

6

After McCollum was terminated, Lamberth assigned her duties to McNamee. *Depo. of Lamberth, p. 101, lines 20-23; p. 102, lines 1-23.* McNamee assumed the accounting duties related to payroll, accounts receivable, accounts payable, producing checks to make Amtren's payments, completing tax forms, and generating blanket purchase orders. *Depo. of Lamberth, p. 102, lines 1-23; p. 103, lines 1-3; p. 107, lines 5-13.* Lambert promoted her to the position of accounting manager. *Depo. of Lamberth, p. 119, lines 7-20.* Later, McNamee resigned her position with Amtren. *Depo. of Lamberth p. 111, lines 19-23.*

In November 2005, Susan Seeber ("Seeber") was hired by Lamberth to be the accounting manager for Amtren. *Depo. of Lamberth, p. 26, lines 13-17.* Seeber performs the accounting duties related to accounts payable, accounts receivable, purchase orders, prepares monthly income statements, financial statements, prepares checks, makes payments to Blue Cross Blue Shield, makes tax payments  and she has general responsibilities for all accounting areas. *Depo. of Lamberth, p. 24, lines 3-23; p. 25, lines 1-9.*

Here again, McCollum elected to not take the deposition of Seeber. Finally, McCollum has presented no evidence to refute the testimony of Lamberth that she was replaced by McNanee who was replaced by Seeber. Because McCollum failed to demonstrate she was replaced by a person outside of her protected class, she cannot prove her prima facie case of sex, race, or national origin discrimination as a matter of law. Accordingly, this Court should grant summary judgment in favor of Amtren.

### 2.    McCollum failed to show a similarly situated male, Caucasian employee who engaged in the same conduct but was not terminated.

McCollum argues in her brief that "[t]here is evidence that white male employees were not terminated for poor job performance." *See McCollum's Response, p. 13.* In determining whether employees are similarly situated for purposes of establishing a prima facie case, McCollum and the other employee must be "similarly situated in all relevant respects." *Holifield v. Reno,* 115 F. 3d 1555, 1556 (11th Cir. 1997). "The quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges." *Maniccia v. Brown,* 171 F. 3d 1364, 1368 (11 th Cir. 1999). "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different way. *Jones v. Bessemer Carraway Med. Ctr.,* 137 F. 3d 1306, 1311 (11th Cir. 1998), *superceded in non-relevant part on denial of reh's,* 151 F. 3d 1321 (1998). "The most important factors in the disciplinary context ... are the nature of the offenses committed and the nature of the punishment imposed." *Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1259 (11th Cir. 2001). "If a plaintiff fails to identify similarly situated, non-minority employees who were treated more favorably, [her] case must fail because the burden is on [her] to establish [her] prima facie case." *See, Jones,* 137 F. 3d at 1311; *Silvera v. Orange County Sch. Bd.,* 244 F. 3d 1253, 1259 (11th Cir. 2001)(reversing judgment in favor of plaintiff because employer entitled to judgment as a matter of law where plaintiff's comparator engaged

8

in fewer instances of misconduct than plaintiff); *Holifield v. Reno,* 115 F. 3d 1555, 1563 (11th Cir. 1997) (affirming summary judgment where plaintiff failed to produce sufficient evidence that non-minority employees with which he compares his treatment were similarly situated in all aspects, or that their conduct was of comparable seriousness to the conduct for which he was discharged); *Nix v. WLCY Radio/Rahall Communications,* 738 F. 2d 1181, 1185-87 (11th Cir. 1984) (African American plaintiff who was replaced by another African American after termination failed to make out a *prima facie* case of race discrimination because he did not meet his burden of showing that a white employee in similar circumstances was retained while he was fired).

In her brief, McCollum states her "white male predecessor" was not terminated when he made errors related to late tax payments and when "he incurred bank overdraft charges." *See McCollum's Response p. 13.* Further, she states "a white male manager caused an inventory error which cost the company seventy thousand dollars, but was not terminated." *See McCollum's Response p. 13.*

Regarding the alleged inventory error by a white male manager, McCollum testified in her deposition as follows:

"Q. How did you learn of David Fields making the inventory error?
A. Through Mr. Lamberth and other employees.
Q. What did Mr. Lamberth tell you about this?
A. That David Fields made a large inventory error.
Q. Did he tell you anything else?
A. Not that I recall.
Q. When was this error made?
A. I don't know."
--------

9

"Q. Do you know what type of inventory error David made?

A. I believe it was on some – I'm not sure exactly. I'm not sure exactly.

Q. Do you recall anything else about the conversation with Mr. Lamberth regarding this error that David Fields made?

A. I don't recall." *Depo. of McCollum, p. 58, lines 3-14; p. 59, lines 10-17.*

Lambert testified that David Fields' error did not cost Amtren $70,000.00 and it did not cause Amtren to lose money. A preliminary report prepared by him showed Amtren with an additional $70,000.00 of income and the error was corrected before the final report. *Depo. of Lambert p. 126, lines 15-23; p. 127, lines 1-10.*

As a result of this error, Fields was moved to a different position related to production and logistics and removed entirely from his accounting duties. *Depo. of Lambert, p. 100, lines 18-23; p. 102, lines 1-19.* Later, Fields was terminated by Lambert for poor job performance. *Depo. of Lamberth, p. 103, lines 19-23; p. 104, lines 1-6.*

McCollum also argues in her brief that "there were serious problems with late tax payments to the state and federal governments prior to her assumption of the position as accounting manager, but that her predecessor was not terminated." *See McCollum Response, p. 13.* In her affidavit she states, "my white male predecessor as Accounting Manager was not terminated for making under and over payment of payroll taxes to the IRS or to the Alabama Department of Revenue." *See Exhibit 2, par. 9, p. 5, McCollum's Response.*

McCollum testified in detail regarding the errors she made related to Amtren's tax reports and the penalties assessed against Amtren because of these errors. *Depo. of McCollum, p. 117, lines 17-23; p. 118, lines 1-23; p. 119, lines 1-23; p. 120, lines 1-23; p. 121, lines 1-23; p. 122, lines 1-23; p. 123, lines 1-23; p. 124, lines 1-23; p. 125, lines 1-23;*

10

p. 126, lines 1-23; p. 127, lines 1-23; p. 128, lines 1-23; p. 129, lines 1-23; p. 130, lines 1-23; p. 131, lines 1-23; p. 132, lines 1-23; p. 133, lines 1-23; p. 134, lines 1-23; p. 135, lines 1-23; p. 136, lines 1-23; p. 137, lines 1-23; p. 138, lines 1-23; p. 139, lines 1-23; p. 140, lines 1-23; p. 141, lines 1-23; p. 142, lines 1-23; p. 143, lines 1-23; p. 144, lines 1-23; p. 145, lines 1-23; p. 146, lines 1-19. *See also paragraphs 25-28, pp. 9-10 of Amtren's Brief in Support of its Motion for Summary Judgment.*

McCollum fails to establish that she and her comparators are similarly situated in all relevant respects. She fails to establish that her comparators engaged in nearly identical conduct, that is conduct of a materially similar quality and quantity, and were not terminated. More importantly, she fails to establish that "the quantity and quality of the comparator's misconduct [is] nearly identical" to her misconduct. Simply, McCollum has failed to show a similarly situated employee outside of her protected class engaged in similar conduct as egregious as she did and received more favorable treatment. Thus, this Court should grant summary judgment in favor of Amtren.

### 3.    Amtren had legitimate, non-discriminatory reasons for McCollum's termination.

If an employee establishes a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the termination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). The Eleventh Circuit Court of Appeals has held the employer's burden is "exceedingly light" requiring only that the employer offer evidence that could lead a rational fact-finder to believe the decision was not discriminatory.

*Turnes v. AmSouth Bank, N.A.,* 36 F. 3d 1057, 1061 (1994). At this stage, Amtren has only the burden of production, not of persuasion. *See, e.g., Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253-55 (1981). It is not necessary that the court believe the evidence; the court's analysis "can involve no credibility assessment." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993). If the employer is able to satisfy this burden, "the McConnell Douglas framework – with it presumptions and burdens' – disappear[s] and the sole remaining issue [is] 'discrimination vel non.'" *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 142-43 (2000).

Beyond question, Amtren has articulated numerous legitimate, nondiscriminatory reasons for McCollum's termination. *See, Statement of Undisputed Facts in Amtren's Brief in Support of its Motion for Summary Judgment.*

### 4.    McCollum has failed to demonstrate pretext.

A plaintiff may "survive summary judgment, and judgment as a matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the [defendant]'s proffered reasons for its challenged actions. *See Combs v. Plantation Patterns,* 106 F. 3d 1519, 1529 (11th Cir. 1997). However, an employee may not establish an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason. *Id.* at 1529(noting "federal courts do not sit to second-guess the business judgment of employers"). *See also, Nix v. WLCY Radio/Rahall Communications,* 738 F. 2d 1184, 1187 (11th Cir. 1984)("the employer may fire an employee for a good reason, bad reason, a reason based on erroneous fact, or for no reason at all, as long as its action is not

for a discriminatory reason").

In considering a plaintiff's evidence of pretext, this court must be mindful that "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions[.]" *Holifield v. Reno,* 115 F. 3d 1555, 1565 (11th Cir. 1997). *See also, Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F. 3d 1354, 1363 n. 3 (11th Cir. 1999)(no liability for employment discrimination if employer fires employee under honest but mistaken belief that employee violated work rule).

It is difficult to ascertain what evidence McCollum offers as pretext. In her brief, she states that she was "informed by Lamberth that she was being promoted to Controller of the company in October 2004" and instead "assigned Controller duties to his male business manager. (PX 1; Pltf. Depo. pp. 97:21-99:01; PX 2 Pltf. Aff. p. 2, ¶ 4)." *See Response of McCollum, p. 2.*

Jerry Weisenfeld's title was business manager and his role was to expand the business of Amtren, expand sales, vendor relations and develop new sales. *Depo. of Lambert, p. 99, lines 4-23; p. 100, lines 1.* McCollum testified "it is my belief, because I am female, that [Lamberth] hired [Jerry] Weisenfeld, because he is male, to do those duties." *Depo. of McCollum, p. 97, lines 10-23; p. 98, lines 1-23; p. 99, lines 1-23; p. 100, lines 1-23; p. 101, lines 1-6.* However, McCollum's belief is based on the facts that (1) Weisenfeld attended a meeting with a banker and she was not present and (2) Weisenfeld received additional training on the Mas90 system, which was her responsibility. *Depo. of McCollum, p. 100, lines 11-23; p. 101, lines 1-23; p. 102, lines 1-8.* She presents no additional evidence to establish that

Lamberth assigned "Controller duties" to Weisenfeld.

In the section of her brief titled "[a]lleged 'irregularities' in accounting area and remedial efforts," McCollum simply "denies that Lamberth ever indicated that there was any problem with her performance until the date of her termination." *See McCollum Response, pp. 3-4.* She also states "Amtren has not proffered any evidence" for the statement in paragraph 21, page 7 of the Statement of Facts section of its Brief in Support of Summary Judgment that "[d]uring the end of February, March and first part of April 2005, Lambert started to learn that McCollum was not satisfactorily performing her job duties." *See McCollum Response p. 4, par. 1.* Lambert testified to this fact in his deposition. *See Depo. of Lamberth p. 78, lines 21-23; p. 79, lines 1-16.*

In the section of her brief titled "[a]lleged 'performance improvement' efforts by Amtren management," she simply alleges that Lamberth "never indicated to her that there were any problems with the information he was being supplied" in the weekly reports that she prepared for him. *See McCollum Response, p. 4, par. 2.* A close examination of the evidence cited by McCollum for this alleged fact reveals she has not testified in her deposition or affidavit that the weekly reports were accurate. Moreover, the evidence establishes that one of the reasons for her termination is that she failed to inform Lamberth of numerous problems resulting from her poor job performance. *See generally, Amtren's Brief, pp. 3-17.* Nonetheless, nothing in this section of McCollum's Response establishes that the reasons proffered by Lamberth for her termination are merely a pretext for discrimination.

In the section of her brief titled "[a]lleged 'overspending' on inventory and other

14

items," she states she "did not have the authority within the company's management structure to independently manage inventory materials." *See McCollum Response, pp. 4-5.* In her affidavit, McCollum admits her "role in the inventory system was to try to maintain adequate inventory based upon the company's past performance and projections given to me by the production manager and sales manager." *See Exhibit 2, par. 7, p. 2, McCollum's Response.*

Lamberth testified, in detail, regarding the failure of McCollum to adequately perform her job duties in this area and especially her failure related to the planned release of a new product which eventually caused Amtren to delay releasing the product. *See, par. 34, pp. 14-15, Amtren's Brief in Support of its Motion for Summary Judgment.* This section of McCollum's Response does not establish that Lamberth's testimony related to the reasons proffered for her termination are a pretext for discrimination.

In the section of her brief titled "Plextor overpayment," she states "Amtren was notified by email it would qualify for a lower price for certain computer internal drives as of October 18, 2004" and "Lambert did not inform [her] of this reduction and she continued to pay the previous higher price for the drive when she received invoiced from Plextor with that price." Further, she states she "learned of the price reduction in or around January 2005 and immediately notified Plextor that Amtren was taking a credit on current invoices to recoup the overpayment." She states she "did not report this to Lamberth immediately but included it in her weekly reports to him on the company's financial condition." She cites no evidence to support this statement. She did not testify in her deposition or affidavit that she notified Lamberth of the error in her weekly reports to him.

15

McCollum testified in her deposition she believes she learn of the price reduction from Lamberth. *See Depo. of McCollum, p. 54, lines 16-23; p. 55, lines 1-5.* She also testified that even though the error cost Amtren several thousand dollars she " did not tell Lamberth about it at that particular time." *See Depo. of McCollum, p. 56, lines 3-15.* Lamberth testified that after McCollum was terminated he corrected these errors and obtained credits with Plextor amounting to several thousand dollars. *See Depo. of McCollum, p. 88, lines 15-23; p. 89, lines 1-7.* McCollum has elected to not take the deposition of anyone from Plextor and has presented no evidence to refute Lamberth's testimony. This section of McCollum's Response does not establish that Lamberth's testimony related to the reasons proffered for her termination are a pretext for discrimination.

In the section of her brief titled "Padus nonpayment," McCollum states in her affidavit that "Lamberth instructed me, as a matter of company policy, to allow outstanding invoices to age for at least 45 days and to try to pay them within 60 days" and "[t]here were no complaints from Padus regarding nonpayment of their invoices during the time I was employed as Amtren's accounting manager." *See Exhibit 2, par. 6, pp. 3-4.*

Padus provides the software tool kit used by Amtren that is essential in operating the machines manufactured by Amtren. *Depo. of Lamberth, p. 130, lines 1-19.* The loss of the software license from Padus would immediately prevent Amtren from selling and shipping its product. *Depo. of Lamberth, p. 132, lines 19-23; p. 133, lines 1-13.* It was McCollum's responsibility to insure that Padus was timely paid. *Depo. of McCollum, p. 185, lines 3-12.* Exhibit 4 (Doc.# 14) documents the problems that Elisabetta Benetollo, from Padus, had in

attempting to get McCollum to make timely payments. McCollum testified in her deposition

she does not recall talking with Elisabetta Benetollo about Amtren's payments to Padus. *Depo.*

*of McCollum, p. 187, lines 8-23; p. 188, lines 1-10.*

In response to questions about Padus in her deposition, McCollum testified

"Q.  Were there any problems with Amtren making timely payments to Padus?
A.  When you say timely payment, what are the terms?
Q.  What do you mean by timely payments?
A.  We tried to pay all of our vendors within 45 days.  Sometimes that worked out, and sometimes it didn't.  It depended on cash flow.
Q.  Now, my question is, were there problems with making timely payments to Padus?
A.  There may have been.  I don't remember.
Q.  You don't recall any?
A.  I mean, I don't know.  I would have to see the documents.
Q.  Well, were there lots of accounts that there were problems with making timely payments to?
A.  No, not in my opinion.
Q.  Then, if there was a problem with Padus, you should remember that, then; is that correct?
A.  Maybe I should.  It's two years ago.  I don't.
Q.  However, you do recall that there were problems with making timely payments to some of the accounts payable of Amtren; is that correct?
A.  No, I don't recall that.  We tried to pay everybody in 45 days.  You know, that was our terms."    *Depo. of McCollum, p. 185, lines 13-23; p. 186, lines 1-23.*

Clearly, McCollum's testimony in her affidavit contradicts her deposition testimony.

More importantly, McCollum admits she did not inform  Lamberth that she was not paying

Padus within 45 days. *Depo. of McCollum, p. 188, lines 14-19.*  This section of McCollum's

Response does not establish that Lamberth's testimony related to the reasons proffered for her

termination are a pretext for discrimination.

In the section of her brief titled "[s]upplier complaints," she states "Amtren alleges in

its brief that vendors began to complain that they were not being paid and threatened to stop

17

doing business with the company, Amtren offer no evidence to support this accusation." *See McCollum Response, par. 6, p. 6.* Lambert testified in his deposition that he was contacted by several vendors of Amtren who complained that they not being paid on a timely basis. *Depo. of Lamberth, p. 74, lines 7-23; p. 75, lines 1-23; p. 76, line1; p. 78, lines 21-23; p. 79, lines 1-16.* Lamberth was contacted by Brundidge Electronics Corporation and Carter & Carter Manufacturing who are Amtren's largest vendors. *Depo. of Lamberth, p. 69, lines 5-18.* These vendors threaten to stop shipments because Amtren's outstanding balances were being to exceed the allowable limits. *Depo. of Lamberth, p. 69, lines 20-23; p. 70, lines 10-16.* Lamberth was unaware of the fact that Amtren's vendors were not being timely paid and this information was not being provided to him by McCollum in her weekly reports. *Depo. of Lamberth, p. 70, lines 17-22; p. 74, lines 18-22; p. 76, lines 6-13.* At this time, Amtren had sufficient cash and credit available to timely pay its vendors. *Depo. of Lamberth, p. 71, lines 12-23; p. 72, lines 1-12.* During this time frame, Lamberth discussed with McCollum, on numerous occasions, the need to ensure that the information in the accounting system related to accounts payable matched every invoice received by the company and also accurately reflected the amount that Amtren owed its vendors. *Depo. of Lamberth, p. 79, lines 17-23; p. 1-10.* This section of McCollum's Response does not establish that Lamberth's testimony related to the reasons proffered for her termination are a pretext for discrimination.

In the section of her brief titled "[b]ank Overdraft Charges," McCollum apparently attempts to blame Lamberth for Amtren incurring overdraft charges. In her affidavit she states "the majority of the charges occurred after February of 2004 when Lamberth withdrew

18

permission for the company's bank to automatically transfer funds to cover any shortage in its

checking account." *Exhibit 2, par. 7, p. 6, McCollum's Response.* In her deposition,

McCollum testified as follows:

> "Q. Tell me about that.
> A. I'm not really sure. I couldn't elaborate on that. I would have to look and see exactly what the insufficient – the balances were and insufficient funds were for.
> Q. Whose responsibility was it to ensure that the checking accounts did not have insufficient funds?
> A. I guess it was mine.
> Q. You would agree that was an error, then?
> A. (No response.)
> Q. You may think it's funny, but I don't think it's funny.
> A. I know you don't. That's okay.
> Q. Did you advise Mr. Lamberth that Amtren was receiving insufficient funds charges because of a lack of funds in the checking accounts?
> A. I'm sure. I don't remember. I'm sure I did, you know. He had access to the on-line records. I just don't remember, but I'm sure I did." *Depo. of McCollum, p. 176, p. 23; p. 177, p. 1-23.*

Notwithstanding the inconsistency of McCollum's testimony, it was her responsibility

to ensure that the checking accounts contained sufficient funds to avoid overdraft charges.

McCollum's failure to perform her duties amounted to several thousand dollars in overdraft

charges. *Depo. of Lamberth, p. 56, lines 12-18.* Lamberth further testified Amtren never had

overdraft charges before McCollum's employment. *Depo. of Lamberth, p. 55, lines 17-23,*

*p. 56, lines 1-18; p. 57, 1-23; p. 58, lines 1-23.* This section of McCollum's Response does

not establish that Lamberth's testimony related to the reasons proffered for her termination

are a pretext for discrimination.

In the section of her brief titled '"[l]ate payroll tax payments," McCollum admits the

tax forms not correctly filled-out and that Amtren was assessed penalties because of these

errors. *See supra.* However, she apparently blames these errors on "bugs in [Amtren's] accounting system that she was working on correcting." *See Exhibit 2, par. 8, p. 7, McCollum's Response.* She further attempts to diminish these errors by stating "her white predecessor as Accounting Manager was not terminated for making under and over payments of payroll taxes." *Id.*

The evidence presented by Amtren establishes numerous errors made by McCollum and substantial penalties levied against Amtren because of her errors. *See generally, paragraphs 25-28, Amtren's Brief in Support of its Motion for Summary Judgment.* As a matter of law, McCollum cannot establish that any employee of Amtren engaged in the same egregious conduct as she did and was not terminated. Therefore, this section of McCollum's Response does not establish that Lamberth's testimony related to the reasons proffered for her termination are a pretext for discrimination.

In the section of her brief titled "Blue Cross/ Blue Shield Payments," McCollum merely "disputes Amtren's allegation in its summary judgment brief that she failed to make timely payments to Blue Cross/Blue Shield." She cites no evidence to support this statement in her Response. Therefore, this section of McCollum's Response does not establish that Lamberth's testimony related to the reasons proffered for her termination are a pretext for discrimination.

In the section of her brief titled "Credit Card Processing Company," McCollum blames Lamberth for the cancellation of Amtren's credit card processing company contract and states "this cancellation was actually due to Lamberth's withdrawal of authorization to the bank to

automatically pay the company' processing fees." *See McCollum's Response, par. 10, p. 8.*

Amtren's account with Chase Merchant Services was cancelled because of a missed payment of $118.41. *Depo. of Lamberth, p. 120, lines 14-18.* Apparently, Chase Merchant Services could not debit Amtren's checking account for this amount. *Depo. of McCollum, p. 160, lines 2-16.* It was McCollum's responsibility to insure that sufficient funds were in Amtren's checking account and to know which account Chase Merchant Services would debit to insure that this type of problem did not happen. *Depo. of Lamberth, p. 123, lines 19-23; p. 124, line 1; p. 125, lines 5-15.* Notice of any debit to the Amtren's checking account by Chase Merchant Services would have been sent to McCollum. *Depo. of McCollum, p. 169, lines 4-23; p. 170, lines 1-23; p. 171, lines 1-10.* McCollum testified that prior to receiving the notice of cancellation, she may have received notification from Chase Merchant Services that they had attempted to deduct moneys from Amtren's checking account and there were not sufficient moneys in the account. *Depo. of McCollum, p. 175, lines 1-15.* It was McCollum's responsibility to insure that sufficient funds were in the checking account to cover any deduction made by Chase Merchant Services. *Depo. of McCollum, p. 173, lines 20-23, p. 174, lines 1-19.*

The cancellation of Amtren's Chase Merchant Services account is a significant problem because a quarter of Amtren's sales are by credit card and most of the its purchases are by credit card. *Depo. of McCollum, p. 122, lines 4-17.* Because Amtren's account was cancelled, it must now use third-party companies at a higher rate of commission. *Depo. of Lamberth, p. 122, 14-17.* Therefore, this section of McCollum's Response does not establish that

21

Lamberth's testimony related to the reasons proffered for her termination are a pretext for discrimination.

In the section of her brief titled "Copier Lease," McCollum merely states she denies this allegation and "Amtren has not offered nay evidence to support its allegation that the lease was not properly executed." *See McCollum's Response, par. 11, p. 8.* Lamberth testified that there were discussions during management meetings related to leasing a copier. However, McCollum was never authorized to enter into the lease on behalf of Amtren. *See Depo. of Lamberth, p. 93, lines 1-16.* Unsurprisingly, McCollum does not contend she had the authority to enter into the lease on behalf of Amtren. This section of McCollum's Response does not establish that Lamberth's testimony related to the reasons proffered for her termination are a pretext for discrimination.

In the section of her brief titled "MAS90 Implementation," McCollum states "Amtren asserts that McCollum failed to satisfactorily perform her duties regarding installation of the new MAS90 accounting software system, and relies upon a number of conclusory allegations made by Lamberth ... to support the claim." *See McCollum's Response, par. 12, p. 8.*

The failure of McCollum to perform her duties is set forth in detail, with supporting admissible evidence, in paragraph 39, page 15 of Amtren's Brief in Support of its Motion for Summary Judgement. This section of McCollum's Response does not establish that Lamberth's testimony related to the reasons proffered for her termination are a pretext for discrimination.

## II.    CONCLUSION

McCollum has failed to establish her claim of race, sex or national origin discrimination. Specifically, she did not provide sufficient evidence to prove her prima facie case. Further, Amtren has articulated legitimate, nondiscriminatory reason for McCollum's termination and she has failed to demonstrate pretext. Thus, Amtren is entitled to summary judgment as to all of her claims.

**WHEREFORE,** all premises considered, Amtren respectfully requests that this Court grant its Motion for Summary Judgment as to all of McCollum's claims.

Respectfully submitted this 27th day of December, 2006.


_____
**G. R. "Rick" TRAWICK** (Ala. TRA007)
**Attorney for Defendant Amtren, Inc.**

**OF COUNSEL:**
**SLATEN & O'CONNOR, P.C.**
105 Tallapoosa Street, Suite 101
Montgomery, Alabama  36104
(334) 396-8882
(334) 398-8880 fax

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing instrument upon the following attorney(s) of record by placing a copy of same in the United States Mail, postage prepaid this the 27th day of December, 2006.

Jimmy Jacobs, Esquire
143 Eastern Boulevard
Montgomery, Alabama 36117

**OF COUNSEL**

F:\Business Group\Amtren Corporation\McCollum\Plead\Defendant Reply to Plaintiff's Response to Summary Judgment.wpd

24