EXHIBIT

Blumberg No. 5116

# In The Matter Of:

## *Janice McCollum v. Amtren*

---

## *Janice McCollum*
### *October 25, 2006*

---

## *Jennifer Davis, CSR*

Original File MCCOLLUM.v1, Pages 1-194

**Word Index included with this Min-U-Script®**

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

---

**Page 1**

[1]　　　IN THE UNITED STATES DISTRICT COURT

[2]　　　FOR THE MIDDLE DISTRICT OF ALABAMA

[3]　　　　　　　NORTHERN DIVISION

[4]

[5]　CASE NUMBER

[6]　05-cv-0326-W

[7]　(JURY DEMAND)

[8]

[9]　JANICE McCOLLUM,

[10]　　　Plaintiff,

[11]　vs.

[12]　AMTREN, INC.,

[13]　　　Defendant.

[14]

[15]

[16]　　　　DEPOSITION TESTIMONY OF:

[17]　　　　　JANICE McCOLLUM

[18]

[19]　October 25, 2006

[20]　9:00 a.m.

[21]

[22]　COURT REPORTER:

[23]　JENNIFER DAVIS, CSR

　　　　　　Jennifer Davis, CSR
　　　　　　　334-612-9967

---

**Page 2**

[1]　　　　S T I P U L A T I O N

[2]　　　IT IS STIPULATED AND AGREED by and

[3]　between the parties through their respective

[4]　counsel that the deposition of JANICE

[5]　McCOLLUM, may be taken before Jennifer

[6]　Davis, Certified Shorthand Reporter and

[7]　Notary Public, State at Large, at the

[8]　offices of Slaten & O'Connor, 105 Tallapoosa

[9]　Street, Montgomery, Alabama, on October 25,

[10]　2006, commencing at approximately 9:00 a.m.

[11]　　　IT IS FURTHER STIPULATED AND AGREED

[12]　that the signature to and the reading of the

[13]　deposition by the witness is hereby waived,

[14]　the deposition to have the same force and

[15]　effect as if full compliance had been had

[16]　with all laws and rules of Court relating to

[17]　the taking of depositions.

[18]　　　IT IS FURTHER STIPULATED AND AGREED

[19]　that it shall not be necessary for any

[20]　objections to be made by counsel to any

[21]　questions, except as to form or leading

[22]　questions, and that counsel for the parties

[23]　may make objections and assign grounds at

　　　　　　Jennifer Davis, CSR
　　　　　　　334-612-9967

---

**Page 3**

[1]　the time of trial or at the time said

[2]　deposition is offered in evidence, or prior

[3]　thereto.

[4]

[5]　　　　　I N D E X

[6]　EXAMINATION BY:　　　　　PAGE NO.

[7]　MR. TRAWICK　　　　　　　6-193

[8]　CERTIFICATE　　　　　　　194

[9]

[10]　　　INDEX OF EXHIBITS

[11]　EXHIBITS　　　　　　　　PAGE NO.

[12]　DX 1 - response to defendant's
　　　　interrogatories　　　　8

[13]

[14]　DX 2 - notice of deposition　　9

[15]

　　　DX 3 - 3/30/05 letter　　　73

[16]

　　　DX 4 - charge of discrimination　90

[17]

　　　DX 5 - IRS document　　　117

[18]

　　　DX 6 - IRS document　　　127

[19]

　　　DX 7 - IRS document　　　134

[20]

　　　DX 8 - IRS document　　　138

[21]

　　　DX 9 - IRS document　　　139

[22]

　　　DX 10 - IRS document　　143

[23]

　　　DX 11 - IRS document　　145

　　　　　Jennifer Davis, CSR
　　　　　　334-612-9967

---

**Page 4**

[1]　　　INDEX OF EXHIBITS (continued)

[2]　EXHIBITS　　　　　　　　PAGE NO.

[3]　DX 12 - Blue Cross Blue Shield of
　　　　Alabama group invoice　　149

[4]

　　　DX 13 - Blue Cross Blue Shield of

[5]　　　　Alabama group invoice　　150

[6]　DX 14 - Chase Merchant Services
　　　　document　　　　　　159

[7]

[8]　　　DX 15 - lease agreement　　176

[9]　　　DX 16 - Wilson Price invoices　178

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

　　　　　Jennifer Davis, CSR
　　　　　　334-612-9967

---

Page 5

[1]            A P P E A R A N C E S

[2]

[3]    FOR THE PLAINTIFF:

[4]        JIMMY D. JACOBS, ESQUIRE

[5]        Attorney at Law

[6]        143 Eastern Boulevard

[7]        Montgomery, Alabama 36117

[8]

[9]

[10]   FOR THE DEFENDANT:

[11]       G.R. "RICK" TRAWICK, ESQUIRE

[12]       Slaten & O'Connor

[13]       Winter Loeb Building

[14]       105 Tallapoosa Street

[15]       Suite 101

[16]       Montgomery, Alabama  36104

[17]

[18]

[19]

[20]

[21]

[22]

[23]

                Jennifer Davis, CSR
                  334-612-9967

Page 6

[1]        I, Jennifer Davis, a Certified
[2]    Shorthand Reporter of Millbrook, Alabama,
[3]    and a Notary Public for the State of Alabama
[4]    at Large, acting as Commissioner, certify
[5]    that on this date, pursuant to the Federal
[6]    Rules of Civil Procedure, and the foregoing
[7]    stipulation of counsel, there came before me
[8]    at the offices of Slaten & O'Connor, 105
[9]    Tallapoosa Street, Montgomery, Alabama,
[10]   commencing at approximately 9:00 a.m. on
[11]   October 25, 2006, JANICE McCOLLUM, witness
[12]   in the above cause, for oral examination,
[13]   whereupon the following proceedings were
[14]   had:
[15]
[16]        JANICE McCOLLUM,
[17]   having first been duly sworn, was examined
[18]   and testified as follows:
[19]            EXAMINATION
[20]   BY MR. TRAWICK:
[21]        Q.  State your name for the record,
[22]   please.
[23]        A.  Janice McCollum.

Page 7

[1]        Q.  Ms. McCollum, my name is Rick
[2]    Trawick.  I represent Amtren in the lawsuit
[3]    that you filed against that corporation, and
[4]    I will be asking you some questions today.
[5]    If you do not understand one of my
[6]    questions, let me know, and I will attempt
[7]    to rephrase that question.  If I ask you a
[8]    question and you answer the question, is it
[9]    fair to assume that you understood the
[10]   question?
[11]        A.  That would be fair.
[12]        Q.  Is there any reason that you
[13]   cannot truthfully and completely answer my
[14]   questions today?
[15]        A.  Not that I am aware of.
[16]        Q.  You're not taking any medication
[17]   or anything today that would hinder your
[18]   ability to answer my questions; is that
[19]   correct?
[20]        A.  Not that I'm aware of that would
[21]   hinder my abilities.
[22]        MR. TRAWICK:  Jimmy, you told me
[23]   that you would give me a signed copy of your

Page 8

[1]    interrogatories.
[2]        MR. JACOBS:  The only copy that
[3]    I have with me is the one that we sent.  I
[4]    can get that signed if we can make another
[5]    copy of it, or if you have a copy, we will
[6]    have her sign it.
[7]        MR. TRAWICK:  I have a copy.
[8]    Let me mark this as Defendant's Exhibit 1.
[9]    It is pages one through six of the
[10]   plaintiff's response to defendant's
[11]   interrogatories.
[12]        (Whereupon, a document was
[13]   marked as Defendant's Exhibit 1 and is
[14]   attached to the original transcript.)
[15]        MR. TRAWICK:  Is that document a
[16]   complete copy of the plaintiff's response to
[17]   defendant's interrogatories?
[18]        MR. JACOBS:  It appears to be to
[19]   me, except that she needs to sign.
[20]        Q.  (By Mr. Trawick)  Have you had
[21]   an opportunity to review those responses,
[22]   Ms. McCollum?
[23]        A.  Yes.

Janice McCollum v.
Amtren

Page 25

[1]  **A.**  Correct.
[2]  **Q.**  Why did you voluntarily leave
[3]  Thermalex?
[4]  **A.**  Because I thought I might be
[5]  laid off.
[6]  **Q.**  Did you have another position to
[7]  go to?
[8]  **A.**  Yes.
[9]  **Q.**  Which one?
[10]  **A.**  Amtren.
[11]  **Q.**  Had you accepted a position with
[12]  Amtren before you resigned from Thermalex?
[13]  **A.**  I did.
[14]  **Q.**  Tell me about how you learned
[15]  about the position at Amtren.
[16]  **A.**  Newspaper ad.
[17]  **Q.**  What process did you go through
[18]  to apply for this job?
[19]  **A.**  I sent a resume.
[20]  **Q.**  To whom?
[21]  **A.**  To Amtren.
[22]  **Q.**  Do you recall any particular
[23]  person, or was it just addressed to the

Page 26

[1]  corporation?
[2]  **A.**  I don't recall.
[3]  **Q.**  If you will, just generally tell
[4]  me, from the time you sent the resume to
[5]  Amtren in response to the ad in the
[6]  newspaper and the time that you were offered
[7]  the position, what process was followed in
[8]  your employment.
[9]  **A.**  Okay.  Please restate that
[10]  question.
[11]  **Q.**  From the time you sent the
[12]  resume to Amtren until you were offered a
[13]  position, just tell me the process that was
[14]  followed for you -- by you to obtain that
[15]  job.
[16]  **A.**  I received a call from Kirk
[17]  Lamberth.
[18]  **Q.**  Lamberth?
[19]  **A.**  I believe it was a call.  Hold
[20]  on a minute.  There was contact by Kirk
[21]  Lamberth to me to set up a telephone
[22]  interview.  Are you asking me how I received
[23]  the position?  What happened and how did I

Page 27

[1]  receive the position?
[2]  **Q.**  Yes.
[3]  **A.**  Okay.  Contacted me to set up a
[4]  telephone interview.  I went through a
[5]  telephone interview with him, and then I
[6]  went through a formal interview with him.  I
[7]  don't recall how much time it took exactly
[8]  before he called me and offered me the
[9]  position.
[10]  **Q.**  Did you interview with anyone
[11]  else at Amtren?
[12]  **A.**  Not that I recall.
[13]  **Q.**  And when did you start working
[14]  for Amtren?
[15]  **A.**  I believe it was --
[16]  **Q.**  The month and year would be
[17]  sufficient.
[18]  **A.**  Okay.  January of 2004.
[19]  **Q.**  And what position did you accept
[20]  with Amtren?
[21]  **A.**  Accounting manager.
[22]  **Q.**  What was your understanding of
[23]  your duties as the accounting manager at

Page 28

[1]  Amtren?
[2]  **A.**  My understanding would be to
[3]  perform the accounting functions for that
[4]  business, help with projections, and help
[5]  with some analysis.
[6]  **Q.**  Anything else?
[7]  **A.**  Not that I can think of.
[8]  **Q.**  What do you mean by perform
[9]  accounting functions for the business?
[10]  **A.**  I mean, produce financial
[11]  statements, book journal entries.
[12]  **Q.**  Let me ask you to assume that
[13]  the person reading this deposition is not an
[14]  accountant.
[15]  **A.**  Okay.
[16]  **Q.**  I'm not an accountant.  It will
[17]  help if you explain what you mean by journal
[18]  entries and things like that.
[19]  **A.**  Journal entries, those would be
[20]  entries that would be made to the accounting
[21]  system by way of a double entry system,
[22]  debits and credits.
[23]  **Q.**  Accounts receivable and accounts

Janice McCollum v.
Amtren

Page 53

[1] difference. But, there again, I would need
[2] to see the documentation.
[3]    **Q.**  And it's your testimony that the
[4] vendor submitted an invoice at the higher
[5] price, which was incorrect, and you did not
[6] bring this to the attention of Mr. Lamberth;
[7] is that correct?
[8]    **A.**  That would be correct. I must
[9] state I did not know that at the time,
[10] either.
[11]    **Q.**  Did not know what?
[12]    **A.**  That -- let me rephrase that.
[13] The price on the invoice was paid at the
[14] invoice price; the error was later caught; I
[15] corrected it.
[16]    **Q.**  Is it correct that the price on
[17] the invoice that you paid was at the higher
[18] price and not the lower price?
[19]    **A.**  Yes.
[20]    **Q.**  Therefore, the invoice was
[21] incorrect. Is that a fair statement?
[22]    **A.**  I would say.
[23]    **Q.**  And it's your testimony that you

Page 54

[1] spoke with someone at Plextor about this
[2] incorrect invoice?
[3]    **A.**  I did.
[4]    **Q.**  And you do not recall the name
[5] of the person who you spoke with; is that
[6] correct?
[7]    **A.**  That's correct.
[8]    **Q.**  And you testified that the error
[9] was caught. How was the error caught?
[10]    **A.**  From what I recall, after I was
[11] -- I realized that the price should have
[12] been the lower price, and I reviewed -- I
[13] did a review of checks and that sort of
[14] thing, and I saw that the -- it was at the
[15] higher price, so I corrected it.
[16]    **Q.**  How did you learn that the price
[17] should have been lower?
[18]    **A.**  I don't recall all the steps. I
[19] just don't recall them all.
[20]    **Q.**  You don't recall how you learned
[21] that the price should have been lower?
[22]    **A.**  I believe it was through
[23] Mr. Lamberth, but I don't really -- I've got

Page 55

[1] to think about it. I believe so. I would
[2] like to see it on the documentation.
[3]    **Q.**  I'm asking you what you recall
[4] today, Ms. McCollum.
[5]    **A.**  Okay. That's all I recall.
[6]    **Q.**  What dollar amount was the error
[7] involving?
[8]    **A.**  I'd need to see. I'm not sure
[9] exactly what it was.
[10]    **Q.**  Several thousand dollars?
[11]    **A.**  Yeah. Uh-huh.
[12]    **Q.**  Would you agree that an error in
[13] a price invoice from the vendor that
[14] resulted in the company paying several
[15] thousand dollars more than it should have is
[16] a significant error?
[17]    **A.**  No.
[18]    **Q.**  I'm not asking if it is a
[19] significant error on your part. I'm asking
[20] if you would agree that it's a significant
[21] error on the price --
[22]    **A.**  I would not agree.
[23]    **Q.**  Let me finish my question -- the

Page 56

[1] price of the vendor.
[2]    **A.**  Okay. Say it again, please.
[3]    **Q.**  Would you agree that an invoice
[4] that had the wrong price, which caused the
[5] company to pay several thousand dollars more
[6] than it should have, was a significant error
[7] on the part of the vendor?
[8]    **A.**  A significant error on the part
[9] of the vendor? Probably.
[10]    **Q.**  And you didn't bring this to the
[11] attention of Mr. Lamberth; is that correct?
[12]    **A.**  I believe I have stated that I
[13] found the error; I corrected the error; I
[14] did not tell Mr. Lamberth about it at that
[15] particular time.
[16]    **Q.**  Did all future invoices from
[17] this vendor contain the new price which was
[18] lower?
[19]    **A.**  I don't know. I'd have to see
[20] invoices.
[21]    **Q.**  Do you recall making any other
[22] payments to this vendor that --
[23]    **A.**  I'd have to see them.

Janice McCollum v.
Amtren

Page 57

[1]    Q.   That's not my question,
[2]  Ms. McCollum. Listen to my question. It's
[3]  a very simple question.
[4]    A.   Okay.
[5]    Q.   Do you recall after this --
[6]  after making payment to this vendor at the
[7]  incorrect price, any other invoices that
[8]  were received from this same vendor that
[9]  contained the incorrect price?
[10]    A.   I don't recall.
[11]    Q.   In response to the
[12]  interrogatory, you state that other male and
[13]  white employees, who held a professional
[14]  position such as myself, were not treated in
[15]  the same manner. What do you mean by that
[16]  statement?
[17]    A.   I mean that other male
[18]  employees, for example, David Fields, who
[19]  made an error -- an inventory error -- was
[20]  not terminated. There are three engineers
[21]  that work there, male, who have made
[22]  mistakes and errors costing the company.
[23]  They have not been terminated.

Page 58

[1]    Q.   Anyone else?
[2]    A.   Not that I recall.
[3]    Q.   How did you learn of David
[4]  Fields making the inventory error?
[5]    A.   Through Mr. Lamberth and other
[6]  employees.
[7]    Q.   What did Mr. Lamberth tell you
[8]  about this?
[9]    A.   That David Fields made a large
[10]  inventory error.
[11]    Q.   Did he tell you anything else?
[12]    A.   Not that I recall.
[13]    Q.   When was this error made?
[14]    A.   I don't know.
[15]    Q.   Before you were terminated, I
[16]  assume?
[17]    A.   Yes.
[18]    Q.   When you left Amtren, was David
[19]  still employed?
[20]    A.   Yes.
[21]    Q.   Do you know if David has
[22]  subsequently been terminated?
[23]    A.   Yes, I believe he has.

Page 59

[1]    Q.   How did you learn of David's
[2]  termination?
[3]    A.   I don't recall. I don't
[4]  remember exactly how.
[5]    Q.   When Mr. Lamberth allegedly had
[6]  this conversation with you about David
[7]  Fields, did you ask what type of inventory
[8]  error?
[9]    A.   I don't recall.
[10]    Q.   Do you know what type of
[11]  inventory error David made?
[12]    A.   I believe it was on some -- I'm
[13]  not sure exactly. I'm not sure exactly.
[14]    Q.   Do you recall anything else
[15]  about the conversation with Mr. Lamberth
[16]  regarding this error that David Fields made?
[17]    A.   I don't recall.
[18]    Q.   Yes or no. Do you recall
[19]  anything else about the conversation with
[20]  Mr. Lamberth regarding the error that you
[21]  contend --
[22]    A.   I cannot --
[23]    Q.   Let me finish my question,

Page 60

[1]  Ms. McCollum. This lady can't take both of
[2]  us talking at the same time.
[3]    A.   Okay.
[4]    Q.   Do you recall anything else
[5]  about the conversation with Mr. Lamberth
[6]  wherein you allege that he told you about
[7]  this error that David Fields made?
[8]    A.   No.
[9]    Q.   Are you aware of any other
[10]  errors that David Fields made?
[11]    A.   I don't recall.
[12]    Q.   Do you know if the error that
[13]  David Fields made cost the company any
[14]  money?
[15]    A.   Seventy thousand dollars.
[16]    Q.   How do you know it cost the
[17]  company seventy thousand dollars?
[18]    A.   That is what I was told.
[19]    Q.   Told by whom?
[20]    A.   Kirk Lamberth.
[21]    Q.   So you do remember something
[22]  else about the conversation?
[23]    A.   Yes, sir.

Janice McCollum v.
Amtren

Page 85

[1]    A.   The actions.  Okay.
[2]    Q.   Let me give you an opportunity
[3]  to review your answer.
[4]    A.   (Witness reviews document.)
[5]  Okay.
[6]    Q.   In your answer, you state you
[7]  were expected to make coffee on a number of
[8]  occasions.  Did anyone else make coffee?
[9]    A.   Probably.
[10]    Q.   Any males make coffee?
[11]    A.   In what time frame?
[12]    Q.   Any time frame that you worked
[13]  there.
[14]    A.   Let's see.  Maybe after the
[15]  coffee service, but I don't really —
[16]    Q.   Did you ever observe any males
[17]  at Amtren, during the time that you worked
[18]  there, make coffee?
[19]    A.   Yes.
[20]    Q.   Did you observe any males make
[21]  coffee during meetings?
[22]    A.   I don't recall.
[23]    Q.   May have, but you just don't

Page 86

[1]  recall?
[2]    A.   Uh-huh.
[3]    Q.   Did you ever observe
[4]  Mr. Lamberth making coffee?
[5]    A.   Probably.
[6]    Q.   Okay.  You further state that
[7]  you were directed by Mr. Lamberth to order
[8]  and serve lunch when we had employee
[9]  lunches.  What do you mean by serve lunch?
[10]    A.   Basically set all of it up.
[11]    Q.   What do you mean by set all of
[12]  it up?
[13]    A.   The food, the plates, the
[14]  silverware, that sort of thing.
[15]    Q.   Was it served buffet style?
[16]    A.   Most of the time, yes.
[17]    Q.   And the lunch was ordered from
[18]  restaurants?
[19]    A.   Yes.
[20]    Q.   So is it correct you picked up
[21]  the phone and placed an order for an
[22]  employee lunch?
[23]    A.   I did do that.

Page 87

[1]    Q.   Anyone else ever order lunches
[2]  for the staff or for business meetings?
[3]    A.   Probably.  I don't know who they
[4]  were.
[5]    Q.   Any males?
[6]    A.   May have.
[7]    Q.   You make the statement that male
[8]  management employees were never assigned
[9]  such duties nor was such an expectation of
[10]  their employment by Mr. Lamberth.
[11]    A.   Okay.  Say that again, please.
[12]  Where is that?
[13]    Q.   It's in your answer.
[14]    A.   Okay.  Which one?  I'm sorry.
[15]  Unless you want me to read —
[16]    Q.   In your response to
[17]  interrogatory number four, you make the
[18]  statement, male management employees were
[19]  never assigned such duties, nor were such an
[20]  expectation of employment by Mr. Lamberth.
[21]  Did I read that correctly?
[22]    A.   Yes.
[23]    Q.   Do you stand by that statement?

Page 88

[1]    A.   I do.
[2]    Q.   I think you just testified other
[3]  male employees made coffee, other male
[4]  employees ordered lunch.  How did that
[5]  differ from what you did?
[6]    A.   I said they may have, you know.
[7]  How did that differ?
[8]    Q.   Yes.
[9]    A.   When coffee was not made when we
[10]  had customers or guests, Mr. Lamberth became
[11]  very irate at me.
[12]    Q.   What did he do?
[13]    A.   He became irate, angry at me.
[14]    Q.   What did he say?
[15]    A.   I don't recall exactly his
[16]  words.  It was more of his actions.  Things
[17]  like, you know, no coffee's made, or just
[18]  very angry and his tone of voice.  He became
[19]  angry at me, not other male employees.
[20]    Q.   Did you ever have any
[21]  discussions with Mr. Lamberth about this?
[22]    A.   No.  I did what he asked me to
[23]  do.

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

---

Page 89

[1]    **Q.** It's a fair statement you never
[2] told Mr. Lamberth, I don't think I should be
[3] making coffee, and I shouldn't be ordering
[4] lunch?
[5]    **A.** That's a fair statement.
[6]    **Q.** You didn't tell Mr. Lamberth
[7] that, then? Is that your testimony?
[8]    **A.** Right. I did not tell him that,
[9] no. Is that what you're asking?
[10]   **Q.** Yes. Did you tell Mr. Lamberth,
[11] I don't think I should be making coffee; I
[12] don't think I should be ordering lunch?
[13]   **A.** No.
[14]   **Q.** And, to your knowledge, you
[15] don't have any knowledge as to whether or
[16] not any other male employees made coffee or
[17] ordered lunch; is that correct?
[18]   **A.** I said they may have.
[19]   **Q.** Let me show you what has been
[20] marked as Defendant's Exhibit 4, which
[21] appears to be a copy of the charge of
[22] discrimination that you filed with the Equal
[23] Employment Opportunity Commission.

---

Page 90

[1]       (Whereupon, a document was
[2] marked as Defendant's Exhibit 4 and is
[3] attached to the original transcript.)
[4]    **A.** Uh-huh.
[5]    **Q.** Is that your handwriting?
[6]    **A.** The signature?
[7]    **Q.** Yes.
[8]    **A.** Yes.
[9]    **Q.** The date on that is May 19,
[10] 2005; is that correct?
[11]   **A.** Uh-huh.
[12]   **Q.** At the time you filed this, did
[13] you have a lawyer?
[14]      **THE WITNESS:** Both you and I put
[15] that together.
[16]   **A.** Uh-huh.
[17]   **Q.** Is it correct that your
[18] attorney, Mr. Jacobs, assisted you in
[19] drafting this document?
[20]   **A.** Yes.
[21]   **Q.** In this document, you have
[22] alleged that the cause of discrimination is
[23] based upon color. What do you mean by that?

---

Page 91

[1]    **A.** I am an Asian.
[2]    **Q.** Korean?
[3]    **A.** Yes.
[4]    **Q.** And you have also alleged sex,
[5] which is obviously female; is that correct?
[6]    **A.** Correct.
[7]    **Q.** And you also allege national
[8] origin. What is your national origin you
[9] are contending you were discriminated
[10] against?
[11]   **A.** Asian.
[12]   **Q.** Again, Korean?
[13]   **A.** Uh-huh.
[14]   **Q.** You know Lisa McNamee, don't
[15] you?
[16]   **A.** Yes.
[17]   **Q.** Is she part Korean?
[18]   **A.** I believe she is.
[19]   **Q.** And is it correct that she was
[20] hired at Amtren while you were still working
[21] there?
[22]   **A.** Yes.
[23]   **Q.** And I believe you previously

---

Page 92

[1] testified that Lisa -- you worked with Lisa;
[2] is that correct?
[3]    **A.** Yes.
[4]    **Q.** Did you supervise Lisa?
[5]    **A.** To some extent. Both
[6] Mr. Lamberth and myself.
[7]    **Q.** Do you know who hired Lisa?
[8]    **A.** Myself and Mr. Lamberth.
[9]    **Q.** Did you have the authority to
[10] hire Lisa without Mr. Lamberth's approval?
[11]   **A.** No.
[12]   **Q.** Is it a correct statement, then,
[13] that Mr. Lamberth had the authority to hire
[14] new employees at Amtren?
[15]   **A.** Yes.
[16]   **Q.** When you left Amtren, was Lisa
[17] still working there?
[18]   **A.** Yes.
[19]   **Q.** When you worked with Lisa, what
[20] were Lisa's duties?
[21]   **A.** Data entry.
[22]   **Q.** Into Mas90?
[23]   **A.** Into whatever system was there.

---

---

**Page 93**

[1]    **Q.** Do you recall if Mas90 was --

[2]    **A.** I believe it was, but I would

[3] need to look at all those to make sure.

[4] Whatever accounting system, it's data entry.

[5]    **Q.** What type of data would she

[6] enter into the accounting system?

[7]    **A.** Invoices.

[8]    **Q.** Anything else?

[9]    **A.** I don't remember everything.

[10] But I know it was invoices, customer

[11] purchase orders.

[12]    **Q.** Anything else?

[13]    **A.** Not that -- it was mostly --

[14] distribution of mail.

[15]    **A.** I didn't make myself very

[16] clear. Any other type of data entry that

[17] Lisa did into the accounting system other

[18] than invoices and customer purchase orders?

[19]    **A.** I thought you said what her

[20] duties were.

[21]    **Q.** I did first. But you said data

[22] entry, and I'm asking you about what type of

[23] data did she enter into the system, and you

---

**Page 94**

[1] told me invoices and customer purchase

[2] orders. And my question now is, any other

[3] type of data that she entered into the

[4] system?

[5]    **A.** Not that I can recall.

[6]    **Q.** Do you recall if Lisa was there

[7] when this error with Plextor was made and

[8] caught by you?

[9]    **A.** I don't.

[10]    **Q.** What other type of duties did

[11] Lisa perform other than data entry?

[12]    **A.** Mail distribution and answering

[13] the phone.

[14]    **Q.** Anything else that you recall?

[15]    **A.** Not that I recall right now.

[16]    **Q.** Did she perform duties as

[17] assigned by you?

[18]    **A.** Yes, she would.

[19]    **Q.** Do you recall any other duties

[20] that you may have assigned her?

[21]    **A.** No, not that I can recall right

[22] offhand.

[23]        **MR. TRAWICK:** Let's go off the

---

**Page 95**

[1] record.

[2]        (Off-the-record discussion.)

[3]        (Lunch recess.)

[4]    **Q.** (By Mr. Trawick) Ms. McCollum,

[5] let me direct your attention to Defendant's

[6] Exhibit 4, which is a copy of the charge of

[7] discrimination that you filed. In the

[8] factual part of the charge you state,

[9] Mr. Lamberth began to give me sexually

[10] stereotypical duties, e.g., ordering lunch.

[11] Previously you've testified about ordering

[12] lunch and making coffee and setting up for

[13] the lunches. Anything else you're referring

[14] to as sexually stereotypical duties?

[15]    **A.** Not that I can think of.

[16]    **Q.** You go on to state that you were

[17] troubled by these assignments and comments

[18] made by the company president. What

[19] comments are you making reference to?

[20]    **A.** He made a comment that he was a

[21] chauvinist and that he knew it all. We were

[22] invited to a luncheon with the two people

[23] from Walker Personnel, both female. I asked

---

**Page 96**

[1] Mr. Lamberth if he would like to attend. He

[2] stated for me just to take Jerry Weisenfeld,

[3] that he was a chauvinist and he knew it all,

[4] and he did not want to attend to lunch.

[5]    **Q.** Was anyone present when

[6] Mr. Lamberth allegedly made these

[7] conversations?

[8]    **A.** Other than myself?

[9]    **Q.** Yes.

[10]    **A.** No.

[11]    **Q.** What did you understand

[12] Mr. Lamberth to mean by the comment he knew

[13] it all?

[14]    **A.** It is my belief that he meant he

[15] really didn't have time to go to lunch with

[16] women, and he knew everything and it

[17] wouldn't benefit him.

[18]    **Q.** What was the purpose of this

[19] luncheon with Walker Personnel?

[20]    **A.** They just called and asked us to

[21] go to lunch because we were doing business

[22] with them.

[23]    **Q.** And did Mr. Lamberth say that he

---

Janice McCollum v.
Amtren

Page 97

[1] didn't want to go to lunch because the
[2] representatives from Walker Personnel were
[3] female?
[4]    **A.**  He said what I just stated.
[5]    **Q.**  So it is correct that he did not
[6] state that he did not want to go to lunch
[7] because he would be going to lunch with
[8] females; is that correct?
[9]    **A.**  That would be correct.
[10]    **Q.**  You go on to state in your
[11] charge that in December of 2004 Mr. Lamberth
[12] hired a man who was given the title of
[13] business manager.  Who are you making
[14] reference to?
[15]    **A.**  Jerry Weisenfeld.
[16]    **Q.**  You go on to state, I believe he
[17] terminated me because of my sex and color or
[18] nationality; I am Asian-American.  What
[19] facts are you relying upon to make that
[20] statement?
[21]    **A.**  I was treated differently than
[22] other male employees; that my duties were
[23] more female stereotypical.  When I was first

Page 98

[1] brought on board with Amtren, I was told
[2] that I would have more of the
[3] responsibilities of helping run the business
[4] and that sort of thing.  And it is my
[5] belief, because I am female, that he hired
[6] Mr. Weisenfeld, because he is male, to do
[7] those duties.
[8]    **Q.**  To do what duties?
[9]    **A.**  The duties that I was told that
[10] I would have as far as the accounting
[11] functions and the planning, that sort of
[12] thing.
[13]    **Q.**  You're going to have to list
[14] those duties for me.
[15]    **A.**  List my duties?
[16]    **Q.**  No.  You just testified -- and
[17] I'll have the court reporter read it back if
[18] you want.  But you testified you believe
[19] that Mr. Lamberth hired Jerry to do those
[20] duties that you thought you were going to
[21] do.  I'm simply asking you what duties are
[22] you making reference to?
[23]    **A.**  I am making reference to

Page 99

[1] controller-type duties.
[2]    **Q.**  What are they?
[3]    **A.**  Accounting functions.
[4]    **Q.**  What accounting functions?  That
[5] doesn't tell me anything.
[6]    **A.**  Accounts payable, accounts
[7] receivable, software system, planning for
[8] the future of the company, analysis.  Those
[9] type duties.
[10]    **Q.**  What functions pertaining to
[11] accounts payable are you making reference to
[12] that you did not perform?
[13]    **A.**  I'm sorry?
[14]    **MR. TRAWICK:**  Read the question
[15] back and read her answer.
[16]    (The requested portion of the
[17] record, page 97, lines 16-23, and page 98,
[18] lines 1-14, were read by the reporter.)
[19]    **Q.**  (By Mr. Trawick) Okay.  What
[20] duties?  You said accounting --
[21]    **A.**  Okay.  For example, this meeting
[22] that I was not included in to re-evaluate
[23] the line of credit planning, that was a

Page 100

[1] meeting held between the banker,
[2] Mr. Lamberth, and Jerry Weisenfeld.  I am
[3] controller at that point in time.  I feel
[4] like I should have been in that meeting.
[5]    **Q.**  Anything else?  You mention
[6] accounting functions, dealing with accounts
[7] payable.
[8]    **A.**  Any accounting function.  It is
[9] my belief that Mr. Weisenfeld, like I said,
[10] was hired to basically replace me.
[11]    **Q.**  And what facts are you relying
[12] upon for that statement, or is that just
[13] your opinion?
[14]    **A.**  Well, here's one.  This is a
[15] meeting between a banker and Mr. Lamberth,
[16] the president of the company, and --
[17]    **Q.**  Defendant's Exhibit 3?
[18]    **A.**  Number 3.
[19]    **Q.**  Anything else?  You have said
[20] Defendant's Exhibit 3.
[21]    **A.**  Yes.  Also, he was receiving
[22] training -- additional training on the Mas90
[23] system, which was my responsibility.  The

Page 101

[1] Amtren -- Mr. Lamberth chose to pay Wilson
[2] Price extra money to train Mr. Weisenfeld
[3] when I could have easily shown him those
[4] functions and that system.
[5] Q. Anything else?
[6] A. Not that I recall.
[7] Q. Okay. So we have the meeting
[8] that took place in March 2005. It's
[9] referenced in Defendant's Exhibit 3. We
[10] have that Jerry Weisenfeld received training
[11] from Bobby Lake on Mas90. Anything else?
[12] A. Not that I can think of right
[13] now.
[14] Q. Okay. So there's nothing
[15] dealing with the accounts payable, accounts
[16] receivable, et cetera, that you previously
[17] testified about?
[18] A. It's my belief that Jerry
[19] Weisenfeld was to take my place. Accounts
[20] payable was part of my responsibility,
[21] therefore it would be part of his.
[22] Q. Do you have any facts upon which
[23] you base that opinion, other than the two

Page 102

[1] things you just told me?
[2] A. That is my belief.
[3] Q. Do you have any facts to support
[4] that belief other than the two things you
[5] told me, one being this meeting in March
[6] 2005 with the banker, and that Jerry
[7] Weisenfeld received training on Mas90?
[8] A. Not at this time.
[9] Q. Okay. You go on to state that
[10] Lamberth hired six women, only one is still
[11] with the company. Who are those six women?
[12] A. I don't recall their names. I
[13] don't know their names. I would need to see
[14] payroll records.
[15] Q. You don't recall any of the
[16] names?
[17] A. Lisa McNamee, for one.
[18] Q. And she was still with the
[19] company when you left?
[20] A. Yes.
[21] Q. Any of the other five, do you
[22] recall their names?
[23] A. No, not right at this time.

Page 103

[1] Q. And is it your testimony that
[2] those five women who you cannot recall their
[3] name at this time were not with the company
[4] when you left; is that correct?
[5] A. As far as I can remember. I
[6] can't remember all of it. But as far as I
[7] can remember, they were not except for Lisa
[8] McNamee.
[9] Q. Are you contending that
[10] Mr. Lamberth fired these five women because
[11] they are women after he hired them?
[12] A. Yes.
[13] Q. What facts do you base that
[14] opinion upon?
[15] A. What he had told me, that he did
[16] not trust me, he also told me that after
[17] firing two, I believe. I don't recall
[18] exactly how many of the other women. They
[19] were doing a fine job. They were doing just
[20] fine, and they were terminated. So I can
[21] only assume that they were terminated due to
[22] their sex.
[23] Q. Is it your testimony that

Page 104

[1] Mr. Lamberth told you that these two women,
[2] who you can't identify --
[3] A. Not without the payroll records.
[4] Q. You can't identify them today;
[5] is that correct?
[6] A. Not without the payroll records.
[7] Q. That's not my question,
[8] Ms. McCollum. Do you know their names
[9] today?
[10] A. No. I can't recall them.
[11] Q. Then is it your testimony that
[12] these two women who you contend were fired,
[13] Mr. Lamberth said they were doing a good
[14] job? Is that your testimony?
[15] A. I don't recall him saying that.
[16] Q. Okay. He didn't say that, then,
[17] to your recollection?
[18] A. He didn't say that to me
[19] directly.
[20] Q. Who did he say it to?
[21] A. He said it, I believe, to other
[22] people. He would be saying what a good job
[23] they're doing.

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

---

Page 113

[1]  product; is that correct?
[2]  **A.**  It wasn't always that way when I
[3]  was there.
[4]  **Q.**  How was it then?
[5]  **A.**  It was all in one building when
[6]  I was there.  Maybe those changes have come
[7]  forth since.
[8]  **Q.**  Okay.  Is it a correct
[9]  statement, other than Jerry, David, Steve,
[10]  Mike, and John, you don't know what these
[11]  other males did?
[12]  **A.**  Some of them were in production,
[13]  some of them were in customer service.
[14]  **Q.**  You go on to state, since
[15]  leaving the company, I have learned that
[16]  Lamberth expressed his bias against women
[17]  and persons of color to other management
[18]  staff.  Who told you that?
[19]  **A.**  Mike Bishop.
[20]  **Q.**  Is this the Mike you couldn't
[21]  remember his last name a minute ago, the
[22]  engineer?
[23]  **A.**  No.

---

Page 114

[1]  **Q.**  Mike Bishop is someone else?
[2]  **A.**  Yes.
[3]  **Q.**  Did Mike Bishop work at Amtren?
[4]  **A.**  Yes.
[5]  **Q.**  What was his position?
[6]  **A.**  He was, I believe, the
[7]  operations manager.
[8]  **Q.**  Who else?
[9]  **A.**  Who else what?
[10]  **Q.**  Anyone else tell you this?
[11]  **A.**  No.
[12]  **Q.**  Is Mike Bishop still employed at
[13]  Amtren?
[14]  **A.**  No.
[15]  **Q.**  Why did he leave?
[16]  **A.**  He quit, but I'm not sure of all
[17]  the reasons.
[18]  **Q.**  What did Mike Bishop tell you?
[19]  **A.**  He just said that he was moving
[20]  on to own his own business.
[21]  **Q.**  Let me rephrase that question.
[22]  **A.**  Uh-huh.
[23]  **Q.**  What did Mike Bishop tell you to

---

Page 115

[1]  cause you to make this statement that
[2]  Lamberth expressed bias against women and
[3]  persons of color?
[4]  **A.**  That he had —
[5]  **Q.**  He who?
[6]  **A.**  Mike Bishop had heard Kirk
[7]  Lamberth make racial slurs.
[8]  **Q.**  Did he tell you what racial
[9]  slurs?
[10]  **A.**  No, he did not.
[11]  **Q.**  Did you ask?
[12]  **A.**  I believe I did.
[13]  **Q.**  And you — what did Mike tell
[14]  you when you asked?
[15]  **A.**  He didn't tell me what he said.
[16]  **Q.**  Did he tell you he couldn't
[17]  recall?
[18]  **A.**  He just didn't tell me.
[19]  **Q.**  What else did Mike tell you that
[20]  he heard Kirk say?
[21]  **A.**  That's all I can remember at
[22]  this time.
[23]  **Q.**  Have you ever heard Kirk make

---

Page 116

[1]  any racial slurs?
[2]  **A.**  Not that I recall.
[3]  **Q.**  And Mike Bishop is the only
[4]  person that you were making reference to
[5]  when you make the statement you've learned
[6]  that he — that Lamberth expressed bias to
[7]  other management staff; is that correct?
[8]  **A.**  Yes.
[9]  **Q.**  In response to my question about
[10]  the reasons you think you were terminated,
[11]  because of your sex and color, you stated
[12]  you were treated differently than the other
[13]  males.  You previously answered that
[14]  question.  Is there anything else that you
[15]  want to add to that, as to how you were
[16]  treated differently than males?
[17]  **A.**  Not at this time.
[18]  **Q.**  And you also testified that your
[19]  duties were more female stereotypical.
[20]  You've testified about that previously as
[21]  far as ordering lunch, et cetera.  Anything
[22]  else other than what you've already told me?
[23]  **A.**  Not at this time.

---

Page 117

[1]    **Q.** Well, does that mean at some
[2] later time you're going to have something
[3] else, Ms. McCollum? The purpose of this
[4] deposition is to find out what you contend
[5] was done to you wrong. Now, your response,
[6] not at this time, implies that there may be
[7] something at some later time. I'm trying to
[8] find out at this point in time, is there
[9] anything else regarding these duties that
[10] you consider was female stereotypical?
[11]    **A.** Not at this point in time.
[12]    **MR. TRAWICK:** Let's mark this as
[13] Defendant's Exhibit 5.
[14]    (Whereupon, a document was
[15] marked as Defendant's Exhibit 5 and is
[16] attached to the original transcript.)
[17]    **Q.** Let me show you what has been
[18] marked as Defendant's Exhibit 5, which are
[19] documents numbered 0012, 13, and 14 that
[20] were produced to your lawyer by the
[21] defendant in this case. Take a look at
[22] those documents.
[23]    **A.** (Witness reviews documents.)

Page 118

[1]    **Q.** What are those documents?
[2]    **A.** It appears to me -- well, what
[3] it is, it's just a statement from the
[4] Internal Revenue Service stating a penalty,
[5] federal tax liability -- for federal tax
[6] liability.
[7]    **Q.** For Amtren?
[8]    **A.** I don't see where it's directed
[9] to Amtren. I don't know.
[10]    **Q.** Have you seen these documents
[11] before?
[12]    **A.** I believe I have.
[13]    **Q.** Tell me what context you saw
[14] these documents in.
[15]    **A.** I believe it was in the
[16] paperwork that was requested by my lawyer.
[17]    **Q.** When you performed your duties
[18] at Amtren, did you see these documents?
[19]    **A.** I don't know. I may have. I
[20] don't know. I mean, you're asking me to
[21] remember. I don't know.
[22]    **Q.** Let me ask you this question,
[23] then. During the time that you were

Page 119

[1] responsible for making the tax payments, the
[2] payroll taxes on behalf of Amtren, were
[3] there any penalties assessed against Amtren?
[4]    **A.** You know, I would have to see
[5] all the documentation. I mean, I -- I know
[6] that there was -- when I first started
[7] there, there was a penalty for failure of
[8] not paying state payroll taxes for three
[9] months. But that would not have been -- I
[10] mean, I wasn't even there then.
[11]    **Q.** You learned about that after you
[12] started working for Amtren; is that correct?
[13]    **A.** Yes.
[14]    **Q.** Is it your testimony that you
[15] cannot recall, during the time that you
[16] worked there and the time that you were
[17] responsible for making the tax payments on
[18] behalf of Amtren, any penalty being
[19] assessed?
[20]    **A.** There may have been, but I would
[21] not be able to answer that question fully
[22] without looking at all the documentation.
[23] Do I recall any penalty at all? Is that

Page 120

[1] your question?
[2]    **Q.** That's my question. Yes.
[3]    **A.** Probably, yes.
[4]    **Q.** Probably?
[5]    **A.** Uh-huh. Yes.
[6]    **Q.** Tell me what you recall about
[7] the penalty that was assessed against
[8] Amtren.
[9]    **A.** There was a penalty for the
[10] three months of state taxes that was not
[11] filed.
[12]    **Q.** And I think you testified that
[13] was before you got there; is that correct?
[14]    **A.** I saw the -- no. Well, the
[15] three months that weren't filed happened
[16] before I got there.
[17]    **Q.** You told me about that.
[18]    **A.** Okay.
[19]    **Q.** Now, during the time that you
[20] were there and the time that you were
[21] responsible for making the payroll taxes to
[22] the IRS and to the state, were there any
[23] penalties assessed against Amtren?

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

Page 121

[1]    **A.**   Yes, I believe so.

[2]    **Q.**   Tell me about those penalties.

[3]    **A.**   Okay.  I just don't recall all

[4] what they were.  I know that there were.  I

[5] don't know exactly which form it was or

[6] which tax it was.  I mean, I just don't

[7] recall.

[8]    **Q.**   Who was responsible for making

[9] those payroll taxes?

[10]    **A.**   That would be myself.

[11]    **Q.**   And it's your testimony that you

[12] don't recall anything about those penalties

[13] being assessed against Amtren, even though

[14] it was your responsibility, other than the

[15] fact that the penalties were assessed?

[16]    **A.**   There were penalties assessed.

[17] I don't recall --

[18]    **Q.**   More than one?  On more than one

[19] occasion; is that correct?

[20]    **A.**   I believe so, but I don't recall

[21] which form it was, which tax it was.

[22]    **Q.**   I'm not asking you that.  I'm

[23] asking you was it your responsibility to

Page 122

[1] make those payments in a timely fashion?

[2]    **A.**   Yes.

[3]    **Q.**   Did you fail to make those

[4] payments in a timely fashion and, thus, a

[5] penalty was assessed?

[6]    **A.**   No.

[7]    **Q.**   Why was the penalty assessed,

[8] then?

[9]    **A.**   I would need to see the

[10] documentation.  I'm not sure.

[11]    **Q.**   You don't know; is that correct?

[12]    **A.**   I'm not sure.

[13]    **Q.**   And you're saying it wasn't

[14] your --

[15]    **A.**   I don't see Amtren's name on

[16] there at all.

[17]    **Q.**   You've previously testified that

[18] on more than one occasion penalties were

[19] assessed against Amtren, either by the state

[20] or by the federal government for late tax

[21] payments; is that correct?

[22]    **A.**   I'm not sure what the penalties

[23] were for.  I know there were some

Page 123

[1] penalties.  I know the state was due two or

[2] three months of nonpayment of payroll

[3] taxes.

[4]    **MR. TRAWICK:**  Excuse me a

[5] minute.

[6]    (Off-the-record discussion.)

[7]    **Q.**   (By Mr. Trawick)  Ms. McCollum,

[8] you would agree that a penalty of several

[9] thousand dollars is a significant penalty?

[10]    **A.**   Yes, I would.

[11]    **Q.**   And these -- you've already

[12] testified that these penalties were assessed

[13] during the time that you had the

[14] responsibility for making the payroll taxes;

[15] is that correct?

[16]    **A.**   That's not correct.  I don't

[17] know when the penalties were assessed.  I

[18] don't know.  I just know that there were

[19] some.  I don't -- you're referring to

[20] this --

[21]    **Q.**   No, I'm not referring to

[22] Defendant's Exhibit 5.  You testified

[23] previously that penalties were assessed

Page 124

[1] against Amtren during the time that you were

[2] responsible for making the payroll tax

[3] payments to the federal government and to

[4] the state government; correct?

[5]    **A.**   There were penalties assessed.

[6]    **Q.**   Okay.  It was on more --

[7]    **A.**   I do not know if it was for

[8] payroll taxes or for which tax it was for.

[9] There were a number of taxes.

[10]    **Q.**   Let me rephrase the question,

[11] then.

[12]    **A.**   Uh-huh.

[13]    **Q.**   During the time that you worked

[14] for Amtren, were there ever any penalties

[15] assessed for the late payment of payroll

[16] taxes or the incorrect payment of payroll

[17] taxes?

[18]    **A.**   I'm not sure.  I mean, there

[19] were penalties, but I'm not sure which tax

[20] it was for.

[21]    **Q.**   Was someone else responsible for

[22] making tax payments, then, other than you?

[23]    **A.**   Tax payments is pretty broad.

Janice McCollum v.
Amtren

Janice McCollum
October 25, 2006

Page 125

[1] Are you saying payroll tax payments?  I was
[2] responsible --
[3]     **Q.**  Ms. McCollum, you just testified
[4] that during the time that you worked at
[5] Amtren, there were penalties assessed
[6] regarding taxes.
[7]     **A.**  Yes.  But I don't know which tax
[8] it was.
[9]     **Q.**  And my question is, was anyone
[10] else responsible for ensuring that those
[11] taxes were paid timely or paid correctly,
[12] other than you?
[13]     **A.**  Not -- it was just me.
[14]     **Q.**  We've established that, then.
[15]     **A.**  Okay.
[16]     **Q.**  And is it your testimony that
[17] sitting here today you have no recollection
[18] of the reasons those penalties were
[19] assessed?
[20]     **A.**  Not at this time.
[21]     **Q.**  All right.  Is it your
[22] testimony, Ms. McCollum, that these
[23] penalties were not the result of your errors

Page 126

[1] and omissions?
[2]     **A.**  I don't know what penalty you're
[3] talking about.
[4]     **Q.**  Ms. McCollum, you testified --
[5]     **A.**  That there were penalties.
[6]     **Q.**  Yes.  And my question is, is it
[7] your testimony those penalties were not
[8] assessed because of your errors and
[9] omissions?
[10]     **A.**  I'm not sure.  I would have to
[11] look at the paperwork.
[12]     **Q.**  Ms. McCollum, this is not a
[13] difficult question.
[14]     **A.**  Uh-huh.
[15]     **Q.**  You're obviously a very
[16] intelligent woman, and you've previously
[17] testified that penalties being assessed are
[18] something that is significant.
[19]     **A.**  Yes.
[20]     **Q.**  And it's your testimony you
[21] don't know if these penalties were assessed
[22] because of something you failed to do or
[23] not?

Page 127

[1]     **A.**  I'm just not sure.
[2]     **Q.**  Then it could be because of your
[3] duties?
[4]     **A.**  It could be.
[5]     **Q.**  Okay.  You just don't have any
[6] recollection of the facts as to why these
[7] penalties were assessed; is that correct?
[8]     **A.**  Like I said, it could have
[9] been.  I just would need to see it.
[10]     **Q.**  Let me show you what's been
[11] marked as Defendant's Exhibit 6, which are
[12] documents number 0297, 298, and 299, which
[13] were produced to your lawyer.
[14]          (Whereupon, a document was
[15] marked as Defendant's Exhibit 6 and is
[16] attached to the original transcript.)
[17]     **A.**  Okay.
[18]     **Q.**  Take a look at those documents.
[19]     **A.**  (Witness reviews documents.)
[20] Okay.
[21]     **Q.**  You would agree that that's --
[22] strike that.  Tell me what those documents
[23] are that are marked as Defendant's Exhibit

Page 128

[1] 6.
[2]     **A.**  It's a notice saying that they
[3] have changed the balances in the federal tax
[4] deposits for the quarter, and this would be
[5] for tax period December 31, 2004.
[6]     **Q.**  And why would there be changes
[7] made by the IRS?  Let me ask you this
[8] question, then.  Strike that.  Did you
[9] receive this document when you were employed
[10] at Amtren?
[11]     **A.**  I may have.  I received many
[12] documents.  I can't pinpoint exactly.
[13]     **Q.**  I think, as Mr. Lamberth pointed
[14] out just a second ago, Defendant's Exhibit 6
[15] and Defendant's Exhibit 5 go together.
[16] Would you agree with that?
[17]     **A.**  Let's see.  Deposits
[18] insufficient -- yes, it appears that it
[19] does.
[20]     **Q.**  Okay.  During the time that you
[21] worked with Amtren, do you recall receiving
[22] the documents, Defendant's Exhibit 6 and 5?
[23]     **A.**  Yes, I believe I did.

Page 129

[1]    **Q.** Defendant's Exhibit 6 states, we
[2] changed your tax return because we found a
[3] calculation error. Did I read that
[4] correctly?
[5]    **A.** Yes.
[6]    **Q.** Who is responsible for filing
[7] the returns that these documents,
[8] Defendant's Exhibit 5 and 6, apply to?
[9]    **A.** I was responsible.
[10]    **Q.** And as a result of the
[11] calculation error or the errors in those
[12] documents, is it correct that Amtren was
[13] assessed a penalty of $1,012.05?
[14]    **A.** According to this letter, they
[15] were. I wonder if they paid that penalty.
[16]    **Q.** Who would have been responsible
[17] for paying it?
[18]    **A.** Well, let's see. This right
[19] here -- sometimes you can do some things.
[20] This right here is a 941, probably not due
[21] until January 31st. This is dated March
[22] 14th, 2005. So I was terminated on April
[23] 8th. So that notice was just before my

Page 130

[1] termination.
[2]    **Q.** But you agree that this notice
[3] that's identified as Defendant's Exhibits 5
[4] and 6 pertain to the time that you had
[5] responsibility for performing these duties;
[6] is that correct?
[7]    **A.** Yes.
[8]    **Q.** And you will agree that because
[9] you failed to perform your duties correctly,
[10] Amtren was assessed a penalty of $1,012.05;
[11] is that correct?
[12]    **A.** I would not agree with that.
[13]    **Q.** Why was Amtren assessed that
[14] penalty, then?
[15]    **A.** According to this, it was
[16] because of a calculation error. But that
[17] could be a lot of different things. For one
[18] thing, if I recall correctly, this right
[19] here, when I received this notice, most of
[20] it was due to the fact that the incorrect
[21] week numbers were listed on the 941. But
[22] again, I would have to see the 941s to be
[23] able to --

Page 131

[1]    **Q.** Who was responsible for filling
[2] out the 941s?
[3]    **A.** I was.
[4]    **Q.** Would you agree that,
[5] apparently, the 941s were filled out
[6] incorrectly?
[7]    **A.** Yes. But it was corrected.
[8]    **Q.** It was corrected by the IRS and
[9] a penalty was assessed; is that correct?
[10]    **A.** That is incorrect.
[11]    **Q.** Well, who corrected it then?
[12]    **A.** I believe I did.
[13]    **Q.** It's your testimony that you
[14] submitted an incorrect IRS form and the IRS
[15] notified you that Amtren is being assessed
[16] this penalty because you submitted an
[17] incorrect form?
[18]    **A.** And when I called the Internal
[19] Revenue Service, we determined, I believe,
[20] that it was the weeks that were incorrect
[21] and -- I don't believe Amtren ever paid the
[22] penalty.
[23]    **Q.** That's not my question. Listen

Page 132

[1] to my question. I think the testimony is
[2] going to show they had to pay it, but that's
[3] not material at this point. You will agree
[4] -- strike that. Is it correct that this
[5] penalty was assessed because of an error you
[6] made in filing the forms on behalf of
[7] Amtren?
[8]    **A.** It would appear to be.
[9]    **Q.** When you received the documents
[10] identified as Exhibits 5 and 6, did you
[11] inform Mr. Lamberth of this problem?
[12]    **A.** Yes, I believe did.
[13]    **Q.** What did you tell him?
[14]    **A.** To the best of my memory, that
[15] there was a penalty; that I was researching
[16] it and would try to correct it. But I don't
[17] recall -- I do believe I informed him about
[18] it, though.
[19]    **Q.** Was anyone present when you told
[20] him about this?
[21]    **A.** No.
[22]    **Q.** Did you correct this error
[23] before you left?

Page 133

[1] **A.** I believe I did. I believe I
[2] did.
[3] **Q.** Whose handwriting is this on the
[4] first page of Defendant's Exhibit 6 that has
[5] some numbers, 94-11342?
[6] **A.** I have no idea.
[7] **Q.** That's not your handwriting?
[8] **A.** No.
[9] **Q.** Is this 185 here your
[10] handwriting?
[11] **A.** It doesn't look like it.
[12] **Q.** Let me direct your attention to
[13] document number 0298, which is a part of
[14] Defendant's Exhibit 6. This indicates a
[15] balance due of $1,556.56; is that correct?
[16] **A.** That is what this says, yes.
[17] **Q.** Do you know what that dollar
[18] amount represents?
[19] **A.** I'm not real sure. I would have
[20] to study the 941.
[21] **Q.** It is your testimony that you
[22] took care of this before you left; is that
[23] correct?

Page 134

[1] **A.** I said I believe I did.
[2] **Q.** Let me show you what has been
[3] marked Defendant's Exhibit 7. Documents
[4] number 0302 and 0303. Have you ever seen
[5] these documents before?
[6]    (Whereupon, a document was
[7] marked as Defendant's Exhibit 7 and is
[8] attached to the original transcript.)
[9] **A.** (Witness reviews documents.)
[10] I'm not sure.
[11] **Q.** What is the date —
[12] **A.** I probably did.
[13] **Q.** What's the date of the document
[14] up in the right-hand corner?
[15] **A.** 4/18/2005.
[16] **Q.** You would agree that that amount
[17] identified in the document, Defendant's
[18] Exhibit 6, is the same amount in -- strike
[19] that. You would agree that the amount in
[20] which the IRS is demanding payment in
[21] Defendant's Exhibit 7 of $1,594.56 is the
[22] same amount here, plus the additional
[23] penalty that's added here for it not being

Page 135

[1] paid here as in Defendant's Exhibit 6?
[2] **A.** This is 1556 plus 271. So, no,
[3] they don't agree.
[4] **Q.** Is the penalty that's identified
[5] in Defendant's Exhibit 7, the penalty that
[6] you think you took care of prior to leaving?
[7] **A.** I'm not sure.
[8] **Q.** What period is this penalty —
[9] strike that. Let me direct your attention
[10] to Defendant's Exhibit 7. What notice does
[11] this tax period indicate? What is the tax
[12] period that this notice indicates it applies
[13] to?
[14] **A.** It says here tax period
[15] 12/31/2004.
[16] **Q.** May I see the document?
[17] **A.** Sure.
[18] **Q.** Is it correct that during the
[19] tax period ending December 31, 2004 you were
[20] responsible for making the tax payments to
[21] the IRS?
[22] **A.** On the 941s, yes.
[23] **Q.** Does this apply to a 941?

Page 136

[1] **A.** Yes.
[2] **Q.** Defendant's Exhibit 7 applies to
[3] a 941; is that correct?
[4] **A.** Is that 7?
[5] **Q.** Yes.
[6] **A.** Yes.
[7] **Q.** Is it correct that Defendant's
[8] Exhibit 7 indicates that these taxes were
[9] not paid timely?
[10] **A.** I really don't know what it's
[11] trying to indicate. I can't tell.
[12] **Q.** You would agree that that notice
[13] indicates that there's an interest and
[14] penalty because the taxes were not timely
[15] paid; is that correct?
[16] **A.** That's what the notice says, our
[17] records indicate you haven't paid the amount
[18] you owe.
[19] **Q.** It is your responsibility for
[20] making certain those taxes were being paid
[21] during that time frame; is that correct?
[22] **A.** Yes.
[23] **Q.** Would you agree that that was an

Page 137

[1] error on your part?

[2] **A.** No.

[3] **Q.** Why was it not an error?

[4] **A.** I need to see all the forms and

[5] see exactly what happened before I would

[6] make that determination on my part.

[7] **Q.** Is it your testimony that you do

[8] not recall the circumstances under -- why

[9] the taxes were not paid for the tax period

[10] ending December 31, 2004?

[11] **A.** I don't recall. But that's what

[12] that notice says.

[13] **MR. JACOBS:** Rick, can we take a

[14] short break?

[15] **MR. TRAWICK:** Sure.

[16] (Brief recess.)

[17] **Q.** (By Mr. Trawick) Let me show

[18] you what has been marked Defendant's Exhibit

[19] 8 that is -- consists of documents 0024, 25,

[20] 26, and 27 that have been produced to your

[21] attorney and ask if you've seen those

[22] documents before.

[23] (Whereupon, a document was

Page 138

[1] marked as Defendant's Exhibit 8 and is

[2] attached to the original transcript.)

[3] **A.** Probably in the package

[4] documents.

[5] **Q.** Do you know what those documents

[6] are?

[7] **A.** This shows -- this is a notice.

[8] I mean, it's a notice from the IRS.

[9] **Q.** Have you seen documents like

[10] this before?

[11] **A.** I've seen documents like this,

[12] yes.

[13] **Q.** You would agree this is for the

[14] tax period ending March 31, 2005; is that

[15] correct?

[16] **A.** Yes.

[17] **Q.** And is it correct that for the

[18] tax period ending March 31, 2005 you were

[19] responsible for filing the taxes on behalf

[20] of Amtren?

[21] **A.** Yes.

[22] **Q.** Would you agree that this

[23] indicates that the tax returns that you

Page 139

[1] filed were not correct?

[2] **A.** May I see that document?

[3] **Q.** Sure.

[4] **A.** Please ask your question again.

[5] **Q.** Would you agree that documents

[6] identified as Defendants's Exhibit 6

[7] indicate that the IRS is telling Amtren that

[8] the tax documents you filed were not

[9] correct?

[10] **A.** That's what it's saying, yes.

[11] **Q.** Let me show you what's been

[12] marked as Defendant's Exhibit 9, which is

[13] also document number 0030. Take a second

[14] and look at that document.

[15] (Whereupon, a document was

[16] marked as Defendant's Exhibit 9 and is

[17] attached to the original transcript.)

[18] **A.** (Witness reviews document.)

[19] Okay.

[20] **Q.** What is the tax period that that

[21] document references?

[22] **A.** March 31, 2004.

[23] **Q.** Tax period ending on March 31,

Page 140

[1] 2004?

[2] **A.** That's what it says, yes.

[3] **Q.** Do you recall receiving that

[4] document?

[5] **A.** I may have, yes.

[6] **Q.** In fact, the date of the notice

[7] of the document is April 12, 2004; is that

[8] correct?

[9] **A.** Yes.

[10] **Q.** Is it also correct that these

[11] type of documents would have gone to you at

[12] Amtren?

[13] **A.** Yes.

[14] **Q.** Is it also correct that this

[15] document indicates that -- this document,

[16] meaning Defendant's Exhibit 9, indicates

[17] that the tax documents that you filed on

[18] behalf of Amtren were incorrect?

[19] **A.** No. I believe all this document

[20] states is they could not identify the tax

[21] period -- that's all -- on the remittance.

[22] It's not saying anything was incorrect.

[23] **Q.** Who was responsible for

Janice McCollum v.
Amtren

---

Page 141

[1] indicating the tax period on the federal tax
[2] deposit?
[3]    A.  You know, I would have to see
[4] the records, but I believe at that point in
[5] time, it was the bank, MidSouth Bank in
[6] Dothan.
[7]    Q.  Did you bring this to the
[8] attention of Mr. Lamberth?
[9]    A.  I don't recall.
[10]    Q.  Is this something you would have
[11] typically brought to his attention or should
[12] have brought to his attention?
[13]    A.  I may have.  I may not have.  I
[14] don't think that would have been a -- all I
[15] it's saying is they couldn't identify the
[16] tax period.  That's all it's saying.
[17]    Q.  Is this something you should
[18] have brought to the attention of
[19] Mr. Lamberth?
[20]    A.  Maybe so.
[21]    Q.  Yes or no?  It's a simple
[22] question.
[23]    A.  Yes.

---

Page 142

[1]    Q.  Did you bring it to his
[2] attention?
[3]    A.  I don't recall.  I probably did.
[4]    Q.  And it's your testimony that
[5] this was an error on the bank's part, not
[6] your part; is that correct?
[7]    A.  I'm not sure.
[8]    Q.  Could have been an error on your
[9] part?
[10]    A.  Probably not.  Not during that
[11] time period, no.
[12]    Q.  Why not?
[13]    A.  Because I didn't remit the tax
[14] during that time.  I mean, I didn't actually
[15] fill out the form.
[16]    Q.  Who filled out the form?
[17]    A.  I believe it was the bank.
[18]    Q.  When did you stop filling out
[19] the form?
[20]    A.  I don't remember.  I'll have to
[21] look at the records to --
[22]    Q.  Then how do you know it wasn't
[23] during this time frame if you don't remember

---

Page 143

[1] when you stopped filling out the form?
[2]    A.  I said I don't believe it was.
[3]    Q.  So could have been?
[4]    A.  Could have been.
[5]    Q.  Let me show you what's been
[6] marked as Defendant's Exhibit 10.  Take a
[7] look at that document.
[8]       (Whereupon, a document was
[9] marked as Defendant's Exhibit 10 and is
[10] attached to the original transcript.)
[11]    A.  (Witness reviews document.)
[12] Uh-huh.
[13]    Q.  Do you recall receiving that
[14] document?
[15]    A.  I probably did.
[16]    Q.  Okay.  What's that document
[17] indicate?
[18]    A.  Can I see this one?
[19]    Q.  Sure.  This one meaning
[20] Defendant's Exhibit 9?
[21]    A.  Yes.
[22]    Q.  Okay.
[23]    A.  Okay.  Indicates they could not

---

Page 144

[1] determine the tax period once again.
[2]    Q.  On another document?  On another
[3] tax return; is that correct?
[4]    A.  Payroll tax remittance.  Yes.
[5]    Q.  Is this something you should
[6] have brought to the attention of
[7] Mr. Lamberth?
[8]    A.  Yes.  Sure.
[9]    Q.  Is it correct that you do not
[10] know whether or not you filled out the tax
[11] form that Defendant's Exhibit 10 applies to
[12] or the bank?
[13]    A.  I'm pretty sure it wasn't me.
[14]    Q.  Why's that?
[15]    A.  I had just started that January
[16] of 2004.  That's dated March 2004.  The bank
[17] was, I believe, doing it at that time.
[18]    Q.  Okay.  And it's your testimony
[19] you don't recall when you started doing it;
[20] is that correct?
[21]    A.  That's correct.
[22]    Q.  Let me show you what's been
[23] marked Defendant's Exhibit 11, which is also

---

Page 145

[1] document 0032. Do you recall receiving this
[2] document?
[3] (Whereupon, a document was
[4] marked as Defendant's Exhibit 11 and is
[5] attached to the original transcript.)
[6] A. I probably did.
[7] Q. Is it correct that this document
[8] is notifying you that there's a problem with
[9] the tax return that was filed on behalf --
[10] A. Again, it was the same thing.
[11] They just couldn't determine the tax
[12] period --
[13] Q. Who did you talk with at the
[14] bank about this problem?
[15] A. I don't remember. I don't
[16] remember talking to the bank about it. I
[17] don't know. I just don't recall. It was a
[18] long time ago.
[19] Q. You would agree that this is a
[20] significant problem that's identified in
[21] Defendant's Exhibits 9, 10, and 11, that tax
[22] returns are not being filed correctly?
[23] A. I would agree that it is an

Page 146

[1] issue that needed to be corrected if the IRS
[2] couldn't determine the tax periods.
[3] Q. Okay. And you don't recall
[4] whether or not you filed those returns or
[5] whether or not the bank filed those returns;
[6] is that correct?
[7] A. The remittance, that would be
[8] correct. I do not recall, but I believe it
[9] was the bank. Excuse me. Let me retract
[10] that, because I had just started working
[11] there.
[12] Q. And you don't recall talking to
[13] the bank about this problem?
[14] A. I don't remember.
[15] Q. Is it correct you did not recall
[16] at this time discussing this issue with the
[17] bank?
[18] A. I don't really remember, but I
[19] may have.
[20] Q. You previously testified that it
[21] was your responsibility during the time that
[22] you were at Amtren to make the payments on
[23] behalf of Amtren to Blue Cross Blue Shield;

Page 147

[1] is that correct?
[2] A. Yes.
[3] Q. Were there ever any problems
[4] with those payments?
[5] A. Not that I would consider major
[6] problems. They were all paid.
[7] Q. What were the minor problems,
[8] then?
[9] A. Well, I don't -- in my opinion,
[10] there weren't any as far as payment.
[11] Q. Were the payments always on
[12] time?
[13] A. They were in a timely fashion.
[14] Q. That's not my question. Do you
[15] want me to repeat my question?
[16] A. They were made in a timely
[17] fashion.
[18] Q. Were they made by the date that
[19] they were due?
[20] A. I believe they were.
[21] Q. Were the insurance payments made
[22] in advance of the time period -- let me
[23] rephrase that. It's a bad question. Were

Page 148

[1] the insurance payments made monthly or
[2] quarterly?
[3] A. I believe it was monthly.
[4] Q. Is it correct that, for example,
[5] the payment for the month of March would
[6] have been due in February?
[7] A. I'm not really sure exactly when
[8] it would have been due. I would need to see
[9] an invoice.
[10] Q. You don't recall one way or the
[11] other?
[12] A. To the best of my recollection,
[13] it would have been due by the 10th of the
[14] month that it was covering, or the 5th. I
[15] don't exactly remember, but it was not -- to
[16] the best of my knowledge, you know, if it
[17] was to cover the month of March, it would
[18] have been due March 1st.
[19] Q. Let me show you what's been
[20] marked as Defendant's Exhibit 12. Do you
[21] recall receiving this document from Blue
[22] Cross Blue Shield?
[23] (Whereupon, a document was

Janice McCollum v.
Amtren

Page 169

[1]    Q.  What was the process by which
[2]  Amtren would bay that charge back?
[3]    A.  I'm not sure.
[4]    Q.  Did you ever receive any
[5]  documentation that either Chase Merchant
[6]  Services or a credit card company had made a
[7]  draft on Amtren's checking accounts for a
[8]  charge back?
[9]    A.  Okay.  That may be the way they
[10]  got it through the bank.  Yeah.  You're
[11]  right.  I'm sorry.
[12]    Q.  It is correct that those kinds
[13]  of documents came to you, and you were
[14]  advised of that since you were responsible
[15]  for the checking accounts?
[16]    A.  I was responsible for the
[17]  checking account, and I assume those
[18]  documents would have come to me, yes.
[19]    Q.  So even though you don't recall
[20]  at the present time other than there were
[21]  some charge backs, you would have been
[22]  notified through some documentation that
[23]  either Chase Merchant Services or a credit

Page 170

[1]  card processing company had attempted to
[2]  deduct some money from Amtren's checking
[3]  account because of a charge back; is that
[4]  correct?
[5]    A.  I would assume they would notify
[6]  me, yes.
[7]    Q.  Are you testifying they could
[8]  have deducted money from Amtren's checking
[9]  accounts and you wouldn't have known
[10]  anything about it?
[11]    A.  They couldn't have done it if
[12]  somebody didn't give them authorization, and
[13]  that would have been Kirk Lamberth.
[14]    Q.  Okay.  Assuming they had
[15]  authorization, is it your testimony that
[16]  they could have deducted the money and you
[17]  would not have known through any
[18]  documentation that the money was deducted
[19]  from the account?
[20]    A.  I would know the money was
[21]  deducted from the account, because I
[22]  reconciled the bank statement.  So I'd know
[23]  if money was deducted from the account.

Page 171

[1]    Q.  You would get some kind of
[2]  documentation from whoever deducted the
[3]  money from the account that we deducted X
[4]  amount of dollars and here's the reason we
[5]  deducted X amount of dollars; is that
[6]  correct?
[7]    A.  I would assume so.
[8]    Q.  And you routinely received such
[9]  documentation, did you not?
[10]    A.  I probably did.
[11]    Q.  Ms. McCollum, this is nuts.
[12]  Strike that.  Is it your testimony that
[13]  sitting here today, you don't recall what
[14]  your duties were regarding the balancing of
[15]  checking accounts and whether or not you
[16]  received any documentation from companies
[17]  that they were deducting money from Amtren's
[18]  checking account?
[19]    A.  No, that is not my testimony.
[20]    Q.  Is it correct, then, that you
[21]  routinely received documentation from Chase
[22]  Merchant Services or other processing
[23]  companies that money was being deducted from

Page 172

[1]  Amtren's checking account?
[2]    A.  I don't recall receiving the
[3]  exact documentation.  I would have known the
[4]  money was deducted because I reconciled the
[5]  bank accounts.
[6]    Q.  How would you have known the
[7]  money was deducted?
[8]    A.  Because I reconciled the bank
[9]  accounts.
[10]    Q.  You would get some kind of
[11]  document indicating that money was deducted
[12]  from the account, would you not?
[13]    A.  I may have.
[14]    Q.  How --
[15]    A.  I mean, I'm just saying, I may
[16]  have.  But it would have been deducted from
[17]  the account.  When you reconciled the bank
[18]  statement, you would see the money being
[19]  removed and by whom.
[20]    Q.  Would there be any notification
[21]  other than the bank statement that you
[22]  received from the bank?
[23]    A.  There may have been.

---

Page 173

[1]    **Q.** What kind of documentation would
[2] that have been, then?
[3]    **A.** I would assume a notice of some
[4] sort, you know. I'm not really sure.
[5]    **Q.** You just don't recall ever
[6] receiving a notice, then, that money was
[7] being deducted?
[8]    **A.** I said I may have.
[9]    **Q.** Okay. Were there ever occasions
[10] when the Chase Merchant Services attempted
[11] to deduct the money from Amtren's checking
[12] account and there was not money in there
[13] sufficient for that deduction?
[14]    **A.** That may have been possible. I
[15] just don't know. I would have to see the
[16] bank account.
[17]    **Q.** You don't recall any specific
[18] incident when that happened?
[19]    **A.** I don't recall.
[20]    **Q.** Whose responsibility would it
[21] have been to ensure that there was enough
[22] money in that account to cover that
[23] deduction?

---

Page 174

[1]    **A.** It was my responsibility to
[2] maintain the checking account, if that's
[3] what you're asking.
[4]    **Q.** And it would have been your
[5] responsibility to ensure that there were
[6] sufficient funds in that account to cover
[7] any deductions that Chase Merchant Services
[8] may have made?
[9]    **A.** I don't believe that would have
[10] been all my responsibility.
[11]    **Q.** Whose responsibility would it
[12] have been?
[13]    **A.** There's a lot of factors
[14] involved. You just can't sit there and say
[15] — there's just a lot of factors involved.
[16]    **Q.** What factors?
[17]    **A.** Ask the question again. I'm
[18] getting tired. I'm sorry.
[19]    **Q.** So am I.
[20]    **A.** Okay. And I'm trying to
[21] remember. This was two years ago. It's
[22] been a long time.
[23]    **Q.** We've established that this was

---

Page 175

[1] a significant problem -- or at least a
[2] problem. You wouldn't say it was
[3] significant. But it was at least a problem
[4] that Amtren encountered.
[5]    **A.** Yes, it was a problem. The
[6] credit card processing was definitely a
[7] problem.
[8]    **Q.** And my question is, prior to
[9] receiving Defendant's Exhibit 14, were there
[10] occasions when you received notification
[11] from Chase Merchant Services that they
[12] attempted to deduct money from Amtren's
[13] account to process charges when there was
[14] not sufficient funds in that account?
[15]    **A.** I may have.
[16]    **Q.** But you don't recall that?
[17]    **A.** I don't.
[18]    **Q.** Even though it was a problem?
[19]    **A.** Right.
[20]    **Q.** Let me show you what's been
[21] marked as Defendant's Exhibit 15 and ask you
[22] if you recall seeing that document.
[23]        (Whereupon, a document was

---

Page 176

[1] marked as Defendant's Exhibit 15 and is
[2] attached to the original transcript.)
[3]    **A.** Yes, I do.
[4]    **Q.** Tell me about that document.
[5]    **A.** It's a lease agreement for a
[6] copier.
[7]    **Q.** Did you get approval to enter
[8] into this lease agreement?
[9]    **A.** Yes.
[10]    **Q.** Who gave you that approval?
[11]    **A.** Mr. Lamberth.
[12]    **Q.** When did he give you that
[13] approval?
[14]    **A.** Prior to me turning in the
[15] agreement.
[16]    **Q.** Okay. During the time that you
[17] were responsible for Amtren's checking
[18] accounts, were there occasions when the
[19] checking accounts did not have sufficient
[20] funds in the accounts and there were charges
[21] to Amtren because of insufficient funds?
[22]    **A.** Yes.
[23]    **Q.** Tell me about that.

---

Page 177

[1] A. I'm not really sure. I couldn't
[2] elaborate on that. I would have to look and
[3] see exactly what the insufficient -- the
[4] balances were and insufficient funds were
[5] for.
[6] Q. Whose responsibility was it to
[7] ensure that the checking accounts did not
[8] have insufficient funds?
[9] A. I guess it was mine.
[10] Q. You would agree that that was an
[11] error, then?
[12] A. (No response.)
[13] Q. You may think it's funny, but I
[14] don't think it's funny.
[15] A. I know you don't. That's okay.
[16] Q. Did you advise Mr. Lamberth that
[17] Amtren was receiving insufficient funds
[18] charges because of a lack of funds in the
[19] checking accounts?
[20] A. I'm sure. I don't remember.
[21] I'm sure I did, you know. He had access to
[22] the on-line records. I just don't remember,
[23] but I'm sure I did.

Page 178

[1] Q. Let me show you what's been
[2] marked as Defendant's Exhibit 16, document
[3] 0042 through 0048. Have you seen those
[4] documents before?
[5]     (Whereupon, a document was
[6] marked as Defendant's Exhibit 16 and is
[7] attached to the original transcript.)
[8] A. Yes. I believe these are the
[9] ones --
[10]     THE WITNESS: Didn't we receive
[11] these in the packet?
[12] Q. (By Mr. Trawick) Let me
[13] rephrase that question. Do you recall
[14] receiving those documents during the time
[15] you worked at Amtren?
[16] A. I couldn't have received those.
[17] Q. You could have received --
[18] A. I could not have received
[19] those. And I believe I did receive these.
[20] Q. You received document numbers
[21] 0042, 0043, and 0044 and 0045; is that
[22] correct?
[23] A. Yes, I believe I did.

Page 179

[1] Q. And it's your testimony you did
[2] not receive document numbers 0046, 47, and
[3] 48; is that correct?
[4] A. Yes.
[5] Q. Who would have received these
[6] documents?
[7] A. I don't know.
[8] Q. Is it correct that documents 46
[9] through 48 are invoices?
[10] A. 46 through 48, yes, that's what
[11] it appears to be.
[12] Q. Is it correct that you would
[13] have been responsible for paying these
[14] invoices?
[15] A. Not those.
[16] Q. Why not these?
[17] A. That's after my termination
[18] date.
[19] Q. That's correct. Is it correct
[20] that documents 42, 43, 44 deal with the
[21] purchase of the Mas90 system?
[22] A. I'm not sure what that is. I
[23] believe that's what this is. Mas90, yeah.

Page 180

[1] But I don't know what that code means, that
[2] code that's on there.
[3] Q. Mas90?
[4] A. Okay. Yes.
[5] Q. I believe you previously
[6] testified that Bobby Lake was the person at
[7] Wilson Price who, for lack of a better word,
[8] trained you on Mas90?
[9] A. He was the consultant that
[10] helped us install Mas90, yes.
[11] Q. Okay. Was there an occasion
[12] when you informed Mr. Lake that his services
[13] were no longer needed?
[14] A. I don't remember, you know,
[15] telling him that, that his services were no
[16] longer needed.
[17] Q. Did Amtren have a contract with
[18] Wilson Price for a certain amount of
[19] technical services on installing Mas90?
[20] A. Yes.
[21] Q. Did you ever reduce that amount
[22] of technical service?
[23] A. I don't know. I may have to

Page 185

[1]  payable accounts?

[2]  **A.**  Sure, uh-huh.

[3]  **Q.**  And it's my understanding that

[4]  Padus -- is that the way you pronounce it?

[5]  **A.**  I believe that's right.  Padus.

[6]  **Q.**  Would send invoices to Amtren to

[7]  be paid?

[8]  **A.**  Yes.

[9]  **Q.**  I believe it was your

[10]  responsibility to ensure that those invoices

[11]  were timely paid?

[12]  **A.**  Yes.

[13]  **Q.**  Were there ever any problems

[14]  with Amtren making timely payments to Padus?

[15]  **A.**  When you say timely payments,

[16]  what are the terms?

[17]  **Q.**  What do you mean by timely

[18]  payments?

[19]  **A.**  We tried to pay all of our

[20]  vendors within 45 days.  Sometimes that

[21]  worked out, and sometimes it didn't.  It

[22]  depended on cash flow.

[23]  **Q.**  Now, my question is, were there

Page 186

[1]  problems with making timely payments to

[2]  Padus?

[3]  **A.**  There may have been.  I don't

[4]  remember.

[5]  **Q.**  You don't recall any?

[6]  **A.**  I mean, I don't know.  I would

[7]  have to see the documents.

[8]  **Q.**  Well, were there lots of

[9]  accounts that there were problems with

[10]  making timely payments to?

[11]  **A.**  No, not in my opinion.

[12]  **Q.**  Then, if there was a problem

[13]  with Padus, you should remember that, then;

[14]  is that correct?

[15]  **A.**  Maybe I should.  It's two years

[16]  ago.  I don't.

[17]  **Q.**  However, you do recall that

[18]  there were problems with making timely

[19]  payments to some of the accounts payable of

[20]  Amtren; is that correct?

[21]  **A.**  No, I don't recall that.  We

[22]  tried to pay everybody in 45 days.  You

[23]  know, that was our terms.

Page 187

[1]  **Q.**  Were the accounts paid within 45

[2]  days?

[3]  **A.**  We tried to.

[4]  **Q.**  Does that mean that sometimes --

[5]  **A.**  I'm not going to sit here and

[6]  say we paid every account in 45 days,

[7]  because I don't know.

[8]  **Q.**  Do you know who Elisabetta

[9]  Benetollo is?

[10]  **A.**  Does she work for Padus?

[11]  **Q.**  Yes.  It's spelled

[12]  E-L-I-S-A-B-E-T-T-A, B-E-N-E-T-O-L-L-O.

[13]  **A.**  Okay.

[14]  **Q.**  Do you recall her?

[15]  **A.**  I believe I do.

[16]  **Q.**  I spelled it for the court

[17]  reporter, not you.

[18]  **A.**  I know that.

[19]  **Q.**  Did you ever have any problems

[20]  with -- strike that.  Do you recall

[21]  discussing any problems with Ms. Benetollo

[22]  about problems getting the invoices paid to

[23]  Padus?

Page 188

[1]  **A.**  I don't remember the specifics.

[2]  I would need to see the documents.

[3]  **Q.**  What do you remember generally?

[4]  **A.**  I remember talking to her, I

[5]  believe.  I don't know every piece of the

[6]  conversation.

[7]  **Q.**  Well, do you recall generally

[8]  what the problem was or problems were?

[9]  **A.**  I don't know if there was a

[10]  problem.

[11]  **Q.**  You just don't know --

[12]  **A.**  If it's regarding payment.  Like

[13]  I said, we tried to pay everyone in 45 days.

[14]  **Q.**  Did you ever talk with

[15]  Mr. Lamberth about problems with not paying

[16]  everyone in 45 days?

[17]  **A.**  No, not that I remember.

[18]  Mr. Lamberth was all for paying everybody in

[19]  45 days.

[20]  **Q.**  Was it your responsibility --

[21]  strike that.  Did you have any

[22]  responsibility with the processing of orders

[23]  from Amtren's customers?

Page 193

[1]    **A.** Yes.

[2]    **Q.** Were there occasions when you

[3] incorrectly entered the bills of materials

[4] into Mas?

[5]    **A.** Might have been. But those

[6] systems that Amtren manufactures has

[7] anywhere from fifty to a hundred parts

[8] listed on it. So there may have been.

[9]    **Q.** However, today you don't recall

[10] any specific incidents?

[11]    **A.** I don't recall a specific

[12] incident, no.

[13]    **MR. TRAWICK:** Let's take a short

[14] break. I'm about finished.

[15]    (Brief recess.)

[16]    **MR. TRAWICK:** I don't think I

[17] have anything else. That's it.

[18]

[19]

[20]    3:55 p.m.

[21]

[22]

[23]    FURTHER THE DEPONENT SAITH NOT

Page 194

[1]    C E R T I F I C A T E

[2]

[3] STATE OF ALABAMA)

[4] COUNTY OF ELMORE)

[5]

[6]    I hereby certify that the above and

[7] foregoing deposition was taken down by me in

[8] stenotype, and the questions and answers

[9] thereto were transcribed by means of

[10] computer-aided transcription, and that the

[11] foregoing represents a true and correct

[12] transcript of the deposition given by said

[13] witness upon said hearing.

[14]    I further certify that I am neither

[15] of counsel nor of kin to the parties to the

[16] action, nor am I in anywise interested in

[17] the result of said cause.

[18]

[19]

    Jennifer Davis, CSR

[20]

[21]

[22] My Commission expires

[23] October 11, 2010