

# DEPOSITION OF KIRK LAMBERTH

## November 15, 2006

## Pages 1 through 135

## CONDENSED TRANSCRIPT AND CONCORDANCE
## PREPARED BY:

Haislip, Ragan, Green, Starkie & Watson, P.C.
566 South Perry Street
Post Office Box 62
Montgomery, AL 36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JANICE McCOLLUM,

  Plaintiff,

Vs.                    CIVIL ACTION NO.
                       05-cv-0326-W
Amtren, Inc.,

  Defendant.

* * * * * * * * * * * *

DEPOSITION OF KIRK LAMBERTH, taken pursuant to stipulation and agreement before Patricia G. Starkie, Registered Diplomate Reporter, CRR, and Commissioner for the State of Alabama at Large, in the Law Offices of Slaten & O'Connor, 105 Tallapoosa Street, Montgomery, Alabama, on Wednesday, November 15, 2006, commencing at approximately 10:05 a.m.

* * * * * * * * * * * *

Page 2

APPEARANCES

FOR THE PLAINTIFF:
Mr. Jimmy D. Jacobs
Attorney at Law
143 Eastern Boulevard
Montgomery, Alabama

FOR THE DEFENDANT:
Mr. G. R. "Rick" Trawick
SLATEN & O'CONNOR
Attorneys at Law
105 Tallapoosa Street
Montgomery, Alabama

ALSO PRESENT:

Ms. McCollum

* * * * * * * * * * * *
EXAMINATION INDEX
KIRK LAMBERTH
BY MR. JACOBS .......... 5
BY MR. TRAWICK ......... 118

Page 3

EXHIBIT INDEX
PLAINTIFF'S EXHIBITS

1  Amtren's responses to Plaintiff's        28
   discovery requests

2  Five-page letter to the EEOC from Mr.    57
   Lamberth

3  Attachment to PX-2 relating to item five 58
   (bank overdrafts)

4  Attachment to PX-2 relating to item two  80
   (health insurance premium payments)

5  Attachment to PX-2 relating to item one  91
   (Late Payroll Tax Deposits)

6  Attachment to PX-2 relating to item      93
   three (Credit Card Processor
   Cancellation due to lack of payment)

7  Attachment to PX-2 relating to item four 93
   (Lease of Copier)

8  Form 941 - penalty and interest (Also    108
   marked DX-5 to McCollum deposition)

* * * * * * * * * * * *
STIPULATION
It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of:
    KIRK LAMBERTH
is taken pursuant to the Federal Rules of Civil

Page 4

Procedure and that said deposition may be taken before Patricia G. Starkie, Registered Diplomate Reporter, CRR, and Commissioner for the State of Alabama at Large, without the formality of a commission;
    That objections to questions other than objections as to the form of the question need not be made at this time but may be reserved for a ruling at such time as the said deposition may be offered in evidence or used for any other purpose by either party provided for by the Statute.
    It is further stipulated and agreed by and between counsel representing the parties in this case that the filing of said deposition is hereby waived and may be introduced at the trial of this case or used in any other manner by either party hereto provided for by the Statute regardless of the waiving of the filing of the same.
    It is further stipulated and agreed by and between the parties hereto and the witness that the signature of the witness to this deposition is hereby waived.
    * * * * * * * * * * * *

Case 2:05-cv-01237-WKW-WC    Document 26-3    Filed 12/27/2006    Page 3 of 19

Deposition of Kirk Lamberth                McCollum vs. Amtren                November 15, 2006

Page 21

1 manufacture?
2 A. Let me count, because I want to try -- I'm
3    not going -- again, I'm going to use a
4    number that I just -- I think it's going to
5    be six or seven.
6 Q. Okay. Now, do the engineers do any of the
7    manufacturing work?
8 A. Their responsibility does not do that, but
9    they do assist from time to time.
10 Q. Okay. And to sort of get a picture in my
11    head, once a unit is produced, I would
12    assume it's boxed somehow, and your
13    manufacturing people would do that and move
14    it to some location to be sold?
15 A. We have an assembly line process. At the
16    end of the line it's quality checked, and
17    then it goes into a carton and is closed
18    up, yes.
19 Q. How many people are currently involved in
20    management with Amtren?
21 A. Currently? Five. Let me count...
22       MR. TRAWICK: To keep from
23         confusing the court reporter,

Page 22

1    if you verbalize your
2    thoughts, she takes it down.
3       THE WITNESS: Sorry about that.
4       My apologies.
5 A. I'm going to say five.
6 Q. Okay. And I'm assuming that you are one of
7    those?
8 A. Yes, that's correct.
9 Q. You are the president and CEO?
10 A. That's correct.
11 Q. Who are the other four?
12 A. By name, Bobby Lake, Susan Seeber, Derrick
13    Garrett --
14 Q. Derrick?
15 A. D-E-R-R-I-C-K, Garrett, G-A-R-R-E-T-T, and
16    Michael Rogers.
17 Q. What is Bobby Lake's title?
18 A. His title is general manager. There's a
19    secondary title with that, too, controller.
20 Q. Is Susan Seeber --
21 A. Seeber.
22 Q. Seeber?
23 A. Yes, uh-huh (positive response).

Page 23

1 Q. What's her title?
2 A. Accounting manager.
3    Let me clarify that. It's accounting
4    and business management.
5 Q. And Derrick Garrett?
6 A. Service manager.
7 Q. And Michael Rogers?
8 A. He's the logistics and inventory manager.
9 Q. Is he that person that we were talking
10    about that would purchase and --
11 A. Exactly.
12 Q. -- do inventory control and so on?
13 A. Yes.
14 Q. Okay. And typically service manager to me
15    means something in a retail setting, but
16    what does your service manager do?
17 A. Our service manager receives calls from the
18    customer. He manages a small group,
19    there's only two in it, but they're the
20    calls that come in from the customer with
21    issues regarding the systems.
22 Q. Okay.
23 A. Questions that -- you know, it's service

Page 24

1    calls similar to if you would call a
2    manufacturer for help with a product.
3 Q. And the accounting manager?
4 A. Susan?
5 Q. Yes.
6 A. What was your question?
7 Q. What specifically does she do?
8 A. Susan is responsible for the accounts
9    payable, the accounts receivable, the
10    basically matching the purchase orders with
11    the packing lists. I would say primarily
12    any accounting duty up and to the
13    production of -- in fact, I guess all
14    accounting areas. She also manages the
15    front office, too, anybody in the front
16    office.
17 Q. Okay. Does she do like monthly income
18    statements?
19 A. Yes, she does.
20 Q. Financial statements for the end of the
21    year?
22 A. Yes, she does. Those are nonaudited, just
23    output type reports. And she does,

Case 2:05-cv-01237-WKW-WC    Document 26-3    Filed 12/27/2006    Page 4 of 19

Deposition of Kirk Lamberth    McCollum vs. Amtren    November 15, 2006

Page 25

1    actually, some of them weekly.
2  Q. Okay. Is she also responsible for writing
3    checks?
4  A. Yes, she is.
5  Q. Making payments to Blue Cross Blue Shield?
6  A. Yes, she is.
7  Q. And tax payments?
8  A. Yes, she is.
9  Q. Is she a CPA?
10 A. No, she is not.
11 Q. To try to shorten things a little bit, I'm
12    going to say I think the general manager is
13    responsible for everything; is that right?
14 A. The general manager in the role is -- yes,
15    operations and -- I call it the front
16    office, if you will. It would be the
17    service and the purchasing and the
18    accounting areas, yes.
19 Q. Okay.
20 A. I think that's correct.
21 Q. And how is that role different from that of
22    controller?
23 A. The controller title in Mr. Lake's

Page 26

1    situation is because he is the CPA, and he
2    does review our accounting output; thus,
3    the title is, if you will, a co-title to
4    allow that role to be a double check for
5    the accounting system.
6  Q. Okay. When was Bobby Lake employed as
7    general manager and/or controller?
8  A. I believe the dates are somewhere -- we can
9    verify this. It would be January or
10    February of this year. We can verify the
11    exact date if you want to. I do know it
12    was the beginning of this year.
13 Q. Okay. How about Susan Seeber?
14 A. I believe her role -- it would be in the
15    fall of last year. It would be somewhere
16    around October -- again -- September,
17    October, I believe.
18 Q. Was Susan Seeber hired into the position of
19    accounting manager or --
20 A. Yes, she was.
21 Q. Okay. And I want to ask the same question
22    about Bobby Lake. Was he hired as general
23    manager or did he have some other position

Page 27

1    before that?
2  A. No, he was hired in as general manager.
3  Q. Okay. What about Derrick Garrett? How
4    long has he been with you?
5  A. Again, I'm going to estimate 2003. Late
6    2003, early 2004.
7  Q. And Michael Rogers?
8  A. Spring of 2006. Exact month, I would
9    estimate May.
10 Q. Who did Mr. Rogers replace?
11 A. At the time of his employment?
12 Q. Yes.
13 A. Wayne Crabtree.
14 Q. And who did Derrick Garrett replace?
15 A. The position did not -- it's a growth
16    position. It did not exist.
17 Q. New position?
18 A. Yes.
19 Q. And whom did Susan Seeber replace?
20 A. Lisa McNamee.
21 Q. And Bobby Lake?
22 A. New position.
23 Q. Do you recall the date that Janice McCollum

Page 28

1    was initially employed?
2  A. The dates of her employment?
3  Q. Yes.
4  A. January of 2004 through April of 2005.
5  Q. Okay. Who was responsible for hiring her?
6  A. I was.
7           (Plaintiff's Exhibit 1 was marked
8           for identification.)
9  Q. If you would look at -- I'll represent to
10    you this is Amtren's responses to
11    Ms. McCollum's discovery requests. Have
12    you ever signed a copy of this?
13           MR. TRAWICK: Yes.
14 A. Yes.
15           MR. TRAWICK: We can get you a
16           signed copy.
17           MR. JACOBS: I'm not sure that I
18           have one.
19           MR. TRAWICK: My recollection is
20           we sent this to you and told
21           you we would supplement with a
22           signed copy.
23           MR. JACOBS: That you would get a

Case 2:05-cv-01237-WKW-WC    Document 26-3    Filed 12/27/2006    Page 5 of 19

Deposition of Kirk Lamberth — McCollum vs. Amtren — November 15, 2006

Page 53

1  A. I gave her that.
2  Q. How did you do that?
3  A. I asked for more information be provided
4     during the weekly summaries that she was
5     providing.
6  Q. Okay. And when you say you asked, was that
7     verbal or in writing?
8  A. It was verbal.
9        MR. JACOBS: I'd like to take a
10           short break.
11          (Brief recess.)
12 Q. (Mr. Jacobs continuing) Mr. Lamberth, did
13    Ms. McCollum have a written job
14    description?
15 A. No. I don't recall. I don't think we ever
16    did. As a whole, we don't do job
17    descriptions.
18 Q. That was going to be my next question.
19    Does anyone in the company have a job
20    description, a written one?
21 A. No.
22 Q. In your response to our discovery
23    request -- I'm going to ask you about a

Page 54

1     series of things and reasons that you gave
2     for terminating Ms. McCollum.
3        One of those things was you allege that
4     she failed to adequately perform her
5     responsibilities pertaining to Amtren's
6     accounting system.
7        MR. TRAWICK: You're reading from
8           paragraph number eight on page
9           four?
10          MR. JACOBS: I believe so, yes.
11          We're going to be drawing from
12          that for the next period of
13          time.
14          THE WITNESS: What page?
15          MR. TRAWICK: Four.
16 Q. Page four, number eight.
17    What responsibilities did she fail to
18    adequately perform?
19 A. For?
20 Q. The accounting system.
21 A. The accounting system? Like the day-to-day
22    activity or the --
23 Q. I honestly don't know. I'm reading your

Page 55

1     response to you and telling you -- asking
2     you to tell me what responsibilities she
3     adequately failed to perform.
4  A. The accounting system -- basically, there
5     were several areas that -- you know, in the
6     accounting system, this is -- you're not
7     really pertaining to the software or
8     anything, you're talking about the
9     duties -- we're talking about the duties,
10    you're basically saying now?
11 Q. I don't know what I'm talking about. I'm
12    asking you about your --
13          MR. TRAWICK: I think he's just
14          asking you to explain this
15          answer.
16 Q. Yes.
17 A. Okay. I can clarify that the system in
18    that statement was a process, so I can
19    explain her deficiencies in that. When I
20    mean system, I mean a system like our
21    entire process.
22       Several areas that she did. One is
23    that she did overdraw at our -- on our bank

Page 56

1     account. We had never had that before. I
2     was unaware of that. I was never made
3     aware of that, and Amtren had adequate
4     funds for the transactions.
5        She issued the checks -- signed the
6     checks, disbursed the checks, and then
7     pulled money from our money market account
8     to our checking account incorrectly. And
9     then they would basically, apparently, not
10    be covered, and we would pay for those
11    penalties with overdraft charges.
12 Q. Was this a particular transaction you're
13    talking about, or was this more than one
14    transaction?
15 A. No, it was more than one transaction. If
16    I'm not mistaken, it was several. It
17    amounted to several thousand dollars in
18    overdraft charges.
19 Q. Could you identify those transactions for
20    me?
21 A. Could I identify them?
22 Q. Yes.
23 A. I believe that -- I don't know if we

Page 57

1    provided a list or not. I'm not sure.
2  Q. Let me represent to you that I haven't seen
3    a list.
4  A. Well, I guess we will have to -- I believe
5    that there is a list in this. Hang on.
6    There is a list in here.
7        MR. TRAWICK: I think the last
8        page.
9  A. It is in the --
10        MR. TRAWICK: We produced this to
11        you.
12  A. Right. It is the last page of this.
13  Q. And that would be the last page of your
14    response to the EEOC?
15  A. That's correct.
16  Q. All right.
17  A. Regarding the --
18  Q. If we could mark this as Plaintiff's
19    Exhibit 2.
20        (Plaintiff's Exhibit 2 was marked
21        for identification.)
22        MR. TRAWICK: Plaintiff's Exhibit
23        2 will be this five-page

Page 58

1    letter to the EEOC signed by
2    Kirk?
3        MR. JACOBS: Right.
4        (Plaintiff's Exhibit 3 was marked
5        for identification.)
6        MR. JACOBS: And then Plaintiff's
7        Exhibit 3 will be the
8        attachment relating to item
9        five.
10  Q. Is that the one you're referring to, bank
11    overdrafts, Mr. Lamberth?
12  A. Yes.
13  Q. If you would, explain that sheet to me.
14  A. This sheet is a summary that outlines just
15    the transactions on our checking account
16    for these periods of time regarding this
17    activity. We -- I had never really
18    experienced overdrafts before, so when we
19    discovered this, we just produced this
20    document as a summary document to represent
21    the number of NSFs which are identified in
22    there.
23  Q. First of all, when was this document

Page 59

1    generated, this summary?
2  A. I would say it would be on or around the
3    date of this letter.
4  Q. Okay.
5  A. June 29th of 2005.
6  Q. Let me just look at the very first item
7    there, 10/26/2004. It says,
8    reversal/credit, and then it has the number
9    30 over there. Could you explain to me
10    what that represents?
11  A. I'm not sure what that means. The only
12    part of this document that I'm probably
13    going to be -- that I focused on or --
14    would be the NSF charges.
15  Q. Okay. And there are a series of those from
16    10/29 of 2004 to 4/13/2005.
17        If you would, take the first one of
18    those, 10/25, and tell me what that
19    represents.
20  A. You mean the NSF?
21  Q. Yes. Yes, the NSF.
22  A. It's my understanding that that is a charge
23    for nonsufficient funds for a check

Page 60

1    presented at our bank without proper funds
2    in the account.
3  Q. What does the dash 30 mean?
4  A. I think that that is a charge to our -- for
5    the overdraft charge.
6  Q. Okay. You're not sure what that is?
7  A. I'm -- on that one, I think that is. It
8    states NSF fee. I'm pretty certain that
9    that's a charge from the bank to us for the
10    overdraft.
11  Q. Okay. Is it my understanding, then, that
12    these other items on here other than NSF
13    fees don't represent errors of any kind
14    that you're referring to as --
15  A. Not to my knowledge. I think that was a
16    summary document that was produced that had
17    other information on it. We were primarily
18    for this attachment focused on the NSF fee
19    portion.
20  Q. Okay. And who generated this report?
21  A. I did.
22  Q. You did?
23  A. Uh-huh (positive response).

Page 69

1  first one, failed to adequately perform her
2  responsibilities pertaining to the
3  accounting system?
4  A. Yes.
5  Q. Okay. Which one or ones of Amtren's
6  vendors did Ms. McCollum not pay?
7  A. Ms. McCollum in -- toward the end of
8  February, the beginning of March, several
9  vendors contacted me directly and stated to
10  me that their -- they said --
11    The two primary vendors are Brundidge
12  Electronics Corporation in Brundidge,
13  Alabama, and Carter & Carter Manufacturing
14  in Lacey's Spring, Alabama. They're our
15  two largest vendors. We have done business
16  with them for years.
17    They contacted me with concern over
18  payments to their account.
19  Q. Okay.
20  A. Basically, we were approaching a limit of
21  terms with them that they - we were
22  exceeding the credit limit is what we were
23  approaching.

Page 70

1  Q. All right. How did they contact you?
2  A. By phone.
3  Q. Do you have records of when they contacted
4  you with those phone calls?
5  A. Unh-unh (negative response). I do not.
6  Q. What specifically did they tell you when
7  they called you?
8  A. Just that they were concerned about the
9  payments to their accounts.
10  Q. Are you telling me they said they had not
11  been paid?
12  A. They -- really, more likely that the amount
13  of money that -- we weren't paying against
14  their account enough to decrease the amount
15  we owed them. In other words, the
16  outstanding amount was growing.
17  Q. Okay. Was that outstanding amount
18  reflected in the weekly recaps that you
19  got?
20  A. Not completely.
21  Q. Was it partially?
22  A. Partially.
23  Q. Were the company's accounts, cash accounts

Page 71

1  sufficient to make larger payments at that
2  time?
3  A. They should have been.
4  Q. Well, were they?
5  A. At that time, this would be -- I would say
6  there should have been adequate cash to pay
7  the accounts.
8  Q. All right. Do you know whether there was
9  adequate cash or not?
10  A. To the best of my knowledge, there was
11  adequate cash there.
12  Q. If Ms. McCollum were to represent that
13  there was not adequate cash to pay more,
14  you would say that was not true?
15  A. Not correct. That's really not -- Let me
16  see. Let me go -- basically, the cash
17  planning of the company was Ms. McCollum's
18  responsibility. We had a line of credit
19  and we had a checking account and we had
20  materials. Totally responsible. Totally
21  responsible for issuing the checks. So the
22  problem occurs in that the cash position
23  was also being reported there, too. The

Page 72

1  line of credit. So it's difficult for me
2  to state one item without looking --
3  discussing the other ones, see, because she
4  reported the entire -- both situations to
5  me.
6  Q. All right.
7  A. So we -- according to the plans, going back
8  to the planned migration of the product,
9  meaning the older revision to the newer
10  revision, there was plenty of cash and a
11  line of credit available to pay all vendors
12  timely.
13  Q. All right. What would we have to look at
14  to verify that there was enough cash or
15  that there was not enough cash available?
16    MR. TRAWICK: Well, you're
17    limiting your question to
18    cash. I think his answer
19    includes the line of credit
20    also.
21  Q. Well, then, I'll back up. What were all of
22  the things that we would have to look at to
23  determine whether there was sufficient

Case 2:05-cv-01237-WKW-WC   Document 26-3   Filed 12/27/2006   Page 8 of 19

Deposition of Kirk Lamberth    McCollum vs. Amtren    November 15, 2006

Page 73

1   resources available?
2   A. What you would look at is the cash position
3      and the line of credit position beginning,
4      say, in October -- September, October of
5      the previous year and try to watch that
6      through this period that you're talking
7      about.
8   Q. Okay. And what would we have to look at in
9      order to be able to do that? Bank
10     statements?
11  A. I believe the bank statements would tell
12     you the transactions and the position, but
13     then we would also have to look at the --
14     probably an inventory sheet that would show
15     the inventory amounts as well.
16  Q. Okay. Anything else we would need to look
17     at?
18  A. I can't -- you know, that's asking
19     something I'm not completely familiar with,
20     how to completely do that.
21  Q. Are there any documents related to the use
22     or availability of the line of credit?
23  A. Well, I would imagine that would probably

Page 74

1   come from the bank statements, too.
2   Q. Okay.
3   A. I believe that that would -- again, I'm not
4      completely well versed at how you would
5      check that, but I believe that would be the
6      way to do it.
7   Q. What did you look at to make your
8      determination that that was the cause, that
9      she didn't pay the vendors, and there was
10     plenty of cash available?
11  A. Well, the -- my result -- this statement
12     results from the fact that when I was
13     made --
14        The vendors contacted me. I did
15     research into this to look into it. At
16     that time, I guess the information showed
17     that we had really just overspent in
18     several areas, including the inventory. So
19     my issue with Ms. McCollum at that time was
20     the incorrect execution of it or even
21     sharing with us this, you know, that this
22     was an issue that was arising.
23        Am I answering the question?

Page 75

1   Q. Well, what I'm trying to determine,
2      Mr. Lamberth, is sort of what you said.
3      You said at the time, you researched this.
4      I'm trying to find out what you researched,
5      what did you look at, what would I have to
6      go back and look at to verify whether what
7      you say you saw was, in fact, true.
8   A. I would say that I verified the accounts
9      payable that was being informed to me. And
10     some of these reports that I'm getting we
11     have not been able to locate as yet. So
12     what I was using was basically the
13     information shared from the weekly to show
14     the outstanding accounts payable, which is
15     the amount of money we owe the vendors.
16     When I received a call like this, I did not
17     know that that was growing. So my research
18     would have been to look into the accounts
19     payable, which in March I began to see
20     certain areas that concerned me. That
21     indicated to me that the information shared
22     with me on a weekly basis was not exactly
23     the position of the accounts payable we

Page 76

1   owed our vendors.
2   Q. If I were to look at or to have someone
3      knowledgeable to look at the accounts
4      payable, would I see the same things you
5      saw?
6   A. The issue here is the weekly reporting to
7      me as her supervisor versus what was
8      actually in the system. I do not know --
9      we have not been able to produce the weekly
10     reports completely yet, though we've
11     looked. So the issue is the information
12     shared with me on a weekly basis versus the
13     position of the company.
14  Q. So you don't have any evidence to back that
15     up at this time?
16        MR. TRAWICK: Object to the form.
17           I don't think that's what he
18           testified to.
19  Q. Well, I mean --
20  A. No. We have evidence, yes. Given time, we
21     can produce evidence.
22  Q. Okay. Well, what evidence do you have?
23  A. The evidence will be I have some of the

Case 2:05-cv-01237-WKW-WC   Document 26-3   Filed 12/27/2006   Page 9 of 19

Deposition of Kirk Lamberth   McCollum vs. Amtren   November 15, 2006

Page 77

1  forms. We're continuing to look for them,
2  the reports. We actually have -- we've
3  located several. I do believe that there
4  are -- and I'll have to refer -- I think
5  that we can definitely show this, because
6  the information is not something that just
7  was not completely apparent.
8  Q. What documents have you turned over to me
9  as Ms. McCollum's attorney that would show
10  that?
11  A. Well, this would be in our response. Let
12  me see if I put anything --
13       MR. TRAWICK: Don't verbalize your
14       thoughts.
15  A. I can't say at this time. I know that, to
16  answer your question, we submitted all of
17  the material that we had in response to
18  your request for information. If we had it
19  at that time, it would have been submitted.
20  Q. Okay.
21  A. I can't answer.
22  Q. Have you discovered any additional
23  documents since then?

Page 78

1  A. Relating to the inventory?
2  Q. Yes, relating to that issue.
3  A. No.
4  Q. Do I understand you that you believe there
5  are other documents that you have not been
6  able to locate yet that would substantiate
7  that position?
8  A. We have been through the files
9  extensively. Unfortunately, I do not think
10  we will be able to locate a lot of these
11  documents.
12  Q. When Ms. McCollum gave you weekly reports,
13  what did you do with them?
14  A. Most of the time, she would take them back
15  with her. Occasionally I would maybe keep
16  a copy of them, but not anything definite.
17  Q. So you didn't have any regular
18  recordkeeping system?
19  A. Not personally, I did not. I relied on the
20  staff to do that.
21  Q. Have you told me the basis for the
22  statement that she failed to notify
23  management that some of the vendors were

Page 79

1  not being paid? Is that what you were just
2  telling me about?
3  A. Well, the -- probably the -- there is an
4  issue about the health insurance that would
5  have occurred where -- that is a vendor --
6  where the health insurance premium was not
7  being paid timely, and we received notice
8  of this. Basically, during my research
9  during this period of investigating, I
10  discovered that our health insurance was
11  not being paid timely. That's one. Those
12  are probably the three most significant
13  ones.
14  Q. What period of time was this investigation?
15  A. Probably end of February through March,
16  first of April.
17  Q. Okay. During this time period that you
18  were doing this investigation, did you
19  discuss any of this with Ms. McCollum?
20  A. I discussed with her weekly about getting
21  the accounts payable information to match
22  what exactly we owed. I asked her weekly
23  to be certain that the accounts payable

Page 80

1  information matched every invoice received
2  by the company the date of the receipt.
3  Q. Did you ever go to her and say,
4  Ms. McCollum, this doesn't match?
5  A. Yes.
6  Q. Okay. And when did you do that?
7  A. Toward the period of March, there were a
8  couple of times when the information just
9  didn't appear to be -- to include
10  everything, the accounts payable
11  information that she had reported.
12  Q. You say it didn't appear to. Were there
13  specific things that you pointed out to her
14  and said, explain this to me?
15  A. No, I did not.
16  Q. Okay. Attachment two to your EEOC
17  response, to item number two, we'll mark
18  as -- I think it's Plaintiff's 4.
19       (Plaintiff's Exhibit 4 was marked
20       for identification.)
21  Q. Are those the documents that you rely on
22  for your statement that she failed to pay
23  health insurance premiums timely?

Case 2:05-cv-01237-WKW-WC Document 26-3 Filed 12/27/2006 Page 10 of 19

Deposition of Kirk Lamberth — McCollum vs. Amtren — November 15, 2006

Page 93

1    (Plaintiff's Exhibit 6 was marked
2       for identification.)
3  Q. Could you explain to me what you meant by
4     exceeded her authority on several
5     occasions.
6  A. Primarily that would relate to the copier
7     lease where that -- we had discussed
8     obtaining a copier, and we did obtain a
9     copier, and she entered into a lease
10    agreement. Even though the company had
11    discussed the fact that we would do that, I
12    was unaware that she had executed a lease.
13 Q. Was that discussed in one of the management
14    meetings, getting a copier?
15 A. The copier. Not the execution of the lease
16    without an officer signing it.
17 Q. Okay.
18         MR. JACOBS: Let's mark this one
19            as Plaintiff's 7.
20         (Plaintiff's Exhibit 7 was marked
21            for identification.)
22 Q. The next item refers to price decreases
23    from Plextor. Have we discussed that?

Page 94

1  A. That was the item we talked about.
2  Q. All right. Which of her duties pertaining
3     to the purchase of MAS90 did she not
4     perform adequately?
5  A. The integration of MAS90 was discussed
6     extensively at the end of 2004, and we had
7     generated a document to sit down and review
8     this process. The undertaking would be
9     significant. It was my understanding that
10    as Ms. McCollum moved forward with that,
11    she would seek integrated services, turnkey
12    integrated services from the vendors that
13    we were discussing. She handled the
14    discussions with the vendors and sought the
15    bidding and was subsequently awarded the
16    bid. At that time – and it wasn't until
17    later did I know that we did not submit --
18    we did not obtain a fully integrated
19    package. We obtained a package that was
20    partially integrated that we would
21    subsequently have to -- I guess the word is
22    enter the data on our own later to
23    completely fulfill it.

Page 95

1  Q. Did you ever see the agreement that was
2     signed regarding that system?
3  A. I saw parts of the agreement. I don't know
4     that I knew specifically about that. It
5     was Ms. McCollum's responsibility. For
6     Amtren's benefit, that had to be a fully
7     integrated system. It was my understanding
8     with her we would obtain a turnkey fully
9     integrated system, and I subsequently
10    approved her to spend the moneys that we
11    did on that. I do not recall looking
12    specifically at the details of the contract
13    to that extent.
14 Q. Was there a specific amount of money that
15    you approved for her to spend?
16 A. I don't think it was specific, but I think
17    we do -- we did discuss the numbers that we
18    ended up paying. I don't know the exact
19    numbers, but I do think 20 or $30,000. The
20    issue was not really the financial part so
21    much as to make sure it was turnkey; that
22    it was to be fully implemented.
23 Q. Okay. So if I can restate, and you tell me

Page 96

1     if I'm wrong. Is it fair to say that what
2     you're complaining of there is the fact
3     that she did not contract with Wilson,
4     Price for a completely installed and
5     implemented system?
6  A. Yes. That is a pretty fair assumption.
7     There are a lot of terms that have been
8     passed around about integration of MAS90.
9     The issue that we had was pretty much in
10    line with what you said.
11 Q. Okay. And is that also the basis for your
12    complaint, the next one, that she released
13    Wilson, Price prior to the complete and
14    satisfactory conversion to the new
15    accounting system?
16 A. Yes.
17 Q. Who was your technical assistance person
18    from Wilson, Price in implementation of
19    that system?
20 A. Bobby Lake.
21 Q. Okay. Do you know if Bobby Lake ever
22    complained to Wilson, Price regarding any
23    lack of appropriate performance on the part

Case 2:05-cv-01237-WKW-WC    Document 26-3    Filed 12/27/2006    Page 11 of 19

Deposition of Kirk Lamberth     McCollum vs. Amtren     November 15, 2006

Page 97

1      of Ms. McCollum?
2 A. I'm unaware. I don't know.
3 Q. During the time that Ms. McCollum was
4      employed by you, were there any reports to
5      you from Wilson, Price that her performance
6      was less than adequate?
7 A. I don't think so. I don't think so.
8 Q. Okay. When you hired Bobby Lake, were you
9      aware that your contract forbade the hiring
10     of any person from Wilson, Price who was
11     involved in implementing that contract for
12     a period of 180 days?
13          MR. TRAWICK: Object to the form.
14            Are you stating that's what
15            the contract states?
16          MR. JACOBS: Yes.
17 Q. I'm asking you if you were aware there was
18     a restriction in your contract with Wilson,
19     Price that you could not hire any of their
20     employees who were involved in that
21     contract for a time period after completion
22     of the contract.
23 A. Of how many days?

Page 98

1 Q. I believe it was -- I believe it was 180
2      days.
3        Eighteen months. I'm sorry.
4 A. Those items were discussed with Wilson,
5      Price when Bobby's employment was sought.
6      So we were aware, yes, but the items were
7      discussed with Wilson, Price.
8 Q. Whom did you discuss it with at Wilson,
9      Price?
10 A. I basically -- I personally don't think I
11     discussed with anybody anything. I think
12     Mr. Lake -- it was his responsibility to
13     review that.
14 Q. Okay. But Amtren was a signatory to the
15     contract?
16 A. I'll have to see the contract that you're
17     talking about. You're talking about for
18     that -- the Wilson, Price contract?
19 Q. Yes.
20 A. How can I answer that without seeing it? I
21     mean, I would say we entered into an
22     agreement, yes, to purchase MAS90. I do
23     not recall the details of the contract, to

Page 99

1      that nature.
2 Q. Okay.
3 A. Does that -- that's the best I can answer.
4 Q. Okay. I'm going to ask you about some
5      individuals now. Jerry Weisenfeld is the
6      first one. What was Jerry Weisenfeld's
7      title?
8 A. His title, I believe, was business manager
9      or business management. It was more of a
10     business expansion role.
11 Q. Okay. Was his job different from the
12     person who now has the title of business
13     manager?
14 A. Oh, yes, completely.
15 Q. Okay.
16 A. Yes. His role -- to clarify,
17     Mr. Weisenfeld's role was sales and
18     vendor -- large account relations. We have
19     a lot of large accounts. His role on the
20     business side was really not the inner
21     workings, but more about sales, to assist
22     in sales, development of strategic
23     relationships with some of our larger

Page 100

1      accounts.
2 Q. Did he have any responsibility for the
3      MAS90 system?
4 A. No, he did not have any responsibility.
5 Q. Did he have any responsibilities for
6      banking?
7 A. No, no direct responsibilities for banking.
8 Q. Did he have an indirect responsibility?
9 A. No, I don't think so.
10 Q. Okay.
11 A. You know, his role did overlap in certain
12     areas, but he didn't have any direct
13     responsibility for banking.
14 Q. And was it Mike Bishop you told me was the
15     logistics person?
16 A. No, David Fields.
17 Q. David Fields. Okay.
18       Did David Fields ever make any large
19     mistakes in inventory?
20 A. Pertaining to what period? The period --
21 Q. During the time he was employed by Amtren.
22 A. In a previous position. It wasn't his
23     mistake as an individual, but we did have

Case 2:05-cv-01237-WKW-WC   Document 26-3   Filed 12/27/2006   Page 12 of 19

Deposition of Kirk Lamberth   McCollum vs. Amtren   November 15, 2006

Page 101

1  to -- he did make -- there was a sizable
2  mistake made in the costing of our product
3  through the year. At the end of the year,
4  the initial report showed the mistake.
5  Before we closed the year end and produced
6  the documents, it was corrected. So I
7  would say yes, there was an error or
8  omission on his part at that time.
9  Subsequently we identified that and
10 discussed it with him and --
11 Q. Corrected it?
12 A. -- corrected it.
13 Q. And I assume he did not get terminated?
14 A. He got moved to a different position. He
15 got -- he was removed entirely from his
16 accounting duties.
17 Q. Okay. What position was he moved to?
18 A. Primarily purchasing -- well, the
19 production and logistics role.
20 Q. Okay. I believe that it's been indicated
21 in responses that Lisa McNamee took over
22 Ms. McCollum's duties when she was
23 terminated.

Page 102

1  A. That's correct.
2      MR. TRAWICK: Well, I think our
3      responses were she took over
4      some of the duties, and later
5      Susan took over some as
6      Mr. Lamberth has testified
7      here today.
8  Q. Okay. What duties did Lisa McNamee take
9      over?
10 A. Primarily the execution of the accounts
11 payable, accounts receivable. She did the
12 accounting portions as far as the --
13 actually, the payroll, the accounts
14 payable, and the accounts receivable.
15 Q. Putting information into –
16 A. And mainly producing the documents --
17 Q. Okay.
18 A. She produced the checks for payment. She
19 did everything -- she did not sign them,
20 but she did produce the checks for payment.
21 Q. Okay. Did she have the same responsibility
22 in reference to those blanket purchase
23 orders that you were talking about?

Page 103

1  A. In generating them, because of the
2  deficiencies of the system, we worked
3  together to try to correct some of those.
4  Q. Okay. And Susan Seeber, what duties did
5  she have when she came on board?
6  A. She basically --
7      MR. TRAWICK: Other than what he's
8      already testified to?
9      MR. JACOBS: Yes.
10 A. That's primarily it.
11 Q. Okay.
12     MR. TRAWICK: Unless you have
13     something to add to what
14     you've already testified to.
15     THE WITNESS: No.
16 Q. Who at the company was responsible for
17 strategic planning?
18 A. That probably would be myself.
19 Q. Have you fired any management employees at
20 Amtren other than Ms. McCollum?
21 A. You mean in the history of the company
22 or --
23 Q. Yes.

Page 104

1  A. Well, I would say yes.
2  Q. Okay. Who else have you fired?
3  A. Mr. Fields.
4  Q. Why was Mr. Fields fired?
5  A. Basically, his job performance. Inadequate
6  job performance.
7  Q. Any others?
8  A. Mr. Traywick.
9      MR. TRAWICK: Not me.
10 A. I'm sorry. Len Traywick.
11     MR. TRAWICK: I haven't been fired
12     yet.
13 Q. What was that person's position?
14 A. Len was -- Len was there a short time
15 frame. He was there for production,
16 primarily production, but he failed to be
17 productive, basically, and his job
18 performance failed to meet expectations of
19 the company.
20 Q. Is it true that when you fired
21 Ms. McCollum, you told her that you
22 couldn't -- you were firing her because you
23 couldn't trust her?

Case 2:05-cv-01237-WKW-WC    Document 26-3    Filed 12/27/2006    Page 13 of 19

Deposition of Kirk Lamberth    McCollum vs. Amtren    November 15, 2006

Page 105

1  A.  Not entirely, no. I didn't make the
2     statement, that's why I'm firing you, no.
3     We sat down and discussed the deficiencies
4     of these items we've discussed here.
5  Q.  And to be sure I'm clear, you went over
6     each of these items with her when you
7     terminated her?
8  A.  Actually, no. The exit interview -- being
9     a small business, I prepared for the exit
10    interview with a list of items that we had
11    located during this few months of
12    discovery. I sat down with her to discuss
13    those, and we only got through a few, and
14    that basically -- I think it pretty much --
15    she knew where we were going, and we
16    just -- I moved on. I did not --
17        It would be a given, you know, that any
18    of those items on there, to my opinion,
19    were sufficient enough for dismissal. So
20    even though the additional documents were
21    there, after I got through the first few, I
22    didn't continue on with the rest of them.
23 Q.  Were there any other females that you

Page 106

1     terminated in 2004, 2005?
2  A.  Terminated?
3  Q.  Yes.
4  A.  No. Let me verify that, make sure. 2004,
5     2005. Full-time employees?
6  Q.  Full time or part time.
7  A.  If that doesn't include contract workers,
8     no. No one else.
9  Q.  Were there any contract workers that you
10    terminated?
11 A.  Well, contract workers are temporary. I
12    mean, they're hired on need and
13    occasionally released when the need is not
14    there. So, yes, I believe there was one
15    during this period.
16 Q.  Okay. Do you recall who that was?
17 A.  Not by name.
18 Q.  Let me tell you, I have heard the name in
19    Ms. McCollum's position of Melody or
20    Melanie.
21 A.  No. Melanie, she resigned.
22 Q.  Okay. And she was not terminated?
23 A.  No. She resigned.

Page 107

1  Q.  Was she a full-time employee?
2  A.  Yes, she was.
3  Q.  And where did she -- what was her position?
4  A.  She was an assistant to me.
5  Q.  Who was responsible for filing your tax
6     payments and tax returns after Ms. McCollum
7     was terminated?
8  A.  That would have -- immediately after that,
9     it would have fallen into Ms. McCollum's
10    responsibilities -- I mean, Ms. McNamee's
11    responsibilities. Yes. Immediately upon
12    that, it would have been -- fallen to
13    Ms. McNamee.
14 Q.  When did you first become aware of what was
15    submitted as Defendant's Exhibit 5 at
16    Ms. McCollum's deposition? I believe it's
17    Exhibit 5 also to this deposition.
18        MR. TRAWICK: You have
19        Defendant's --
20        MR. JACOBS: I have Defendant's 5
21        here.
22        MR. TRAWICK: I don't have my copy
23        of her deposition. Can we

Page 108

1     take a break, let me get my
2     copy?
3     (Plaintiff's Exhibit 8 was marked
4     for identification.)
5     (Brief recess.)
6  Q.  (Mr. Jacobs continuing) Mr. Lamberth, I've
7     given you a copy of what was marked as
8     Defendant's Exhibit 5 at Ms. McCollum's
9     deposition. I'd like to ask you, when did
10    you become aware of that document?
11 A.  I don't really recall the exact date of
12    this.
13        MR. TRAWICK: Now, in the
14        Plaintiff's Exhibit 8, you've
15        included Defendant's Exhibit 5
16        to Ms. McCollum's deposition
17        and Defendant's Exhibit 6 to
18        her deposition. I'm not sure
19        exactly what you're asking
20        him.
21        MR. JACOBS: I was asking about
22        5. I didn't really mean to
23        include 6, although it's a

Case 2:05-cv-01237-WKW-WC    Document 26-3    Filed 12/27/2006    Page 14 of 19

Deposition of Kirk Lamberth    McCollum vs. Amtren    November 15, 2006

**Page 109**

1       similar type of document.
2 A. I don't know if it's the exact tax notice,
3     but I did -- during this period of review,
4     we did discover an unposted notice in the
5     accounting area that had -- showed a
6     penalty that I was unaware of. I don't
7     know if the exact document or not.
8        MR. JACOBS: And I'm going to take
9        Number 6 off of the back of
10       this. I really didn't intend
11       to include that. I just made
12       a mistake in handing it to
13       him.
14 Q. So you believe that you got that prior to
15     the time that she was terminated?
16 A. I can't say if this same exact document.
17     I'm not sure of that. But I will tell you
18     that I discovered a notice from the IRS on
19     a late penalty that I was unaware of.
20 Q. All right. Prior to Ms. McCollum's
21     employment with Amtren, had there ever been
22     any 941's that were paid late, taxes that
23     were paid late or penalties incurred?

**Page 110**

1 A. I don't know about the 941, but we had --
2     there were some occasions where we did have
3     penalties on the payroll, late.
4 Q. Okay. Have you had any since she was
5     terminated?
6 A. I can't answer that completely. To the
7     best of my knowledge, if we had any, it
8     would have been during the period
9     immediately following Ms. McCollum's
10    departure because we did not have all the
11    information to subsequently track where we
12    were. But since taking -- moving several
13    months beyond that, when we properly track
14    and document what we needed to do, we've
15    not paid any. So I don't know the exact
16    time there as to when.
17 Q. In the time period prior to her employment
18    where there were some late payments and
19    some penalties, was the person who was
20    responsible for that terminated?
21 A. No.
22 Q. Did Blue Cross Blue Shield actually
23    terminate your health insurance coverage?

**Page 111**

1 A. They sent a letter of notice of
2     termination, immediate termination.
3 Q. And I guess my question is, did they
4     actually terminate it?
5 A. Upon receipt of that letter, we arranged
6     special circumstances and sent them an
7     express payment overnight. It is my
8     understanding that Alabama has a protection
9     factor in there that allowed us to send
10    that check overnight, and they would
11    continue our coverage. I'm not sure of the
12    exact -- how all that works. But when we
13    discovered the notice and we made the --
14    contacted them, they assured us. They
15    mandated that we catch the arrears payment
16    that had been collecting up front, so we
17    had to pay two payments immediately in
18    overnight payment.
19 Q. Was Lisa McNamee ever terminated?
20 A. No.
21 Q. Did she leave the employ of Amtren at some
22    point?
23 A. Yes.

**Page 112**

1 Q. What is the position held by Amy Holley?
2 A. She is a -- I would classify Amy as a
3     part-time support, office staff support.
4        Let me ask you. During this period now
5     or the time of Ms. McCollum?
6 Q. Let me ask now.
7 A. Now? As a support person.
8 Q. Okay.
9 A. She supports in a couple of areas, pretty
10    much where they need her.
11 Q. What was her position during the time
12    Ms. McCollum was employed?
13 A. I think she was the receptionist, and she
14    worked with Ms. McCollum on accounting
15    entry duties.
16 Q. Okay. Have you ever been terminated from a
17    job?
18 A. From a -- yes, from a company I owned part
19    of.
20 Q. You were a part owner of the company?
21 A. Yes. It was -- I guess I was 25 years old
22    and had started -- 25, 26 -- started a
23    business. The business owners and myself

Page 117

```
 1        unclear from this response,
 2        without waiving the objection,
 3        that they will be made
 4        available --
 5    MR. TRAWICK: I can tell you that
 6        I'm not going to spring some
 7        documents on you at the last
 8        minute if that's what you're
 9        asking.
10    MR. JACOBS: Well, that's one of
11        my concerns, obviously.
12    MR. TRAWICK: No. I don't
13        practice law that way. If
14        there's a document that we're
15        going to rely upon, and it
16        hasn't been produced, I'll
17        supplement it before motions
18        for summary judgment are due.
19        I think we've produced
20        everything.
21    MR. JACOBS: I believe that's all
22        that I have, but I would like
23        for us to discuss that issue.
```

Page 118

```
 1    MR. TRAWICK: I'll be happy to do
 2        that. I have a couple of
 3        questions.
 4              EXAMINATION
 5  BY MR. TRAWICK:
 6  Q. Lisa McNamee is obviously female; is that
 7      correct?
 8  A. That's correct.
 9  Q. And what is her race or ethnicity? Is she
10      Korean?
11  A. She's Korean.
12  Q. And Susan Seeber. Susan's obviously a
13      female?
14  A. That's correct.
15  Q. And I believe you hired Lisa and Susan; is
16      that correct?
17  A. That's correct.
18  Q. The females that currently work at Amtren,
19      did you hire them? And I'm talking about
20      full time.
21  A. Yes. Full time, yes. If I didn't hire, I
22      was in on the hiring process definitely and
23      on the approval process, yes.
```

Page 119

```
 1  Q. Is it a fair statement that you could have
 2      said no --
 3  A. Exactly.
 4  Q. -- on hiring any of the females who
 5      currently work there?
 6  A. That's correct.
 7  Q. In the case of Lisa McNamee, did she get
 8      additional duties after Ms. McCollum was
 9      terminated and after you had a chance to
10      evaluate her job performance?
11  A. Yes. She basically performed the role of
12      the accounting person for several weeks,
13      and then her ability -- it was apparent
14      that she could move further in the role,
15      and so we moved her into the role of
16      accounting manager after observing her
17      efforts during this period after
18      Ms. McCollum was terminated.
19  Q. In fact, I think you gave Ms. McNamee a
20      raise after you had an opportunity to
21      evaluate her job performance in her new
22      role; is that correct?
23  A. That's correct.
```

Page 120

```
 1  Q. Has Susan received a raise since she's been
 2      employed?
 3  A. Yes. She -- I think her starting pay was
 4      around 40,000, and she's subsequently at
 5      50,000 per year now.
 6  Q. Let me ask you about this cancellation of
 7      Amtren's credit card processor. You were
 8      present during Ms. McCollum's deposition,
 9      correct?
10  A. Yes, sir.
11  Q. Ms. McCollum seems to blame that on you.
12      Do you recall that testimony?
13  A. Yes.
14  Q. Tell me about how Amtren's credit card
15      processor got canceled.
16  A. The merchant agreement account was
17      terminated over lack of payment of $118. I
18      can't remember the exact amount.
19          The notification was submitted to
20      Amtren. I had never been made aware of
21      that notification. There is, apparently, a
22      time frame to respond to it. We missed
23      that time frame, and Chase Manhattan
```

Case 2:05-cv-01237-WKW-WC    Document 26-3    Filed 12/27/2006    Page 16 of 19

Deposition of Kirk Lamberth        McCollum vs. Amtren        November 15, 2006

Page 121

1 terminated our agreement.
2     This termination resulted in us never
3 being able to receive -- use a Visa or
4 MasterCard as a corporation again. It's
5 actually, from what I understand, a
6 permanent blackball. Subsequently we used
7 a third party, Pay Pal, and they -- due
8 diligence was used to even use our services
9 because of this original termination.
10    The reason for the termination --
11 Ms. McCollum's testimony was that we had
12 limited the use -- I believe put limits on
13 the use of an account or something. The
14 basis of the mistake she made was that if
15 we just provided them the $118 in a timely
16 manner or allowed them to -- access to -- I
17 believe that may have been a back charge --
18 then the agreement would have stood. I was
19 never made aware of that, you know, in any
20 way, form, or fashion. At that time we
21 had -- I was informed that we needed to
22 change credit card accounts for other
23 purposes. So it was timed during a time

Page 122

1 that we were pursuing other credit card
2 accounts, so I was unaware of the
3 termination.
4 Q. Ms. McCollum testified or refused to admit
5 that this is a significant problem for
6 Amtren. How would you characterize this
7 problem?
8 A. It is significant, because every item that
9 we sell on the Internet is sold by credit
10 card. Every purchase, every spare part has
11 to be sold by credit card. In our sales
12 methods of today, I would say credit cards
13 probably would achieve, you know, a quarter
14 of our sales. We subsequently have to use
15 third-party companies to do this now, you
16 know, at a higher rate of commission, I
17 guess, to the merchant account.
18 Q. Ms. McCollum also in her testimony seemed
19 to blame you for the fact that Chase
20 Merchant Services could not deduct this
21 $118.41 from your bank account. Is that
22 correct?
23 A. No, that's not correct. That's not

Page 123

1 correct. I was unaware of any errors in
2 back charging by Chase. The separation of
3 accounts that Ms. McCollum had testified
4 where we had separated our accounts --
5 Chase Manhattan has an account they can
6 sweep -- apparently, they can deduct money
7 from once they deposit. I was aware we did
8 separate the accounts. I was not aware we
9 did not manage the dollar amount in those
10 accounts to sufficiently satisfy any back
11 charges being generated by Chase
12 Manhattan.
13    Any time a back charge is initiated, a
14 paper document is mailed to the company.
15 There is, I guess, a time frame there that
16 you can respond to the -- that -- you know,
17 the fact that they couldn't back charge. I
18 guess it would be a -- miss a payment.
19 Q. Was it Ms. McCollum's responsibility to
20 insure that this kind of problem didn't
21 happen?
22 A. Yes. In her role, she would have been
23 responsible to make sure there was timely

Page 124

1 payment of the back charges.
2 Q. Would notices to the company have gone to
3 Ms. McCollum?
4 A. No. The notice -- at that time, the notice
5 went to Mr. Fields.
6 Q. Okay.
7 A. Actually, let me clarify that. The notice
8 was directed to her by matter of her
9 responsibility. It wasn't addressed to
10 her. Yes, all notices went to her, but
11 this notice -- this subsequent notice was
12 not addressed to her.
13 Q. Okay. I believe Ms. McCollum testified in
14 her deposition she couldn't refute
15 testimony that she received this notice.
16 It's your understanding that she did
17 receive this notice; is that correct?
18 A. Yes.
19 Q. Did she deny receiving this notice when you
20 talked with her about it?
21 A. I'm not sure. I don't think I discussed it
22 with her. I didn't discuss it with her.
23    At that time, we were unaware of the

Case 2:05-cv-01237-WKW-WC   Document 26-3   Filed 12/27/2006   Page 17 of 19

Deposition of Kirk Lamberth | McCollum vs. Amtren | November 15, 2006

Page 125

1    magnitude of it. We were aware that we
2    had -- the account had terminated, but we
3    had not discovered that document that we
4    later showed.
5  Q. But it was Ms. McCollum's responsibility to
6    insure that there were sufficient funds in
7    Amtren's accounts so that this problem
8    would not have happened; is that right?
9  A. Right. Separation of the accounts is her
10   responsibility to manage the funds.
11 Q. Would it have been her responsibility to
12   know which bank accounts Chase Merchant
13   Services would have attempted to deduct
14   this from?
15 A. Yes.
16 Q. I want to direct your attention to
17   Plaintiff's Exhibit 2, page two,
18   paragraph -- or item number one. This
19   document states that Amtren suffered
20   penalties of $3,008.66. Is that what the
21   document states?
22 A. Yes.
23 Q. And is it correct that these penalties were

Page 126

1    paid by Amtren because of errors of
2    Ms. McCollum?
3  A. Yes. She was responsible for making the
4    deposits at that time or the reports.
5      There were two errors. One was a
6    reporting error and the other was the
7    timely deposit of the weekly tax
8    withholdings.
9  Q. Let me direct your attention to item number
10   two. In response to Mr. Jacobs' questions,
11   you answered questions about Amtren's
12   health insurance. Is that with Blue Cross
13   Blue Shield?
14 A. Yes, it is.
15 Q. Ms. McCollum in her deposition testified
16   that David Fields' error cost Amtren
17   $70,000. I believe Mr. Jacobs asked you
18   about errors made by David Fields. Did
19   Mr. Fields' error cost Amtren $70,000?
20 A. No, not in income. Not direct --
21   basically, it did not cause the loss of
22   that money. What it did, basically, was
23   the difference -- the preliminary -- the

Page 127

1    costing information for the products at the
2    end of the period showed that we had an
3    additional $70,000 of income available when
4    we did our preliminary close. At the
5    period when we adjusted everything for
6    final close, the error was picked up. So
7    there was basically a situation of a
8    reporting error is what it amounts to of
9    the preliminary document versus the final
10   document.
11 Q. Ms. McCollum also testified she believes
12   Jerry Weisenfeld was hired to replace her.
13   Is that correct?
14 A. That is not correct. Mr. Weisenfeld was
15   hired to basically -- the role that he was
16   hired into was a business management role,
17   but it was a business management role that
18   would basically expand our sales base. And
19   at that time we had considered partnering
20   with certain other companies on technology,
21   and it was a position to strategically
22   align some of those partnerships.
23   Technical partnerships, to clarify.

Page 128

1  Q. Ms. McCollum also testified regarding a
2    letter which is marked as Defendant's
3    Exhibit 3 to her deposition. Her testimony
4    was something to the effect that in this
5    letter, you praised her accounting
6    abilities. Tell me about this letter
7    that's dated March 30th, 2005.
8  A. That letter was a -- it's a letter for
9    renewing our credit with our bank. It's a
10   letter that we attempt to do, if not once,
11   twice a year. Just -- it's a health check
12   to provide to the bank.
13 Q. This is a letter for the benefit of the
14   bank?
15 A. It is. It is a letter that is a -- it's an
16   information letter is what it is.
17 Q. It's not a letter where you're telling
18   Ms. McCollum she's doing a great job?
19 A. No. In fact, statements in there are
20   statements that the company is in good
21   shape and that -- at that time, even when I
22   generated the information, I had no reason
23   to suspect the information Ms. McCollum was

Case 2:05-cv-01237-WKW-WC   Document 26-3   Filed 12/27/2006   Page 18 of 19

Deposition of Kirk Lamberth    McCollum vs. Amtren    November 15, 2006

Page 129

1 providing was anything but true.
2 Q. Who was responsible for maintaining custody
3    of the hard copies of the checking accounts
4    that Amtren received?
5 A. Ms. McCollum.
6 Q. Did those go missing after she was
7    terminated or about the time she was
8    terminated?
9      Let me strike that and rephrase that.
10     After Ms. McCollum was terminated, did
11   Amtren attempt to find those hard copies of
12   the checking accounts?
13 A. Yes. In fact, I looked for several weeks
14   prior to terminating Ms. McCollum to try to
15   understand our position, and we could not
16   find any reconciled check statements or any
17   statements in any of our files. We later
18   requested from the bank those.
19 Q. In response to a question by Mr. Jacobs,
20   you testified about the problems and the
21   errors committed by Ms. McCollum regarding
22   Plextor. Do you recall that testimony?
23 A. Yes.

Page 130

1 Q. I believe in Ms. McCollum's deposition, she
2    testified she could not recall if she was
3    present during management meetings where
4    this issue was discussed. Was Ms. McCollum
5    present when these issues with Plextor were
6    discussed?
7 A. Yes.
8 Q. And were they discussed with her?
9 A. Yes.
10 Q. Tell me about the company name Padus,
11   P-A-D-U-S.
12 A. Padus is a critical vendor for us. y
13   make the software tool kit we use. It's an
14   imbedded portion of our product. They have
15   been a major part of our company since the
16   beginning. We selected -- their software
17   and the software they generate that's
18   inside our software has provided tremendous
19   benefits because of the technology.
20 Q. I believe Ms. McCollum testified in her
21   deposition that it was her responsibility
22   to insure that Padus was timely paid. Is
23   that correct?

Page 131

1 A. In fact, we -- there is no -- there is --
2    there was a notice from -- I believe it was
3    Padus, the second in charge of Padus,
4    Elizabeth -- I can't remember her last
5    name, Benito or something, that -- the
6    issues that had been going on for
7    Ms. McCollum when Ms. McCollum was handling
8    their account.
9 Q. I believe Ms. McCollum in her deposition
10   blamed the failure to timely pay Padus on
11   cash flow problems. Would you agree with
12   that testimony?
13 A. No.
14 Q. During this period of time, did Amtren have
15   a line of credit available to the company?
16 A. Let me clarify. Again, there's a series of
17   events that led to the depletion of that
18   amount of money. So backing up to --
19 Q. The depletion of the amount of money in
20   Amtren's checking accounts?
21 A. Well, the line of credit. In other words,
22   the -- under Ms. McCollum's management, our
23   line -- at the beginning of -- I would say

Page 132

1    maybe at the end of 2004, our line of
2    credit was -- in fact, I don't think we had
3    much money borrowed on our line of credit,
4    and we had sufficient cash. During the
5    periods of November, December, January,
6    February, March -- December of '04 and
7    January, February, March '05, the moneys
8    were basically expended and our line of
9    credit was drawn on maximum. In fact, upon
10   Ms. McCollum's departure, I had to seek
11   immediate -- an immediate loan of $200,000
12   to pay down the vendors that had been aged
13   out, you know, aged out meaning that had
14   been -- that hadn't been paid. I'm not
15   sure of the exact amount. I believe it was
16   about 200,000, because the credit -- they
17   were basically one by one threatening to
18   cut off our credit.
19 Q. Is it correct that Padus is an important
20   vendor that Amtren buys things from?
21 A. The loss of the license from Padus would
22   shut us down because what we would have to
23   do is -- there's no quick way to engineer

Page 133

1  another software package. You would
2  literally be -- if they terminated their
3  license, we would have to stop shipping
4  product immediately.
5  Q. So is it fair to say that it was essential
6    for Amtren's continued operation to keep
7    Padus paid timely and keep them happy?
8  A. Absolutely. Unlike other items that you
9    ship, you can -- materials are yours and
10   you can ship, when there's a license
11   involved, upon notice that a license is
12   terminated, you can no longer ship your
13   product.
14      MR. TRAWICK: I think that's all I
15   have.
16
17      * * * * * * * * * * * *
18      FURTHER DEPONENT SAITH NOT
19      * * * * * * * * * * * *
20
21
22
23

Page 134

1      REPORTER'S CERTIFICATE
2  STATE OF ALABAMA:
3  MONTGOMERY COUNTY:
4      I, Patricia G. Starkie, Registered
5  Diplomate Reporter, CRR, and Commissioner for the
6  State of Alabama at Large, do hereby certify that I
7  reported the deposition of:
8      KIRK LAMBERTH
9  who was first duly sworn by me to speak the truth,
10 the whole truth and nothing but the truth, in the
11 matter of:
12     JANICE McCOLLUM,
13     Plaintiff,
14     vs.
15     AMTREN, INC.,
16     Defendant.
17     In The U.S. District Court
18     For the Middle District of Alabama
19     Northern Division
20     Case Number 05-CV-0326-W
21 on October 15, 2006.
22     The foregoing 133 computer printed pages
23 contain a true and correct transcript of the

Page 135

1  examination of said witness by counsel for the
2  parties set out herein. The reading and signing of
3  same is hereby waived.
4      I further certify that I am neither of kin
5  nor of counsel to the parties to said cause nor in
6  any manner interested in the results thereof.
7      This 17th day of November 2006.
8
9
10     _____
11     Patricia G. Starkie, Registered
       Diplomate Reporter, CRR, and
12     Commissioner for the State
       of Alabama at Large
13
14
15
16
17
18
19
20
21
22
23