IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JANICE MCCOLLUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:05-cv-1237-WKW |
| | ) | |
| AMTREN, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant's Motion for Summary Judgment (Doc. # 12) and Defendant's Motion to Strike Portions of Plaintiff's Affidavit Testimony in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. # 25). For the reasons that follow, Defendant's Motion for Summary Judgment (Doc. # 12) is GRANTED, and Defendant's Motion to Strike (Doc. # 25) is rendered MOOT by entry of summary judgment in Defendant's favor.

## I. FACTS AND PROCEDURAL HISTORY

This action charges employment discrimination under 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"). Plaintiff alleges that Defendant discharged her because of her gender, race, and national origin, and subjected her to a hostile working environment. The court construes the facts of this case in the light most favorable to the Plaintiff as the non-moving party.

### A.    *Plaintiff's Employment with Amtren, Inc.*

Amtren, Inc. ("Amtren" and sometimes referred to as the "Company" and the "Defendant"), is a corporation which manufactures CD and DVD duplication systems. In January 2004, Janet McCollum ("McCollum" and sometimes referred to as the "Plaintiff"), an Asian-American female,

was hired by Kirk Lamberth ("Lamberth"), Chief Executive Officer and sole owner of Amtren, Inc., to work as an accountant manager with his company. She performed general bookkeeping and accounting functions related to Amtren's business, including paying the Company's bills, remitting payroll taxes, and preparing weekly reports addressed to Lamberth detailing the financial position of the Company. At the time of and during her employment with the Company, McCollum was Amtren's only accountant. However, near the end of McCollum's career with Amtren, Lisa McNamee ("McNamee"), an Asian-American female, was hired by Lamberth to take responsibility over some of the accounting duties of McCollum. Lamberth and McCollum jointly supervised McNamee in her position with Amtren.

McCollum received a raise on April 19, 2004, and April 1, 2005. McCollum also received an end-of-the-year profit sharing bonus for managerial employees of $10,000 in December 2004. During August 2004, McCollum began to take a more active role in the company; for example, she was placed in charge of replacing the Company's old accounting software with a new Windows based software package ("MAS90"). In October 2004, McCollum was given authority to write and sign checks for the Company. Additionally, Lamberth recognized McCollum's "tight financial control" in a letter dated March 30, 2005, to Mid South Bank. (Pl.'s. Ex. 3 at 1.) The letter was addressed to the renewal of Amtren's line of credit with Mid South Bank.

**B.    *Plaintiff's Allegations of Gender and Race Discrimination***

McCollum felt as though she was not being utilized fully in her position as accountant manager. She felt as though she was hired by Lamberth to perform more important duties, such as Company projections, financial analysis, and major accounting responsibilities, rather than mere day-to-day bookkeeping and administrative functions. McCollum avers that these responsibilities were

2

not given to her because she was an Asian-American female.  McCollum asserts that throughout the period of her employment, she was forced to perform various "female stereotypical" duties by Lamberth; for example, Lamberth directed her to make coffee for the management office, order lunch for meetings and for other employees, and clean the area after lunch was served.  (Pl.'s Dep. 97:23.)  However, McCollum admitted that she observed other male employees make coffee during their employment with the Company, as well as probably ordering lunch for meetings.  McCollum stated that even though other males performed these duties, Lamberth would "[become] angry at [her], [and] not other male employees" if "coffee was not made when [the Company] had customers or guests."  (*Id.* at 88:9-19.)  Although she could not recall Lamberth's angry words, McCollum instinctively knew that he was angry at her by "his actions" and "his tone of voice."  (*Id.* at 88:15-19.)

According to McCollum, Lamberth's blatant hostility toward women did not end with assigning her gender-specific duties; Lamberth also made discriminatory remarks to her and her co-workers.  Wilson Price, an accounting firm and business associate of Amtren, invited Lamberth to have lunch.  According to McCollum, the representatives of Wilson Price were both female.  In response to whether Lamberth would be attending the luncheon, he commented to McCollum that "he was a chauvinist and that he knew it all."  (*Id.* at 95:20-21.)  As further evidence of Lamberth's alleged discriminatory remarks, Mike Bishop, the former Operations Manager of Amtren, submitted an affidavit on behalf of McCollum.  Bishop stated that during his employment, he "overheard Kirk Lamberth . . . make a number of remarks which were discriminatory in nature."  (Bishop Aff. ¶ 1.)  For example, Lamberth exclaimed, while conversing with Bishop regarding women in the workplace, that "[m]ore than one woman is definitely trouble!"  (*Id.* at ¶ 2.)  Bishop further overheard Lamberth

3

say that "'I would never put a woman out there,' during a discussion of whether [Amtren] should have females working in the production area." *Id.*  Also, Lamberth told Bishop, during the post-interviewing of candidates, that "he would not hire a black person." *Id.*  In response to Bishop's statements, Amtren provided the affidavit of Amy Holley, Director of Human Resources for Amtren, listing the gender and race of employees on Amtren's roster as of April 1, 2005, as sixteen white males, one white female, two Asian-American females, and two African-American males.  (Holley Aff. Ex. 1.)

McCollum also alleges that Lamberth devised a scheme to eventually fire her.  In October 2004, Lamberth informed McCollum that she was being promoted to the role of Controller of Amtren.  In January 2005, Lamberth officially gave the title of Controller to McCollum.  However, in December 2004, Lamberth hired a white male, Jerry Weisenfeld, to act as the business manager of the Company.  McCollum avers that Weisenfeld "was [hired] to take [her] place."  (Pl.'s Dep. 101:18-19.)[1]  As evidence for this assertion, McCollum recalls a meeting where Weisenfeld, an unnamed banker, and Lamberth "re-evaluate[d] the line of credit planning [of Amtren] . . . ."  (*Id.* at 99:22-23.)  McCollum claims that, in her position as Controller of the Company, she, rather than Weisenfeld, should have been invited to the meeting.  Further, McCollum is of the opinion that she, acting in her role as Controller, should have been given more responsibility in the Company by "perform[ing] all of the duties normally associated with the position of Controller . . . ." (Pl.'s Resp.

---

[1]  It is unclear the distinction in duties of the position of Controller and accounting manager of Amtren.  In McCollum's deposition she states that "controller-type duties" are "[a]ccounts payable, accounts receivable, software system, planning for the future of the company, analysis . . . ." (Pl.'s Dep. 99:1-9.)  However, in response to a question regarding her duties as the accounting manager, McCollum stated that she "perform[ed] the accounting functions for that business, help[ed] with projections, and help[ed] with some analysis."  (Pl.'s Dep. 28:2-5.)  Lamberth testified that a prerequisite for the title of Controller is to be a Certified Public Accountant ("CPA").  McCollum has stated that she is not a CPA.

to Def.'s Summ. J. Br. 2.)[2]  McCollum also claims that Weisenfeld was trained by Wilson Price on using the newly installed MAS90 accounting system.  McCollum emphatically states that "[she] could have easily shown [Weisenfeld] those functions and that system."  (Pl.'s Dep. 101:2-3.)[3]

On April 8, 2005, Lamberth terminated McCollum because he "could not trust [her]" and she had overpaid a vendor ten thousand dollars.  (Pl.'s Aff. ¶ 2.)  McCollum recounts that Lamberth used similar language regarding trust as a precursor to firing other female employees.

## C.    *Defendant's Reasons for Termination*

Having given McCollum at least one reason for her termination at the time she was fired, Lamberth subsequently asserted numerous other reasons uncovered during his investigation of Plaintiff prior to her termination.  A summary of all of the reasons follows.

### 1.    *Untimely Payments to Amtren's Vendors*

Around February or March 2005, two of Amtren's largest vendors, Brundidge Electronics Corporation and Carter & Carter Manufacturing, contacted Lamberth to suggest a problem with payment of their accounts.  The vendors allegedly voiced their concern that Amtren was close to its credit limit.  Lamberth claims that he researched the issue of vendor complaints; compared the accounts payable to the weekly reports that McCollum submitted to him; and that he found that McCollum was "[t]otally responsible" for those complaints  (Lamberth's Dep. 71:20.)  At the conclusion of the investigation, Lamberth noticed that McCollum's reports were not reflective of the

---

[2]  Lamberth has stated, and McCollum has not contested, that "[the Company does not] do job descriptions." (Lamberth's Dep. 53:16:17.)  No one in the Company had a job description.  (*Id.* at 53:19-21.)  The court cannot assume, without a job description, that the duties that McCollum believes are indicative of any Controller of any company are the same as those duties of the Controller of Amtren.

[3]  The court is unsure of how this statement, fully credited, indicates Weisenfeld's alleged control of Plaintiff's role as the accounting manager or Controller of the Company.

5

true accounts payable of the Company. (*Id.* at 75:20-23, 76:1.) Having found that Lamberth made a mistake in her weekly reports and was to blame for the vendor's complaints, Lamberth further investigated McCollum and found that she made various other errors.

Additionally, Amtren contends that McCollum did not make timely payments to Padus, one of Amtren's important vendors. In support of its contention, Amtren submitted a string of emails from an individual named Elisabetta Benetollo from Padus. Benetollo, in an email to McNamee, stated that "there was some problem in the past about some payments of few particular invoices that were by mistake skipped by Janice." (Def.'s Ex. 4 at 2.) Benetollo, in response to an email from McNamee, stated that "I really appreciate your answer especially after the frustration of dealing with Janice." (*Id.* at 1.) While she admits that it was her responsibility to see that Padus was timely paid, McCollum generally denies that these errors ever occurred.

   2.   *Alleged Mismanagement of Company Checking Accounts*

Lamberth alleges that he terminated McCollum, in part, because during October 2004 and April 2005, McCollum wrote checks for the Company on insufficient funds, incurring overdraft fees. Lamberth stated that the overdraft fees were the result of McCollum incorrectly moving "money from [the] money market account to [the] checking account . . . ." (Lamberth's Dep. 56:5-11.) In support of Lamberth's testimony, Amtren provided a summary of charges to its checking account, including overdraft fees, for a period of time beginning October 26, 2004, until April 13, 2005. (Def.'s Ex. 5.) Amtren alleges that McCollum cost the company $1,230.00 in overdraft charges. McCollum does not deny that Amtren incurred overdraft charges. However, McCollum alleges that "the majority of the [overdraft] charges occurred after February of 2004 when Lamberth withdrew permission for the

company's bank to automatically transfer funds to cover any shortage in its checking account." (Pl.'s Resp. 8.)

      3.      *Errors in Calculation and Late Filing of Taxes for the Internal Revenue Service*

Amtren alleges that "[o]n or about March 14, 2005, Amtren was notified by the Internal Revenue Service [("IRS")] that it owed $1,556.56 because of errors made by McCollum in the 941 forms that she filed between October 4, 2004 and January 5, 2005." (Def.'s Summ. J. Br. ¶ 26.) In support of this allegation, Amtren submits a letter dated March 14, 2005, from the IRS stating that there was a calculation error in computation of taxes and, as a result of this error, the Company owed $1,556.56 (Def.'s Ex. 6); a letter dated April 15, 2005, from the IRS stating that it "intend[s] to levy on certain assets" because of the nonpayment of the error (Def.'s Ex. 7); and a letter dated June 25, 2005, from the IRS referencing Form 941 and stating that a penalty of $1,012.05 was assessed for late filing of taxes for the tax period ending March 31, 2005. (Def.'s Ex. 8.) The IRS claimed that from December 8, 2004, until December 29, 2004, taxes were paid late a total of seven times.

McCollum admits that she was responsible for "remitting the payroll taxes to the proper departments" and "filling out the remittal form [and] the 941 . . . ." (Pl.'s Dep. 29:6-11.) McCollum further admits that penalties were assessed against Amtren because the 941 forms were not correctly completed. However, McCollum responds to Amtren's reasoning by stating that the Company always had problems with late payments of taxes, even before her tenure, and, even with her progress in fixing the accounting procedures, the "accounting system still had bugs that generated errors in some instances." (Pl.'s Aff. ¶ 9.)

4.    *Untimely Payments to Blue Cross Blue Shield*

Amtren states that it fired McCollum, in part, because she did not make timely payments to Blue Cross Blue Shield insurance company.  As evidence for its assertion, Amtren submits an invoice from Blue Cross Blue Shield that is stamped "Received Mar 28 2005" indicating an outstanding balance owed of $14,940.00.  (Def.'s Ex. 9.)  Further, the letter notifies Amtren that

> [a]s of 3/18/2005, Blue Cross and Blue Shield of Alabama had not received sufficient payment for all eligible emplo[yees] and their dependents.  Payment has been stopped for claims incurred after the date to which your account is paid.  Coverage will be cancelled if the adjusted previous balance is not brought current before 3/31/2005.

(Def.'s Ex. 9.)  Additionally, Amtren submits an invoice from Blue Cross Blue Shield for the billing period of May 1, 2005, to June 1, 2005, indicating that an outstanding balance exists of $14,790.00.  (Def.'s Ex. 10.)  Finally, Amtren submits a letter from Blue Cross Blue Shield dated April 25, 2005, and "Received May 2 2005" that suggests that Amtren is close to its grace period for payments of premiums.  (Def.'s Ex. 11.)  The letter further states that "[i]f [Amtren does] not pay the balance in full by May 5, 2005, all enrolled employees will be notified that their coverage is cancelled, effective April 1, 2005."  *Id.*

McCollum admits that it was her responsibility to pay Blue Cross Blue Shield premiums.  She excuses the delinquent payments to Blue Cross Blue Shield by stating that "the check was probably crossed up in the mail."  (Pl.'s Dep. 149:21-22.)

5.    *Untimely Payments of Overdue Charges to Chase Merchant Services*

Amtren received a letter dated October 7, 2004, from Chase Merchant Services that notifies Amtren that its "MasterCard/Visa account with Chase Merchant Services has been <u>CANCELLED</u> due to overdue unpaid charge(s) of $118.41."  (Def.'s Ex. 12.)  Amtren contends that Chase

8

attempted to debit the Company's checking account for the amount charged, but was unsuccessful because there were insufficient funds in the account.  McCollum admits that part of her responsibility was to maintain adequate funds in the Company checking account.  However, McCollum contends that the cancellation of the MasterCard/Visa account was Lamberth's fault.  McCollum asserts that Lamberth "with[drew] authorization to the bank to automatically pay the company's processing fees . . . ." (Pl.'s Resp. 8.)

      *6.     Overpayments to Vendor Plextor*

Plextor is a "major supplier of CD and DVD drives to Amtren."  (Def.'s Summ. J. Br. ¶ 33.) Allegedly, Plextor made a price change to their products in October 2004.  Lamberth contends that he discussed this price change with McCollum and instructed her to obtain a credit for past overpayments to Plextor.  Amtren says that McCollum overpaid Plextor nearly $10,000 by continuing to pay invoices with overstated prices.  McCollum admits that an error occurred, but she generally denies that the error was her fault.

      *7.     Unauthorized Execution of a Copier Lease Agreement*

McCollum allegedly exceeded her authority by executing a lease for a copier without the proper approval from an officer of the Company.  Amtren contends that any lease had to be executed by an officer's signature.  McCollum responds that "Lamberth approved the contract prior to its execution."  (Pl.'s Resp. 8.)

      *8.     Mismanagement of the Company's Inventory*

"[In] late December of 2004 and January of 2005", Amtren began to plan the introduction of a new product to the public.  (Lamberth's Dep. 63:19-20.)  The plan required a major reduction in inventory of the parts for the older product.  McCollum was in charge of decreasing the inventory

of the older product by "control[ling] the purchase documents . . . ." (*Id.* at 68:2-5.) Lamberth indicated that he discussed the progression of the transition with McCollum "every week in a staff meeting . . . ." (*Id.* at 10:11.)

By the middle of February 2005, Lamberth had noticed an excess of inventory of the older parts received on the inventory floor. According to Lamberth, this mistake was the direct result of McCollum not "executing the proper changes to reduce [the] inventory. . . ." (*Id.* at 66:12-16.) Lamberth testified that he fired McCollum, in part, because of this mistake. McCollum responds that "[her] role in the inventory system was to try to maintain adequate inventory based upon the company's past performance and projections given to [her] by the production manager and sales manager." (Pl.'s Aff. ¶ 7.) McCollum further states that "Amtren has offered no proof of any overspending on [her] part." *Id.*

        9.     *Failure to Maintain Proper Support and Training for MAS90 System*

On August 20, 2004, Amtren entered into a contract with the Wilson Price firm for the installation of the MAS90 accounting system. Embedded in the contract were support services provided by Wilson Price for the new system. However, according to Amtren, McCollum released "Wilson Price from the contract prior to the complete and satisfactory conversion to the new accounting system." (Def.'s Summ. J. Br. ¶ 36.) McCollum responds by stating that she placed herself in charge of technical assistance in order to save the Company money.

**D.**   ***Plaintiff's Termination***

Amtren contends that it fired McCollum because of the aforementioned egregious mistakes. McCollum admits that some errors were made in her position as accounting manager, but these mistakes were not her fault. McCollum further contends that *even if* the court finds that mistakes

were made, other white male employees of Amtren made mistakes similar to her mistakes and were allowed to remain as employees with the Company. As support for her contention, McCollum points to David Felds, a white male employee of Amtren, who allegedly made an error that cost the Company $70,000 and was not terminated.[4] McCollum states that "Lamberth and other employees" told her of this error. (Pl.'s Dep. 58:3-6.) McCollum does not recall the details of the error nor when the error occurred. Additionally, McCollum testified that three male engineers, Steve, Mike, and John, made costly errors to the Company by causing the shutdown of the production line because of a production defect. Similarly, McCollum does not recall the details of the error nor how she received knowledge of the supposed error.

Amtren replaced McCollum with McNamee, an Asian-American female. At the time of McCollum's termination, Lamberth gave McNamee a large part of McCollum's accounting duties. Lamberth and McNamee worked together on the remainder of McCollum's duties. McNamee later resigned from her position as accounting manager and was replaced by Susan Seeber, a white female. Susan Seeber performs the same duties as McCollum did in her role as accounting manager.

On May 20, 2005, McCollum filed a Charge of Discrimination with the EEOC. McCollum has exhausted all available administrative remedies with the EEOC and ultimately received a Notice of Right to Sue on October 6, 2005. She filed this lawsuit on December 29, 2005.

---

[4] David Felds was later terminated from his position by Lamberth for poor performance in his accounting duties. Felds was terminated after McCollum's departure from the Company; however, the exact date of his termination is unclear from the record.

11

## II. JURISDICTION AND VENUE

Because this case arises under Section 1981 and Title VII, the court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue, and the court finds a sufficient basis for each.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex Corp.*, 477 U.S. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith*

12

*Radio Corp.*, 475 U.S. 574, 586 (1986).  A genuine factual dispute exists if the "jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir. 1999) (citation omitted).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).[5]

## IV.  DISCUSSION

Plaintiff brings this action under Title VII and Section 1981.  Title VII and Section 1981 have "the same requirements of proof and use the same analytical framework . . . ." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  The court's discussion of this action will address only the framework of Title VII with the explicit assumption that such rationale also addresses Plaintiff's claim under Section 1981.

**A.**    ***Discriminatory Discharge***

Title VII reads in pertinent part:

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(a).  "In order to establish a case under Title VII, a plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or

---

[5]  Plaintiff contends that there is a lower bar to overcome summary judgment for a plaintiff alleging discrimination under Title VII.  The Eleventh Circuit has expressly rejected any variance in the summary judgment standard for Title VII discrimination cases.  *See Chapman v. AI Transport*, 229 F.3d 1012, 1026 (11th Cir. 2000) (holding that "the summary judgment rule applies in job discrimination cases just as in other cases"); *see also Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir. 2004) (rejecting Plaintiff's contention that "summary judgment is especially questionable and should seldom be used in employment discrimination cases because they involve examination of motivation and intent").

statistical evidence. The analytical framework and burden of production varies depending on the method of proof chosen." *A.B.E.L. Servs., Inc.,* 161 F.3d at 1330. Plaintiff contends that she has proffered both direct and circumstantial evidence of discriminatory animus on the part of Amtren.

    1.    *Direct Evidence*

"A prima facie case of discrimination may . . . be proven by direct evidence of . . . sex [and race/national origin] discrimination." *Burns v. Gadsden State Cmty. Coll.*, 908 F.2d 1512, 1518 (11th Cir. 1990) (internal citations omitted). Direct evidence of discrimination is "evidence, which if believed, proves [the] existence of [a] fact in issue *without inference or presumption*." *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1529 n.6 (11th Cir. 1987) (quoting *Black's Law Dictionary* 413 (5th ed. 1979)). "Direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998) (citation omitted) . "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race/national origin or gender] will constitute direct evidence of discrimination." *Damon,* 196 F.3d at 1359 (internal quotation marks and citation omitted).

    Plaintiff has not proffered direct evidence of Lamberth's intent to discriminate against her on the basis of gender , race, or national origin. Mike Bishop's affidavit is intended to support her claim that Lamberth discriminated against her because she is an Asian-American. Lamberth's statement that "he would not hire a black person," even if fully credited, is not proof, direct or circumstantial, that he terminated McCollum because she is an Asian-American. (Bishop Aff. ¶ 2). Nothing in Lamberth's statement directly or indirectly references McCollum's protected class nor the complained of employment decision. Plaintiff asks the court to infer that because Lamberth

"would not hire a black person," then he would terminate Plaintiff because she is Asian American. If any inference is drawn from the statement, then it is not direct evidence.

Plaintiff avers that the remaining statements in Bishop's affidavit are also direct evidence of Lamberth's discriminatory intent. However, neither of the statements is direct evidence of gender discrimination. First, it is unclear as to what context the comment "[m]ore than one woman is definitely trouble!" was uttered. Bishop claims this remark was espoused by Lamberth while he was discussing "women in the workplace." However, the statement, even fully credited, is still vague as to McCollum's position with the Company. Additionally, it is unclear at what period of time the comment by Lamberth was uttered. Bishop's affidavit does not establish his own dates of employment with Amtren nor does it suggest a range of dates where he might have overheard Lamberth make the remark. Notwithstanding the aforementioned defects in the affidavit, the statement viewed in isolation does not prove that Lamberth terminated Plaintiff because of her gender. *Cf. Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir. 1990) (opining that the statement "Fire Earley - he is too old" would be direct evidence of discriminatory animus). Further, the statement alone does not constitute broad labeling of incompetency normally associated with direct evidence. *See Haynes v. W.C. Caye & Co., Inc.,* 52 F.3d 928, 931 (11th Cir. 1995) (" Indeed, a statement that members of a racial minority in general or women in general are simply not competent enough to do a particular job would seem to be a classic example of direct evidence.").

The statement "I would never put a woman out there," made in the context of females in the production area, does not suggest that Lamberth terminated Plaintiff because of her gender. The inference Plaintiff asks the court to draw is that because Lamberth would not "put" a woman in the production area, then he would later terminate McCollum in her role as accountant manager.

15

Plaintiff was a managerial employee and not a production employee. Further, Plaintiff did not apply for a production level position nor was she rejected for a production level position. Moreover, because an inference is required, the statement cannot be direct evidence of discrimination.

Plaintiff contends that Lamberth's discriminatory animus is also directly proven by the discussion she had with Lamberth prior to the Wilson Price luncheon, where Lamberth stated that he was "a chauvinist and that he knew it all." (Pl.'s Dep. 95:20-21.) However, this statement is patently ambiguous in meaning and intended object, if any. It was not made in the context of Plaintiff's forthcoming termination from Amtren nor was it directed at Plaintiff. If the statement could be construed to *suggest* that Lamberth was gender biased, then it might be properly considered circumstantial rather than direct evidence.

McCollum further avers that Lamberth assigned her "stereotypical duties," which she submits as direct evidence of Lamberth's discriminatory animus. McCollum admits that male employees participated in the same duties that she alleges are "sexually stereotypical." McCollum contends, however, that even though the aforementioned duties were also assigned to males, Lamberth became angry at her and not at other male employees if coffee was not made to Lamberth's wishes. The court would need to make several inferences as to Lamberth's discriminatory intent in assigning these duties to McCollum and the basis for his anger. For instance, the court might infer that Lamberth became angry at McCollum for not promptly making coffee or he became angry at her specifically because she is a female. The inferences that the Plaintiff asks the court to draw from the statement preclude a characterization of it as direct evidence.

McCollum suggests that Lamberth's "lack of trust speech" as a precursor to female termination is direct evidence of discrimination. However, the speech is only direct evidence of

Lamberth's lack of trust of McCollum; at least one inference, that he did not trust McCollum because of her gender, would be necessary to even suggest discriminatory animus. That inference, which in itself defeats any claim that the evidence is direct evidence of discriminatory animus, is clearly rebutted by the fact that Amtren hired McCollum in the first place, and entrusted her with the Company's finances for over two years.

Plaintiff would require the court to make numerous inferences from the aforementioned evidence in order to classify them as direct evidence. The court finds that they are not direct evidence of discriminatory animus on the basis of sex, race, or national origin.

## 2.    *Circumstantial Evidence*

A plaintiff who relies on circumstantial evidence to support a claim of a Title VII violation must fulfill the three-step framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of [gender, race, and national origin] discrimination." *McDonnell Douglas Corp.,* 411 U.S. at 802. The plaintiff must establish that "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position; (3) [s]he suffered an adverse employment action; and (4) [s]he was replaced by a person outside her protected class or was treated less favorably than a similarly-situated individual outside her protected class." *Maynard v. Bd. of Regents of the Div. of Univ. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003). Once an employee establishes a prima facie case of discrimination, then a presumption arises that the employer discriminated against the employee in violation of Title VII. *See Chapman*, 229 F.3d at 1024. To rebut the presumption, the defendant "must articulate a legitimate, nondiscriminatory reason for the challenged employment action." *Id*. The employer has only the burden of production; "[i]t is

sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id*. (citation omitted). Once the defendant employer carries the burden of production by articulating a nondiscriminatory reason, then "the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman*, 229 F.3d at 1024 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)). Summary judgment will be granted in favor of the defendant if the plaintiff fails to produce evidence that is sufficient for a reasonable fact finder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual. *Id*. at 1024-25.

The parties agree that McCollum meets the first three prongs of the *McDonnell Douglas* framework. Plaintiff is a member of a protected class, an Asian-American female; she was qualified for the position of account manager; and she was terminated from Amtren. The parties strongly disagree as to whether McCollum has met the fourth prong of the *McDonnell Douglas* framework.

To complete her *prima facie* case, McCollum must show that Amtren "treated similarly situated employees outside [her] classification more favorably than herself." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). "To make a comparison of the plaintiff's treatment to that of [white male] employees, the plaintiff must show that [she] and the employees are similarly situated in *all* relevant respects." *Id.* (citations omitted) (emphasis added). McCollum can also establish the fourth prong of a *prima facie* case by evidence of her replacement by someone outside of her protected class. *See Maynard,* 342 F.3d at 1289.

18

McCollum points to David Felds, the three male engineers identified as Mike, Steve, and, John, and her "white male predecessor" as suitable comparators. McCollum avers that Felds made a costly error that cost the Company $70,000. Additionally, McCollum states that the three engineers made costly errors by shutting down the production line. McCollum further alleges that "her white male predecessor" was not terminated for making late tax payments nor was he terminated when he incurred bank overdraft charges. However, McCollum's deposition testimony indicates that she knew nothing of the details of the errors by Felds or the three engineers. Additionally, McCollum presents no evidence, other than her own affidavit, of the alleged errors that her "white male predecessor" caused during his employment with Amtren. She does not attempt to explain how her "white male predecessor" is similarly situated to her nor what magnitude of error he committed during his employment with Amtren. Nor does she indicate how the engineers are comparators for her position as accounting manager. McCollum "must show that the comparator employees are 'involved in or accused of the same or similar conduct' yet are disciplined in a different, more favorable manner." *Anderson v. WBMG-42*, 253 F.3d 561, 564 (11th Cir. 2001) (quoting *Holifield*, 115 F.3d at 1562)). In short, Plaintiff does not establish that other employees outside of her protected class were treated more favorably.[6]

Even if Plaintiff could establish a *prima facie* case of discrimination, Amtren offers a litany of nondiscriminatory, legitimate reasons as to why it terminated her employment. In analyzing whether a Plaintiff rebuts an employer's legitimate, non-discriminatory reason for termination, it is the district court's duty to "evaluate whether the plaintiff has demonstrated such weaknesses,

---

[6] Plaintiff does not contend that she was replaced by someone outside of her protected class. She argues only that "white male employees were not terminated for poor performance," while she was terminated for small mistakes made during her employment with the Company. (Pl.'s Resp. 13.)

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (internal quotation marks and citation omitted).  It is well established, however, that "[Title VII does not] require the employer to have good cause for its decisions.  The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) (citations omitted).

McCollum admits that there was an error in her payment of Plextor that cost the Company "several thousand dollars." (Pl.'s Aff. ¶ 2; Pl.'s Dep 55:10-11.)  McCollum further admits that Lamberth provided her with this reason at the time of her termination.  However, she contends that Lamberth, rather than herself, was to blame for the overpayment.  The overpayment of a vendor is a legitimate, non-discriminatory reason for termination of McCollum.  McCollum has provided no substantial evidence indicating that the reason offered for her termination was pretextual.  On the contrary, McCollum has offered evidence indicating that the reason for her termination is true.  McCollum attempts to suggest pretext by proffering a letter from Lamberth to Mid South Bank, in which Lamberth recognized McCollum's "tight financial control" of the Company.  (Pl.'s. Ex. 3 1.)  However, the letter was not addressed to McCollum and was more in praise of the Company rather than any individual employee.  The court construes the letter as mere puffery in pursuit of favorable credit.  Further, the submission of the letter, without more, does not fulfill the shifting burden of *McDonnell Douglas*.  McCollum must put forth sufficient evidence to call into question the truth of Amtren's reasons for her termination.  *See Combs*, 106 F.3d at 1529.  A general denial of stated reasons coupled with unsupported allegations of a scheme by Lambert to rid the Company of her

20

presence, without more, does not overcome Plaintiff's burden as stated in *McDonnell Douglas*. *See Kelliher v. Veneman*, 313 F.3d 1270, 1276 n.8 (11th Cir. 2002) (finding that a plaintiff's "assertions that the allegations made against him are untrue and that his supervisor was out to get him" are insufficient proof to establish that his "termination was in fact a pretext for [race, national origin, and gender] discrimination").

McCollum also labels Amtren's reasons as pretextual because they were offered after her termination. McCollum states in her reply brief that "justifications offered after a termination has taken place but that were not given to the employee at the time of the termination create an issue of fact for the jury." (Pl.'s Resp. 14.) McCollum cites *Mock v. Bell Helicopter Textron*, *Inc.*, No. 06-11161, 2006 WL 2422835 (11th Cir. Aug 23, 2006), for this proposition, but the comparison is inapposite. In *Mock*, the plaintiff asked his employer for a reason for his termination. The employer refused to give a reason. After plaintiff's termination, the employer sent him a letter stating that "he had been terminated for unacceptable performance," without anything more. *Id* at * 1. The Eleventh Circuit held that "[i]n light of Bell's refusal to tell Mock - at the time it fired him - why his employment had come to an end, a trier of fact reasonably could find that the letter constituted a pretext for discrimination." *Id.* It is important to note that in *Mock* the employer refused to give Plaintiff *any* reason as to why he was terminated. However, in this case, McCollum admits that Lamberth "referred to an overpayment for some drives purchased by Amtren from Plextor" when he terminated her from her employment. (Pl.'s Aff. ¶ 1.) Disregarding *arguendo* all the other reasons offered by Amtren in support of McCollum's termination, and likewise accepting the broad holding of *Mock* that Plaintiff argues, summary judgment would still be appropriate.

21

From the evidence submitted, the court finds that the Defendant has provided a legitimate, nondiscriminatory reason for Plaintiff's termination, and that Plaintiff has failed to establish pretext in opposition. As such, Defendant is entitled to summary judgment on Plaintiff's Title VII and Section 1981 claims of discriminatory discharge.

**B.**     ***Hostile Working Environment***

The court construes Plaintiff's contention that she "was denied a work environment free of discrimination . . . ." as a claim alleging a hostile working environment based on sex, national origin, and race in violation of Title VII. (Compl. ¶ 1.) For McCollum to establish a hostile working environment claim she must show "(1) that [she] belongs to a protected group; (2) that [she] has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [gender, race, or] national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." *Miller v. Kenworth of Dothan*, 277 F.3d 1269, 1275 (11th Cir. 2002) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)).

McCollum has established that she is an Asian-American female, thereby fulfilling the first prong. However, the second through fifth prongs are left unsupported by Plaintiff's submission of evidence. It is hard to pinpoint exactly what evidence Plaintiff submits to establish her claim. Plaintiff did not brief her contention that "she was denied the benefit of working in an environment in which employees are treated equally regardless of race [national origin, and gender]." (Compl. ¶ 25.) After a thorough review of Plaintiff's evidence, the court finds that she offers no evidence to

establish that her national origin or race played any part in her allegedly hostile working environment. Plaintiff merely offers Bishop's testimony that Lamberth told Bishop that he would not hire any black people. This statement has nothing at all to do with Plaintiff's protected class. Further, the only *possible* evidence suggesting a hint of hostile behavior in the form of gender discrimination is that Lamberth asked McCollum to perform stereotypical duties. However, McCollum admits that other employees, both male and female, were similarly told to do and did perform the same duties Plaintiff claims as specifically hostile toward her gender. Because male employees performed the same allegedly stereotypical duties that McCollum claims are hostile, the third prong is left bare. Further, McCollum states that Lamberth became irate at her if coffee was not made. However, McCollum does not offer any evidence suggesting how this behavior is indicative of gender discrimination. Plaintiff offers little evidence in support of the severity or frequency of Lamberth's alleged behavior.

The court finds no disputed issue of material fact with respect to Plaintiff's hostile working environment claim. Therefore, to the extent that Plaintiff alleges that Amtren created a hostile working environment, summary judgment is due to be GRANTED.

### V. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that

1.    Defendant's Motion for Summary Judgment (Doc. # 12) is GRANTED;

2.    All claims against the Defendant are DISMISSED;

3.    Defendant's Motion to Strike (Doc. # 25) is DENIED as MOOT by entry of Summary Judgment in Defendant's favor;

4.    All remaining dates and deadlines are CANCELLED; and

5.      An appropriate judgment will be entered.

DONE this 22nd day of March, 2007.

_____/s/   W.  Keith Watkins_____
UNITED STATES DISTRICT JUDGE